Kristine Akland
Akland Law Firm, PLLC
317 E. Spruce Street
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

Tanya Sanerib, pro hac vice admission pending
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
(206) 379-7363
tsanerib@biologicaldiversity.org

Sarah Uhlemann, pro hac vice admission pending
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
(206) 327-2344
suhlemann@biologicaldiversity.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No.: |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| UNITED STATES FISH & WILDLIFE SERVICE; and RYAN ZINKE, in his official capacity as Secretary of the Interior. | |
| Defendants. | |

## INTRODUCTION

1.    Each year around 80,000 wild bobcats, river otters, gray wolves, Canada lynx, and brown bears are killed and commercially exported from the United States to supply the international fur trade.

2.    Commercial trapping of these "furbearer" species can cause population declines at the local, state, regional, and even national levels and significantly impact the ecosystems of which these species are a critical component. In fact, scientists have expressed serious concerns regarding the sustainability of trapping and harvest of these five furbearer species in many areas throughout the United States.

3.    Bobcats, river otters, gray wolves, Canada lynx, and brown bears are protected as Appendix II species under the Convention on International Trade in Endangered Species of Fauna and Flora ("CITES"). CITES, March 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 (entered into force July 1, 1975). Accordingly, pursuant to CITES and the Endangered Species Act ("ESA"), the U.S. Fish and Wildlife Service ("the Service") must regulate the export of these species from the United States. 16 U.S.C. § 1537A.

4.    Specifically, to grant an export permit for any of these five furbearer species, the Service must determine that the export will not be "detrimental to the survival of the species," including finding that harvest of the animals is

sustainable, and that the specimen to be exported was legally obtained. CITES, Art. IV(2)(a), (b); 50 C.F.R. § 23.61(c).

5.    To facilitate its CITES permitting process, the Service implements a CITES Export Program ("CEP") for the five furbearer species. As envisioned under the CEP, a state or tribe may seek approval of its harvest management program from the Service by submitting its harvest regulations, harvest levels, and the effects of its harvest program to the Service. 50 C.F.R. § 23.69. The Service uses these submissions and its approval decisions to make its CITES-required non-detriment findings, which often cover a two- to five-year period, and its legal acquisition findings, upon which the Service relies in issuing individual permits. Once the Service approves a program, the state or tribe must submit an annual "activity report" regarding the effects of its program, *id.* § 23.69(b)(3), and the Service makes an annual determination as to whether export from the jurisdiction may continue.

6.    On May 18, 2017, the Service issued a Final Environmental Assessment for its CITES Export Program ("CITES Export Program EA" or "the EA"), pursuant to the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. The EA is vague and devoid of critical information necessary to adequately evaluate the environmental effects of the CITES Export Program, including U.S. harvest and export of the five furbearer

species, at the national, state, regional, or local levels. The EA generally fails to provide population estimates for the furbearer species; national, state, or local harvest levels; or sufficient information for either the public or the Service to determine that U.S. harvest of these furbearer populations is sustainable.

7.      Accordingly, Plaintiff Center for Biological Diversity challenges the Service for failing to comply with NEPA and seeks remedy for those violations.

## JURISDICTION AND VENUE

8.      Jurisdiction over this action is conferred by the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief). This cause of action arises under the laws of the United States, including NEPA and the APA. An actual, justiciable controversy exists between Plaintiff and Defendants.

9.      Venue is proper in the District of Montana pursuant to 28 U.S.C. § 1391(b)(2) and (e) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Montana has a Service-approved CITES Export Program for bobcats, river otters, and gray wolves, and commercial trapping for the three species occurs within the State. Assignment of this case to the Missoula Division of this Court is appropriate pursuant to Local Rule 3.2(b).

## PARTIES

10.    Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) non-profit corporation incorporated in the State of California, with offices located across the United States. Through science, policy, and environmental law, the Center advocates for the protection of species and their habitats, including imperiled and rare species, throughout the United States and abroad.

11.    The Center has more than 58,000 active members and 1.3 million online activists. The Center has members living throughout the United States who regularly view and seek to view bobcats, river otters, gray wolves, Canada lynx, and brown bears, as well as other species indirectly impacted by the Service's CEP and the species' habitats, for recreational, aesthetic, scientific, and spiritual purposes.

12.    Among these members include several members who reside in Montana and regularly recreate in wolf, bobcat, river otter, and lynx habitat throughout the State. For example, one Montana member hikes to view wildlife nearly every day.  Throughout the summer, this member visits known lynx, wolf, and bobcat habitat typically once a week on these hikes. During his regular wildlife hikes, which he plans to continue into the future, he has seen a bobcat as well as wolves on several occasions and always hopes to view a lynx. If any of these three species declined in the areas in which this member regularly hikes, including due

5

to death from trapping or hunting for export of the species, his chance of viewing these species will decrease, his enjoyment of his routine hikes will diminish, and he will be less likely to use the areas.

13.     Another Center member lives in Idaho, a few miles from the Nez Perce National Forest. This member is a former Forest Service biologist who studied and worked extensively on Canada lynx, including both mapping and surveying lynx habitat. As often as she can and at least several times every year, this member visits bobcat and lynx habitat in Idaho to camp, hike, take photographs, and view wildlife, including lynx and bobcat. She has seen a lynx in the wild and, on several occasions, has seen bobcats in both forest and non-forest settings, and she derives both aesthetic enjoyment and spiritual fulfillment from these sightings. She plans to continue her regular wildlife viewing and photography, including of bobcat and lynx, in the future. However, she is very concerned that continued trapping and export of bobcats has and will diminish her ability to view and enjoy bobcats on these trips and reduce her opportunities to view imperiled Canada lynx, which have been documented as bycatch in bobcat traps. A reduced opportunity to view lynx and bobcats will diminish her overall enjoyment of their habitat and her other recreational pursuits.

14.     Another Center member resides in New Mexico and is an avid wildlife watcher. He hikes with the goal of viewing wildlife, including bobcats,

near his home and around the State, about 20 times a month. He has viewed wild bobcats in New Mexico several times and has seen bobcat tracks and scat on numerous occasions. This member hopes to view and anticipates viewing a bobcat on each hike he takes in New Mexico, and he has both concrete and immediate plans to continue his regular wildlife viewing, as he has done in the past. This member is concerned that furbearer trapping and export reduces the bobcat population, particularly local populations near his home, reducing the chance he will get to see wild bobcats.

15.    A Center member residing in Alaska also regularly recreates near her home and within the State to look for and view wildlife, including brown bears, lynx, river otters, and wolves, and she plans to continue her regular wildlife viewing for the rest of her life. She has seen brown bears several times on her trips, including a Kenai brown bear fishing for salmon. She has also seen lynx several times, including a mother lynx and three kits while cross country skiing. She very much wants to see a wolf, though she's concerned her opportunities for doing so have been greatly diminished because wolves in at least one of the areas she recreates annually – Denali National Park – have dramatically declined in the last decade. She has also seen a group of river otters playing. She plans to continue biking, hiking, skiing, and kayaking in Alaska, and looking for and viewing wildlife is an essential part of the experience for her. She is worried that the

trapping and export of charismatic furbearers like bears, lynx, river otters, and wolves will make it less likely that she will get to observe these animals in the future.

16.    A Center member residing in Tennessee regularly paddles the Chattanooga River where he views and actively looks for river otters and water fowl. He plans to continue these trips regularly in the future. He enjoys seeing river otters both in the water and on the shoreline and is concerned that, if river otter trapping and export continues or expands in Tennessee, he will see fewer river otters on his trips. This member also works on beaver restoration and is concerned about the impact of bycatch of beavers in river otter traps. A reduced opportunity to view otters and beavers will diminish his overall enjoyment of their habitat and his other recreational pursuits.

17.    Another Center member from Mississippi enjoys observing river otter while recreating in his State. He has observed river otters on numerous occasions, including at the Pearl River wildlife management area and in the backwater sloughs of Lefleur's Bluff State Park, two places he regularly visits and plans to return to, as well as in other areas. He enjoys watching otters and the playful behaviors they engage in. When river otters are present they contribute to his enjoyment of various recreational activities, and he is concerned that trapping for

export could diminish his ability to enjoy these creatures while recreating in Mississippi.

18.    The Center's and its members' injuries are caused by the Service's CITES Export Program and the Service's failure to fully evaluate the CEP's environmental impacts under NEPA. The Service's CEP creates and maintains incentives for individuals to kill bobcats, river otters, gray wolves, lynx, and brown bears. The Service's CEP facilitates and allows trappers and hunters to access the lucrative international fur market through export and thus creates a profit incentive for trappers and hunters to kill bobcats, river otters, gray wolves, lynx, and brown bears. Because, as part of the CEP, the Service determines whether the export of species will be detrimental to the species' survival – a determination that is a prerequisite to export under CITES, 50 C.F.R. § 23.61 – and the Service relies on that determination in deciding whether or not to grant individual export permits, the Service, through its CEP, has direct control over the number of specimens exported from the United States.

19.    The Service's CITES Export Program EA acknowledges that the "[p]rohibition of export" of the five furbearer species "would likely reduce the harvest of all five of these species." EA at 26.

20.    The Service's CITES Export Program EA, however, fails to provide a full evaluation of all the impacts, including all direct, indirect, and cumulative

impacts, of the Program on bobcat, wolves, river otters, lynx, and brown bears and their habitats. Due to this procedural failure to fully evaluate all effects, Plaintiff's members are concerned that their aesthetic enjoyment of these species is diminished because the Service did not modify its CITES Export Program in a way that was likely to have reduced localized impacts on populations and trapping bycatch. Further, the Service's deficient NEPA analysis denied the Center and its members their rights to be fully informed about the Program's impacts and the right to meaningfully participate in the public process, as envisioned by NEPA.

21. If Plaintiff prevails in this NEPA case and Defendants more fully evaluate the environmental effects of the CEP, the Center and its members' injuries will likely be redressed. A legally sufficient NEPA document that fully considers all the impacts of the CEP is likely to lead to Service decisions that better protect Plaintiff's interests.

22. Defendant United States Fish and Wildlife Service ("the Service") is a federal bureau within the U.S. Department of the Interior. The United States' CITES Scientific Authority and CITES Management Authority are both housed within the Service. The Service implements the CITES Export Program for furbearers and issued the Environmental Assessment and Finding of No Significant Impact challenged in this case, and thus the Service is responsible for the agency actions challenged herein.

10

23.    Defendant Ryan Zinke is the Secretary of the Interior. Mr. Zinke is sued in his official capacity. As the Secretary of the Interior, Mr. Zinke is responsible for the agency actions challenged herein.

24.    Defendants U.S. Fish and Wildlife Service and Secretary Zinke will be referred jointly as "Defendants" or "the Service" in this Complaint.

## LEGAL AND FACTUAL BACKGROUND

## I.    CITES, the ESA, and Non-Detriment Findings

25.    The Convention on International Trade in Endangered Species of Fauna and Flora ("CITES") is an international treaty governing trade in imperiled species of wildlife and plants. CITES, 27 U.S.T. 1087. CITES recognizes that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems" and that "international co-operation is essential for the protection of [these] species . . . against over-exploitation through international trade." *Id.*, Preamble. There are now 183 signatories or "Parties" to the Convention.

26.    To receive protection under CITES, species must be included on one of the CITES Appendices, and each Appendix provides listed species varying degrees of protection.

27.    Specifically, species included on Appendix I of CITES are "threatened with extinction" and receive the strongest protections. CITES at Art.

II(1). CITES strictly bans all commercial, international trade in Appendix I species, although non-commercial trade in scientific, zoological, and other specimens may still occur with proper permitting. *Id.* at Art. III(1)-(3).

28.    Appendix II species are "not necessarily now threatened with extinction [but] may become so unless trade . . . is subject to strict regulation in order to avoid utilization incompatible with their survival" or otherwise "must be subject to regulation in order that trade in specimens of [other listed species] may be brought under effective control," for example, if the species is difficult to distinguish from other CITES-listed species. CITES, at Art. II(2).

29.    All international trade in Appendix II species is prohibited unless the exporting nation issues a valid CITES export permit. CITES, at Art. IV. To issue a valid export permit: (1) the exporting nation's designated CITES Scientific Authority must find the export "will not be detrimental to the survival of the species," and (2) the exporting nation's CITES Management Authority must "be satisfied that the specimen was not obtained in contravention of the laws of th[e] State for the protection of fauna and flora." *Id.* at Art. IV(2)(a), (b).

30.    The first required finding – that export "will not be detrimental to the survival of the species" – is referred to as a "non-detriment finding" or "NDF."

31.    To assist Parties in making NDF determinations, the CITES Parties adopted Resolution Conf. 16.7. Resolution Conf. 16.7 instructs that, in issuing an

NDF, a nation should assess the species' biology, life-history, range, population structure, status, trends, threats, and levels and patterns of harvest and mortality. Parties are also specifically directed to consider "the sustainability of the overall harvest" and "whether the species would be maintained *throughout its range* at a level consistent with its role in the ecosystems in which it occurs." *Id.* (emphasis added).

32.    In the United States, CITES is implemented by the U.S. Fish and Wildlife Service ("the Service") pursuant to the Endangered Species Act ("ESA") and the Service's CITES regulations. 16 U.S.C. §§ 1537A; 1538; 50 C.F.R. §§ 23.1-23.92.

33.    The Service has promulgated regulations governing the issuance of NDF determinations for Appendix II species. The regulations recognize that "[d]etrimental activities" include "unsustainable use and any activities that would pose a net harm to the status of the species in the wild." 50 C.F.R. § 23.61(b).

34.    The regulations require that, in making an NDF determination, the Service must consider whether:

(1)    Biological and management information demonstrates that the proposed activity represents sustainable use, [defined by the regulations to mean "the use of a species in a manner and at a level that maintains wild populations at biologically viable levels for the long term," 50 C.F.R. § 23.5];

(2)    The removal of the animal or plant from the wild is part of a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species;

(3)    If no sustainable-use management plan has been established, the removal of the animal or plant from the wild would not contribute to the over-utilization of the species, considering both domestic and international uses;

(4)    The proposed activity, including the methods used to acquire the specimen, would pose no net harm to the status of the species in the wild;

(5)    The proposed activity would not lead to long-term declines that would place the viability of the affected population in question; and

(6)    The proposed activity would not lead to significant habitat or range loss or restriction.

*Id.* § 23.61(c).

35.    The agency must make NDFs based "on the best available biological information," and, if information is insufficient, the Service will "take precautionary measures and would be unable to make the required" NDF determination. 50 C.F.R. § 23.61(f).

## II. The Service's CITES Export Program for Furbearers

36.    Several U.S. species of "furbearers," or mammal species that are trapped or hunted for their fur, are included on CITES Appendix II, including bobcats, gray wolves, river otters, Canada lynx, and brown bears.

37.    Because these species are exported from the United States in relatively high volumes, in 1977, the Service began making its CITES-required findings for several of these species, including its NDF determination and its finding that the specimen was legally obtained, on a programmatic basis, rather than on a permit-by-permit basis.

38.    In 2007, the Service issued regulations implementing its CITES Export Program ("CEP") for bobcats, gray wolves, river otters, Canada lynx, and brown bears. 72 Fed. Reg. 48,402 (Aug. 23, 2007); 50 C.F.R. § 23.69. Under the CEP, a state or tribe may seek approval of its harvest management program from the Service for any of the five species. The state or tribe must provide sufficient information for the Service to determine that the state or tribal management program and harvest controls are appropriate to ensure that CITES furbearers harvested within the jurisdiction are legally acquired and that export will not be detrimental to species' survival in the wild. The Service uses the state and tribal submissions and other available information to make either state-specific or nation-wide non-detriment findings for the five species.

39.    If a state or tribe is approved for the CEP, the Service must still issue an individual permit for each export of specimens of any of the five furbearer species. 50 C.F.R. § 23.69(e). However, the Service will rely on its CEP approval,

its State-specific or nation-wide non-detriment findings, and required tagging of specimens to make its CITES-required findings for each permit.

40.    For a furbearer management  program to receive approval, a state or tribe must provide:

(A)    An assessment of the condition of the population and the basis for that assessment, such as carcass demographics, population models, analysis of past harvest levels as a function of fur prices or trapper effort, or indices of abundance independent of harvest information;

(B)    Current harvest control measures, including laws regulating harvest seasons and methods;

(C)    Total allowable harvest of the species;

(D)    Distribution of harvest;

(E)    Indication of how frequently harvest levels are evaluated;

(F)    Tagging or marking requirements for fur skins;

(G)    Habitat evaluation; and

(H)    A copy of any management plan, "[i]f available."

50 C.F.R. § 23.69(b)(1). However, if the Service has made a nation-wide non-detriment finding for a species, a state or tribe seeking initial approval under the

CITES Export Program need only submit the information listed in (B) through (F) above. *Id.* § 23.69(b)(2).

41.    To assist the Service in making its CITES-required legal acquisition finding, each fur skin exported pursuant to the CEP must have a permanent CITES tag attached, displaying the U.S. CITES logo, the state of harvest, a standard species code, and a unique serial number. 50 C.F.R. § 23.69(c). However, no tagging is required for "fur skin products." *Id.* § 23.69(c)(4).

42.    Once the Service approves a program, the state or tribe must submit an annual "activity report" by October 31. 50 C.F.R. § 23.69(b)(3). The report must include:

(A)    The total number of animals taken in the jurisdiction;

(B)    An assessment of the condition of the population, including trends, and description of the types of information on which the assessment is based, and if population levels are decreasing, the state or tribe's professional assessment of the reason for the decline and any steps being taken to address it;

(C)    Any changes in laws or regulations affecting these species; and

(D)    If available, copies of relevant reports that the state or tribe has prepared during the year in question as part of its existing management programs for CITES furbearers.

17

*Id.* However, if the Service has issued a nation-wide non-detriment finding for a species, the annual furbearer activity report from a state or tribe must include only a statement indicating whether or not the status of the species has changed and the information listed in (C) and (D) above.

43.    Based on these annual reports, the Service makes an annual determination that each approved state and tribe qualifies for export.

44.    In issuing the CEP regulations, the Service noted that it requires information regarding population status and management on a state-by-state and tribe-by-tribe basis because the Service "approve[s] program[s] for the export of . . . furbearers . . . on a state-by-state and tribe-by-tribe basis." 72 Fed. Reg. at 48,435. The Service explained that, while "a range-wide population assessment would be useful in making non-detriment findings because it would place the State or tribal programs in the context of species management and population status throughout its range . . . in making a non-detriment finding, [the Service] must determine whether there are effects from the export, *including locally*, that will impact the survival of the species." *Id.* (emphasis added).

## III.    U.S. Furbearer Species Exported Pursuant to the Service's CEP

45.    As noted above, five U.S. furbearer species are included on CITES Appendix II and covered by the Service's CEP, including bobcats, gray wolves, river otters, Canada lynx, and brown bears.

46.     Currently, 41 states and 32 tribes have Service-approved harvest programs for bobcats under the CEP. Forty states and 16 tribes have Service-approved harvest programs for river otters under the CEP. The States of Montana and Alaska have Service-approved harvest programs for gray wolves under the CEP. The State of Alaska also has Service-approved harvest programs for both Canada lynx and brown bears under the CEP.

### A.     Bobcats

47.     Bobcats (*Lynx rufus*) are wild cats with a beautiful gray-brown coat, roughly double the size of a house cat. Bobcats inhabit the United States, Mexico, and southern Canada.

48.     Bobcats were included on CITES Appendix II in 1977. At the CITES Conferences of the Parties held in 2004, 2007, and 2010, the United States proposed to delete bobcats (*Lynx rufus*) from CITES Appendix II. The 2004 proposal was withdrawn, and the 2007 and 2010 proposals were rejected by the CITES Parties.

49.     While the International Union for the Conservation of Nature ("IUCN") considers the range-wide bobcat population to be stable, localized bobcat populations may be at risk. Concentrated local trapping can result in the local decline and extirpation of bobcat populations.

50.    In 2016, the IUCN noted that "local threats may present challenges for long term persistence [of bobcats] in some regions including market hunting for the fur trade, direct habitat loss caused by increased urbanization, and indirect effects of urbanization." For example, Florida has a declining bobcat population. Further, IUCN notes that "[c]oncern exists about sustainability of current bag limits with the increasing value of Bobcat pelts," for example, in West Virginia. In a 2010 survey, six states were unable to report bobcat population trends.

51.    Bobcat pelt prices have increased from $85 in 2000, to record highs of $589 in 2013, $447 in 2014, and $305 in 2015, driven by high demand for fur in China, Europe, and Russia. Due to high pelt prices, the number of bobcat pelts exported from the United States *quadrupled* over roughly the last 15 years, climbing from 16,258 wild-sourced skins exported commercially in 2001 to a high of 65,603 wild-sourced skins exported commercially in 2013.

52.    In 2015, at least 30,312 wild-sourced bobcat skins were exported commercially from the United States, in addition to 129 garments, 318 kg of skin pieces, and 1 additional skin piece. In 2014, 57,405 wild-sourced bobcat skins were exported commercially from the United States, as well as 90 garments.

53.    U.S. CITES exports for 2015 as reported by the Service in Appendix 2 of its Environmental Assessment do not yet represent total U.S. CITES exports for 2015 because not all 2015 data has been entered into the trade database.

20

**B. Gray wolves**

54.    Gray wolves (*Canis lupus*) are intelligent mammals with a highly developed social structure, relying on pack members to help raise young and hunt. They eat ungulates including elk, deer, moose, and caribou, as well as beaver, rabbits, and other small prey. As top predators, they play a key role in keeping ecosystems healthy. Gray wolves' coats range from white to grizzled gray to black and are highly prized in the fur industry.

55.    Gray wolves were once widespread across the United States but were virtually extirpated from the lower 48 states due to government-sanctioned extermination programs and overhunting. The Northern Rocky Mountain gray wolf subspecies was listed under the Endangered Species Conservation Act of 1969. In 1978, the broader gray wolf species was listed as endangered under the Endangered Species Act ("ESA") in the lower 48 States, except for a population in northern Minnesota that was listed as threatened. 47 Fed. Reg. 9607 (March 9, 1978). Gray wolves were included on CITES Appendix II in 1977.

56.    Following ESA protection, wolves made progress toward recovery in some regions of the United States due to reintroduction and migration from Canada. In 2009, the Service removed ESA protections for the Northern Rocky Mountain Distinct Population Segment of gray wolves, including wolves in Montana, Idaho, eastern Washington, eastern Oregon, and north central Utah. 74

Fed. Reg. 15,123 (Apr. 2, 2009). The decision was successfully challenged by conservation groups and vacated in U.S. District Court but subsequently reinstated due to a congressional rider. 76 Fed. Reg. 25,590 (May 5, 2011).

57.   The primary threats to wolves are killing by humans and insufficient prey.

58.   Wolves are legally hunted and trapped in Alaska, Montana, and Idaho, and wolf harvest is set to resume in portions of Wyoming this year.

59.   In Montana, wolf hunting and trapping began in 2009. In 2011, Montana had an estimated minimum population of 653 wolves but the estimated minimum population has declined since then to 554 in 2014, 536 in 2015, and 477 in 2016.

60.   In 2015, 205 wolves were harvested in Montana, 39 were killed during lethal control, and 32 additional wolves were killed or found dead for other or unknown reasons, for a total of 276 wolves killed in the State. These deaths constitute approximately 51% of Montana's 2015 estimated minimum wolf population.

61.   In 2016, a total of 255 wolves were killed during Montana's hunting and trapping season. An additional 61 wolves were killed for depredating livestock (other documented mortalities are unknown), for a minimum total of 316 wolves killed, or approximately 66% of the 2016 minimum wolf population estimate.

62.    Under its current regulations, Montana has no state-wide quota or limit on recreational/commercial wolf harvest.

63.    Recently, scientists have expressed concerns with the high levels of gray wolf harvest in the Northern Rockies. In 2015, a group of international carnivore experts wrote in the prominent journal *Science* that current harvest policies for Northern Rocky Mountains wolves "suggest that annual harvest of up to 50% of the population has little or no effect on dynamics" but noted this policy "suffer[s] from a lack of science-based guidance." The authors concluded that "[i]ncreased adult mortality [associated with harvest] was correlated with a decrease in wolf pack size since the onset of legal hunting in Montana and Idaho, where pack size declined by 29 to 33% between 2008 and 2013." Harvest can also disrupt social organization and reduce juvenile survival and recruitment. The authors expressed concerns that current hunting policies "do not specify maximum harvest." Similarly, a 2010 paper concluded that allowing between 28-50% of a wolf population exceeds sustainable rates.

64.    Alaska estimates its state-wide wolf population between 7,000 and 11,000 animals. In 2015, 951 wolves were hunted or trapped in Alaska.

65.    There are concerns about the status and overharvest of several wolf populations in Alaska. For example, Southeast Alaska's Alexander Archipelago wolf population declined 60% between 2013 and 2014, from 221 individuals to 89

on Prince of Wales and surrounding islands. Yet in 2015, the State of Alaska still allowed a wolf hunt in this region, allowing the killing of 9 more wolves. The harvest of wolves, including illegal harvest, on Prince of Wales and surrounding islands has been unsustainable in recent years.

66.    The number of gray wolf skins commercially exported from the United States varies by year, ranging from a recent low of 2 skins in 2003 to 39 skins in 2009 to 19 skins in 2013. In 2014, 2 wild-sourced gray wolf skins were commercially exported from the United States, in addition to 3 garments. In 2015, at least 16 wild-sourced gray wolf skins were commercially exported from the United States.

**C. River Otters**

67.    River otters (*Lontra canadensis*) are semi-aquatic mammals inhabiting coastal areas and most major drainages in the United States. Known for their long bodies, long whiskers, and playful nature and weighing between 10 and 30 lbs, river otters' thick, glossy brown, water-repellant fur is traded internationally.

68.    Due to overharvest, habitat loss, and water pollution, river otter populations had declined significantly by the early 1900s, and by 1977, the species' historic distribution had been reduced by 75%. Through trapping management, habitat restoration, and reintroduction, populations have now

24

increased and expanded geographically. However, according to the IUCN, river otters remain rare or absent in the southwestern United States, and water quality and development limit recovery of populations in some areas. The North American river otter was included on Appendix II of CITES in 1977.

69.     Because river otters in different regions disperse at significantly different distances, trapping and harvest in different regions affect local populations differently. For example, river otter populations in coastal areas in the southern United States may face greater impacts due to their lower dispersal rate than otter populations further north with greater dispersal rates.

70.     To ensure river otter populations remain viable, trapping must be tracked and regulated. The Service states that "river otter populations can be sustained with a harvest of 15-17 percent (assuming a 10% poaching factor)" of fall population estimates.

71.     The Service does not disclose an estimate of the total U.S. river otter population, a nationwide annual harvest rate, the river otter population estimate for any State, or annual harvest numbers from any State for river otters, except for Mississippi, where 1,850 otters were harvested during the 2015-2016 trapping season.

72.     Some states do not have a state-wide river otter population estimate. Some states do not set a quota for river otter harvest.

73.    Often beavers are caught in traps intended for river otters, negatively impacting both beaver populations and the stream ecosystems of which both river otters and beavers are an essential part.

74.    The number of river otter skins commercially exported from the United States varies by year, ranging from a recent low of 9,784 in 2007 to 33,461 in 2013. In 2014, 26,329 wild-sourced river otter skins were commercially exported from the United States. In 2015, at least 10,365 wild-sourced river otter skins were commercially exported from the United States, in addition to 10 live otters.

### D. Canada Lynx

75.    Canada lynx (*Lynx canadensis*) are wild cats with dense, silvery-brown fur and tufted ears, weighing about twice the size of a house cat. The species ranges across Alaska and Canada, in some northern States, and into the Rocky Mountain region.

76.    Canada lynx were included on CITES Appendix II in 1977.

77.    In Alaska, where lynx are not protected by the ESA, the actual number of lynx is unknown. Lynx populations vary widely based on where in Alaska they occur. For example, lynx do not occur in southeast Alaska and are poorly documented in southwest Alaska. In some areas of Alaska, such as the Alaska Peninsula, lynx are present but in low numbers.

78.    Alaska allows the direct harvest of lynx in several game units. There are or have been concerns about the sustainability of lynx harvest in some areas of Alaska. For example, lynx on the Kenai Peninsula were subject to overexploitation in the early 1980s. Further, despite relatively low numbers of lynx on the Alaska Peninsula and an unknown population estimate, lynx are still regularly harvested there.

79.    During its 2015-2016 harvest season, Alaska reports that 1,376 lynx were killed in the State. However, the Service does not disclose where the harvest occurred or from what Alaskan lynx population.

80.    The number of lynx exported from the United States has varied each year but climbed significantly from 781 wild-sourced skins commercially exported in 2005 to 5,266 wild-sourced skins commercially exported in 2011. In 2014, 1,781 wild-sourced skins were commercially exported from the United States. In 2015, at least 331 wild-sourced skins were commercially exported from the United States.

81.    Due in part to legal and illegal trapping, in 2000, the Service listed the Canada lynx population in the lower 48 States as threatened under the ESA. 58 Fed. Reg. 16,052 (March 24, 2000). Accordingly, the trapping or killing of wild lynx in the lower 48 States is generally prohibited. 50 C.F.R. § 17.40(k).

82.    However, threatened lynx are taken incidentally in traps set for bobcats and wolves, including in Montana, Idaho, and Maine. In Montana between 2000 and 2007, at least nine lynx were reported to have been caught in traps or snares set for other species in Montana; four of these lynx died. Between 2012 and 2014, at least four lynx were reported caught in traps in Idaho. Between 1999 and 2012, at least 70 lynx were reported to have been trapped in Maine; seven of these lynx died.

83.    Not all incidental lynx trapping is reported. The Service has stated that incidental take of lynx from state trapping is difficult to detect because there is little likelihood that trappers would report bycatch of lynx.

**E. Brown Bear**

84.    The brown bear or grizzly bear (*Ursus arctos*) once ranged across large portions of western North America; however, due to hunting and habitat loss, the U.S. portion of the species' historic range is now limited to the States of Alaska, Wyoming, Montana, Idaho, and potentially Washington. Brown bears were listed in Appendix II of CITES in 1992.

85.    In Alaska, brown bear densities vary geographically, with particularly low densities in the North Slope and higher densities further south.

86.    Since 1994, Alaska's brown bear harvest regulations have been relaxed, including through extended hunting seasons and reduced licensing fees.

Harvest has increased from a four-year mean of 387 bears between 1976-1980 to a mean of 823 bears between 2005-2008. In 2015, 1,779 brown bears were hunted or trapped in Alaska.

87.    Some brown bear populations in Alaska may be harvested unsustainably. A 2011 report by Miller *et al.* warned that state managers lacked research on brown bear populations in areas of Alaska where hunting regulations were more liberal and that Alaska's aggressive bear management in some areas increases risk to the population. The study also concluded that brown bear management in Alaska is "politically driven rather than scientifically supported" because state law limits the ability of state biologists to alter management. While the report did not document declining brown bear populations, the authors noted that such declines would be difficult to detect due to limited research and inadequate monitoring and reporting.

88.    Further, in 1998, the State of Alaska designated the brown bear population on the Kenai Peninsula a population of special concerns, stating it was "vulnerable to a significant decline due to low numbers [and] restricted distribution," among other factors, but the State later removed the designation. Despite uncertainty about the population's status, brown bear harvest on the Kenai Peninsula was liberalized in 2007, reaching a high of over 70 bears killed in 2014 between harvest and defense of life. A 2016 paper estimated the brown bear

population on the Kenai Peninsula at 582 bears, and the authors expressed concern about the long-term conservation of the population, noting that a 12% harvest rate (70 bears from a population of 582) is double the amount of harvest recommended by scientists.

89.    If overharvested, risks to brown bear populations can be significant as bears have low reproductive rates and depleted populations are slow to recover. Harvest can also have ripple effects on bear populations, leading to infanticide, lower cub litter sizes, and lower cub survival rates when compared with unhunted populations.

90.    The number of brown bear skins commercially exported from the United States varies by year, ranging from a recent low of zero in 2003 to 28 in 2009. In 2014, two wild-sourced brown bear skins were commercially exported from the United States, in addition to one rug and two skulls. In 2015, at least two wild-sourced brown bear skins were commercially exported from the United States, in addition to one rug and two skulls.

## IV.    The National Environmental Policy Act

91.    NEPA is the United States' "basic national charter for protection of the environment," establishing procedures to ensure that "high quality" environmental information "is available to public officials and citizens before decisions are made and actions are taken." 40 C.F.R. § 1500.1(a), (b). Accordingly,

the statute's twin objectives are: (1) to ensure that agencies take a "hard look" at every significant aspect of the environmental impact of a proposed action, and (2) to guarantee that relevant information is available to the public to promote well-informed public participation.

92.　　NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

93.　　An agency may prepare an environmental assessment ("EA") to briefly put forth sufficient evidence and analysis to determine whether to prepare an EIS or to instead issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.9.

94.　　An agency may only issue a FONSI for actions that have no significant impact on the human environment. 40 C.F.R. § 1508.13. If an action *may* have a significant effect on the environment, or even if there are substantial questions as to whether it may, the agency must prepare an EIS.

95.　　NEPA's regulations define significance in terms of context and intensity, providing ten factors that an agency must consider in determining whether its action may cause significant impacts. 40 C.F.R. § 1508.27(b). These factors include, *inter alia*: effects that are "highly uncertain or involve unique or unknown risks" or "likely to be highly controversial," *id.* § 1508.27(b)(5), (4);

cumulative impacts, *id*. § 1508.27(b)(7); adverse effects on endangered or threatened species, *id*. § 1508.27(b)(9); and actions that threaten violation of other laws, *id*. § 1508.27(b)(10). If the agency's action may be environmentally significant under even one of these criteria, the agency must prepare an EIS.

96.    Both EAs and EISs must discuss a proposed action's direct, indirect, and cumulative effects. 40 C.F.R. §§ 1502.16; 1508.9(b). Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id*. § 1508.7.

97.    To satisfy NEPA's hard look and public disclosure and participation requirements, an agency must evaluate in detail a project's potential site-specific impacts.

98.    An agency's decision not to prepare an EIS or an adequate EA may be overturned if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## V.    The Service's Analysis of Its CITES Export Program Pursuant to NEPA

99.    On February 8, 2017, the U.S. Fish and Wildlife Service's Division of Management Authority issued the Draft Environmental Assessment: Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("Draft EA").

100.    On April 20, 2017, the Center submitted substantive comments on the Draft EA.

101.    On May 18, 2017, the Service issued the Final Environmental Assessment: Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES Export Program EA" or "the EA") and an associated Finding of No Significant Impact.

102.    The EA was issued in response to litigation currently pending in this district. *See WildEarth Guardians, et al. v. Hoover, et al.*, 9:16-cv-00065-DWM.

103.    The EA includes four alternatives: (1) a preferred and "no action" alternative of maintaining the CEP in its current form, including "evaluating information provided annually by States and Tribes participating in the CEP, making the necessary CITES findings on a State, tribal, or even nationwide basis, and the mandatory tagging of skins of these species prior to export;" (2) a "no tag" alternative, under which the Service would not issue or require tagging prior to

export; (3) a "no permit" alternative, under which the Service would deny export of CEP species from the wild, and (4) a "no approved CITES export program" in which the Service would eliminate its CEP but still allow export on a case-by-case basis. EA at 12, 21, 24.

104.    The EA fails to fully analyze the direct, indirect, and cumulative impacts of the Service's CITES Export Program under any alternative.

105.    For example, in describing direct and indirect effects, the EA states that "[p]rohibition of export" under Alternative 3 "would likely reduce the harvest of all five species;" however, "[t]he extent to which an export prohibition would affect harvest is unknown." EA at 26. The EA concludes that:

> It is not possible to describe with any confidence the environmental impacts of a prohibition on export of these species, even if population increases were to result. It is also unknown to what extent such increases might affect populations of other species in affected ecosystems . . . [E]liminating export of these species may or may not result in minor local population fluctuations . . .

EA at 27-28.

106.    For cumulative effects, the EA concludes:

> Continuing to approve the export of these five species might benefit other species of spotted cats and otters, and other populations of brown bear and gray wolf protected by CITES by reducing harvest pressures on potentially less well-managed populations. Conversely, prohibiting export of these native furbearers may result in increased harvest pressure on less well-managed populations.

EA at 31.

107.   The EA fails to consider site-specific impacts of the CEP. The EA fails to evaluate the program's regional, state, or local direct, indirect, and cumulative impacts on bobcats, river otters, gray wolves, Canada lynx, and brown bears.

108.   The EA fails to adequately evaluate the cumulative effect of the CITES Export Program, state and tribal harvest programs, and other threats on the five furbearer species.

109.   The EA fails to adequately consider impacts on other non-CITES-listed species caught as bycatch in furbearer trapping programs or to habitats and species otherwise affected by the CITES Export Program.

110.   The Service's EA does not disclose the total U.S. bobcat population estimate.

111.   The Service's EA does not disclose the number of bobcats harvested nationwide in the United States.

112.   The Service's EA does not disclose the bobcat population estimate for any state.

113.   The Service's EA does not disclose the number of bobcats harvested in any state, with the exception of Arizona, Colorado, and Mississippi.

114.   The Service's EA does not disclose the number of bobcats harvested within any regions or localized populations.

115.    The Service's EA provides no basis for determining whether bobcat harvest is sustainable on a national, regional, state, or local level.

116.    Despite a documented decline of the gray wolf population in Montana and a total, annual wolf death rate exceeding 50% in recent years, the Service's EA fails to provide an adequate basis for determining wolf harvest is sustainable in Montana or at local levels.

117.    The Service's EA does not disclose where in Alaska gray wolves were harvested each year or from which Alaskan gray wolf populations.

118.    The Service's EA provides no basis for determining whether gray wolf harvest is sustainable on a population or local level in Alaska.

119.    The Service's EA does not provide an estimate of the U.S. river otter population.

120.    The Service's EA does not provide annual nationwide harvest numbers for river otters.

121.    The Service's EA does not provide the river otter population estimate for any state.

122.    The Service's EA does not provide annual harvest numbers from any state for river otters, except for Mississippi.

123.    The Service's EA does not provide the river otter population estimate for any region or localized area.

36

124.   The Service's EA does not provide annual harvest numbers from any region or localized area for river otters.

125.   The Service's EA provides no basis for determining whether river otter harvest is sustainable on a national, regional, state, or local level.

126.   The Service's EA fails to address the indirect impacts to beaver from river otter trapping.

127.   The EA does not disclose the total Canada lynx population estimate in Alaska.

128.   The Service's EA does not disclose where lynx harvest occurs in Alaska or from which lynx populations.

129.   The Service's EA provides no basis for determining whether Canada lynx harvest is sustainable within Alaska or at local levels.

130.   The Service's EA fails to address the indirect impacts to Canada lynx from trapping of other CEP species in the U.S. outside of Alaska.

131.   The Service's EA does not disclose the total brown bear population estimate in Alaska.

132.   The Service's EA does not disclose where brown bear harvest occurs in Alaska or from which brown bear populations.

133.   The Service's EA provides no basis for determining whether brown bear harvest is sustainable within Alaska or at local levels.

134.   The Service's EA does not evaluate or disclose the impacts of harvest of any of the five species on their native ecosystems, including at the national, state, or local levels.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of NEPA and the APA: Failure To Adequately Evaluate Effects

135.   Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

136.   In its CITES Export Program EA, the Service fails to take a hard look at the effects of the CITES Export Program, including effects of U.S. exports of bobcats, gray wolves, river otters, Canada lynx, and brown bears and nationwide, regional, state, and local harvest of the species. The Service's EA fails to adequately evaluate all direct, indirect, and cumulative effects of the CITES Export Program, U.S. exports, and nationwide, regional, state, and local harvest.

137.   Defendants' failure to adequately evaluate the effects of the CITES Export Program violates NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law under the APA. *See* 40 C.F.R. §§ 1502.16; 1508.9; 5 U.S.C. §§ 551; 706.

## SECOND CAUSE OF ACTION
### Violation of NEPA and the APA: Failure To Provide Rational Basis for Finding of No Significant Impact

138.   Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

139.   The Service's EA and FONSI fail to provide a rational basis for the Service's finding that the CITES Export Program, including U.S. export of furbearers and the associated nationwide, regional, state, and local harvest, will not significantly impact the environment. The Service's EA fails to provide sufficient information to support the Service's determination that the CITES Export Program, *inter alia*: (1) does not threaten a violation of CITES and the ESA, including ensuring there is sufficient information to support a legally sufficient CITES non-detriment finding, (2) does not have adverse effects on endangered or threatened species, and (3) does not have significant cumulative impacts. 40 C.F.R. § 1508.27(b).

140.   The Service's failure to provide a rational basis for its finding that the CITES Export Program will not significantly impact the environment violates NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law under the APA. *See* 40 C.F.R. §§ 1508.9; 1508.13; 1508.27(b); 5 U.S.C. §§ 551; 706.

## THIRD CAUSE OF ACTION
## Violation of NEPA and the APA: Failure To Prepare an EIS

141.  Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

142.  The Service fails to prepare a comprehensive environmental impact statement for its CITES Export Program, including U.S. export of furbearers and associated nationwide, regional, state, and local harvest, despite significant impacts on the environment. 42 U.S.C. § 4332(2)(C). These effects include, *inter alia*: (1) effects that are "highly uncertain or involve unique or unknown risks," (2) "unique characteristics of the geographic area;" (3) effects that are "likely to be highly controversial," (4) cumulative impacts, (5) adverse effects on endangered or threatened species, and (6) actions that threaten violation of other laws. 40 C.F.R. § 1508.27(b).

143.  The Service's failure to prepare an environmental impact statement violates NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law and/or unreasonably delayed under the APA. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.27(b); 5 U.S.C. §§ 551; 706.

## REQUESTED RELIEF

For the reasons stated above, Plaintiff respectfully requests that the Court grant the following relief:

1.    Declare that the Service violated NEPA and its implementing regulations and the APA by failing to adequately evaluate effects of the CITES Export Program, failing to provide a rational basis for its finding of no significant impact, and failing to prepare an environmental impact statement;

2.    Set aside and remand the Service's EA and compel the Service to promptly conduct a new NEPA analysis on its CITES Export Program;

3.    Issue such temporary restraining order(s), preliminary injunction(s) and/or permanent injunctive relief as may be requested hereafter by Plaintiff;

4.    Award Plaintiff its costs of litigation, including reasonable attorneys' fees; and

5.    Grant Plaintiff such other relief as the Court deems just and proper.


Dated:  July 13, 2017                    Respectfully Submitted,

                                         /s/  Kristine Akland
                                         Akland Law Firm, PLLC
                                         317 E. Spruce Street
                                         P.O. Box 7274
                                         Missoula, MT 59807
                                         (406) 544-9863
                                         aklandlawfirm@gmail.com

                                         *Tanya Sanerib
                                         Center for Biological Diversity
                                         2400 NW 80th Street, #146
                                         Seattle, WA 98117
                                         Phone:  (206) 379-7363
                                         tsanerib@biologicaldiversity.org

*Sarah Uhlemann
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
Phone:  (206) 327-2344
suhlemann@biologicaldiversity.org

*Attorneys for Plaintiff*
* Pro hac vice admission pending