Sarah McMillan
WildEarth Guardians
P.O. Box 7516
Missoula, Montana 59807
Tel: 406-549-3895
smcmillan@wildearthguardians.org

Peter M.K. Frost
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-359-3238
frost@westernlaw.org

Attorneys for Plaintiff WildEarth Guardians

Sarah Uhlemann
Tanya Sanerib
Center for Biological Diversity
2400 N.W. 80th Street, #146
Seattle, Washington 98117
Tel: 206-327-2344
Tel: 206-379-7363
suhlemann@biologicaldiversity.org
tsanerib@biologicaldiversity.org

Kristine Akland
Akland Law Firm, PLLC
317 E. Spruce Street
P.O. Box 7274
Missoula, Montana 59807
Tel: 406-544-9863
aklandlawfirm@gmail.com

Attorneys for Plaintiff Center for Biological Diversity

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, | Lead Case No. |
| | CV 16-65-M-DWM |
| Plaintiff, | |

| and | Member Case No. CV 17-99-M-DWM |
| CENTER FOR BIOLOGICAL DIVERSITY, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' AND DEFENDANT-INTERVENORS' SUMMARY JUDGMENT MOTIONS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION** |
| Consolidated-Plaintiff, | |
| vs. | |
| U.S. FISH & WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| MONTANA TRAPPERS ASSOCIATION, et al. | |
| Defendant-Intervenors. | |

## TABLE OF CONTENTS

Table of Contents ................................................................................ i

Table of Authorities ......................................................................... iii

Introduction .......................................................................................... 1

Argument ................................................................................................. 2

A. Plaintiffs Have Standing .............................................................. 6

B. The Service Violated NEPA ...................................................... 10

   1. The Direct and Localized Impacts of the Program Are Not
     Adequately Evaluated in the EA ......................................... 11

   2. The EA Fails to Adequately Analyze Bycatch and Indirect Effects ................. 15

   3. The EA Fails to Provide Sufficient Information to Evaluate
     Whether the Program Complies with CITES Requirements ............................. 16

   4. The EA Fails to Analyze Cumulative Effects of the Program ........................... 18

   5. The Incidental Take Statement Required NEPA Analysis................................ 19

   6. An EIS Is Required.................................................................. 20

   7. Plaintiffs Exhausted Their Administrative Remedies ......................................... 21

C. The Service Violated the ESA ................................................... 22

   1. The Statement Cannot Immunize Take Due To Trapping .................................. 22

   2. The Statement Lacks a Clear "Trigger" for Take................................................ 24

   3. "Injured" is Not Based on Best Available Science ............................................. 26

   4. The Service Fails to Ensure Accurate Reporting ............................................... 27

i

5.  The Statement Illegally Fails to Minimize Incidental Take ................................. 28

D. The Court Should Vacate and Remand .................................................................... 29

Conclusion ................................................................................................................. 31

## TABLE OF AUTHORITIES

**Cases**

*Alsea Valley Alliance v. Dep't of Commerce,*
    358 F.3d 1181 (9th Cir. 2004) ................................................................. 30

*Anderson v. Evans,*
    314 F.3d 1006 (9th Cir. 2002) ................................................................. 12

*Animal Prot. Inst. v. Holsten,*
    541 F. Supp. 2d 1073 (D. Minn. 2008) .................................................... 29

*Ariz. Cattle Growers v. FWS,*
    273 F.3d 1229 (9th Cir. 2001) ........................................................... 24, 25

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012) ................................................................... 30

*City of Mukilteo v. DOT,*
    815 F.3d 632 (9th Cir. 2016) ................................................................... 13

*Ctr. for Biological Diversity v. Forest Serv.,*
    349 F.3d 1157 (9th Cir. 2003) ................................................................. 13

*Ctr. for Biological Diversity v. NHTSA,*
    538 F.3d 1172 (9th Cir. 2008) ................................................................. 13

*Ctr. for Biological Diversity v. Otter,*
    No. 1:14-cv-258-BLW, 2018 WL 539329 (D. Id. Jan. 24, 2018) ............... 22

*Ctr. for Envtl. Health v. Vilsack,*
    No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016) ...... 30

*Cottonwood v. Envtl. Law Ctr. v. Forest Serv.,*
    789 F.3d 1075 (9th Cir. 2015) ................................................................... 9

*Defenders of Wildlife v. Hall,*
    807 F. Supp. 2d 972 (D. Mont. 2011) ................................................ 12, 13

*DOT v. Pub. Citizen*,
  541 U.S. 752 (2004) .................................................................. 14

*FEC v. Akins*,
  524 U.S. 11 (1998) .................................................................... 9

*Friends of the Earth v. Jantzen*,
  760 F.2d 976 (9th Cir. 1985) ................................................... 19

*Friends of the Wild Swan v. Babbitt*,
  No. CV 96-172-M-DWM (D. Mont. Oct. 14, 1997) ........................... 20, 23

*Fund for Animals v. Norton*,
  281 F. Supp. 2d 209 (D.D.C. 2003) ........................................... 12

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
  387 F.3d 989 (9th Cir. 2004) ................................................... 18

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................ 6, 7

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................ 30

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) ................................................... 18

*Novak v. United States*,
  795 F.3d 1012 (9th Cir. 2015) ................................................. 9

*NRDC v. Jewell*,
  749 F.3d 776 (9th Cir. 2014) ................................................... 6

*Or. Nat. Desert Ass'n v. BLM*,
  531 F.3d 1114 (9th Cir. 2008) ................................................. 11, 22

*Or. Nat. Desert Ass'n v. BLM*,
  625 F.3d 1092 (9th Cir. 2010) ................................................. 15

iv

*Pub. Citizen v. DOT*,
   316 F.3d 1002 (9th Cir. 2003) ................................................................... 16

*Ramsey v. Kantor*,
   96 F.3d 434 (9th Cir. 1996) .................................................. 19, 22, 23, 24

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) .................................................................... 10

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ..................................................................... 19

*Save Our Cabinets v. U.S. Dep't of Agric.*,
   No. 9-16-cv-00053-DWM (D. Mont. June 29, 2017) ................................ 30

*Se. Alaska Conserv. Council v. Army Corps of Eng'rs*,
   486 F.3d 638 (9th Cir. 2007) ..................................................................... 29

*Sierra Club v. Forest Serv.*,
   843 F.2d 1190 (9th Cir. 1988) ................................................................... 16

*Tri-Valley CAREs v. DOE*,
   671 F.3d 1113 (9th Cir. 2012) ................................................................... 13

*Western Watersheds Project v. FWS*,
   2014 WL 4853200 (D. Id. Sept. 29, 2014) ............................................... 28

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010) ..................................................................... 27

*WildEarth Guardians v. Dep't of Agric.*,
   795 F.3d 1148 (9th Cir. 2015) .......................................................... 7, 8, 9

## Regulations

## NEPA Regulations

   40 C.F.R. § 1508.7 ............................................................................. 19, 21

40 C.F.R. § 1508.27(b) ............................................................... 16, 18, 20, 21

**CITES Regulations**

50 C.F.R. § 23.13(a) .......................................................................... 2

50 C.F.R. § 23.60 .............................................................................. 2

50 C.F.R. § 23.61 ......................................................................... 2, 16, 19

50 C.F.R. § 23.69(b) .................................................................. 3, 16, 17, 19

**ESA Regulations**

50 C.F.R. § 402.02 ......................................................................... 23, 24

50 C.F.R. § 402.14(g) ....................................................................... 26

**INTRODUCTION**

Under the CITES Export Program the Service regulates and allows the export of tens of thousands of pelts or parts from bobcats, river otters, brown bears, lynx, and wolves. Despite this fact, the Service and Intervenors attempt to relegate the Program to a mere paperwork exercise with no real world effects. *See, e.g.*, Defs' Br. at 16-17, 20, 23; Ints' Br. at 7, 9. To the contrary, the record before the Court plainly demonstrates that by allowing exports into the international fur market, the Service significantly affects the level of trapping at the state and local level. The record also shows that the Program causes Plaintiffs' injuries and the relief sought here provides redress; that the Program has many impacts that were

never analyzed in the EA and which require review in an EIS; and that the Service has violated the ESA.

## ARGUMENT

To defend its EA and other final agency actions, the Service fundamentally misrepresents the nature of the Program. First, it is undisputed the Service alone controls whether CITES-listed furbearers may be exported from the United States. 50 C.F.R. § 23.13(a) (prohibiting export of CITES Appendix II-listed species without export permit from the Service). The Service acknowledged this by evaluating Alternative 3 in the EA, under which it would prohibit the export of the furbearer species taken from the wild. AR023-24.

Second, it is undisputed that implementing the Program both streamlines exports of furbearers *and* includes the decision-making necessary for the Service to regulate and allow exports. As Plaintiffs established in their opening brief, before allowing export of any CITES Appendix II-listed species, the Service must find that: (1) the specimen was legally acquired, and (2) the export will not be "detrimental to the survival of the species" – essentially a finding that harvest is "sustainable." Plfs' Br. at 4-5 (citing 50 C.F.R. §§ 23.60; 23.61; *see also* AR002). The Service recognized that making these determinations on an individual, permit-by-permit basis for tens of thousands of pelt exports would be unmanageable, *see* AR007, so it adopted the Program.

2

Under the Program, the Service requires states and tribes that seek approval of their harvest/trapping management programs to submit information including population assessments, total harvest allowed, and distribution of harvest. 50 C.F.R. § 23.69(b)(1). Based on these submissions, the Service determines whether "CITES furbearers harvested within [the] jurisdiction are legally acquired and that export will not be detrimental to the survival of the species in the wild," AR008, and may decide to approve the state's or tribe's participation in the Program. The Service then relies on its approval decisions, required annual reports, associated non-detriment findings, and required tagging to issue export permits, *instead of making an individual determination on each permit*. AR003.

Thus, implementation of the Program results in a final decision whether the harvest of furbearers in any state or tribal area meets CITES requirements for export. As the Service confirms in its EA, the Program "allows [the Service] to streamline the permitting process since [required tagging] demonstrate[s] that the pelts were legally taken . . . and a non-detriment finding for the [CITES Export Program] *has already been made*." AR003 (emphasis added); *cf.* AR007 (for pelt exports from states and tribes *not* approved under the Program, "CITES findings must be made on a shipment-by-shipment basis"). Because the Program is the mechanism by which the Service makes a final determination that the export of

3

furbearers is not detrimental and complies with CITES, the Program is more than a mere paperwork exercise.

Moreover, allowing fur trappers access to the international market beyond the domestic fur market increases trapping. The Service admits this fact in the EA: "Prohibition of export ([as evaluated in] Alternative 3 [of the EA]) would likely reduce the harvest of all five of these species." AR026; *see also* AR20321 (draft EA: "populations of these species probably would increase in abundance, at least in some areas, if export were not allowed"); AR20318 (draft EA noting "the higher price for pelts in foreign markets" than in the domestic market); AR20321 (draft EA: "most of these five species pelts are exported"); Ints' Br. at 4 ("the Service . . . admitted . . . that prohibition of exports likely would lessen trapping").

Indeed, the record is also replete with comments from state agencies stating that trapping would decrease if trappers could no longer export or had to obtain individual export permits. For example, the state of Maine stated that "[e]liminating the CITES tagging system or requiring trappers and hunters to secure tags on a case-by-case basis *would effectively end the harvest of these species* and decrease overall trapping participation." AR23095 (emphasis added). Similarly, the state of Colorado explains that "loss of the ability to trade in

furbearer parts and derivatives would lead to a loss of hunter and trapper license sales," as fewer people would trap. AR21435.[1]

Individual trappers make related statements, explaining how requiring individual permits or stopping exports "would make the resource nearly unmarketable. Without an outlet [abroad] for these species, trapping and hunting would dwindle . . . ." AR21402; AR21415 (trapper: "Any changes that would eliminate/reduce the demand for these pelts would result in less trapping activity"); AR21240 (trapper: "Loss or higher cost/burden of export will result in declines in trapper participation").[2] Thus, the Service, states, and trappers themselves acknowledge the Program has direct consequences on the ground.

---

[1] See also AR23141 (Connecticut: "[f]oreign markets have been highly important to the trade value of wild caught furs. The loss of these markets and decline in wild fur values . . . would decrease trappers' incentive to trap."); AR21623 (Virginia: making export more expensive or difficult would result in "a decline in trapper participation"); AR24824 (Minnesota: "reduced prices" from loss of export market "will reduce hunting and trapping participation and effort"); AR21554 (Michigan: halting export permits "could potentially decrease interest in participating in the legal take of bobcats"); AR24828-29 (Missouri: "[a]s a result of decreased economic incentive [from Alternatives 3 and 4], participation in trapping will likely suffer"); AR24884 (Kentucky: "[l]oss of export markets . . . [and] applying for individual CITES permits . . . would reduce participation in trapping all furbearers"); AR24887 (Arizona: the no permit or no export options "could lead to a decrease in participation in trapping and hunting activities").

[2] See AR21451 (same); AR21545 (same); AR21229 (noting reduction in trappers if exports are limited); AR21347 ("[w]ithout a viable way to sell the furs of these animals [through the CITES Program] there is no incentive for individuals to harvest these animals").

Intervenors argue "the fluctuating price of fur pelts" drives trapping, Ints' Br. at 9, but the Program provides trappers access to the generally higher prices obtained on the international market, beyond the domestic market. AR20318 (noting "the higher price for pelts in foreign markets"); AR23226-27 (noting "highly prized" bobcat pelts in markets in China, Russia, and Europe). As such, through Program approval, foreign demand for fur and international prices directly influence trapping levels in approved states.[3]

## A.     Plaintiffs Have Standing

Plaintiffs have standing to challenge the Service's NEPA and ESA decisions related to the Program because by regulating and allowing fur exports, the Program results in increased fur trapping and associated impacts to native wildlife. Plaintiffs are injured by these impacts, which the Service concedes, Defs' Br. at 12, and contrary to its assertions, Plaintiffs meet the lowered burden for proving causation and redressability in this procedural case.

To prove causation, a plaintiff must demonstrate "the injury is fairly traceable to the challenged conduct." *NRDC v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014) (en banc) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

---

[3]   Plaintiffs acknowledge that population levels of furbearers, gas prices, and other factors, in addition to domestic and international fur prices, all influence trapping levels. Defs' Br. at 19-20. Nonetheless, access to the international market is a driving force in trapping and thus does not change the Service's obligation to address the impacts that allowing international market access has on domestic fur trapping levels.

(1992)). As the Service concedes, a plaintiff alleging a procedural violation "can assert that right without meeting all the normal standards for traceability and redressibility." *Id.*; *see* Defs' Br. at 13. Further, "[s]o long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury." *WildEarth Guardians v. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015).

The Service asserts it has not caused Plaintiffs' members' undisputed injuries, because the Program is "simply an administrative tool for streamlining" permit approvals, and "has no substantiated link with the frequency or methodology of trapping nationwide or at the specific locales where" Plaintiffs' members have been injured. Defs' Br. at 13. In these respects, the Service misrepresents the nature of the Program, as noted *supra* at 2-6.

Further, Plaintiffs' members have filed undisputed testimony that the Program, by "helping facilitate and allowing the export of furs and parts for profit[,] encourages more traps placed in the environment," and "thereby, directly affects the number of species, whether targeted or not, that are caught and injured or killed in traps." Bishop Decl. ¶ 18 (Doc. 98-1); *see also* Peck Decl. ¶ 16 (Doc. 98-10) (trapping for wolves and bobcats "dramatically increase[s]" the "likelihood" that lynx will be trapped); *id*. ¶ 18 (providing evidence that hunting wolves leads to fewer wolf sightings). Moreover, these members recreate or work

7

in precisely the areas where animals whose pelts are exported under the Program may be found. *See, e.g.*, Bishop Decl. ¶¶ 11-13 (recreating in wolf habitat, and seeing a wolf, in West Yellowstone); High Decl. ¶¶ 9-10 (Doc. 98-5) (working and recreating in bobcat and lynx habitat in Idaho); Whitehurst Decl. ¶¶ 4-9 (Doc. 98-15) (recreating in river otter habitat and enjoying the species).

The record corroborates Plaintiffs' members' testimony, documenting that the Program directly affects the level of trapping and harvest in states. The EA states that export of CITES species is "regulated by the Service and facilitated by the [export] Program." AR026. The draft EA states that "most of the five [CITES furbearer] species pelts are exported," AR20321, and the final EA states that "[b]obcat and river otter are commonly exported in considerable quantities." AR006. The final EA confirms that if the Service were to prohibit furbearer exports, it "would likely reduce the harvest of all five [furbearer] species." AR026. Indeed, the state of Minnesota commented "reduced prices" from loss of the export market "will reduce hunting and trapping participation and effort."AR24824; *supra* at 2-6. The record establishes a clear connection between the Service's regulation and allowance of exports as part of the Program and the level of trapping of the five furbearer species. That individual trappers ultimately cause the injury does not defeat causation, given that the Service regulates and allows exports, which impacts the trappers' actions and levels of harvest. *WildEarth Guardians*, 795 F.3d

8

at 1157 (finding causation "[s]o long as a defendant is at least partially causing the alleged injury").[4]

The Service continues that Plaintiffs fail to show redressability, because a favorable court decision "will have no effect on the individual trappers or sovereign trapping regimes." Defs' Br. at 15. To show redressability in this procedural case, Plaintiffs do not need to show that a favorable court decision will in fact change trapping or state or tribal management of trapping; they must only show it "*could* influence" the Program and thereby trapping. *WildEarth Guardians*, 795 F.3d at 1156 (emphasis original); *see also Cottonwood v. Envtl. Law Ctr. v. Forest Serv.*, 789 F.3d 1075, 1083 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 293 (2016) (to show redressability for procedural claims, the plaintiff "need not show that [the procedures sought] would lead to a different result at either the programmatic or project-specific level"); *FEC v. Akins*, 524 U.S. 11, 25 (1998) (noting plaintiffs showed causation and redressability even where, after remand, "the agency . . . might later . . . reach the same result for a different reason").

---

[4]   The Service cites *Novak v. United States*, 795 F.3d 1012 (9th Cir. 2015), Defs' Br. at 13, but it is inapposite. There, the plaintiffs alleged they suffered financial injuries due to Jones Act requirements for American-made and -controlled shipping in Hawaii. *Id*. at 1017. The Ninth Circuit held they could have suffered all their injuries regardless of the federal requirements. *Id*. at 1019. By contrast, here, the Service completely controls CITES exports, thereby significantly influencing the amount of trapping.

Here, Plaintiffs ask the Court to set aside and remand the EA, which could influence the chosen alternative under NEPA, and to set aside the biological opinion and incidental take statement, which could influence terms and conditions to minimize take of lynx.[5] As the Court previously held, Plaintiffs satisfy the relaxed standard for redressability. *WildEarth Guardians v. Hoover*, Doc. 35 at 10-11.

**B.     The Service Violated NEPA**

The Parties' NEPA arguments largely center around a single dispute: whether the Service influences furbearer trapping in its role regulating and allowing exports under the Program and thus whether those effects must be evaluated under NEPA. In its brief, the Service takes a more strident position than in the EA, asserting the Program has no real effect. *See* Defs' Br. at 17 (on direct effects: "Program's only purpose is to marginally streamline future permits – not the act of trapping itself"); *id.* at 20 (on indirect effects: "the Program simply

---

[5]   The Service relies on *Gutierrez*, Defs' Br. at 15, but it is inapposite. There, the Ninth Circuit noted the district court could not set aside the United States' decision to enter into a treaty with Canada, because it was committed to the executive branch. *Gutierrez*, 545 F.3d at 1226. Here, this Court has undisputed authority to set aside the Service's actions.

streamlines export approvals and does not . . . effectuate the act of trapping"; *id.* at

23 (on cumulative effects: "the Program has so few effects").[6]

However, as this Court has already held, "the numbers and methods of

trapping are not wholly outside the Service's control." *Hoover*, Doc. 35 at 9; *see*

*also supra* at 2-6. In fact, because regulating and allowing the export of wildlife

parts and pelts and thereby allowing access to the international market beyond the

available domestic market increases trapping, the Program has impacts on native

wildlife and their habitat that must be analyzed under NEPA.

**1.    The Direct and Localized Impacts of the Program Are Not Adequately Evaluated in the EA**

The EA fails to address the direct and localized impacts of the Program.

Plfs' Br. at 11-14. The EA construes the Program as having limited impacts on

native wildlife, but the Service goes a step further in its brief, asserting the

Program is "fundamentally administrative" with "no effects on the physical

environment." Defs' Br. at 16. However, the record is to the contrary and shows

the Service failed to evaluate those effects.

First, as noted above, the Service conceded in its draft EA that "populations

of these species probably would increase in abundance, at least in some areas, if

---

[6]   As the Supreme Court has explained, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *see also Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1141 (9th Cir. 2008) ("courts may not accept [] counsel's post hoc rationalizations for agency action").

11

export were not allowed." AR20321. Trappers concur that furbearer populations would increase if exports halted – demonstrating the Program undeniably has direct impacts on population levels. *See* AR23102 ("loss of export would cause negative trapper interest to harvest these species, which in turn, would cause an overpopulation"); AR23104 ("River otter would increase" if exports stopped).

Second, the Service itself has acknowledged that "in making a nondetriment finding," which is a key component of the Program, "we must determine whether there are effects from the export, *including locally*, that will impact the survival of the species." AR2578 (emphasis added). Despite the need for the Service to consider local impacts in making non-detriment findings, and the confessed direct impacts of the Program on furbearer populations, the EA simply fails to contain the requisite analysis of the direct effects of trapping for export. AR002-34; Plfs' Stmt of Facts ¶¶ 8, 57-60: Plfs' Br. at 12-13.

Instead, the EA offers merely "conclusory" statements that courts regularly reject, whether they are contained in an EA or EIS. *Anderson v. Evans*, 314 F.3d 1006, 1021 (9th Cir. 2002); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 234 (D.D.C. 2003). As this Court has explained, while "[t]he detailed and site specific information required in an [EIS] is not necessarily required in an [EA]," in "situations where immediate site-specific consequences were foreseeable and ascertainable," those impacts require analysis. *Defenders of Wildlife v. Hall*, 807 F.

12

Supp. 2d 972, 987 (D. Mont. 2011). Here, the EA lacks such an analysis. It fails to address the foreseeable consequences of the Program – additional fur trapping – as well as the information provided by states and tribes that the Service requires and relies on to find harvest is not detrimental to the furbearers' survival.[7]

The Service cites to *Tri-Valley CAREs v. DOE,* 671 F.3d 1113 (9th Cir. 2012), but it is inapposite. There a site-specific analysis was not required because the environmental impact, *i.e.*, the "release of a pathogen," was the same nation-wide, as the materials and threat levels were consistent throughout the country. *Id.* at 1127. By contrast, here, the Service has acknowledged the need to "determine whether there are effects from the export, including locally" in making a non-detriment finding. AR2578. Moreover, the record evidences site-specific impacts that vary from state-to-state. *See, e.g.*, Plfs' Br. at 12-13 (documenting local concerns in Maine where "river otter harvest exceeded the maximum allowable harvest in several" areas). Thus, the Service cannot avoid analysis of the Program's

---

[7]   Intervenors argue the record contains the state-by-state analysis Plaintiffs seek. Ints' Br. at 10. While the record contains substantial factual information, it was neither disclosed to the public, nor analyzed by the Service as NEPA requires. *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1185 (9th Cir. 2008). The public should not have to sue to be privy to the information. Nor does *City of Mukilteo v. DOT*, 815 F.3d 632 (9th Cir. 2016) support Intervenors' argument. There, the Ninth Circuit noted in a NEPA case that "the starting point is the administrative record" – not the ending point. *Id*. at 636. The fact the record is voluminous does not itself cure an invalid EA. *Ctr. for Biological Diversity v. Forest Serv.*, 349 F.3d 1157, 1169 (9th Cir. 2003) ("mere presence of the information in the record" is not sufficient under NEPA).

direct effects under NEPA by claiming it "does not affect the physical environment" and at most has "tenuous effects on the furbearer market." Defs' Br. at 17.

Nor does the Service lack "the ability to prevent" detrimental trapping for export. *Cf.* Defs' Br. at 18 (citing *DOT v. Pub. Citizen*, 541 U.S. 752, 770 (2004)). The Service conditions approvals, AR15640 (to Texas explaining "[t]his finding carried conditions, which must be met for this finding to be valid"), and denies program approvals noting additional measures or information that is required. *See, e.g.*, AR8677 (Idaho not approved where the Service "cannot determine if Idaho has a population monitoring program currently in place for river otters").[8] Similarly, the record establishes that the Service can retract its approvals. *See, e.g.*, AR2167 ("finding is valid through" a certain "harvest season unless we receive new or additional information regarding the species' status or management by the States or Tribes that suggests this finding should be modified"). Thus, the Service regulates and allows exports and, thereby, affects trapping levels, but fails to analyze the direct, local, and site-specific effects of that authorization as NEPA requires.

---

[8]   *See also* AR17182 ("until we receive [annual harvest] information, we will be unable to issue export permits for bobcat harvested in West Virginia"); AR14043 (same to New Jersey about river otter harvest); AR2126 ("to be approved . . . must have a management program that regulates a sustainable harvest").

14

**2.      The EA Fails to Adequately Analyze Bycatch and Indirect Effects**

The EA fails to provide any analysis to support the Service's conclusion that bycatch of CITES furbearers is not significant, and it ignores impacts that trapping for export has on non-CITES listed species. Plfs' Br. at 14-15. In response, the Service makes two contradictory arguments. First, it asks for deference for its representation that "[e]ven if the Export Program affected bycatch . . . [it] has not reached noteworthy levels." Defs' Br. at 21. Given the volume of furbearer exports from the United States and the overlapping ranges of furbearers and other animals caught in traps, the Service cannot simply assert the indirect impacts of the Program are not "noteworthy." The Service must supply the requisite analysis to support it; otherwise, it asks the Court to "defer to a void." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010) ("Here, the BLM used no method to analyze or plan for the management of such values. We cannot defer to a void.").

Second, the Service argues its "Program does not cause bycatch in any fashion." Defs' Br. at 20. This contradicts the Service's first argument and is belied by the record, which shows that by allowing fur exports, the Program results in additional trapping beyond what the domestic market would support. *See supra* at 2-6 (providing record citations). As Plaintiffs demonstrated, Plfs' Br. at 14-15, additional trapping for export has deleterious consequences for both CITES-listed and other wildlife, which are unintentionally caught by traps. Thus, the Program

15

has indirect effects such as bycatch impacts that have not been analyzed as NEPA requires.

### 3.    The EA Fails to Provide Sufficient Information to Evaluate Whether the Program Complies with CITES Requirements

An EA must fully evaluate whether a proposed action complies with substantive law. 40 C.F.R. § 1508.27(b)(10) (EA must evaluate whether "the action threatens a violation of Federal . . . law" to determine whether action is significant); *Sierra Club v. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988). The Service agrees, noting that "the requirement applies 'regardless' of the action's ultimate compatibility with competing sources of law." Defs' Br. at 23 (*citing Pub. Citizen v. DOT*, 316 F.3d 1002, 1026 (9th Cir. 2003) *rev'd on other grounds* 541 U.S. 752 (2004) (finding agency "had an obligation to consider whether its regulations *might* violate" state air quality regulations in its EA) (emphasis in original)).

As the Court is aware, CITES regulations require the Service to determine whether the export of furbearers will be "detrimental" to the species' survival, evaluating whether harvest is "sustainable," regulated pursuant to a "biologically based . . . management plan," and would lead to "significant . . . range loss" for the species. 50 C.F.R. § 23.61(a), (c); Plfs' Br. at 18-21. Under the Program, the Service makes these determinations by evaluating and approving individual state and tribal harvest schemes. 50 C.F.R. § 23.69(b); AR016; AR011. Yet the EA

16

provides *no* analysis of the species' state-wide population levels, harvest levels, or state harvest programs. It is thus impossible for the public to evaluate whether the Program complies with CITES requirements. Plfs' Br. at 18-21.

Instead of identifying where this substantive analysis appears in the EA, the Service complains that Plaintiffs expect the Service to evaluate its approval of the various states and tribes into the Program. Defs' Br. at 24 (arguing the EA need not evaluate Service's decisions "to admit" states into Program). Yet it is *the Service* that chose to implement the Program on a state-by-state basis, and chose to evaluate that entire Program in an EA. AR003-04 (final EA: "we have decided to prepare an EA under NEPA on our CITES export program"); 50 C.F.R. § 23.69(b) (describing Program and required findings, including state and tribal "approval[s]," tagging, and annual reporting); AR008-010 (EA describing export program including state and tribal "approval[s]," tagging, and annual reporting).[9]

The Service attempts to distinguish controlling cases by noting that in *Public Citizen* and *Sierra Club*, the federal defendants "entirely ignored" relevant substantive legal requirements. Defs' Br. at 24. But here, at most, the EA merely

---

[9]   Even if the Service were correct that it need not evaluate its decisions to *approve* state and tribal programs, it does not appear to contest that the EA must evaluate its "annual determinations" that each approved state and tribal harvest program continues to meet CITES' non-detriment standard. AR016 (final EA: "approved States and Tribes qualify for export through annual determinations by the Service"); 50 C.F.R. § 23.69(b)(3). The EA is bereft of this state-by-state and tribe-by-tribe analysis.

17

acknowledges the CITES regulatory requirements. AR008-010. But simply citing a legal standard is not sufficient; agencies must provide a "convincing statement of reasons" why the significance factors have not been triggered. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). The Service fails to convincingly describe how its approvals and determinations actually comply with regulatory requirements. 40 C.F.R. § 1508.27(b)(10).

### 4.    The EA Fails to Analyze Cumulative Effects of the Program

The EA also fails to provide the necessary analysis of the Program's cumulative effects. *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993-94 (9th Cir. 2004) (cumulative impacts analysis "requires 'some quantified or detailed information; . . . general statements about possible effects and some risk do not constitute a hard look'" (internal citation omitted)). As the Program allows access to the international market and regulates furbearer exports through state approvals and non-detriment findings, there are significant cumulative effects documented in the record that are not disclosed or analyzed in the EA.

The EA fails to analyze the effects of trapping in the context of the myriad of other impacts CITES-listed furbearers face including from being caught in traps set for other species. Plfs' Br. at 17. The Service dismisses these impacts as "baseless," advocating again that the Program is administrative, Defs' Br. at 22, but a non-detriment finding requires consideration of the status of the furbearers

18

being analyzed, *see* 50 C.F.R. §§ 23.61; 23.69(b)(3); *see also* AR034 (EA noting

that non-detriment "determinations . . . must [be made] to allow export of

specimens of these species under CITES"). Moreover, the record contains the

information necessary for this analysis, the Service simply failed to consider the

"incremental impact" of the Program along with all other impacts to furbearers

under NEPA. 40 C.F.R. § 1508.7.

### 5.  The Incidental Take Statement Required NEPA Analysis

The Service prepared a biological opinion and incidental take statement for

the CITES Export Program because, as Service employee Bridget Fahey testified,

"but for the [Service] authorizing states to trap and export bobcat, Canada lynx

would not be in a position to be accidentally trapped by a proposed action."

AR24589. In issuing the incidental take statement, the Service chose to extend

immunity for incidental take of lynx to the states and tribes it approved to

participate in the Program. Thus, it was required to analyze under NEPA the

environmental effects of choosing to do so. *Ramsey v. Kantor*, 96 F.3d 434, 444

(9th Cir. 1996).

This makes sense, because granting take immunity this way is the

"functional equivalent" of an incidental take permit, *id.*, and such a permit must

undergo NEPA analysis. *See, e.g.*, *Friends of the Earth v. Jantzen*, 760 F.2d 976,

986-989 (9th Cir. 1985) (upholding EA for incidental take permit). Indeed, this

Court has cited *Ramsey* and held "the issuance of an incidental take statement is a major federal action for the purposes of NEPA." *Friends of the Wild Swan v. Babbitt*, No. CV 96-172-M-DWM, Doc. 67 at 15 (D. Mont. Oct. 14, 1997), *aff'd on other grounds*, 168 F.3d 498 (9th Cir. 1999).

The Service asserts it was not required to analyze the statement under NEPA because in *Ramsey*, the states issued "federal-type permits under a unique federal compact," and that, in that case, if the relevant agency did not comply with NEPA, then the federal action [of issuing the statement] "would have evaded NEPA altogether." Defs' Br. at 32 (citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 644 (9th Cir. 2014)). That is exactly what has happened here: the Service has not reviewed its authorization of take immunity under NEPA. The Service continues that the "federal components of CITES permitting have already undergone NEPA review or are categorically excluded from that review." Defs' Br. at 33. Both of those assertions miss the point as they fail to excuse the lack of a NEPA analysis for the authorization of take immunity.

## 6.    An EIS Is Required

An EIS is required because trapping for export under the Program causes significant impacts to an ESA-listed species and has cumulative impacts. 40 C.F.R. § 1508.27(b)(9), (7). It is undisputed that lynx have been incidentally taken in traps set for bobcats and wolves, including in Montana, Idaho, Minnesota, and Maine.

20

Plfs' SOF ¶ 43. Actual incidental take is likely higher than officially reported; the Service has found there is "little likelihood" that trappers will report bycatch of lynx. AR21002. The significant cumulative impacts and impacts on lynx trigger the requirement to prepare an EIS. Plfs' Br. at 21-22. Such impacts are not merely "cherry picked" data, Defs' Br. at 25, but instead meet the regulatory criterion that triggers the need for an EIS. 40 C.F.R. § 1508.27(b)(9).

Further, the EA's purported cumulative impacts section fails to address the "other past, present, and reasonably foreseeable future actions" impacting furbearers. *Id.* § 1508.7. Yet, the record evidences that furbearers face not only traps but also other government programs that eliminate wildlife, AR23234-23235; habitat loss, AR10174; drought, AR13794; water pollution, AR9240; and disease, AR14464. These impacts along with the trapping of furbearers for export result in significant cumulative impacts that require evaluation in an EIS. 40 C.F.R. § 1508.27(b)(7).

### 7.    Plaintiffs Exhausted Their Administrative Remedies

The Service asserts Plaintiffs failed to exhaust their bycatch and cumulative impacts claims in their comments on the EA. Defs' Br. at 19, 22. That is incorrect: Plaintiffs commented on both issues. AR23231 (Center raising beaver bycatch); AR23232 (Center raising bycatch of beavers, lynx, and other species); AR23233-36 (Center raising cumulative effects); AR23425 (Guardians raising bycatch of

lynx); AR23426-27 (Guardians raising bycatch of species including wolverines and related issues); AR23426; AR23430 (raising cumulative effects). As the Ninth Circuit has held, "[a]ll that is required" to exhaust remedies under NEPA is that commenters "alert[ ] the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Or. Nat. Desert Ass'n*, 531 F.3d at 1141 n.23 (internal quotation omitted). Plaintiffs' bycatch and cumulative effects claims have been clearly exhausted and are properly before this Court.

## C.    The Service Violated the ESA

As noted, the Parties agree the Service issued an incidental take statement that gives states and tribes immunity for incidental take of lynx due to bobcat trapping. Plfs' Br. at 23; *see Ctr. for Biological Diversity v. Otter*, No. 1:14-cv-258-BLW, 2018 WL 539329, *2-3 (D. Id. Jan. 24, 2018). This case challenges whether the statement is lawful. It is not for multiple reasons.

### 1.    The Statement Cannot Immunize Take Due To Trapping

Plaintiffs acknowledge that under Section 7 of the ESA, a non-federal entity may gain take immunity under a statement. However, that can occur only where a federal agency has both analyzed the non-federal activity that may result in take, and set mandatory conditions for the activity to minimize take. *Ramsey v. Kantor*, 96 F.3d at 438 (states gain immunity for licensing fishing that takes salmon under a

"unique, judicially-created, federal-state-tribal compact that controls, through a consent decree, fishing"); *Friends of the Wild Swan v. Babbitt*, No. CV 96-172-M-DWM (D. Mont. Oct. 14, 1997) (Doc. 67 at 1 & 6) (timber company gains immunity where Service approved a "conservation agreement" with standards for how logging would occur in grizzly bear habitat). However, as Plaintiffs explained in their opening brief, the Service has not imposed control of or standards for trapping related to lynx that enable it to extend immunity for incidental take of lynx. Plfs' Br. at 23-25; AR020 (EA asserting Service has no control and admitting that nothing in the statement adopts or requires any management standard for trapping).

The Service responds that states and tribes are "plainly applicants" under 50 C.F.R. § 402.02 and, therefore, the statement "plainly" applies to them. Defs' Br. at 33 n.5. This defense fails because neither of the tests under Section 402.02 is met. First, the states and tribes are not "applicant[s]," because they do not require "formal approval or authorization from a Federal agency as a prerequisite to conducting *the action*" that directly causes incidental take, which is trapping. *Id*. (emphasis added). Second, state and tribal trapping is not "authorized, funded, or carried out, in whole or in part, *by Federal agencies*." *Id*. (emphasis added); *see* Defs' Answer, Doc. 62 ¶ 37 (Service does not "authorize," "regulate or control," "fund," or "carry out," "in whole or part," bobcat trapping).

23

However, the Ninth Circuit has held that a non-federal entity may gain take immunity under a statement even if it is *not* an applicant for a federally-authorized or funded action under 50 C.F.R. § 402.02. *Ramsey*, 96 F.3d at 441-42. But the federal agency that issues the statement must analyze the non-federal action, and set mandatory conditions to minimize incidental take. The Service admits it did neither here.[10]

Finally, neither the Service nor Intervenors respond to Plaintiffs' argument that the statement itself proves it cannot cover trapping. The statement provides that if the trigger is exceeded, "*any operations* causing such take must cease pending reinitiation." AR21004 (emphasis added). But the "operations" that would cease under the statement are bobcat exports. State and tribal trapping would continue; so the statement cannot extend take immunity for that "action."

## 2.    The Statement Lacks a Clear "Trigger" for Take

A "trigger" must set a "clear standard for determining when the authorized level of [incidental] take has been exceeded." *Ariz. Cattle Growers v. FWS*, 273

---

[10]   Intervenors assert the statement "contemplates" state and tribal trapping and, therefore, sufficiently "analyzes" them. Ints' Br. at 19. However, in *Ramsey*, the Ninth Circuit noted the agency based its statement on its *analysis* of the Columbia River Fish Management Plan, which apportions fishing rights among states and tribes and, importantly, sets mandatory "terms" that state and tribal regulations must comply with. *Id.*, 96 F.3d at 438. Here, the Service does not assert it reviewed state or tribal trapping programs vis-a-vis take of lynx, and it admits it has not set mandatory terms state or tribal trapping programs must comply within its take statement.

F.3d 1229, 1249 (9th Cir. 2001). Plaintiffs allege the trigger of "two lynx killed and two lynx injured annually" due to trapping is ambiguous, because the conjunctive "and" may be interpreted to be mean the trigger is met only if *both* two lynx are killed and two lynx are injured. Plfs' Br. at 3. The Service now concedes the trigger is "not entirely clear," and is "subject to" that interpretation, but that in deposition testimony in *Otter* (not made publicly-available in a revised statement), it "clarified" that the trigger is met if two lynx are killed *or* if two lynx are injured. Defs' Br. at 27; *see* AR24595; AR24618; Ints' Br. at 19.

But the trigger remains ambiguous for a second reason Plaintiffs identified: the word "annually" could be interpreted to mean the requisite lynx take in any single year, or that it must repeat in some (undefined) number of successive years.[11] *See* Plfs' Br. at 26. If in fact the trigger is met if two lynx are killed *or* two lynx are injured *in any single year* during the existence of the statement, it should clearly state that.[12] Plaintiffs are entitled to summary judgment that the trigger was in one respect, and remains in a second respect, unlawfully unclear.

---

[11]   The current statement is an indefinite extension of the prior, 10-year statement, which provides that "two (2) lynx may be killed and two (2) lynx injured annually due to trapping *over the 10-year term* of this biological opinion." AR21002 (emphasis added).

[12]   That is the interpretation of Service staff. AR24595 (deposition testimony that trigger is met if two lynx are injured "in a single year").

### 3.    "Injured" is Not Based on Best Available Science

Plaintiffs allege the "injured" standard in the statement is not based on the best available science. 50 C.F.R. § 402.14(g)(8). It is undisputed that generally, trappers first discover a trapped lynx. AR20997. A veterinarian who traps wildlife for research and removal asserts the health of lynx cannot "be accurately evaluated by observing the animal in the trap, or as it dashes away after release;" it may still be seriously injured. AR24540-41.[13] The Service found the same thing: "[I]t is difficult to detect some trap related injuries (e.g., the more serious injuries such as luxation, fractures, mild freezing) in a field setting." AR24042. It is also undisputed that a Montana trapper caught and released a lynx he thought was "apparently uninjured," but it was later found dead close to a bobcat set. AR20997.

The Service miscasts this challenge as a reporting issue. Defs' Br. at 28, which it is not. The problem is the Service chose a standard that trappers are not qualified to assess, as demonstrated by the best available science. That is precisely why, elsewhere, the Service required Maine trappers to contact state officials before releasing a trapped lynx, so "adequately trained wildlife biologists" could respond and "assess the potential for injuries prior to release." AR24361-62.

---

[13]   The Service suggests the veterinarian's comments are "post-decisional," Defs' Br. at 28, and should not bear on the statement. If so, this highlights why the Service should have prepared a NEPA analysis before extending take immunity to the states and tribes.

Nonetheless, the Service asserts "[t]rappers are largely capable of recognizing injuries to captured animals." Defs' Br. at 28 (citing AR21000). That citation says that of 18 lynx "expected" to be "reported and unreported" as trapped in one year, "some" were "released alive but injured from traps, and may have survived." AR21000. But that proves only that trappers did not know whether a trapped, injured, and released lynx may have died. The Service also cites AR20809-833, Defs' Br. at 28, but these are reports from Maine, where trappers must contact state authorities if they trap a lynx. Those reports show that qualified officials responded to assess, treat, or release lynx. AR20809 ("biological staff" assessed); AR20818 ("Vet examined" lynx). The defending parties have no answer as to how trappers can accurately assess injury and obviate further harm to lynx.

### 4.    The Service Fails to Ensure Accurate Reporting

A trigger "is useful only insofar as the agency is capable of quantifying take." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010). The defending parties agree a statement must require reporting of lynx take to ensure the trigger is not exceeded. Defs' Br. at 29; Ints' Br. at 21. But they do not respond to the fact that the Service found "incidental take of lynx will be difficult to detect because there is little likelihood that trappers would report bycatch of lynx." AR21002. Indeed, in 2001, after 20 years of bobcat pelt exports, only *one* lynx bycatch was reported. AR20999. Yet, the Service asserts this does not matter,

27

because the amount of authorized permissible take anticipates trappers will not report. Defs' Br. at 28. But even that assumption does not account for the fact that states and tribes also do not report. AR24546; AR20429. In sum, the Service asks this Court to approve a "reporting" system where, indisputably, reporting is not done.

This case is not like *Western Watersheds Project v. FWS*, No. 4:13-cv-176-BLW, 2014 WL 4853200 (D. Id. Sept. 29, 2014), where the court upheld difficult monitoring of take of bull trout across what it called a "huge" livestock allotment. *Cf.* Defs' Br. at 29. Lynx are not like fish; a habitat surrogate is not needed to know if a lynx is trapped. Here, the Service did not base its approval of exports of bobcat pelts from states or tribes on any ramifications if they or the trappers they license do not accurately report trapped lynx.

### 5. The Statement Illegally Fails to Minimize Incidental Take

The Parties agree a statement must specify "reasonable and prudent measures" "necessary or appropriate to minimize" the impact of incidental take, and that the statement requires the Service to provide states and tribes with "information" related to lynx, AR21002, and a brochure for trappers to read. AR21002-03. But "the fact that a trapper may not have followed the discretionary, unenforceable recommendations" in the brochure is meaningless if he traps a lynx;

"[t]rappers are not even required to read" it. *Animal Prot. Inst. v. Holsten*, 541 F.

Supp. 2d 1073, 1080 (D. Minn. 2008).

Plaintiffs noted measures to minimize harm from take of lynx, such as

reasonable trap-check intervals, or having qualified staff respond to assess trapped

lynx. Plfs' Br. at 30. Yet the Service defends handing out a brochure as good

enough to minimize incidental take of lynx, because CITES "has a limited role as a

mechanism for streamlining export permitting and its minimal connections to

trapping or trapping permits themselves." Defs' Br. at 31. None of that is true, but

even if it is, the Service cannot then legally, at the same time, extend immunity to

states and tribes for incidental take of lynx by their licensed bobcat trappers. The

Service admits that in its role solely controlling bobcat pelt exports, it has not

placed conditions on the activity – bobcat trapping – to reduce lynx take. As such,

it cannot at the same time comply with its duty to establish "measures," and "terms

and conditions" that meaningfully "minimizes" such take.

## D.    The Court Should Vacate and Remand

The opposing parties do not dispute that under the APA, vacatur and remand

are "the normal remedy for unlawful agency action." Defs' Br. at 33-34; Ints' Br.

at 23; *see Se. Alaska Conserv. Council v. Army Corps of Eng'rs*, 486 F.3d 638, 654

(9th Cir. 2007) (stating standard). However, Intervenors assert vacatur is

inappropriate because "Plaintiffs previously disavowed any request or need for

29

injunctive relief." Ints' Br. at 23. A request for vacatur is not a request for an injunction. *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1186 (9th Cir. 2004); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of [an agency's] deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted").

For its part, the Service objects to vacatur and remand on the basis that *Plaintiffs* fail to establish an exception to the normal rule. Defs' Br. at 33 (citing *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)). That, however, is the Service's job. *Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, *13 (N.D. Cal. June 20, 2016) ("[G]iven that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted"). Regardless, this case does not present grounds for an exception under *California Communities*. In that case, as this Court has noted, the Ninth Circuit declined to order the normal remedy under the APA because doing so "could result in blackouts, 'economically disastrous' results, and require extensive legislative remedies." *Save Our Cabinets v. U.S. Dep't of Agric.*, No. 9-16-cv-00053-DWM, Doc. 74 at 3 (D. Mont. June 29, 2017) (citation omitted). No such drastic consequences are present here.

30

Instead, vacatur of the EA with instructions to prepare an EIS will give the Service another chance to comply with NEPA, taking into consideration this Court's ruling. Similarly, vacatur of the incidental take statement and biological opinion would allow the Service to update those documents to reflect current data and understanding of the Program, and ensure that appropriate measures are adopted to minimize further take of lynx.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment, vacate the NEPA and ESA documents, and remand this matter to the Service with instructions to prepare an EIS.

Date: April 20, 2018.              Respectfully submitted,

                                   /s/ Peter M.K. Frost
                                   Peter M.K. Frost
                                   Sarah McMillan

                                   Attorneys for Plaintiff WildEarth Guardians

                                   /s/ Sarah Uhlemann
                                   Sarah Uhlemann
                                   Tanya Sanerib
                                   Kristine Akland

                                   Attorneys for Plaintiff Center for Biological
                                   Diversity

**Certificate of Compliance**

Pursuant to L.R. 7.1(d)(2)(E) and the Court's Order of September 26, 2017

(Doc. 73), I hereby certify this brief contains 7,425 words.

Date: April 20, 2018.          /s/ Peter M.K. Frost
                               Peter M.K. Frost

**Final Environmental Assessment: Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)**

**Prepared by:**

**Wildlife Trade and Conservation Branch**

**Division of Management Authority**

**U.S. Fish and Wildlife Service**

**5275 Leesburg Pike**

**Falls Church, VA 22041**

**May 18, 2017**

000001

*Introduction*

Some native furbearers are listed under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES, Convention), including bobcat (*Lynx rufus*), river otter (*Lontra canadensis*), Canada lynx (*Lynx canadensis*), gray wolf (*Canis lupus*), and brown bear (*Ursus arctos*). These species have been listed in CITES Appendix II since the 1970s. Export from the United States of specimens of CITES Appendix-II species requires a CITES export permit issued by the U.S. Fish and Wildlife Service (Service). The Service may not issue a CITES export permit unless we are able to determine that the specimens to be exported were legally acquired and that their export will not be detrimental to the survival of the species. Since these five U.S. furbearers were first listed under CITES, the Service has worked with States and Tribes to develop a program to ensure that we are able to meet our obligations under CITES and allow export of these species.

This Environmental Assessment (EA) analyzes the environmental impacts of the "no action" alternative (maintaining the Service's CITES Export Program in its current form), which is also the Service's preferred alternative, the "no tag" alternative (eliminating the use of Service-issued tags on skins for export), the "no permit" alternative (prohibiting the export of these species) and the "no approved CITES export program" alternative (eliminating Service approval of State or tribal programs). The Service published a draft EA (82 FR 13360, March 10, 2017, Docket No. FWS-HQ-IA-2017-0012) and announced a 30-day comment period. In announcing the availability of the draft EA, the Service was interested in public comment on whether the proposed action would have significant environmental effects that should be considered under the National Environmental Policy Act (NEPA), 42 USC § § 4321-4345.

000002

In response to the public comments received, we have included additional information about the basis for our findings underpinning the CITES Export Program (CEP), including the following documents attached to this final EA:

- Recent CEP Export Non-detriment Findings, see Appendix 8

- CEP Fur Export Summary Reports, 2001-2015 (bobcat, Canada lynx, river otter), 2003-2015 (brown bear, gray wolf), see Appendix 2

- Biological Opinions, Canada lynx (bobcat trapping), see Appendix 4

- Sample of State and Tribal Annual Reports, see Appendix 11

Our regulations at 50 CFR 23.69(e)(1) describe the application process for obtaining a permit to export furs acquired under the CEP.  Applicants complete and submit Form 3-200-26, which was specifically developed for export of specimens taken from a State or Tribe participating in the CEP.  The applicant is required to include a complete list of the CITES tag numbers for the pelts to be exported and those tag numbers will then be included on any permit issued.  This allows us to streamline the permitting process since the tags demonstrate that the pelts were legally taken under the CEP and a non-detriment finding for the CEP has already been made.

Under the Department of the Interior (DOI) policy and procedures, the issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife or plants, including permits involving species listed under CITES, are categorically excluded from the requirement for preparation of an EA or an EIS under NEPA when such permits cause no or negligible environmental disturbance (Departmental Manual, Part 516, Chapter 8.5(C)(1).  Although the export program for certain native furbearers is directly tied to CITES permitting, we have

3

decided to prepare an EA under NEPA on our export program for certain native furbearer species to help us conduct a thorough review of all relevant factors and potential impacts on the quality of the human environment as envisioned under NEPA.

*Background*

CITES entered into force in the United States on July 1, 1975.  27 U.S.T. 1087 (March 3, 1973).  Today, there are 183 Parties to CITES, including the United States, that implement CITES.  CITES is an international agreement among governments that provides a framework for regulating international trade in listed animals and plants, including their parts and products, to ensure the trade is legal and does not threaten the survival of the species.  CITES regulates both commercial and noncommercial international trade through a system of permits and certificates that must be presented when leaving and entering a country with CITES specimens.  Species are listed in one of three CITES Appendices, which provide different levels of protection and regulation.  The text of the Convention and the official list of all species included in its three Appendices are available from the CITES Secretariat's website at http://www.cites.org.

Appendix I includes species threatened with extinction that are or may be affected by international trade, and are generally prohibited from commercial trade.  Appendix II includes species that, although not necessarily threatened with extinction now, may become so unless the trade is strictly controlled.  Appendix II also includes species listed due to similarity of appearance or other factors.  (See CITES Article II(2)(b) and 50 CFR 23.89.)  Most CITES species are listed in Appendix II.  Article IV of the Convention lays out the requirements for the trade of specimens of species included in Appendix II.  Appendix III includes native species,

4

identified by any Party, that are regulated to prevent or restrict exploitation, where the Party requests the help of other Parties to monitor and control the trade of the species.

Section 8A of the Endangered Species Act of 1973 (ESA), as amended (16 U.S.C. 1531 et seq.), designates the Secretary of the Interior as the U.S. Management Authority and U.S. Scientific Authority for CITES.  These authorities have been delegated to the Service.  The Service's Division of Scientific Authority (DSA) provides scientific advice and the Service's Division of Management Authority (DMA) administers the CITES permitting program.  U.S. CITES implementing regulations are found at 50 CFR part 23.

Bobcat (*Lynx rufus*), river otter (*Lontra canadensis*), Canada lynx (*Lynx canadensis*), gray wolf (*Canis lupus*), and brown bear (*Ursus arctos*) have been listed in CITES Appendix II since the latter part of the 1970's[1] (bobcat, lynx, river otter: effective 2/4/77, bear and wolf 6/28/79.  These five species were all included in Appendix II based on their similarity of appearance to other CITES-listed species (under Article II 2(b)).  CITES documents are generally required for export of these species from the United States, including parts and products of these species.  Before a permit can be issued for the export of an Appendix-II species, the Service must be able to determine that the export will not be detrimental to the survival of the species and that the specimens to be exported have not been obtained in violation of laws for their protection.

As noted above, since these five U.S. furbearers were first listed under CITES, the Service has worked with States and Tribes to develop a program to ensure that we are able to further the purposes of CITES when we are able to make the required determinations that the

---

[1] See CITES species database available at: https://cites.org/eng.

5

specimens were legally acquired and that the export is not detrimental to the survival of the species.

Bobcat and river otter are commonly exported in considerable quantities, typically as fur skins, while the other species are exported in smaller numbers.[2]  When these furbearers were first listed, only nine States required tagging of bobcat and only five States required tagging of river otter.  No States had established seasonal limits on total legal harvest of any of the CITES furbearer species.  A working group of experts from both the Federal and State governments was assembled by the Service (Jan 23-25, 1978)[3] to determine what biological and management programs were needed to ensure that required CITES findings could be made for listed species.  The group's mandate was to determine as specifically as possible the biological information and management programs needed to ensure that harvests of bobcat, river otter and Canada lynx would not be detrimental to their survival or to the maintenance of the species at levels consistent with their normal roles in the environment.  The group decided at that time, among other things, that the State of origin should be required to tag every animal legally harvested.

In developing the CITES Export Program, we considered the recommendations of the working group and incorporated the following concepts:

- Export of these species from the United States is controlled by U.S. regulations implementing CITES.

- States and Tribes have broad trustee and policy powers to control and regulate the taking and possession of resident wild species within their boundaries.

---

[2] CEP Fur Export Summary Reports.
[3] Report of the Working Group on Bobcat, Lynx, and River Otter (March 28, 1978).

6

- Given the high trade volume for some of these species, it is more practical to develop non-detriment findings on a State-wide or tribal basis, where possible, rather than individual findings for each export of specimens of these species during the year.

- Recognition that the time required to make CITES findings on a shipment-by-shipment basis for export of these species would be disruptive to the normal movement of commerce in these species.

- States and Tribes wishing to participate in the CITES Export Program are required to develop a Service-approved tagging program that requires the tagging of the skins of these species for the skins to be eligible for export.  This tagging requirement is not a CITES requirement, it is a stricter domestic measure promulgated by the Service through the U.S. CITES implementing regulations.  Further, it only applies to skins destined for export and does not apply to skins held in the United States.

- U.S. CITES tags for these species will be non-reusable and have a standard legend imprinted on the tag indicating the State or Tribe of origin, unique serial number, and species.  The State or Tribe of origin demonstrates that a tagged pelt originated in a Service-approved State or Tribe.  A numbered tag system enables the State or Tribe of origin and the Service to determine actual harvest and export.

- Export of specimens of these species taken from States and Tribes that do not participate in the CITES Export Program is allowed, but CITES findings must be made on a shipment-by-shipment basis.

000007

The CITES Export Program was developed to provide an efficient framework for our permitting process for the export of these five native furbearers.  It is important to recognize that harvest is not authorized or facilitated by the Service or the CITES Export Program.  States and Tribes manage and control harvest of these species and the CITES Export Program facilitates the permitting process for export of these species that have been harvested in States or Tribes with approved programs.

Service regulations governing the export of bobcat, river otter, Canada lynx, gray wolf, and brown bear harvested in the United States are found at 50 CFR 23.69.  Our regulations allow States and Tribes to request approval of a CITES export program for these native furbearers.  States and Tribes set up and maintain management and harvest programs designed to monitor and protect CITES furbearers from over-harvest.  When a State or Tribe with a management program provides the Service with the necessary information, we make programmatic findings and have specific requirements that allow export under CITES.  We must still issue a CITES export permit for each export, but the programmatic findings and tagging program provide for a more streamlined and efficient permitting process.  A State or Tribe must provide sufficient information for us to determine that its management program and harvest controls are appropriate to ensure that CITES furbearers harvested within its jurisdiction are legally acquired and that export will not be detrimental to the survival of the species in the wild.

A State or Tribe seeking initial CITES export program approval must submit information to the Service, including: an assessment of the condition of the population (and a description of the types of information on which the assessment is based); current harvest control measures, including laws regulating harvest seasons and methods; total allowable harvest of the species; an indication of how frequently harvest levels are evaluated; tagging or marking requirements for

8

fur skins; and, if available, copies of any furbearer management plans or other relevant reports that the State or Tribe has prepared as part of its existing management program.  DSA has made range-wide non-detriment findings for bobcat and river otter.  For these two species, States and Tribes need only provide current harvest control measures, including laws regulating harvest seasons and methods, and tagging or marking requirements for fur skins.

If both DSA and DMA criteria for approval into the export program are met, the State or Tribe is approved for CITES export authority and DMA supplies the State or Tribe with serially unique CITES export tags specific to the State or Tribe.  These States and Tribes must, in turn, require that fur skins of the species for which they have export program approval are tagged prior to export with these serially unique, non-reusable tags as evidence of legal acquisition.  The tags signify that the requisite CITES legal and scientific findings have been made, streamlining the permit application process and reducing the paperwork burden on applicants and the Service. Under the CEP, the responsibility for managing these five native furbearers remains with the States and Tribes, while the ability to export these species is regulated by the Service and facilitated through the CEP.  Skins are tagged with Service-supplied U.S. CITES tags (indicating the State or Tribe of origin) in accordance with the protocol set up by the State or Tribe and approved by the Service.  The export of skins tagged with U.S. CITES tags is allowed, from any Service-designated port for wildlife, provided the exporter has applied for and received a valid CITES export permit (listing the tag numbers), which must accompany the exported skins.

A State or Tribe with an approved CITES export program must submit an annual activity report to the Service that includes, among other things, information on any changes in laws or regulations affecting these species.  Export of CITES furbearers from States or Tribes without an

000009

approved export program is allowed.  Applicants must follow the standard Service application

procedure and individual findings must be made before a permit can be issued.

In addition to being listed under CITES, the Canada lynx is listed under the ESA as

threatened wherever found in the contiguous United States (79 FR 54782).  Consequently, take

of Canada lynx is prohibited in the contiguous United States.   However, captive Canada lynx

(subject to conditions) may be taken and exported (65 FR 16052).  Under section 7 of the ESA,

DMA is required to conduct an intra-agency consultation on any federal action that may affect a

listed species.  In accordance with section 7(a)(4) of the ESA, to address incidental take of

Canada lynx in States or Tribes participating in the CEP,  we consulted with the Service's

Ecological Services program regarding the CEP's export authorization for legally taken bobcat

from approved States or Tribes.  We initiated consultation in 2001 and reinitiated consultation in

2012, which resulted in the issuance of a biological opinion (BiOp).[4]  This BiOp is still in effect

and concludes that implementation of the CEP is not likely to jeopardize the continued existence

of the Canada lynx across its range.  The BiOp includes an Incidental Take Statement (ITS)

indicating that incidental take of lynx is expected in the form of two lynx killed and two lynx

injured annually resulting from legal take of bobcat from approved States or Tribes participating

in the CEP.  Under the terms of section 7(b)(4) and section 7(o)(2) of the ESA, taking that is

incidental to and not intended as part of the agency action is not considered to be prohibited

taking under the ESA provided that such taking is in compliance with the ITS.  Since the

issuance of the BiOp, this threshold of two lynx killed and two lynx injured annually attributable

to legally taken bobcat from approved States or Tribes participating in the CEP has not occurred.

---

[4] Canada Lynx Biological Opinions (Bobcat trapping).

000010

Montana was approved for wolf export under the CEP on December 22, 2014.  In accordance with section 7(a)(4) of the ESA, to address incidental take of Canada lynx as a result of our approval of Montana's wolf program in the CEP,  we initiated consultation with the Service's Ecological Services program in July 2014, which resulted in the issuance of a biological opinion.[5]  The BiOp includes an ITS that incidental take of lynx is expected in the form of one lynx killed and an average of one lynx captured per year over a ten year period resulting from the legal take of wolf under Montana's CEP wolf program.  This BiOp is still in effect and concludes that implementation of the CEP for wolves in Montana is not likely to jeopardize the contiguous U.S. Distinct Population Segment of the Canada Lynx.

**Preferred Action ("No Action" alternative)**

In the draft EA, the Service proposed to continue operation of the CITES Export Program in its current form, which includes evaluating information provided annually by States and Tribes participating in the CEP, making the necessary CITES findings on a State, tribal, or even nationwide basis, and the mandatory tagging of skins of bobcat, river otter, Canada lynx, gray wolf, and brown bear prior to export.

**Purpose and need for the preferred action**

The purpose of the CEP is to provide a framework for the permitting system for the export of bobcat, river otter, Canada lynx, gray wolf, and brown bear harvested in the United States.  These species are listed in CITES Appendix II.  An Appendix-II listing is not a ban on trade, rather it provides a means to monitor and regulate international trade of listed species to

---

[5] Biological opinion, Canada Lynx (Montana wolf trapping).

000011

ensure that trade is legal and does not threaten the survival of the species in the wild.  As noted

above, export from the United States of specimens of CITES Appendix-II species requires a

CITES export permit issued by the Service.  Therefore, there is a need for the Service to develop

and maintain an efficient and effective framework for evaluating requests for permits to export

these native species.  In developing this EA, the Service considered **four** alternative actions,

including the *"preferred action" alternative*.  These alternative actions are described below.

Under each of these alternatives, the provisions and requirements of CITES would continue to

apply to these species.

**Alternatives**

***Alternative 1, the "preferred action" alternative***

        This preferred action is consistent with our current regulations at 50 CFR 23.69 and is

also the "no action" alternative.  The preferred action is to maintain the CITES Export Program

in its current form (see discussion under the *Background* section, above), which includes

evaluating information provided annually by States and Tribes participating in the CEP, making

the necessary CITES findings on a State, tribal, or even nationwide basis, and the mandatory

tagging of skins of these species prior to export.

        The species of furbearers included in this EA are managed by the wildlife agencies of

individual States and Tribes.  Each State and Tribe participating in the CEP has a program to

regulate the harvest of the CITES furbearers for which it is approved.  For the past 40 years,

beginning in 1977, the Service has reviewed information on population status, management, and

trade for these animals in every State and Tribe where they are harvested.  This accumulated

information, including available population estimates, demonstrates that these species, where

12

approved for export[6] [7] from the United States under the CEP, may be exported consistent with the fundamental principles of Article II and requirements of Article IV of CITES.  As detailed in DSA's non-detriment finding for the export of bobcat from the contiguous 48 States of the United States dated October 2, 2015[8], the available information suggests that the species is thriving and well-managed by the States and Tribes.  In a 2010 study cited by DSA in its finding, the population was estimated to be between 1,418,333 and 2,637,738 individuals across 68% of the species' range in the United States (Roberts and Crimmins 2010), which represents a population increase since the 1981 estimate of between 725,000 individuals and 1,017,000 bobcats in the United States (USFWS 1982).  Based on State and tribal reports to the Service, the U.S. bobcat population has remained stable since the Roberts and Crimmins (2010) population estimate.  Individual States and Tribes in the CEP have reported secure populations over the most recent 5-year time period.  Florida's bobcat population was reported to be impacted by development during this time period; however, the species was reported to be widespread and secure.  Bobcat populations continue to expand across much of their geographic range.

As detailed in DSA's general advice for the export of river otter from the contiguous 48 States of the United States, dated September 19, 2012 (see Appendix 8), the available information suggests that the species is secure in the United States and that the States and Tribes are managing the species sustainably.  In 2011, the Service, in cooperation with the Association of Fish and Wildlife Agencies (AFWA) conducted a survey of all 49 States within the species' range (see Appendix 8).  Responses to the survey showed that the river otter population trend was stable in 27 States, stable to increasing in 1 State, increasing in 18 States and unknown in 3

---

[6] States with Approved U.S. CITES Fur Export Programs.
[7] Tribes with Approved U.S. CITES Fur Export Programs.
[8] Recent CEP Export Non-detriment Findings (bobcat, river otter, Montana gray wolf).

000013

States (these 3 States do not implement river otter seasons).  No State in this survey reported a decline in river otter population abundance (see Appendix 8).  The IUCN Redlist classifies the North American river otter as "Least Concern" and its population trend as "stable."  The most recent (2014) IUCN status evaluation of the river otter indicates that current harvest strategies do not pose a threat to maintaining otter populations, although harvest may limit expansion of otter populations in some areas (http://www.iucnredlist.org/details/12302/0).  This assessment has been confirmed by States and Tribes that allow harvest, as their monitoring shows that river otter populations remain secure.

Gray wolves are only approved for export under the CEP in Alaska and Montana.  Alaska has reported to the Service no significant changes in gray wolf abundance (see Appendix 11).  Montana has reported to the Service that the gray wolf population is healthy and stable (see Appendix 11).  In Montana, wolf counts have been double that of recovery goals for almost a decade and minimum wolf counts have been 3-4 times that of recovery goals from 2007 through the present.  Montana reports a minimum of 536 wolves in 126 packs; these numbers are well above recovery goals.  In 2010, the IUCN Redlist classified the gray wolf as "Least Concern" and its population trend as "stable" (http://www.iucnredlist.org/details/3746/0).  This assessment covered all subspecies and populations.  Additional information on gray wolves in Montana is detailed in DSA's advice on the State of Montana's request for the export of gray wolves taken during the 2016-2017 and 2017-2018 harvest seasons dated September 20, 2016 (see Appendix 8).

Canada lynx are currently only approved for export under the CEP in Alaska.  Alaska has reported to the Service no significant changes in Canada lynx abundance (see Appendix 11).  In 2010, the IUCN Redlist classified Canada lynx as "Least Concern" and its population trend as

14

"stable" (http://www.iucnredlist.org/details/12518/0) because over most of its range it is widespread and abundant, it has been legally harvested for the international fur trade for more than 200 hundred years, and recent decades of managed harvests do not appear to have caused any significant population decline or range loss (Mowat *et al.* 2000).  This assessment covered all populations.

The preferred action will facilitate the continued efficient export of these species from the United States, thereby allowing access to international markets, while ensuring that export is not detrimental to the survival of these species.  The preferred action allows for regular review of State- and Tribe-approved export programs.  The U.S. CITES export program has proven to be effective over the past 40 years by conforming to the fundamental principles of Article II and implementing the requirements of Article IV of CITES, allowing the Service to further the purposes of CITES for these species when we are able to make the required determinations that the specimens were legally acquired and that the export is not detrimental to the survival of the species.

This action, and the Convention it implements, only applies to international trade.  The requisite CITES legal and scientific findings for the export of these species are based largely on data supplied by State and tribal conservation agencies, and have depended on the existence of State and tribal management programs for these species.  Mandatory tagging of exported pelts and issuance of export permits naming the species addresses problems of identification due to similarity in appearance, while at the same time providing a means to monitor approved State and tribal programs to ensure that export will not be detrimental to the survival of these species in the United States.  Continual monitoring by the Service enables us to detect any significant downward trends in the populations of these species and, where necessary, implement more

15

restrictive export controls in response.  This approach includes analyzing the best available

accumulated information bearing directly on the population status and trends for these species.

Thus, approved States and Tribes qualify for export through annual determinations by the

Service based on information provided by approved States and Tribes in their annual reports and

the tagging requirements for pelts to be exported.  These provisions, on which the export

program is based, help to ensure that we are only allowing export of these species when CITES

requirements are met, i.e., that only lawfully acquired specimens are authorized for export and

that the export will not be detrimental to the survival of the species.

    As the following charts demonstrate for bobcat and river otter (the most utilized species

in the CEP), not only has it not been necessary for the Service to impose additional export

restrictions for these species, based on evaluation of information provided by States and Tribes

and other available information, the Service has expanded export authority to States and Tribes

for these species in the intervening 40 years since the inception of the program.

000016

Chart 1.—*Total number of State programs approved for bobcat export.*



*New Hampshire Season: Closed 12/4/1980; California Season: Exports Discontinued 11/15/2015

000017

Chart 2.—*Total number of State programs approved for river otter export.*



*North Dakota: Incidental Only; Rhode Island Season: Closed since 2002

000018

Chart 3.—*Total number of Tribes approved for bobcat export.*



000019

Chart 4.—*Total number of Tribes approved for river otter export.*



The Service does not control or regulate State or tribal programs or impact harvest of or domestic trade in these species. States and Tribes exercise authority over the harvest and management of these species within their borders. States and Tribes provide data to the Service to qualify for the CITES Export Program on a voluntary basis. States and Tribes regulate the take of these species through their management programs. California, New Hampshire, and Rhode Island have discontinued the export of certain CEP species based on their own State management decisions.

The Service is responsible for ensuring that the provisions of CITES are being implemented and enforced effectively. To the degree that the Service can place confidence in the system provided for controlling trade, we can be satisfied that existing procedures are

20

adequate to ensure that specimens of one species will not be confused, intentionally or

unintentionally, with specimens of other species.  Tagging of pelts helps provide assurance that

specimens destined for international trade will be identified properly.  Without tags, pelts would

only be identified by paper documentation accompanying entire shipments.  For such shipments,

there would be many opportunities for confusing the identity of individual specimens.  In order

to be exportable under the CEP, skins of these species must be tagged before they are moved

from the State or Tribe of origin to accurately indicate their source and legality, as no alternative

method has been developed and approved under the CEP to provide us with the necessary

information to make the required findings to allow export under CITES.  Once pelts are moved

interstate through various auctions, and accumulated by dealers and exporters, determining the

origin of individual unmarked pelts becomes increasingly difficult and inaccurate, even if

accompanied with corresponding paper documentation.

### *Alternative 2, the "no tag" alternative*

Under this alternative, the Service would not issue tags or require skins to be tagged prior

to export.  Our current regulations require the tagging of the skins of these species (unless an

alternative method has been approved) for the skins to be eligible for export.  This tagging

requirement is not a CITES requirement, it is a stricter domestic measure promulgated by the

Service through our CITES implementing regulations.  Under our current regulations, at 50 CFR

23.69, the Service could institute a different legal acquisition verification system, including, for

example, a system that relies on paper record keeping at the State, tribal, or exporter level, if

such an alternative method is able to provide us with the necessary information to make the

required findings to allow export under CITES.  This could consist of affidavits or trapper diaries

or other bookkeeping methods that provide substantially the same information as the tagging

21

system.  This alternative is essentially a substitute for the tagging system.   It would require devising an entirely new chain-of-custody system, and require re-educating trappers, exporters, and State and federal law enforcement on the new system.  It could lead to multiple implementation systems, which could engender greater workloads, inefficiency, and confusion among program participants and regulators at the ports.

Elimination of the tagging requirement under this alternative may dilute efforts to effectively control trade in specimens of these species and related species or populations. Although the Service is not aware of conditions that could increase the take of specimens of other protected species and populations as specimens of legally obtained bobcat, lynx, river otter, brown bear, or gray wolf, specimens of these protected species can be intentionally substituted with specimens of these five CEP species.  For example, river otter pelts are difficult to distinguish from the pelts of some other otters.  Likewise, bobcat and lynx are difficult to distinguish from the endangered Eurasian lynx.  Consequently, enforcing trade restrictions for other spotted cats, otters, brown bear and gray wolves is made more difficult if export of these species is permitted without certain specific requirements.  For this reason, in part, we require tagging of pelts of these specimens to help ensure they are not confused with specimens of other protected species or populations.  In addition, it is possible that skins of native bobcats, river otters and other species currently included in the CITES Export Program, but that are from jurisdictions where legal harvest is prohibited, could be laundered into the legal trade.  Reducing Service oversight by eliminating tagging of the pelts of these species potentially dilutes the traceability of legally acquired specimens and could result in a larger volume of illegal pelts in international trade.

000022

Beginning in 2003, the Service conducted an extensive effort to increase the efficiency of the CITES Export Program for furbearers, which included exploring the feasibility of implementing the "no tag" alternative. A working group was formed consisting of personnel from the Association of Fish and Wildlife Agencies (AFWA), State agency wildlife biologists, Service wildlife biologists and administrators, State and Service law enforcement personnel, and representatives from the regulated fur harvest industry. The working group held five face-to-face meetings between September 2003 and April 2005 and concluded its work in September 2005. As a result of this effort, AFWA, among other things, proposed that the Service eliminate the specific requirement that these five species be tagged with CITES tags prior to export (essentially, the "no tag" alternative). In response, the Service amended CFR 23.69 in 2007 to include the language "unless an alternative method has been approved, each CITES fur skin to be exported or re-exported must have a U.S. CITES tag permanently attached," thereby allowing for the possibility for an approved alternative method to tagging to be developed and implemented. The Service expended substantial effort via the working group to identify an alternative system to tagging (e.g., paper documentation). However, this alternative was deemed unduly burdensome by the regulated industry, particularly in comparison to the current program, and thus was not implemented. To date, the CEP remains the best available system to facilitate the export of these five species while still conforming to the provisions and requirements of CITES. Enacting a paper documentation system would require a complete overhaul of the current system that has been in place and functioning for 40 years, has a strong basis in regulations, and provides a reasonable means to make determinations of legal acquisition.

***Alternative 3, the "no permit" alternative***

000023

This alternative would require the Service to revise 50 CFR 23.69 so that no export of these species legally taken from the wild is permitted.  Under the no permit alternative, these species and their parts and products taken from the wild could not be exported, even where the required findings to allow export under CITES can be made.

Elimination of export approval for specimens of these species taken from the wild would not further the purposes of CITES.  As noted above, a CITES Appendix-II listing is not intended to be a ban on trade.  CITES regulates international trade in listed animals and plants, including their parts and products, to ensure the trade is legal and does not threaten the survival of the species.  Operation of the CEP for these five species over the past 40 years, as detailed above, has demonstrated that the export of these species from the United States does not threaten their survival in the wild and may be authorized consistent with the fundamental principles of Article II and requirements of Article IV of CITES.  The "no permit" alternative would not further the purposes of CITES, when we are able to make the required determinations that the specimens were legally acquired and that the export is not detrimental to the survival of the species.

***Alternative 4, the "no approved CITES export program" alternative***

Under this alternative we would repeal 50 CFR 23.69 and instead allow the export of these species utilizing the process currently described in 50 CFR 23.69(a) for export of specimens harvested in States/Tribes without an approved program:  "For specimens that were harvested from a State or Tribe without an approved CITES export program, see §23.36 for export permits and §23.37 for re-export certificates."  Under the "no approved CITES export program" alternative, the Service would no longer approve State or tribal programs, but individuals could still apply for permits on a case-by-case basis for each specimen to be

24

000024

exported.  This would require the Service to make legal acquisition findings and non-detriment

findings for each specimen to be exported (instead of by approving States/Tribes), as is currently

required for specimens originating from States/Tribes without an approved program.  This

alternative would increase the length of time needed for exporters to obtain permits and would be

overly burdensome to both the Service and exporters.  For example, had this alternative been in

place in 2015, the Service would have needed to make legal acquisition findings for 30,315

bobcat skins and 10,368 river otter skins in that year, instead of relying on legal acquisition

findings made on a State or tribal basis based on the issuance of tags, as is the practice under the

CEP.  Currently, there is a nationwide non-detriment finding in place for these two species.

Where appropriate, the Service can evaluate range-wide status information of species (as has

been done for bobcat and river otter) to determine if such a nationwide finding could be made.

The Service has not made a nationwide non-detriment finding for Canada lynx, gray wolf, or

brown bear.

**Environmental impacts of the proposed action and alternatives**

The National Environmental Policy Act (NEPA), 42 U.S. C. § § 4321-4345, recognizes

"the profound impact of man's activity on the interrelations of all components of the natural

environment" and calls for the federal government to use all practical means and measures to,

among other things, "create and maintain conditions under which man and nature can exist in

productive harmony."  NEPA § 101.  The Council on Environmental quality (CEQ) and DOI

have developed regulations implementing NEPA.  See 40 CFR Part 1500 and 516 DM 1-15.

CEQ regulations require that federal agencies consider the potential for a proposed federal action

to have direct, indirect, or cumulative effects on the quality of the human environment.  The

"human environment" is interpreted to include "the natural and physical environment and the

000025

relationship of people with that environment" (40 CFR 1508.14). "Effects" includes ecological, aesthetic, historic, cultural, economic, social, or health effects (40 CFR 1508.8). Agencies must consider both direct effects "which are caused by the action and occur at the same time and place" and indirect effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 CFR 1508.8. The significance of an action is to be analyzed considering both context (such as society as a whole, the affected region, the affected interests, and the locality) and intensity (the severity of the impact) 40 CFR 1508.27.

Under each of the alternatives considered, State and tribal harvest would continue to result in specimens of these species being removed from the wild. As noted above, the responsibility for managing these five native furbearers and regulating harvest remains with the States and Tribes, while the ability to export specimens of these species is regulated by the Service and facilitated by the CEP Program.

None of the alternatives considered, including the preferred alternative, will impact the physical environment in the United States. Possible impacts on the population status of these species are considered here. Prohibition of export (Alternative 3) would likely reduce the harvest of all five of these species. The extent to which an export prohibition would affect harvest is unknown. Prohibiting export would most likely increase domestic supply and lower wholesale pelt prices for these species in the United States. We do not know the extent to which supply, or harvest, of these species depends on price, although it is generally presumed that lower prices reduce harvest. A cursory, although not conclusive, analysis of pelt price and exports, conducted by the Service for the draft EA, suggests that as price goes down, exports also

26

are reduced (82 FR 13360, March 10, 2017).[9]  Several State wildlife agencies addressed this issue in their comments on the draft EA.  The North Carolina Wildlife Resources Commission (NCWRC) stated that declines in pelt prices on the international market result in declines in domestic pelt prices.  The Kentucky Department of Fish and Wildlife Resources commented that the relatively low numbers of trappers in Kentucky and poor fur market limit harvest.  The Missouri Department of Conservation noted that bobcat pelt prices during 2015-16 dropped by 42.2% and fewer bobcats were harvested.  They stated that they have documented a strong relationship between harvest (supply) and pelt prices (demand).  The New Hampshire Fish and Game Department reported that otter harvest and trapping effort have fluctuated over the years and are highly correlated with pelt price; catch per unit effort has changed little over time.

We do not have information nor did we receive any information during our public comment period on the draft EA demonstrating that the CEP stimulates the demand for these furbearers in international markets.  Also, we do not have information on the capacity of the U.S. domestic market to expand if export were not possible.  The potential exists for domestic stockpiling if export from the wild were not possible, but the extent to which this might occur is unknown.

As noted previously, all States and Tribes participating in the CEP have regulatory mechanisms to manage these species, thus the effects of an export prohibition might be negligible to their conservation.  It is not possible to describe with any confidence the environmental impacts of a prohibition on export of these species, even if population increases were to result.  It is also unknown to what extent such increases might affect populations of other

---

[9] Bobcat, lynx, river otter, brown bear, and gray wolf; price vs. U.S. exports (2013-2015).

000027

species in the affected ecosystems.  Because these five animal species are carnivores and none

has the high reproductive rate of certain herbivores, it is possible that no dramatic fluctuations in

their numbers would occur even if the effects of harvest were removed completely and

populations were left to other limiting factors of their environment.  Export restrictions may

reduce incentives for implementation of State and tribal conservation programs for these species.

In response to our public comment period, 21 States commented that export restrictions would

have a negative economic impact and/or a negative impact on the conservation of these species

(see the ***Comments from States*** section, below).

Not approving export might help alleviate harvest pressure on other protected species and

populations by reducing the opportunities for illegally traded pelts to be traded as legally

obtained pelts.  However, there is little evidence that this is occurring.  On the other hand, not

approving export might increase harvest pressure on other protected species or populations.  It is

uncertain to what extent any of the consequences of this alternative might occur.

While eliminating export of these species may or may not result in minor local population

fluctuations, the direct impacts within the United States will likely be economic.  The declared

value (retrieved 2/1/2017 from the U.S. Fish and Wildlife Service Law Enforcement

Management Information System database) in 2015 of U.S. exports of skins (not including re-

exports) of these five species totaled $4,309,995, broken down by species as follows: bobcat:

$3,830,097; river otter: $450,882; Canada lynx: $26,306; gray wolf: $2,410; brown bear: $300.

Given the higher price for pelts in foreign markets, permitting export increases the

economic value of these species in the United States.  This increased value provides incentives

for better State and tribal management programs.  Increased trapping activity contributes

28

additional funds to management programs through the sale of licenses (see the ***Comments from States*** section, below).  In addition, increased value may generate public support for sound management programs.

**Economic impacts of alternatives**

 ***Alternative 1, the "preferred action" alternative.***  Under the preferred "no action" alternative, our existing regulations at 50 CFR 23.69 remain unchanged and we continue to operate our current CITES Export Program for furbearers.  Economic activity would be unaffected by continuing the CITES export program under this alternative.

 ***Alternative 2, the "no tag" alternative.***  Under this alternative, export of these species would continue without the application of CITES tags to skins of these five species.  The economic consequences of not tagging pelts of these five species for export are uncertain.  However, eliminating the mandatory application of tags to specimens that are exported will result in a much more onerous, inefficient, complicated, and potentially more expensive, chain-of-custody documentation system for the regulated industry (see discussion of Alternative 2 under the **Alternatives** section, above).  This alternative would eliminate the need for the Service to procure CITES tags for these species for distribution to approved States and Tribes, which would result in a cost saving for the Service.

 ***Alternative 3, the "no permit" alternative.***  Under the no export alternative, 50 CFR 23.69 would be revised so that no export of these species, including their parts and products, is permitted.  This would result in the elimination of at least $4 million dollars of economic activity associated with the export of these species annually (2015 declared value).  Additionally, fur harvesters, fur dealers, and fur tanners who derive income from the sale of these five species

29

would lose revenue if these species could not be commercially exported.  It is uncertain what impact this alternative would have on the sale of hunting and trapping licenses for these species, although the absence of a foreign market would most likely lead to a decline in license sales (see the ***Comments from States*** section, below).  In 2015 (see Appendix 2), 80 brown bear trophies were exported from the United States with a declared value of $145,720.  Currently, brown bears in the United States can only be taken in Alaska.  A nonresident hunting license for foreign nonresident hunters for brown bear in Alaska is $1,300.00.[10]  Additionally, foreign nonresident hunters are required to employ guiding services.  Guide services for brown bear are advertised for anywhere from $15,000 to in excess of $90,000.  Consequently, we expect that the no permit alternative would have a negative economic impact on the revenues derived from foreign brown bear hunters in Alaska.

   ***Alternative 4, the "no approved CITES export program" alternative.***  Under the "no approved CITES export program" alternative*,* the Service would no longer approve State or tribal programs, but individuals could still apply for permits on a case-by-case base for each specimen to be exported.  As is the case with Alternative 2, under this alternative, export of these species would continue without the application of CITES tags to skins of these five species.  Likewise, the economic consequences of not tagging pelts of these five species for export are uncertain.  Eliminating the mandatory application of tags (necessary under the CEP) to specimens that are exported will result in a much more onerous, inefficient, complicated, and potentially more expensive, chain-of-custody documentation system for the regulated industry (see discussion of Alternative 2 under the **Alternatives** section, above).  Given this probable

---

[10] See http://www.adfg.alaska.gov/index.cfm?adfg=huntlicense.prices.

000030

outcome, it is reasonable to surmise that the $4 million in annual economic activity (2015 declared value) associated with these exports would be reduced.

This alternative would also eliminate the need for the Service to procure CITES tags for these species for distribution to approved States and Tribes, which would result in a cost saving for the Service.  In response to our public comment period on the draft EA, no commenters expressed support for Alternative 4.

**Cumulative impacts**

Cumulative impacts are those combined effects on the environment that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes the other actions (40 CFR 1508.7). We have considered possible cumulative impacts of the maintaining the CEP, and of the other alternatives, in preparing this final EA.

Continuing to approve the export of these five species might benefit other species of spotted cats and otters, and other populations of brown bear and gray wolf protected by CITES by reducing harvest pressures on potentially less well-managed populations.  Conversely, prohibiting export of these native furbearers may result in increased harvest pressure on less well-managed populations

In some States, license and other fees associated with harvest of furbearers provide funding for conservation projects and species management activities.  To the extent that the CEP provides an incentive to manage populations of these species sustainably, allowing the continued collection of harvest fees, the CEP provides cumulative benefits over time.  In addition, some

31

States indicated that the CEP tagging program provides them with the means to estimate population size and contributes to their knowledge of these species, which may also result in cumulative conservation benefits.

Some commenters indicated that a reduction in or prohibition on harvest of these species, considered pests in some locations, would likely result in increased conflict with humans. Examples cited included depredation of livestock by bobcats and wolves and depredation at aquaculture facilities by river otter.  Regulated and controlled harvest of these species can reduce the likelihood of conflicts with humans.  In addition, sustainable harvest provides income for trappers and others.  A managed harvest program, combined with the CEP, can provide cumulative benefits to the human environment over time.

We considered whether bycatch of non-target CITES-listed species under the CEP may result in cumulative negative impacts.  As noted above, all five of these species were listed under CITES on the basis of their similarity of appearance to other listed species.  Although the Convention does not include an explicit provision for considering impacts on other species, for species listed under Article II(2)(b), we do consider impacts on other CITES-listed species, since that is the specific purpose of such a listing.  The CEP provides us with the means to monitor the impacts of trade on all of these native CITES-listed furbearers, as they are all part of and evaluated under the CEP, to ensure that the species are maintained at a level consistent with their role in the ecosystems in which they occur and well above the level at which they might become eligible for inclusion in CITES Appendix I (as required under Article IV(3)).  Based on the information we have on the current status of these species, including information provided by States and Tribes participating in the CEP, we do not believe that bycatch of non-target CITES-

32

000032

listed species in traps set for other CEP species is resulting or will result in significant

cumulative negative impacts.

We also specifically considered bycatch of ESA-listed Canada lynx (lower 48

populations) in traps set for the other CEP species, including through consultation under Section

7 of the ESA.  This consultation resulted in two Biological Opinions (BiOp) for Canada lynx

(one is specific to wolf trapping in Montana under the CEP), which concludes that

implementation of the CEP is not likely to jeopardize the continued existence of the Canada lynx

either across its range or throughout the contiguous U.S. Distinct Population Segment of the

Canada Lynx.  (See response to *Comments 7, 14, 18* and *25*).  We will conference with the

Ecological Services program as appropriate under Section 7 of the ESA with regard to potential

impacts to other species, including wolverine (*Gulo gulo luscus*), proposed for ESA listing, and

fisher (*Martes pennanti*), which is under review for ESA listing.

While the CEP does not control State or tribal management programs, and does not

authorize or facilitate harvest or domestic trade of these species, it does facilitate the export of

specimens of these species harvested in the United States by providing a means for us to make

our required findings in advance for States and Tribes that are part of the program.  We do not

have information, nor did we receive any information in our public comment period,

demonstrating that the CEP stimulates the demand for these furbearers in international markets.

A number of States and Tribes reported that, whether or not the CEP is maintained, they

will continue to manage these species for the benefit of the species and the public within their

jurisdictions.  Others specifically pointed to the CEP as a benefit to the conservation of these

species.  For example, the Alaska Department of Fish and Game commented that the basis for

ensuring healthy populations of furbearers in Alaska does not rest with the CEP; it is enshrined

in the State's founding documents.  Alaska's constitution mandates management on a sustained yield basis for all species of wildlife and other renewable resources.  The Minnesota Department of Natural Resources reported that the incentive to manage these species is based on the inherent values of wildlife, their fiduciary responsibility to manage wildlife populations for future generations, and sound principals of conservation, not export markets.  The Missouri Department of Conservation commented that it has a mission to protect and manage the wildlife resources of the State; to facilitate and provide opportunity for all citizens to use, enjoy, and learn about these resources.  They report that Missouri's wild fur market has been monitored annually since 1940, with some information dating back to 1934 and that Missouri has seen tremendous fluctuations in the harvest of its primary furbearing animals as both market and social trends change.

The North Carolina Wildlife Resources Commission (NCWRC) stated that river otter populations, almost extirpated from the Western half of North Carolina by the 1950's, are now fully restored statewide due to restoration efforts and harvest regulations implemented by NCWRC.  The Illinois Department of Natural Resources reported that river otter and bobcat were once listed as endangered or threatened in Illinois.  Currently, bobcat and river otter are abundant in Illinois thanks to regulatory oversight and availability of suitable habitat.  Illinois asserts that the CEP as currently administrated contributed to this success.  The Michigan Department of Natural Resources stated that its goal is to maintain sustainable populations of bobcats and river otters while allowing for recreational opportunities for harvest and to ensure that populations of both species thrive.  Due to the management regimes in place in the States and Tribes participating in the CEP, and the determinations we must make to allow export of specimens of these species under CITES, we do not believe that the CEP is causing or will cause negative cumulative impacts to the conservation of these five CITES-listed furbearer species.

34

export controls in response.  In response to this comment and similar comments, in this final EA, we have included a sample of State and tribal annual reports (see Appendix 11).

*Comment 17:*  One NGO commented that the draft EA states that prohibiting the export of these species would likely reduce the harvest of all five of these species.  This commenter asserted that because most States and Tribes presumably know, based on annual or other periodic reports from trappers, how many Appendix-II species are trapped, snared, or otherwise caught, and the Service knows how many Appendix-II species are exported annually, it is feasible and reasonable that the Service collect the data to discern the extent to which authorizing the export of Appendix-II species is linked to their being trapped, snared, or otherwise caught.

*Response:*  We disagree.  In the absence of a prohibition on export, we cannot discern with any confidence the effects of such a prohibition.  Input from State wildlife agencies confirms that harvest levels are tied to pelt prices (see discussion in **Environmental impacts of the proposed action and alternatives**).  While we expect that prohibiting export would reduce harvest of all five of these species, we do not know how the domestic market for skins of these species might expand (or contract) if export were prohibited.

*Comment 18:*  Some commenters stated that lynx are extremely vulnerable to trapping and are often caught in traps set for bobcats and sometime wolves.  They reported that since lynx were listed as threatened under the ESA in March, 2000, at least 16 incidents of lynx being caught and sometimes killed in traps set for other species have been reported in Montana alone.  The draft EA does not consider or analyze the potential effects to an already small lynx population from the export program.

*Response:*  See our response to *Comment 14*.  Only three of the sixteen incidents the commenters are referring to are the result of trapping under the CEP.  All three lynx captured in

56

these incidents were released unharmed.  Lynx caught and released unharmed as a result of

bobcat trapping are not counted towards the threshold as detailed in the ITS of the BiOp.

*Comment 19:*  Several commenters provided extensive comments about wolverines,

including that the Service has proposed wolverines for listing under the ESA and, as such,

conferencing is required under Section 7 of the ESA.

*Response:*  DMA is reviewing our obligations with regard to wolverine and fisher and

will conference with the Ecological Services program as appropriate under Section 7 of the ESA.

*Comment 20:*  Several commenters asserted that the draft EA fails to disclose or analyze

how many exports, and of what species, the Service has authorized on a "shipment-by-shipment"

basis, and the environmental effects thereof.  How can the Service approve such exports without

requisite information from the State or Tribe in which the species was caught, in order to

determine that it was caught legally and its export will not be detrimental to the species?

*Response:*   The commenter is correct that we are not able to issue an export permit for

specimens of a CITES Appendix-II species if we are unable to determine that they were legally

acquired and that the export will not be detrimental to the survival of the species.  If we do not

have the relevant information available (as we do for States and Tribes participating in the CEP)

we would seek the information necessary for us to make our findings on a shipment-by-shipment

basis.  We receive very few applications to export pelts of these CITES furbearers taken in areas

outside of the States and Tribes covered by the CEP and have issued no export permits for such

pelts during at least the last five years.  We note that of the 600 public comments we received on

the draft EA, we note that none expressed support for Alternative 4.

000057

**Environmental Assessment: Exports of Certain Appendix II Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)**

*Introduction*

The U.S. Endangered Species Conservation Act of 1969[1] directed the Secretaries of the Departments of Interior and State to seek the convening of an international ministerial meeting on fish and wildlife prior to June 30, 1971, and the signing of a binding international convention on the conservation of endangered species. In 1973, representatives of 80 countries met in Washington, D.C., to negotiate the provisions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES or Convention). United States ratification occurred on September 13, 1973, with documents submitted to the depository government (Switzerland) on 14, 1974.[2]

CITES entered into force on July 1, 1975. Today, 182 countries and the European Union (these countries are known as Parties) implement CITES, which accords varying degrees of protection to over 35,000 species of animals and plants[3] CITES is an international agreement among governments that provides a framework for regulating international trade in listed animals and plants, including their parts and products, to ensure the trade is legal and does not threaten the survival of the species. CITES regulates both commercial and noncommercial international trade through a system of permits and certificates that must be presented when leaving and entering a country with CITES specimens. Species are listed in one of three CITES Appendices, which provide different levels of protection and regulation. The CITES Appendices are distinct from the list of species issued under the Endangered Species Act of 1973 (ESA), 16 U.S.C.

---

[1] See http://uscode.house.gov/statutes/pl/91/135.pdf.
[2] See https://www.fws.gov/laws/lawsdigest/treaty.html.
[3] See https://www.fws.gov/International/cites/what-is-cites.html.

020306

*Alternative 1, the "preferred action" alternative*

This preferred action is consistent with 50 CFR 23.69  This action is a permit and regulatory function and is categorically excluded from further NEPA review as provided by Department of the Interior Departmental Manual.  Categorical exclusions are classes of actions which do not individually or cumulatively have a significant effect on the human environment. However, the Service may choose to prepare an EA on any action to assist in planning and decision making.

The preferred action is to maintain the CITES export program in its current form, which includes the mandatory tagging of skins of these species that are exported with CITES tags.  Before a species listed in CITES Appendix II can be exported, we must determine that specimens to be exported were legally acquired and that their export will not be detrimental to the survival of the species or to other similar listed species in need of trade controls.  As a result, we receive applications for export permits for bobcat, river otter, Canada lynx, gray wolf, and brown bear. These species were all included in Appendix II based on their similarity of appearance to other CITES-listed species (under Article II(2)(b) of the Treaty).

The species of furbearers included in this EA are managed by the wildlife agencies of individual States and tribes.  Each State and tribe in which these animals are harvested has a program to regulate the harvest.  States and tribes generally do not allow a harvest if they lack adequate populations to sustain one.  For the past forty years, beginning in 1977, the Service has reviewed information on population status, management, and trade for these animals in every State where they are harvested.  This accumulated information, including available population

12

estimates, demonstrates that these species, where approved for export[18] [19] from the United

States, are not potentially threatened due to export from the United States.

The preferred action will facilitate the continued efficient export of these species from the

United States thereby allowing access of these specimens to international markets.  Given the

higher price for pelts in foreign markets, permitting export increases the economic value of these

species in the United States.  This increased value provides incentives for better State and tribal

management programs.  Increased trapping activity contributes additional funds to management

programs through the sale of licenses.  In addition, increased value may generate public support

for sound management programs.  The preferred action allows for regular review of State and

tribe approved export programs.  The U.S. CITES export program for these species has proven to

be effective over the past forty years for the Service to fulfill its obligations regarding these

species pursuant to the CITES treaty.

Continuing to approve the export of these five species might benefit other species of

spotted cats and otters, and other populations of brown bear and gray wolf protected by CITES.

This action, and the Convention it implements, only applies to international trade.  The requisite

CITES legal and scientific findings for the export of these species are based largely on data

supplied by State and tribal conservation agencies, and have depended on the existence of State

and tribal management programs for these species.  However, this action does not control State

and tribal programs.  State and tribal efforts to provide data to the Service to qualify their species

for export are voluntary.  States and tribes regulate the take of these species through their

management programs.

---

[18] States with Approved U.S. CITES Fur Export Programs.
[19] Tribes with Approved U.S. CITES Fur Export Programs.

020318

A fundamental presumption of all findings of the Service must be that the provisions of the CITES are being implemented and enforced effectively.  To the degree that the Service can place confidence in the system provided for controlling trade, we can be correspondingly satisfied that existing procedures are adequate to ensure that specimens of one species will not be confused, intentionally or unintentionally, with specimens of other species.  Tagging of pelts helps provide assurance that specimens will be identified properly.  Without tags, pelts would only be identified by paper documentation accompanying entire shipments.  For such shipments, there would be many opportunities for confusing the identity of individual specimens.  It is our position that to be exportable, these species must be tagged before they are moved from the State or tribe of origin to accurately to indicate their source and legality.  Once pelts are moved interstate through various auctions, and accumulated by dealers and exporters, it is problematic (and probably impossible) to determine the origin of individual unmarked pelts, even if accompanied with corresponding paper documentation.

***Alternative 2, the "no tag" alternative***

The Service could presume that specimens were not taken in violation of federal, State, or tribal law, unless evidence is presented to the contrary, and allow the export of these five species without CITES tags.  Our current regulations require the tagging of these species (unless an alternative method has been approved) in order for the taken specimens to be eligible for export. This tagging requirement is not required by CITES, but rather a Service requirement. Elimination of this requirement under this alternative may dilute efforts to effectively control trade in specimens of related species, or populations. The Service knows of no market incentives that would lead to extensive promotion of specimens of other protected species and populations as specimens of legally obtained bobcat, lynx, river otter, brown bear, or gray wolf; however,

14

specimens of these species can be confused with specimens of other species or populations.  For example, river otter pelts are difficult to distinguish from the pelts of some other otters.  Consequently, enforcing trade restrictions for other spotted cats, otters, brown bear and gray wolves is made more difficult if export of these species is permitted without certain specific conditions.  For this reason, in part, we require tagging of pelts of these specimens to help ensure they are not confused with specimens of other protected species or populations.  Reducing Service oversight to the minimum required by CITES, i.e., no tagging of these species, could result in a larger volume of pelts in international trade, and may result in less rigorous documentation of these pelts.  However, the implications of reduced oversight of exports of these five species are uncertain.

Beginning in 2003, the Service conducted an extensive effort to increase the efficiency of the fur CITES export program, which included exploring the feasibility of implementing the "no tag" alternative.  A working group was formed consisting of personnel from the Association of Fish and Wildlife Agencies (AFWA), State agency wildlife biologists, Service wildlife biologists and administrators, State and Service law enforcement personnel, and representatives from the regulated fur harvest industry.  The working group held five face-to face meetings between September 2003 and April 2005 and concluded its work in September 2005.  As a result of this effort, AFWA, among other things, proposed that the Service eliminate the specific requirement that these five species be tagged with CITES tags.  In response, the Service amended CFR 23.69 in 2007 to include the language "unless an alternative method has been approved, each CITES fur skin to be exported or re-exported must have a U.S. CITES tag permanently attached," thereby allowing for the possibility for an approved alternative method for tagging to be implemented.  The Service expended a comprehensive effort via the working group to identify

15

an alternative system to tagging (e.g.: paper documentation).  However to date, the Services' fur CITES tagging program remains the best available system to facilitate the export of these five species while still conforming to the provisions and requirements of CITES.

***Alternative 3, the "no permit" alternative***

This alternative would require the service to revise 50 CFR 23.69 so that no export of these species legally taken from the wild is permitted.  Under the no export alternative, these species and their parts and products taken from the wild may not be exported, and sold or offered for sale foreign commerce.  Prohibition of export probably would reduce the harvest of all five of these species.  To what extent legal prohibition would actually affect harvest is unknown.  Because most of these five species pelts are exported, embargoing export would most likely lower wholesale pelt price in the United States.  For none of these species, however, do we know to what extent supply, or harvest, depends on price, although it is generally presumed that lower price reduces harvest.  A cursory, although not conclusive, analysis of pelt price and exports suggests that as price goes down, exports also are reduced.[20]

Also, we do not have information on the capacity of our domestic market to expand if export were not possible.  In addition, the potential exists for domestic stockpiling if export from the wild were not possible, but the extent is unknown.  Skins from captive-bred animals would be eligible for export, however currently this component is extremely small.  Despite these uncertainties, populations of these species probably would increase in abundance, at least in some areas, if export were not allowed.

---

[20] Bobcat, lynx, river otter, brown bear, and gray wolf; price vs. U.S. exports (2013-2015).

16

However, all the States and tribes have regulatory mechanisms to manage these species, thus the effects of an embargo might be superfluous to their conservation.  Export or even a harvest embargo during cyclic population increases of Canada lynx might have little effect on lynx populations in Alaska.  However, such an embargo might substantially decelerate cyclic population decline in those local areas that are significantly exploited.  It is not possible to describe with any confidence the environmental impacts of an embargo on export of these species, even if population increase were to result.  It is also unknown to what extent such increases might affect populations of other species of the affected ecosystems.  Because these five animal species are carnivores and none of them have the high reproductive rate of certain herbivores, no dramatic fluctuations in their numbers would be likely even if the effects of harvest were removed completely and populations were left to other limiting factors of their environment. Individuals would presumably be seen more frequently, and could be more easily taken.  Bobcat depredations of poultry and livestock might increase in some localities, but the overall magnitude of this depredation probably would be minor.  Export restrictions may reduce incentives for State and tribal conservation program for these species.

Not approving export might help alleviate harvest pressure on other protected species and populations by reducing the opportunities for illegally traded pelts to be traded as legally obtained.  On the other hand, not approving export might increase harvest pressure on other protected species or populations.  It is uncertain to what extent any of the consequences of this alternative might occur.

Elimination of export approval is inconsistent with the main tenet of CITES which is to ensure that international trade in plants and animals does not threaten their survival in the wild. Participation of these five species in the Services' CITES export program for forty years has

17

demonstrated that the export of these species from the United States does not threaten their survival in the wild.  In our view, the "no permit" alternative is not tenable as the range wide population of these species is not threatened by the Services' CITES export program (pursuant to federal, State, and tribal laws and regulations), causing the "no permit alternative" to be incompatible with our obligations pursuant to the CITES treaty.  Unless we intact stricter domestic measures (e.g.: listing under the ESA) we are obligated to allow for the export of CITES listed species and must make a determination that the specimens were legally acquired and that the export is not detrimental to the survival of the species.

**Environmental impacts for the proposed action and alternatives**

The affected environment is where these species occur in the U.S. and where States and tribes with approved programs have been granted authority by the Service to export specimens legally obtained in that State or tribe.  States and tribes may also develop captive breeding of these species.

The National Environmental Policy Act (NEPA) recognizes "the profound impact of man's activity on the interrelations of all components of the natural environment" and calls for the federal government to use all practical means and measures to, among other things, "create and maintain conditions under which man and nature can exist in productive harmony."  The Council on Environmental quality (CEQ) and the Department of the Interior (DOI) have developed regulations implementing NEPA.  CEQ regulations, 40 CFR 1500-1508,[21] require that federal agencies consider the potential for a proposed federal action to have direct, indirect, or cumulative effects on the quality of the human environment.  The "human environment" is

---

[21] 40 CFR 1500-1508.

020323

September 4, 2007

**DECISION MEMORANDUM FOR THE ASSISTANT SECRETARY**

**FROM:  Teiko Saito, Acting Assistant Director, International Affairs**

**TELEPHONE:  202-208-6393**

**SUBJECT:  Fur CITES Export Program Issues to be Discussed at the Association of Fish and Wildlife Agencies (AFWA) Annual Meeting**

## I.     STATEMENT OF THE ISSUES

(Issue 1).  The Association of Fish and Wildlife Agencies (AFWA) has suggested that the Service propose to AFWA, through an exchange of letters, that AFWA serve as a conduit for the States to make their annual fur CITES Export Program (CEP) reports available to the Service.  (Issue 2).  There is not consensus between the Service and the States as to what should be reported when a national non-detriment finding has been made by the Division of Scientific Authority (DSA).  (Issue 3).  The States are under the impression that a national non-detriment finding for river otter is imminent.  (Issue 4).  Some States would like the Division of Management Authority (DMA) to provide an option of utilizing some other mechanism, such as chain of custody documentation, as an alternative to the current practice of affixing pelt tags which serve to help establish legal acquisition.  (Issue 5).  DMA has not received reports from any States regarding the capture of the threatened Canada lynx incidental to bobcat trapping.  Sates are required to report any take of lynx incidental to bobcat trapping under a Biological Opinion (BO) concerning the fur CEP.  However, DMA has received information from Ecological Services that such incidental take has occurred.

## II.     BACKGROUND

AFWA, the States, and the Service began a dialogue to update, improve, and streamline the thirty-year-old fur CEP in the fall of 2003.  Significant modifications have been made to the fur CEP as a result of these discussions; however, certain areas require additional discussion.

## III.     OPTIONS

*(Issue 1).  AFWA facilitate collection of annual reports.*

020429




# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

Memorandum

FEB 27 2008

To:        Chief, Division of Management Authority

From:    Chief, Branch of Consultation and Monitoring
            Division of Scientific Authority

Subject:  **General Advice on the Export of Bobcat (*Lynx rufus*) and River Otter (*Lontra
            canadensis*) from States or Tribes with approved CITES export programs, and
            Canada Lynx (*Lynx canadensis*), Gray Wolf (*Canis lupus*), and Brown or Grizzly
            Bear (*Ursus arctos*) from Alaska only**

River otter and bobcat are managed by the wildlife agencies of individual States and Indian Tribes
and Nations and in addition, Canada lynx, gray wolf, and brown or grizzly bear are managed by
the State of Alaska.  To be approved and issued tags for export of these CITES Appendix-II
species, each State or Indian Nation or Tribe must have a management program that regulates a
sustainable harvest, and the means to identify and mark pelts that have been legally taken within
their jurisdiction.  For these species, we made non-detriment findings for certain State and Indian
Tribal export programs in a series of rulemakings between 1984 and 1996, and for subsequent
years, in administrative findings.  In each of these rulemakings and administrative findings, we
made commitments to annually monitor the biological status of these species in the States and on
the Tribal lands with approved export programs.  In each harvest season, the States or Tribes that
export these species must certify that the export of these Appendix II species will not be
detrimental to their survival.

The Division of Scientific Authority (DSA) has determined that the export of **wild-caught live
and dead** specimens[1] (pelts, mounted trophies, parts, and products made from parts) of the above
species will be for purposes not detrimental to the survival of the species involved provided:

1.  The State or Tribe was approved by the DSA and Division of Management Authority for
    export of these species;

2.  The State or Tribe has annually certified that the export will not be detrimental to the survival
    of the species in question; and

3.  The holding, breeding, acquisition and/or sale of the specimen complies with State or Tribal

---

[1] **This advice does not include commercial export of parts** (e.g. gall bladders or paws) from
brown or grizzly bear, ***except commercial export of claws (and products made from claws) is included***
under this general advice.  Export of gall bladders or other parts, except claws, is limited to no more than a
single gall bladder (as well as the appropriate kind and number of other parts) per brown or grizzly bear
specimen.

law.

The DSA has also determined that the export of **captive-born live and dead** specimens[1] (pelts, mounted trophies, parts, and products made from parts) of the above species will be for purposes not detrimental to the survival of the species involved provided:

1. The holding, breeding, acquisition and/or sale of the specimen complies with State or Tribal law.

For the export of pelts or parts from wild or captive-born animals, they must be identified as to species, State or Tribe of origin, and season of take.

If an application **does not** meet the above criteria, it should then be referred to DSA for further review and a determination on whether this general advice may be used or a specific advice is required.

002127



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
### Washington, D.C. 20240



OCT -2 2015

MEMORANDUM

To:      Chief, Division of Management Authority

From:    Chief, Division of Scientific Authority

Subject: General advice for the export of bobcat (*Lynx rufus*) from the contiguous 48 States of the United States.

This general advice updates and supersedes the "General advice for the export of bobcat (*Lynx rufus*) from the contiguous 48 States of the United States," dated December 7, 2010.

Currently, 40 States and 31 Tribes have approved multi-year CITES export programs for bobcat (*Lynx rufus*) (see http://www.fws.gov/international/pdf/table-list-of-states-and-tribes-with-approved-export-programs-for-furbearers-alligators-and-ginseng.pdf ).  The available information suggests that the species is thriving and well-managed by the States and Tribes. Therefore, we advise that the export of bobcat (*Lynx rufus*) taken in the contiguous 48 States of the United States will not be detrimental to the survival of the species.  This finding is valid through the 2019-2020 harvest season unless we receive new or additional information regarding the species' status or management by the States or Tribes that suggests this finding should be modified.  We will continue to monitor the status of bobcat populations in the wild and will update our finding in 2020 based on new information gathered during the 2015 to 2020 time period.

**Basis for advice**:

Distribution

The bobcat is the most widely distributed native felid in North America, ranging from as far north as central British Columbia (55°N) and south to Oaxaca, Mexico (17°N).  Currently, the bobcat occurs in each of the contiguous States of the United States, except Delaware (Roberts and Crimmins 2010).  Historically the bobcat was found in all of the contiguous 48 States (Young 1958).  The bobcat's range in North America is approximately 8,708,888 km² including 6,186,819 km² (71% of range) in the United States, 1,702,545 km² (20% of range) in Mexico, and 819,524 km² (9% of range) in Canada (Roberts and Crimmins 2010).

Habitat

1

002167

Bobcats are found in a wide variety of habitats, from bottomland forests in Alabama, United States, to arid deserts in Mexico, and from northern boreal forests in Canada to the humid tropical regions of Florida, United States. Various studies have indicated that bobcats generally prefer rough, rocky country interspersed with dense cover (Pollack 1951, Erickson 1955 *as cited in* Anderson and Lovallo 2003, Young 1958, Zezulak and Schwab 1979, Karpowitz 1981 and Golden 1982 *as cited in* Anderson and Lovallo 2003). McCord (1974) snow-tracked bobcats in Massachusetts and found that individuals preferred roads, cliffs, spruce plantations, and hemlock-hardwood habitats. In Missouri, bobcats were found to prefer bluffs, brushy fields, and second-growth oak habitats (Hamilton 1982 *as cited in* Anderson and Lovallo 2003). In Wisconsin, lowland coniferous forests were consistently selected by both sexes during all seasons, although there were sex-related and seasonal differences in selection of other habitats (Lovallo and Anderson 1996).

Although prey abundance is considered the most important factor in the selection of habitat types, protection from severe weather, availability of resting and den sites, dense cover for hunting and escape, and freedom from disturbance are also important factors in determining bobcat habitat use (Pollack 1951, Erickson 1955 *as cited in* Anderson and Lovallo 2003, Bailey 1974).

Biological characteristics

The bobcat is polygamous, seasonally polyestrous, and may experience up to three estrous cycles from March through June if not impregnated during ovulation (Pollack 1950, Crowe 1975a, Stys and Leopold 1993, Crowe 1975b). The majority of bobcat breeding occurs during February and March but varies with latitude, longitude, altitude, climate, photoperiod, and prey availability (McCord and Cardoza 1982). The gestation period in the bobcat ranges from 63 to 70 days (Anderson and Lovallo 2003). Estimates of average litter sizes range from 1.7 to 3.6 kittens per litter, with a mean of 2.7 (Anderson 1987 *as cited in* Anderson and Lovallo 2003). Sex ratios of bobcat kittens are normally 1:1. Bobcats generally produce a single litter per year, but females are capable of producing a second litter if the initial litter is lost after parturition (Winegarner and Winegarner 1982, Beeler 1985 *as cited in* Anderson and Lovallo 2003, Stys and Leopold 1993). Survival rates of kittens are generally lower than that of adults and may be highly variable, ranging from 18 to 71% annually (Crowe 1975b). Knick (1990) found kitten survival rates to be strongly influenced by prey abundance.

The most common cause of bobcat mortality appears to be human exploitation (Anderson and Lovallo 2003); however research on bobcats indicates little impact of harvest on population size until harvest exceeds 20% of the population (Knick 1990).

Population Status and Trends

During the last century, the range of the bobcat has expanded into northern Minnesota (United States) and southern Ontario and Manitoba (Canada) as lumbering, fire, and farming have opened the dense, unbroken coniferous forests of these areas (Rollings 1945). Bobcat populations continue to be expanding across much of their geographic range (Roberts and

2

Crimmins 2010). The population is estimated to be between 1,418,333 and 2,637,738 individuals across 68% of the species' range in the United States (Roberts and Crimmins 2010), which represents a population increase since the 1981 estimate of between 725,000 and 1,017,000 bobcats in the United States (USFWS 1982). This population growth is likely a response to many factors including changing agricultural practices, range expansion, and habitat improvement programs (Woolf and Hubert 1998, Lovallo 2001).

Based on State and Tribal reports to the U.S. Fish and Wildlife Service, the U.S. bobcat population has remained stable since Roberts' and Crimmins' (2010) population estimate. Individual States and Tribes have reported secure populations over the most recent five-year time period. Florida's bobcat population was reported to be impacted by development during this time period; however, the species was reported to be widespread and secure. In Wyoming, the bobcat population fluctuates along with its principal prey, the cottontail rabbit. The State of Wyoming reports that the cottontail rabbit population has declined substantially since 2007, and the bobcat population has been experiencing a cyclic low in recent years; however, the bobcat population trend has stabilized and the population remains healthy – the bobcat population is expected to increase as its prey base recovers.

Threats

There are no widespread threats to U.S. bobcat populations, which is in part due to the species' ability to exploit a wide variety of habitats. The bobcat is considered "Least Concern" by the IUCN Red List of Threatened Species (Kelly et al. 2008).

Species Management

According to Nowell and Jackson (1996), bobcat management programs in the United States and Canada are the most advanced management programs for commercial exploitation of feline furbearers. The management programs ensure long-term sustainable use of the species and support its conservation. Agencies with jurisdictional authority employ qualified and specialized wildlife biologists to provide management and harvest recommendations for bobcats in their respective regions. In the United States, scientists, agency personnel, and the public review management recommendations before the recommendations are adopted. State and Federal agency wildlife law enforcement personnel are trained to identify bobcat specimens and are well-versed in State and Federal laws regarding the harvest, transport, and sale of bobcat specimens.

In the United States, the States and Tribes that allow harvest of bobcats have implemented measures to control harvest intensity through regulations that dictate season length, methods of take, bag limits, and/or mandatory reporting. Additionally, many jurisdictions use individual permits or statewide harvest quotas to limit the annual harvest (Woolf and Hubert 1998). States periodically review species harvest programs to account for new findings and current advice from experts in their region. Trade in skins or other specimens from captive-bred animals is not common, but where legal, is monitored by State authorities. Wildlife managers generally consider a 20% harvest rate to be the maximum sustainable annual harvest rate for bobcat, and

002169

age structure analyses, such as adult-to-yearling ratios, have been developed to estimate changes in harvest rates over time (Knick 1990).

Population Monitoring

Although bobcat population size is difficult to estimate, in part due to the species' secretive behavior, there are numerous monitoring techniques that are used to determine relative changes in bobcat populations (Anderson and Lovallo 2003). Most jurisdictions in North America use multiple population monitoring tools, including harvest data analysis, hunter surveys, scent or sign station surveys, public sightings, population models, snow track surveys, incidental harvest analysis, and vehicle collisions analysis (Roberts and Crimmins 2010).

International Trade

Bobcats are listed in Appendix II of the Convention on International Trade in Wild Fauna and Flora (CITES) due to the species' similarity of appearance to other listed *Lynx* species (CITES Article II, paragraph 2b). As a result of the listing, the Service regulates its export. Bobcat harvest levels in the United States vary due to changes in pelt value and fur harvest intensity for other species. The variability in levels of bobcat exports from year to year is likewise largely dependent on the pelt market value in a given year; the number of skins exported for any given year does not necessarily reflect harvest levels for that year. Table 1 provides the number of U.S.-origin bobcat skins taken from the wild and subsequently presented at U.S. ports for export during the years 2009 through 2013.

Table 1. U.S. Export* of U.S.-Origin Bobcat Skins (source: wild)

|  | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Cleared | 29,989 | 33,676 | 57,718 | 51,472 | 65,604 |
| Not Cleared | 0 | 2,555 | 1,734 | 32 | 5 |

*Data from U.S. CITES Annual Report database.

**References**

Anderson E.M. and M. J. Lovallo. 2003. Bobcat and Lynx. Pages 758-786 in J. A. Chapman and G. A. Feldhamer, editors. Wild Mammals of North America: Biology, Management, and Economics. Johns Hopkins Press: Baltimore, Maryland.

Bailey, T. N. 1974. Social organization in a bobcat population. Journal of Wildlife Management 38:435-446.

4

002170

Crowe, D.M. 1975a. Aspects of aging, growth and reproduction of bobcats from Wyoming. J. Mammal. 56:177-198.

Crowe, D. M. 1975b. A model for unexploited bobcat populations in Wyoming. Journal of Wildlife Management. 39:408-415.

Kelly, M., Caso, A. & Lopez Gonzalez, C. 2008. *Lynx rufus*. The IUCN Red List of Threatened Species 2008: e.T12521A3352506. http://dx.doi.org/10.2305/IUCN.UK.2008.RLTS.T12521A3352506.en. Downloaded on **01 October 2015**.

Knick, S. T. 1990. Ecology of bobcats relative to exploitation and a prey decline in southeastern Idaho. Wildlife Monographs 108:1-42.

Lovallo, M. J. 2001. Status and management of bobcat in Pennsylvania. Pages 74-79 in A. Woolf, C. K. Nielsen, and R. D. Bluett editors. Proceedings of a Symposium on Current Bobcat Research and Implications for Management. The Wildlife Society 2000 Conference: Nashville, Tennessee.

Lovallo, M. J. and E. M. Anderson 1996. Bobcat (Lynx rufus) home range size and habitat use in northwest Wisconsin. American Midland Naturalist 135:241-252.

McCord, C. M. 1974. Selection of winter habitat by bobcats (Lynx rufus) on the Quabbin Reservation, Massachusetts. Journal of Mammalogy 55:428-437.

McCord, C. M and J. E. Cardoza. 1982. Bobcat and lynx (Felis rufus and F. lynx). Pages 728-766 in J. A. Chapman and G. A. Feldhamer, editors. Wild Mammals of North America: Biology, Management, and Economics. Johns Hopkins Press: Baltimore, Maryland.

Nowell, K. and P. Jackson (compiler and eds.). 1996. Wild Cats: Status Survey and Action Plan. IUCN: Gland, Switzerland. Pp. 140-144.

Pollack, E.M. 1950. Breeding habits of the bobcat in north-eastern United States. J. Mammal. 31:327-330.

Pollack, E. M. 1951. Observations on New England bobcats. Journal of Mammalogy 32:356-358.

Roberts, N.M., and S.M. Crimmins. 2010. Bobcat population status and management in North America: evidence of large-scale population increase. Journal of Fish and Wildlife Management 1(2):169–174; e1944-687X. doi: 10.3996/122009-JFWM-026.

Rollings, C. T. 1945. Habits, foods and parasites of the bobcat in Minnesota. Journal of Wildlife Management 9:131-145.

5

002171

Stys, E. D., and B. D. Leopold. 1993. Reproductive biology and kitten growth of captive bobcats in Mississippi. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 47:80-89.

U.S. Fish and Wildlife Service (USFWS ). 1982. Proposal to remove the bobcat from Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora. Federal Register 47(6)1242-1246.

Winegarner C. E. and Winegarner M. S. 1982. Reproductive history of a bobcat. Journal of Mammalogy 63: 680–682.

Woolf, A. and G. F. Hubert. 1998. Status and management of bobcats in the United States over three decades: 1970's-1990's. Wildlife Society Bulletin 26:287:294.

Young, S. P. 1958. The Bobcat of North America. Wildlife Management Institute: Washington, D.C.

Zezulak, D. S. and R. G. Schwab. 1979. A comparison of density, home range, and habitat utilization of bobcat populations at Lava Beds and Joshua Tree National Monuments, California. Pages 74- 79 in P. C. Escherich and L. Blum, editors. Proceedings of the 1979 bobcat research conference. National Wildlife Federal Science and Technology Series 6.

002172

**48402** **Federal Register** / Vol. 72, No. 163 / Thursday, August 23, 2007 / Rules and Regulations

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Parts 10, 13, 17, and 23

### RIN 1018-AD87

### Revision of Regulations Implementing the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES)

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, we, the Fish and Wildlife Service (FWS), revise the regulations that implement the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), a treaty that regulates international trade in certain protected species. CITES uses a system of permits and certificates to help ensure that international trade is legal and does not threaten the survival of wildlife or plant species in the wild. In this final rule, we have retained most of the general information in the current 50 CFR part 23, but reorganized the sections and added provisions from certain applicable resolutions and decisions adopted by the CITES Conference of the Parties (CoP) at its second through thirteenth meetings (CoP2 – CoP13). The revised regulations will help us more effectively promote species conservation, continue to fulfill our responsibilities under the Treaty, and help those affected by CITES to understand how to conduct lawful international trade in CITES species.

**DATES:** This regulation is effective September 24, 2007. Incorporation by reference of CITES's *Guidelines for transport and preparation for shipment of live wild animals and plants* and the International Air Transport Association Live Animals Regulations listed in this rule is approved by the Director of the Federal Register as of September 24, 2007.

**FOR FURTHER INFORMATION CONTACT:** Chief, Division of Management Authority, Fish and Wildlife Service, 4401 North Fairfax Drive, Room 700, Arlington, Virginia 22203; telephone, (703) 358-2093; fax, (703) 358-2280; or email, *managementauthority@fws.gov*.

**SUPPLEMENTARY INFORMATION:**

## What Acronyms and Abbreviations Are Used in This Rule?

AECA African Elephant Conservation Act (16 U.S.C. 4201-4245)
APHIS U.S. Department of Agriculture, Animal and Plant Health Inspection Service

ATA A combination of the French and English words "Admission temporaire/ Temporary Admission" used in the name of a type of international customs document, the ATA carnet
CITES Convention on International Trade in Endangered Species of Wild Fauna and Flora, also referred to as the Convention or Treaty
CBP Department of Homeland Security, U.S. Customs and Border Protection
CFR Code of Federal Regulations
CoP Conference of the Parties or a meeting of the Conference of the Parties
ESA Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*)
FOIA Freedom of Information Act (5 U.S.C. 552)
FWS U.S. Fish and Wildlife Service
IATA LAR International Air Transport Association Live Animals Regulations
ISO International Organization for Standardization

USDA U.S. Department of Agriculture
WBCA Wild Bird Conservation Act (16 U.S.C. 4901 *et seq.*)

## Background

CITES was negotiated in 1973 in Washington, DC, at a conference attended by delegations from 80 countries. The United States ratified the Treaty on September 13, 1973, and it entered into force on July 1, 1975, after the required 10 countries had ratified it. Section 8A of the ESA, as amended in 1982, designates the Secretary of the Interior as the U.S. Management Authority and U.S. Scientific Authority for CITES. These authorities have been delegated to the FWS. The U.S. regulations implementing CITES took effect on May 23, 1977 (42 FR 10465, February 22, 1977), after the first CoP was held. The CoP meets every 2 to 3 years to vote on proposed resolutions and decisions that interpret and implement the text of the Treaty and on amendments to the listing of species in the CITES Appendices. Currently 171 countries have ratified, accepted, approved, or acceded to CITES; these countries are known as Parties.

*Proposed rule and comments received:* We published a proposed rule on April 19, 2006 (71 FR 20167), to revise the regulations that implement CITES. We accepted public comments on the proposed rule for 60 days, until June 19, 2006. In response to several requests from the public, we reopened the public comment period for an additional 30 days on June 28, 2006 (71 FR 36742). The 2006 proposed rule was a reproposal of revisions proposed on May 8, 2000 (65 FR 26664), which were not finalized. We summarized and addressed comments received on the 2000 proposal in the 2006 proposed rule. Please refer to the preamble to the

April 19, 2006, proposed rule for a discussion of those comments.

We received 344 letters in response to the 2006 proposed rule (71 FR 20167). We received comments from individuals, organizations, and State natural resource agencies. Of the comments we received, 240 letters were from Bengal-cat enthusiasts and breeders, 33 were from State natural resource agencies and regional associations, 21 were from falconers and falconer organizations, and 13 were from fur trapper organizations.

*Resolution consolidation and incorporation:* Since 1976, the Parties have adopted 256 resolutions or revisions to resolutions. In 1994, the Parties began an effort to consolidate some of these resolutions. Some resolutions were no longer relevant, and others needed to be combined because several resolutions were adopted at different CoPs on the same or similar subjects. As a result of this process, there are currently 78 resolutions in effect. This rule incorporates certain of these consolidated resolutions, as appropriate and relevant to U.S. implementation of the Treaty. We cite the current numbers of resolutions since previous resolutions have been renumbered. This allows the reader to easily access the documents currently in effect on the CITES website (*http:// www.cites.org*).

*Stricter national measures:* Article XIV of the Treaty explicitly recognizes the rights of Parties to adopt stricter national measures to restrict or prohibit trade, taking, possession, or transport of any wildlife or plant species. Resolution Conf. 11.3 (Rev. CoP13) recommends that Parties make use of stricter national measures if they have determined "that an Appendix-II or -III species is being traded in a manner detrimental to the survival of that species" or is being "traded in contravention of the laws of any country involved in the transaction." The United States has adopted stricter national measures, such as the ESA, Marine Mammal Protection Act (16 U.S.C. 1361-1407), and Lacey Act Amendments of 1981 (16 U.S.C. 3371-3378).

As outlined in the preamble to CITES, "peoples and States are and should be the best protectors of their own wild fauna and flora." CITES recognizes the sovereign right of a country to regulate trade by passing stricter national measures to help in the conservation of species. Under CITES, an exporting country does not have a sovereign right to override an importing country's laws. When a Party sends information to the Secretariat on how its stricter national measures will affect trade in CITES

that separate sections covering such specimens are not necessary.

*Export of heavily traded native species (§§ 23.68–23.70):* Certain native species (American ginseng (*Panax quinquefolius*), bobcat (*Lynx rufus*), river otter (*Lontra canadensis*), Canada lynx (*Lynx canadensis*), gray wolf (*Canis lupus*), brown bear (*Ursus arctos*), and American alligator (*Alligator mississippiensis*) that are managed by a State or tribal conservation program are traded internationally, sometimes in high volumes. As for all CITES Appendix-I and -II species, before we can issue a CITES document to allow export, we must find that the specimens were legally acquired and that the export will not be detrimental to the survival of the species in the wild. Over the past 25 years, we have worked with State and tribal governments to develop procedures that allow us to make the necessary findings programmatically rather than permit by permit. When States and Tribes provide information showing that they have established a management program that ensures a sustainable harvest, and that they have the means to identify or mark specimens that have been legally taken under their system, we are able to make findings for specimens harvested within their jurisdiction and thereby approve their program. A tag or certificate issued by the State or Tribe demonstrates that a particular specimen was harvested under an approved program and that the appropriate findings have been made. This alternative to making the legal acquisition and non-detriment findings on a permit-by-permit basis reduces a potentially large workload for exporters as well as for our offices.

States and Tribes for which programmatic findings have been made submit annual reports to us containing information on the previous harvest season. In some cases, such as for some furbearer species, we make multi-year findings. Regular reporting from States and Tribes allows us to determine whether our findings remain valid. In these sections, we include the types of information we request from the States and Tribes on an annual basis to maintain approval of their export programs. A list of States and Tribes with approved CITES export programs, copies of recent findings on which the approvals are based, and conditions that must be met for lawful export will be posted on our website or will be available from us (see § 23.7).

Many commenters supported the provisions for approval of State and tribal export programs, but would like the FWS to make range-wide non-

detriment findings, rather than State-by-State or Tribe-by-Tribe assessments. We approve programs for the export of American ginseng, furbearers, and crocodilians on a State-by-State or Tribe-by-Tribe basis because they are managed by individual States or Tribes. We require specific information about the population status and management of the species on those specific State and tribal lands. As discussed in § 23.61, a range-wide population assessment would be useful in making a non-detriment findings because it would place the State or tribal programs in the context of species management and population status throughout its range. However, in making a non-detriment finding, we must determine whether there are effects from the export, including locally, that will impact the survival of the species. Generally, the information provided to the FWS by a State or Tribe is limited to the species' status in that State or tribal management area. If, however, sufficient information is provided by States and Tribes within the range of a particular species, we may review the information, in conjunction with other available information, on a range-wide basis. We have, for example, made a range-wide non-detriment finding for bobcat. We added provisions in § 23.69(b) to accommodate situations where the Scientific Authority has made a range-wide non-detriment finding.

The same commenters suggested that re-evaluation periods for range-wide findings should be no less than every 5 years. As discussed in the 2006 proposed rule (71 FR 20167), subsequent to programmatic approval for a State or Tribe, exports are approved as long as the periodic submission of information by the State or Tribe shows that there is no significant change in status or management of the species that might lead to different treatment of the species.

One commenter requested stronger language to mandate that States and Tribes provide relevant reports, and that the FWS disclose whether it has detected tag fraud for furbearers and alligators issued to the States and Tribes. We review the CITES furbearer and alligator activity reports received from each approved State or Tribe to determine if our programmatic findings remain correct or if the species needs closer monitoring. If an assessment of the information indicates that the population may be declining, we may request additional information from the States or Tribes to conduct a more comprehensive review to ensure that our findings are still valid. Violations in

the use of tags are monitored by the Office of Law Enforcement and disclosure is subject to the rules and regulations governing release of investigative information.

*American ginseng roots (§ 23.68):* Most American ginseng, both collected from the wild and artificially propagated, is exported as roots. Ginseng root is exported in a much larger volume than any other native CITES plant species. Ginseng that has been legally harvested under State or tribal requirements is certified by the appropriate State or tribal authority prior to export. To document the legal origin of the material, State or tribal certificates must accompany the ginseng until the time of export from the United States.

We use two categories for ginseng, wild and artificially propagated, because CITES only recognizes these two categories. The permits we issue and our annual report to the CITES Secretariat use only these two classifications.

If an applicant wishes to export ginseng as artificially propagated even though it visually resembles wild ginseng, he or she must demonstrate that the ginseng indeed meets the criteria for artificially propagated plants. We note that the classification of ginseng as either wild or artificially propagated on export permits is only for CITES purposes and is not intended to indicate marketing categories or value of the roots. Furthermore, it does not preclude the use of additional categories by States and Tribes. We continue to monitor the use of additional categories by States and Tribes, and we may use such information in future decision making on ginseng exports as we evaluate the impact of trade on the viability of the wild populations.

States or Tribes no longer provide us in their annual reports an estimate of the average age of wild-harvested plants. Instead, the U.S. Scientific Authority uses roots-per-pound information provided by the States as an index to indicate shifts in age structure of harvested roots.

One commenter suggested that we modify § 23.68 (b)(1)(iii) so that State or tribal personnel would only inspect and certify wild-collected ginseng for export and not all wild-collected ginseng harvested on State or tribal lands. Since the majority of wild-collected ginseng is exported, having State or tribal officials inspect all ginseng harvested in a particular State will minimize the likelihood of under-aged or illegally obtained wild-collected roots being exported. Additionally, some States do not require inspection of wild-collected

The Scientific Authority has two primary obligations regarding exports of river otters taken in the United States.  We must find that any U.S. exports of river otter pelts are not detrimental to the population status in the wild of any other similar furbearer species listed in Appendix I or II.  We also must determine that the status of river otters in the United States (based on information provided by the States and based on our own monitoring of trade) does not decline to the point where the species itself could qualify for inclusion in CITES Appendix II in its own right, pursuant to Article II.2(a).

On January 5, 1984 (49 FR 590), we published a rule granting approval for the export of pelts of North American river otters and certain other CITES-listed Appendix-II species of furbearing mammals from specified States and Indian Nations. That rule covered the 1983-1984 season as well as subsequent seasons.  In succeeding years, we have approved the export of pelts of one or more species of furbearing mammals listed in CITES Appendix II from other States and Indian Nations, through the administrative or rule-making processes.  These approvals were and continue to be subject to certain population monitoring and export requirements.

Scientific Authority guidelines for review and consideration of State export programs for furbearer species were explained in the aforementioned *Federal Register* notices, as well as in the more recent notice published in the *Federal Register* on January 6, 1999 (64 FR 769, enclosed), in which we approved exports of river otters from the State of Missouri.  At a minimum, these guidelines require detailed information from the applicant, as described below:

A. Minimum requirements for biological information:
    (1) Information on the condition of the population, including trends (the method of determination to be a matter of the State or Indian Nation's choice) and population estimates where such information is available.
    (2) Information on total harvest of the species.
    (3) Information on distribution of harvest.
    (4) Habitat evaluation.

B. Minimum requirements for a management program:
    (1) There should be a controlled harvest, methods and seasons to be determined by the State, Indian Nation.
    (2) All skins must be registered and marked.
    (3) Harvest levels should be determined annually by the State or Indian Nation.

Request from Idaho

In reference to the request submitted by the State of Idaho for multi-year approval of export of river otter, we believe that the information provided is insufficient to approve such a request.  The information does not rise to the standard of submissions recently received from other States for export of river otters.  We call your attention to the notice published in the *Federal Register* on January 6, 1999 (64 FR 769, enclosed), which we request that you provide to Idaho Fish &

-2-

008676

Game.  In that notice, we discussed in detail the history of approval of exports of river otters from the United States, and our information requirements.

The application received in our office from Idaho Fish & Game provides limited substantive information.  Based on the information provided to us, it appears that the river otter population of Idaho is widely distributed, however we are concerned that population numbers and harvest management are based largely on 20-year-old data from a single population study conducted in high-quality otter habitat in west-central Idaho.  It is unclear whether the results of that study can be extrapolated to other, ecologically-different regions of the State in order to derive statewide population estimates.  Furthermore, it is unclear whether the 20-year-old data are still valid even for the study area, since no population monitoring has apparently taken place in the interim.  We understand, for instance, that Idaho has experienced several drought periods since the early 1980s; we would like to know what impact extended drought periods may have on river otter populations.  To make a positive finding, first on an annual basis, and later possibly on a multi-year basis, it would be helpful to receive recent information on river otter population distribution, density, and demographics in Idaho.  Information derived from standard population modeling, used to project population growth and to assess the impact of regulated harvest, would be very helpful (although it is not required).

Based on the information provided to us, we cannot determine if Idaho has a population monitoring program currently in place for river otters.  Other States have ongoing monitoring programs, such as field observations by departmental biologists, stream surveys for otter sign, catch-per-unit-effort indices based on trappers' records, or trapper surveys.  We cannot determine if Idaho is doing any of these monitoring activities.  Although Idaho requires that otter skulls be turned in, it is unclear if or how harvest data will be analyzed to monitor trends.  To make a positive finding, first on an annual basis, and later possibly on a multi-year basis, it would be helpful to have information on Idaho's ongoing monitoring programs for river otter.

Summary

In order that the Scientific Authority may adequately review Idaho's request, we recommend that Idaho Fish & Game be asked to submit additional information.  This information may  include any current scientific reports or assessments, management plans, survey results of the specific river otter population in question, and any other reports based on professionally accepted scientific methodology commonly utilized to assess furbearer populations, for further consideration of their application for export approval.

-3-

008677



# United States Department of the Interior



## FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

OCT   5  2006

MEMORANDUM

To:       Chief, Operations Branch, Division of Management Authority

From:     Chief, Branch of Consultation and Monitoring, Division of Scientific Authority  *R. Gram*

Subject:  Advice on the State of Iowa's application for export of river otters (*Lontra canadensis*)
          taken during the 2006-2007 harvest season

**Based on the information provided by the Iowa Department of Natural Resources, the
Division of Scientific Authority advises that the export of river otters taken in the 2006-
2007 trapping season will not be detrimental to the survival of the species.**

<u>Background</u>

On May 23, 2006, the Iowa Department of Natural Resources (IDNR) sent a request to the
Division of Management Authority (DMA) for approval of the 2006-2007 and subsequent
harvest seasons for the export of river otters (*Lontra canadensis*) legally harvested in Iowa.  We
are limiting the current finding to the 2006-2007 harvest season because the upcoming trapping
season is the first regulated harvest of river otter in Iowa, following a successful river otter
restoration program between 1985-2003.  The effects of harvest pressure during this initial
harvest season are uncertain.  We will consider multi-year approval based on Iowa's 2006-2007
harvest report (see below) and continued population monitoring by IDNR.  Also, please note that
although the IDNR requested CITES tags to export 500 river otter pelts that had been taken
incidental to other trapping activities, our current finding does not apply to the export of these
pelts.  As these otters were taken in the absence of an approved export program, CITES export
authorization may be considered based on submission of a permit application form to DMA.

The river otter is managed by wildlife agencies of individual States and Indian Tribes and
Nations.  To be approved and issued tags for export of this CITES Appendix-II species, each
State or Indian Tribe or Nation must have a management program that regulates a sustainable
harvest, as well as, the means to identify and mark pelts that have been legally taken within their
jurisdiction.

<u>Scientific Authority Requirements</u>

Scientific Authority guidelines for furbearer export, which represent professionally accepted
wildlife management practices, are presented in more detail in the August 18, 1983, <u>Federal</u>

1



009239

Register document (48 FR 37494), subsequently announced as final in the January 5, 1984, Federal Register (49 FR 590) rule. These guidelines are summarized as follows:

A. Minimum requirements for biological information:
    (1) Information on the condition of the population, including trends (the method of determination to be a matter of State or Indian Tribe or Nation's choice), and population estimates where such information is available.
    (2) Information on total harvest of the species.
    (3) Information on distribution of harvest.
    (4) Habitat evaluation.

B. Minimum requirements for a management program:
    (1) There should be a controlled harvest, methods and seasons to be determined by the State or Indian Tribe or Nation.
    (2) All skins must be registered and marked.
    (3) Harvest levels should be determined annually by the State or Indian Tribe or Nation.

## Biological Information

Prior to the time of the European settlement, river otters were common along major streams throughout the State of Iowa (Pitt et al. 2003). As in many other States, unregulated hunting and trapping, stream pollution, and agriculture activities led to the demise of the river otter (Nilsson 1980, Toweill and Tabor 1982, Melquist and Dronkert 1987). Particularly in the Midwest, stream channelization and riparian timber removal degraded the river otter's habitat and that of its prey resources (Pitt et al. 2003). By the early 1900's there were few sightings of otters on Iowa's interior streams (Dinsmore 1994). Except for a remnant river otter population along and adjacent to the Mississippi River in northeastern and eastern Iowa, the species was extirpated from most of the State.

In 1985, the IDNR began restoration of river otters to the interior river systems of the State and has intensively monitored the spread and establishment of Iowa's river otter population since the initial release. Through the year 2003, the IDNR released 345 otters at 25 sites throughout the State (Andrews and Hoffman 2006). About the same time as the initiation of the river otter restoration effort, the U.S. Department of Agriculture implemented the Conservation Reserve Program that succeeded in converting almost 1 million ha of Iowa row cropland into perennial grassland within two to three years (Mayer 1994). That effort, along with better farming practices improved water quality and probably improved the potential success of the river otter restoration program (Pitt et al. 2003). In 2002, the IDNR de-listed the river otter from its list of threatened species, but continued to manage the species under "closed season" status (R. Andrews, pers. comm.). Currently, IDNR considers river otters abundant and widespread in Iowa and has planned a carefully regulated harvest beginning November 4, 2006.

009240

*State of Louisiana*

**Dwight Landreneau**
Secretary

Department of Wildlife & Fisheries
Post Office Box 98000
Baton Rouge, LA 70898-9000
(225) 765-2800

**Kathleen Babineaux Blanco**
Governor

January 13, 2004

Clifton Horton
Division of Management Authority
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive
Rm 700
Arlington, VA 22203
(FAX: 703-358-2298)

Dear Mr. Horton:

The Louisiana Department of Wildlife and Fisheries has the responsibility and authority by state statute for the management of all wildlife and fish resources in the state, including bobcat and river otter.

The Department annually monitors the fur animal harvest. Information collected from fur buyers and dealers includes purchase distribution records, fur severance tax audits, and bobcat and river otter possession and export tag data. This information along with fur prices, harvest level of other species, numbers of trappers and habitat conditions is used to determine the status of bobcat and river otter populations in the state.

During the 2001-2002 season 339 bobcat pelts were tagged for export from the state and during the 2002-2003 season 516 bobcat pelts were tagged for export from the state. During these two seasons, bobcat could only be taken by trapping. The number of bobcat tagged is the best estimate of the harvest. Bobcat habitat in Louisiana has not under gone any significant detrimental changes in recent years. Based on a review of all harvest report information collected from fur buyers and dealers and the status of habitat conditions, the Department concludes that bobcat the population is stable and the 2003-2004 trapping harvest will not be detrimental to the survival of the species.

The Louisiana Department of Wildlife and Fisheries set a hunting season for bobcat during the 2003 – 2004 deer season. One bobcat per season can be taken by any legal means during the open deer season. However, such bobcat cannot be pelted or sold without a trapping license. Prior to setting the bobcat hunting season, the following information was considered, the harvest of bobcat has dropped dramatically since the 1980's, not because of population decline but because of lower prices paid for pelts. During the 1960's and 1970's, habitat for bobcats was declining in the east central and the northeast portions of the state, as hardwoods were cleared for soybeans. That trend was reversed during the last 20 years with land being replanted into bottomland hardwoods. A shorter rotation in pine timber is also likely improving bobcat habitat. Considering this information (lower trapping harvest and improved habitat) the Department is confident that a bobcat hunting season will not be detrimental to the bobcat population in the State. The Department will be monitoring this harvest through deer hunting and bow hunting surveys.

During the 2001-2002 season 2,579 river otter pelts were tagged for export from the state and during the 2002-2003 season 3,932 river otter pelts were tagged for export for the state. The number of river otter tagged is

● Page 2                                                January 14, 2004

the best estimate of the harvest. River otter can only be taken by trapping.  River otter habitat in Louisiana has not under gone any significant detrimental changes in recent years.  Based on a review of all harvest report information collected from fur buyers and dealers and the status of habitat conditions, the Department concludes that river otter populations are stable and the 2003-2004 harvest will not be detrimental to the survival of the species.

        The Department will continue to collect and evaluate all harvest data for these species and monitor habitat conditions for significant changes.  Data collection and analysis from the 2003-2004 trapping season should be complete in the late summer or early fall 2004.  If you need additional information please do not hesitate to call.

                         Sincerely,

                         Philip E. Bowman
                         Assistant Secretary
                         Office of Wildlife

010175



**NEVADA DEPARTMENT OF CONSERVATION AND
NATURAL RESOURCES**
# DIVISION OF WILDLIFE

1100 Valley Road, Reno, Nevada 89512
(775) 688-1500

March 14, 2003

Robert R. Gabel
Division of Scientific Authority
U.S. Fish and Wildlife Service
4401 North Fairfax Drive
Room 750
Arlington, VA 22203



Dear Mr. Gabel,

Following is a review of bobcat and otter harvest information from the state of Nevada for the 2000-2001 and 2001-2002 seasons.

Total Harvest of **CITES** Species in Nevada, 2001 and 2002 Seasons

| YEAR | SPECIES | TOTAL HARVEST | TOTAL TRAPPED | TOTAL SEALED |
|------|---------|---------------|---------------|--------------|
| 2000-2001 | Bobcat | 865 | 811 | 835 |
| 2000-2001 | Otter | 4 | 4 | 0 |
| 2001-2002 | Bobcat | 1.145 | 1,042 | 1185 |
| 2001-2002 | Otter | 6 | 6 | 0 |

Bobcat
    Each year, those harvesting bobcats are required to turn in a lower jaw from each bobcat they harvest. Additionally, a tag must be affixed to the jaw including sex and location of harvest. A canine tooth is extracted from each jaw for aging purposes. Records are kept and analyzed for each state management area as well as on a regional basis. These records help us to monitor fluctuations in the bobcat population, and to adjust harvest seasons accordingly.
    Additionally each trapper in the state is required by state law to fill out two separate forms with harvest effort information. At the time of pelt sealing, an individual must have a completed bobcat harvest report with number of animals harvested by sex, trapping location by harvest management unit, and trap effort. A second form, a trapper questionnaire, must be also be filled out and returned at the conclusion of each trapping season that includes number of animals by species and trapping effort for all animals trapped (including bobcat) for the season. This information adds to our analysis process by allowing us to include trapper effort as a secondary gauge of bobcat population trends.
    We maintain a large database of these statistics with data going back for several decades. Bobcat populations are stable to increasing statewide, except the Mojave desert region of the state appears to be slightly down. Ironically, the same region has seen complaints of nuisance bobcat triple over the last year. Harvest will not be detrimental.

Otter

Each trapper is required by state law to complete and return a trapper questionnaire at the conclusion of each trapping season that includes number of animals by species and trapping effort for all animals trapped (including otter) for the season. This information allows us to monitor trapping effort and harvest levels for otter in the state. Otter trapping within the state of Nevada is limited to 5 of 17 counties, and does not play an important part of the annual trapping effort. Not all populations of otter within the state are open for trapping.

We maintain a large database of harvest levels and trap effort for otter that includes data back for several decades. Populations of otter are stable to increasing across the state. Harvest will not be detrimental.

Enclosed please find copies of our annual furbearer reports for the year of 2001-2002. Please feel free to contact me with any further information you may need.

Sincerely,

Russell Woolstenhulme
Furbearer Staff Biologist,
Nevada Division of Wildlife

013792

# FURBEARERS

**WESTERN REGION**

<u>Harvest</u>

This past trapping season's harvest figures for furbearing animals were obtained as they are every year through a post-season questionnaire sent out to all licensed trappers. The sample figures are then expanded to represent total harvest.

In the Western Region, a total of 1,932 furbearing animals were harvested, up slightly from last season. The overall harvest summary however, averaged for the last 10-15 years, remains low. The decline in fur value since the mid-1980's is representative of the worldwide fur market. Early trapping conditions were favorable even though most area's had an average snowfall. Western Region trappers recorded 48% of the state's total fur harvest of over 4000 animals. The number of licensed trappers has remained consistently low for about the last 15 years. The majority of trappers continue to pursue coyote and bobcat, and a shrinking number of trappers target fox, raccoon and the aquatic species. Table I represents the fur harvest in the Western Region, indicating the seven more sought after species.

**Table 1.  WESTERN REGION FURBEARER HARVEST**
**1998-2002**

| SPECIES | 1997-98 | 1998-99 | 1999-2000 | 2000-01 | 2001-02 | 5-Yr. Avg. |
|---------|---------|---------|-----------|---------|---------|------------|
| Bobcat | 647 | 279 | 781 | 227 | 346 | 456 |
| Coyote | 933 | 337 | 822 | 497 | 518 | 621 |
| Beaver | 347 | 247 | 527 | 260 | 385 | 353 |
| Muskrat | 9484 | 3359 | 2887 | 488 | 424 | 3328 |
| Gray Fox | 161 | 65 | 147 | 155 | 68 | 119 |
| Kit Fox | 212 | 61 | 104 | 81 | 44 | 100 |
| Mink | 69 | 4 | 56 | 15 | 26 | 34 |

Using statewide average fur prices, the expanded fur value for all species taken in the Western Region is $75,312. Bobcat prices increased as expected, up 37%. All species except beaver, badger and kit fox saw an increase in fur value. Coyote and Gray Fox were up 35% and 73% respectively. Muskrat also increased substantially, up 62%, although the total number of muskrats trapped this year pales in comparison to record years. Drought conditions along with pelt prices have affected the harvest of all aquatic species. The total number of furs offered at the Nevada Trapper's Association Fur Sale in Fallon was comparable to last year, with slight increases for some species. Statewide fur values are detailed in Table 2.

**Table 2.  WESTERN REGION - 1998-2002 FUR VALUES**
(All figures in dollars per pelt)

| SPECIES | 1997-98 | 1998-99 | 1999-2000 | 2000-01 | 2001-02 | 5-Yr. Avg. |
|---------|---------|---------|-----------|---------|---------|-----------|
| Bobcat | $77.18 | $94.76 | $84.82 | $133.25 | $170.64 | $112.13 |
| Coyote | $12.19 | $9.69 | $16.13 | $12.20 | $17.74 | $13.59 |
| Beaver | $15.45 | $10.62 | $8.94 | $12.75 | $9.93 | $11.54 |
| Muskrat | $1.83 | $1.06 | $1.45 | $1.73 | $2.76 | $1.77 |
| Gray Fox | $7.90 | $8.57 | $6.44 | $6.51 | $11.73 | $8.23 |
| Kit Fox | $6.85 | $5.19 | $5.45 | $7.00 | $8.70 | $6.64 |
| Mink | $6.63 | $10.56 | $6.00 | Not available | $4.74 | $6.98 |

**Bobcat**

Bobcat harvest data is collected annually from information reported by the trappers on their bobcat harvest report forms.  Additional data is derived from the collection and processing of the lower jaw of each animal.  Trappers are required to turn in the lower jaw, with intact canines, at the time their pelts are sealed.  It remains unknown if and when the season length will have an effect on the number of harvested bobcats.  For now, the driving force for bobcat trappers is the price at sale time.

Although it is difficult to draw statistical inference from the small sample of teeth collected this year, the data is consistent with past years of low harvest.  This is consistent throughout the state.  The small sample sizes produce lower than average ratio's of kittens per adult female and this alone does not offer a clear indication of the specie's overall health.  More so it is a reflection of trapper preference with many trappers targeting male cats, and releasing females and kittens.  The ratio of adult males/adult females is indicative of a healthy bobcat population and has remained so for several years. Biologists are still pessimistic about current habitat conditions, following another year of draught and increasing fire hazards.

013794



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

JUN 6 2008

IN REPLY REFER TO:
FWS/DMA CEP 1-07

Ms. Lisa P. Jackson, Commissioner
New Jersey Department of Environmental Protection
401 E. State Street
P.O. Box 402
Trenton, New Jersey 08625-2885

Dear Ms. Jackson:

I am writing to request your assistance in obtaining New Jersey's harvest report for the 2006-2007 river otter (*Lontra canadensis*), harvest season. Although we have made multiple requests to the Division of Fish and Wildlife of your agency, our normal contact on these matters, we have not received a response.

Via a letter dated August 29, 2007, to Director Dave Chanda, this office requested that New Jersey's harvest report for the 2006-2007 river otter harvest season be provided to us by October 31, 2007 (enclosed). This annual reporting requirement and reporting date are in accordance with 50 Code of Federal Regulations, Part 23.69. Further attempts to obtain this report have been made via the Association of Fish and Wildlife Agencies. Despite these efforts, we have not received any response from New Jersey regarding this report.

For the U.S. Fish and Wildlife Service to approve the export of river otter pelts from a particular State or Tribe, the State or Tribe must provide information on the harvest to enable us to make the required non-detriment and legal acquisition findings required under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). Since we have not received the requested information from New Jersey, we cannot make all of the required findings to approve New Jersey for the export of river otter pelts. Therefore, until we receive this information, we will be unable to authorize the export of river otter harvested in New Jersey for the 2008-2009 river otter harvest season.



014043

Ms. Lisa P. Jackson                                                                 2

If you have any questions or concerns regarding this matter, please contact Craig Hoover, Chief, Branch of Operations, Division of Management Authority, at (703) 358-2162.

Sincerely,

for Robert R. Gabel, Chief
Division of Management Authority

cc: Enclosure
     D. MacLauchlan, AFWA
     Division of Scientific Authority

014044

| | | |
|---|---|---|
| State of: | North Dakota. | |
| Project No.: | W-67-R-49 | Wildlife Surveys and Investigations |
| Phase: | E | Furbearer Investigations |
| Study No.: | E-III | BOBCAT POPULATION DATA |
| Job No.: | E-III-1 | Annual Fur Harvest of North Dakota Bobcats |
| Job No.: | E-III-2 | Bobcat Harvest, Age, and Sex Ratios |
| Period covered: | July 1, 2008 - June 30, 2009 | |
| Submitted by: | Stephanie Tucker | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PERFORMANCE REPORT

A.  This is an annual surveys and inventories project.  The objectives were to determine the annual harvest and the distribution of bobcats in North Dakota (Job 1) and estimate the rate of differential mortality in the bobcat population (Job 2).

B.  Carcasses were obtained from all bobcats known to be harvested in North Dakota during the 2008-2009 harvest season.  For each bobcat, location and date of harvest, method of take, sex, and age (adult or juvenile) were recorded.  Necropsies were conducted to assess body condition, verify sex of animal, examine reproductive tracts of females for placental scarring, collect lower canines for aging, and collect other biological samples for cooperative research projects.  Stomachs and reproductive tracts were sent to South Dakota State University for analyses.  Muscle tissues samples were sent to Frostburg State University for genetic analyses.  Blood samples were sent to USDA-Wildlife Services to be tested for animal exposure to sylvatic plague and tularemia.  Lower jaws were shipped to Matson's Laboratory for age determination via cementum analysis.  As part of a study to characterize the parasite *Cytauxzoon felis* in vector and reservoir populations, we collected spleen tissue samples from and shipped them to the University of Georgia, College of Veterinary Medicine for analyses.

C.  Data have been compiled for 49 of the 51 bobcats harvested during the 2008-2009 season.  Bobcats (27 males, 18 females, 6 unknown) were harvested from 9 counties (Billings [$n$=12], Bowman [$n$=8], Dunn [$n$=3], Grant [$n$=3], McHenry [$n$=1], McKenzie [$n$=9], Morton [$n$=2], Sioux [$n$=5], and Slope [$n$=6]) during the 2008-2009 harvest season.  Based on age estimates at the time carcasses were checked in to the Department, 42 were adults (21 males, 17 females, 2 unknown), 5 were juveniles (4 males, 1 female), and 4

1

014463

were unknown ages (2 males, 2 females). Bobcats died from being snared ($n$=20), trapped ($n$=13), shot ($n$=12), automobile killed ($n$=2), and unknown ($n$=2). Eighteen North Dakota residents harvested 1 bobcat, six individuals harvested 2-5 bobcats, and one individual harvested 7 bobcats.

Age results from Matson's Laboratory have not yet been received for the 2008-2009 harvest season. However, age determination from 154 bobcats harvested in 2007-2008 was completed. Of those, 31 bobcats were juveniles (i.e. less than one year old) and 123 bobcats were adults (i.e. $\geq$ 1 year old). Mean age of adults was 2.2 ± 2.1 years ($\bar{x}$ ± SD), with the oldest bobcat being 15 years old. Adults comprised 80% of the harvest with an age ratio of 4:1 (adult:juvenile) and sex ratio of 1.2:1 (male:female). Sex ratio of juvenile bobcats was 1.1:1 (male:female).

Results were obtained from Frostburg State University on genetic analyses of over 250 muscle tissue samples collected during the 2004-2005 through 2007-2008 harvest seasons. Results indicated little or no inbreeding and a high degree of heterozygosity, suggesting a healthy population with adequate gene flow.

Three of 114 bobcats sampled tested positive for the parasite *Cytauxzoon felis*; prevalence in the population was 2%. Two other samples need to be sequenced again to confirm that they are positive. *Cytauxzoon felis* is a tick-transmitted protozoal parasite that results in a persistent subclinical infection in bobcats and a highly fatal infection in domestic cats.

2




# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

MAR -7 2003

**MEMORANDUM**

To:         Chief, Division of Management Authority

From:       Chief, Division of Scientific Authority

Subject:    Advice on the State of Texas' application for the export of river otter (*Lontra canadensis*) taken during the 2002-2003 harvest season

**Based on information provided by the Texas Parks and Wildlife Department, the Division of Scientific Authority advises that the export of river otters taken in the 2002-2003 trapping season will not be detrimental to the survival of the species. This finding carries conditions, which must be met for this finding to be valid.**

Scientific Authority Requirements

Scientific Authority guidelines previously developed for river otter export, which represent professionally accepted wildlife management practices, are presented in more detail in the August 18, 1983 Federal Register document (48 FR 37494). These guidelines are summarized as follows:

    A. Minimum requirements for biological information:

        (1) Information on the condition of the population, including trends (the method of determination to be a matter of state [and Indian Tribe or Nation's] choice), and population estimates where such information is available.
        (2) Information on total harvest of the species.
        (3) Information on distribution of harvest.
        (4) Habitat evaluation.

    B. Minimum requirements for a management program:

        (1) There should be a controlled harvest, methods and seasons to be a matter of state [or Indian Tribe or Nation] choice.
        (2) All skins should be registered and marked.
        (3) Harvest level objectives should be determined annually by the states [or Indian Tribes or Nations].

Background

On June 26, 2000, the Texas Parks and Wildlife Department (TPWD) submitted a request to the Division of Management Authority (DMA) for multi-year approval for the export of river otter pelts legally harvested in Texas, pursuant to the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES).

In its November 1, 2000, finding, DSA determined that TPWD had submitted insufficient information on which to base a non-detriment finding for the export of river otters taken in Texas in the 2000-2001 trapping season or beyond. DSA determined that the TPWD submission was deficient in the following: (1) the description of the abundance survey methodology (bridge sign surveys) was inadequate for a thorough evaluation of its utility in determining population trends; (2) population trend information based on bridge surveys (Table 1 in the TPWD submission) only covered a 6-year period (1995-2000), and was inadequate for a thorough evaluation; (3) otter harvest figures in Table 2 of the TPWD submission are only estimates with very broad confidence intervals (it is unclear why the harvest information is not more precise); (4) there was no information on the spatial distribution of the otter harvest within Texas; (5) there was no information on amount or quality of otter habitat in Texas; (6) there was no description whatsoever of the State's harvest management program for river otters (i.e., open/closed areas, methods, seasons, daily and seasonal harvest limits, licensing requirements, reporting requirements, tagging, etc.); (7) there was no indication of how annual harvest levels are determined; and (8) there was no indication that skins are marked or tagged in any way. DSA's finding was transmitted to TPWD in a letter dated November 15, 2000, from the Chief, DMA.

TPWD appealed DSA's finding in a letter dated September 21, 2001. The appeal included much information not included in the original submission, including the following: (1) information on the historical distribution of otters in Texas; (2) information on the decline and subsequent recovery of otters in Texas; (3) information on recent otter distribution in Texas; (4) copies of TPWD regulations and a Proclamation; and (5) a discussion of river otter management programs in other eastern States. We evaluated the new information and found that, although it was considerably more substantial than the original submission, it still did not fully meet our minimum requirements for biological information and a management program. Rather than issue another finding at that time, we requested that DMA contact TPWD and request the remaining information we felt was necessary so that we could proceed to make the finding. That information we needed and questions we had are as follows: (1) a copy of the actual harvest regulations for river otter for the current season and last season (harvest season, open/closed areas, harvest limits, licensing requirements, reporting requirements, etc.); (2) more detailed information on the abundance survey methodology (How is "activity" defined? Does the survey evaluate the level of activity at survey locations or just presence/absence? How sensitive is this method to changes in the otter population?); (3) more details on the abundance survey results (How many counties had activity in 1995, 96, 97 and 2000, and which counties are these? Into which 8 counties did river otters expand their range from 1983 to 1995?); (4) more details on the trapper survey (Approximately how many active river otter trappers are there in Texas? Are

-2-

015641

trappers required to respond to the survey or is it optional?  If it is optional, what is the response rate per year?  Are trappers required to report their total harvest to TPWD?  Why is the confidence interval around the estimates in Table 2 so large?  How has river otter harvest varied with pelt price over the last 10 years?  Why are harvest estimates for 1996-1997 and 1997-1998 so much higher than other years--the previous  submission did not provide an adequate explanation?); (5) an explanation of how annual river otter harvest limits are set; (6) a clear map of otter distribution in Texas range (a larger version of Figure 1 in the most recent TPWD submission); and (7) a copy of Table 1 referred to in the most recent TPWD submission.

Current Status of Request for Approval

In an e-mail communication on September 24, 2002, TPWD supplied answers to our questions and provided the results of their otter survey efforts.  Despite providing additional information, we still have concerns that TPWD does not have complete information on the distribution or total harvest of river otters, since trappers are not required to report their harvest (estimated response rate is 25 percent).  Fur dealers/buyers are required to report all furs purchased, but there is a discrepancy in harvest numbers derived from voluntary trapper survey reports when compared to the fur buyer reports.  Also, TPWD did not provide any information showing that they had any evaluation of river otter habitat.  TPWD did provide information on their current regulations: there is no bag limit for persons holding a commercial trapper license and the season runs from November 1 through March 31.  For recreational harvest, there is a possession limit of two animals and the season runs year-long (September 1 to August 31), but animals or skins may not be sold.  In a later e-mail communication with the Operations Branch of DMA, TPWD staff indicated that they would be pursuing the promulgation of regulations in the coming months that will require tagging of all otter pelts taken. Once this regulation is in place, TPWD will know more accurately the total harvest of otters in Texas.

On March 6, 2003, TPWD provided a copy of their internal report, "Status of the river otter (Lutra canadensis) in Texas" from January 1989.  This report contains substantial information, though more than a decade old, on historical distribution of river otters in Texas, habitat types in which the species is found, and where these habitats occur.  Essentially, these are the marshes, freshwater swamps, and permanent streams and tributaries in eastern Texas, in the Pineywoods, Post Oak Savannah, and Gulf Prairies and Marshes ecoregions.

The report characterizes habitat types in each ecoregion.  While available habitat is not quantified, the report states that "most wetland habitats are used in proportion to their availability," and contains information on home range, densities, and relative use of each type of habitat, although otters demonstrated no clear preference for specific habitat components.  Based on densities and estimated areas of individual drainage basins, population estimates are reported. The report shows that recovery of beaver (Castor canadensis) in Texas has been favorable to river otters, due to the habitat modifications caused by beavers.  In addition, anthropogenic changes, such as building of impoundments, canals, levees, and reservoirs, also provide additional habitat for otters.

-3-

015642

This report shows that TPWD had conducted bridge sign surveys going back to 1978, with resultant data that further substantiate a recovery and expansion of range of the species in the State. This data supplements the previous information submitted for 1995-2000 and further illustrates the expansion of range of river otters in Texas, which also then shows an inferred increase in abundance.

Based on an evaluation of all the information that TPWD provided, including the fact that TPWD has documented that the Texas river otter population expanded from 1983 to the late 1990s, as documented by bridge crossing surveys, and the fact that more accurate and complete information will be gained once tagging requirements are in place in Texas, we have determined that Texas' river otter export program for the 2002-2003 season will not be detrimental to the survival of the species. We are making a positive finding of non-detriment under the **CONDITIONS** that the State of Texas will:

> (1) promulgate regulations requiring the tagging of all river otter pelts during the next 6-9 months;
> (2) immediately require tagging of all pelts harvested since September 1, 2002, for export (to comply with our CITES export requirements);
> (3) compile information on the distribution and total harvest of river otters from the 2002-2003 season; and
> (4) continue regular monitoring of otter activity at bridges, including the collection of habitat information in areas of activity.

To be approved for export of river otters beyond those harvested in 2002-2003, the State of Texas must submit a report by March 1, 2004, containing:

> (1) the total harvest and distribution of harvest of river otters from the 2002-2003 season;
> (2) a copy of final regulations requiring tagging of all river otter pelts; and
> (3) results of the most recent bridge surveys, including evidence that shows that information on otter habitat is being collected and evaluated.

If these deficiencies are not addressed, we will not be able to make positive findings for Texas river otters for future years.

We note that Texas is a State already approved for the export of bobcat (*Lynx rufus*) and has complied with CITES export requirements for that species. The State should be advised that bringing their harvest controls and monitoring in line with their current program for bobcat would suffice for ongoing export approval for river otters.

015643




# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

IN REPLY REFER TO:
FWS/DMA CEP 1-07

JUN   6   2008

Mr. Frank Jezioro, Director
West Virginia Division of Natural Resources
State Capitol
Building 3, Room 669
1900 Kanawha Boulevard, East
Charleston, West Virginia 25305

Dear Mr. Jezioro:

I am writing to request your assistance in obtaining West Virginia's harvest report for the 2006-2007 bobcat (*Lynx rufus*) harvest season. Although we have made multiple requests to the Wildlife Resources Section of your agency, our normal contact on these matters, we have not received a response.

Via a letter dated August 29, 2007, to Wildlife Resources Section Chief Curtis Taylor, this office requested that West Virginia's harvest report for the 2006-2007 bobcat harvest season be provided to us by October 31, 2007 (enclosed). This annual reporting requirement and reporting date are in accordance with 50 Code of Federal Regulations, Part 23.69. Further attempts to obtain this report have been made via the Association of Fish and Wildlife Agencies. Despite these efforts, we have not received any response from West Virginia regarding this report.

For the U.S. Fish and Wildlife Service to approve the export of bobcat pelts from a particular State or Tribe, the State or Tribe must provide information on the harvest to enable us to make the required non-detriment and legal acquisition findings required under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). Since we have not received the requested information from West Virginia, we cannot make all of the required findings to approve West Virginia for the export of bobcat pelts. Therefore, until we receive this information, we will be unable to issue export permits for bobcat harvested in West Virginia for the 2008-2009 bobcat harvest season.



017182

Mr. Frank Jezioro                                                                                          2

If you have any questions or concerns regarding this matter, please contact Craig Hoover, Chief, Branch of Operations, Division of Management Authority, at (703) 358-2162.

Sincerely,

for Robert R. Gabel, Chief
Division of Management Authority

cc: Enclosure
    D. MacLauchlan, AFWA
    Division of Scientific Authority

017183



Horton, Clifton <clifton_horton@fws.gov>

## RE: Lynx take reports 7-11
2 messages

**Vashon, Jennifer** <Jennifer.Vashon@maine.gov>                                    Thu, Nov 14, 2013 at 12:02 PM
To: "mark_mccollough@fws.gov" <mark_mccollough@fws.gov>
Cc: "Camuso, Judy" <Judy.Camuso@maine.gov>, "Connolly, James" <James.Connolly@maine.gov>, "Jakubas,
Walter" <Walter.Jakubas@maine.gov>, "DePue, John" <John.E.DePue@maine.gov>, "McLellan, Scott"
<Scott.McLellan@maine.gov>, "Hoppe, Richard" <Richard.Hoppe@maine.gov>, "Kane, Douglas"
<Douglas.Kane@maine.gov>, "Caron, Mark" <Mark.Caron@maine.gov>, "Schaeffer, Thomas"
<Thomas.Schaeffer@maine.gov>, "Robicheau, Ryan" <Ryan.Robicheau@maine.gov>, "DeMusz, Amanda J"
<Amanda.J.DeMusz@maine.gov>, "Starr, Allen" <Allen.Starr@maine.gov>, "Bard, Richard"
<Richard.Bard@maine.gov>, "Clifton Horton (Clifton_Horton@fws.gov)" <Clifton_Horton@fws.gov>

Hi Mark,


To date, we have responded to the take of 13 lynx in foothold traps this fall. You received reports 1-6 last week
and I've attached the redacted reports for takes #7-11. Plaintiff's and intervener's counsel were sent copies of
these last week.


I am working on compiling reports 12 and 13 for two lynx that were caught on Sunday 11/3 and Sunday 11/10.
Both traps were legal, IFW biological staff released the lynx, and the lynx were released with minor injuries.


If you have any questions, feel free to call anytime.


Jen


_____

Jennifer Vashon-MDIFW's Mammal Program

Canada Lynx and Black Bear Biologist

Maine Department of Inland Fisheries and Wildlife

650 State St. Bangor, ME 04401

jennifer.vashon@maine.gov

207.941.4238 (office)

207.941.4450 (fax)

Remember Maine's Wildlife!

Purchase a Loon Plate        Contribute at tax time                                         020809

**5 attachments**

**Lynx Incidental Take Report 2013_TRP011_Redacted.pdf**
430K

**Lynx Incidental Take Report 2013_TRP007_Redacted.pdf**
965K

**Lynx Incidental Take Report 2013_TRP008_Redacted.pdf**
794K

**Lynx Incidental Take Report 2013_TRP009_Redacted.pdf**
394K

**Lynx Incidental Take Report 2013_TRP010_Redacted.pdf**
440K

---

**Horton, Clifton** <clifton_horton@fws.gov>                     Mon, Nov 18, 2013 at 10:17 AM
To: Bridget Fahey <bridget_fahey@fws.gov>
Cc: Craig Hoover <craig_hoover@fws.gov>, Mary Cogliano <Mary_Cogliano@fws.gov>

Hello Bridget,


I am forwarding to you five reports of Canada lynx (*Lynx canadensis*) take in Maine that has been reported to our office. These takes are NOT incidental to bobcat (*Lynx rufus*) trapping. These takes occurred in October 2013 and Maine's bobcat season began on 11/3/2013.  Therefore, these takes are not germane to the Biological Opinion on the CITES Export Program for Furbearers on Canada Lynx.  Please let me know if you have any questions or concerns.

[Quoted text hidden]

---

**5 attachments**

**Lynx Incidental Take Report 2013_TRP011_Redacted.pdf**
430K

**Lynx Incidental Take Report 2013_TRP007_Redacted.pdf**
965K

**Lynx Incidental Take Report 2013_TRP008_Redacted.pdf**
794K

**Lynx Incidental Take Report 2013_TRP009_Redacted.pdf**
394K

**Lynx Incidental Take Report 2013_TRP010_Redacted.pdf**
440K

Lynx Incidental Capture Report

Report No. <u>2013-TRP011</u>

Lynx ID: <u>LIC37</u>

**Name of Individual Reporting Capture:** (b) (6)          rapper, (b) (6)
(b) (6)

**Name of Biologist/Warden Responding to Report:** District Wardens Scott Martin and Seth Powers, Biologists Mark Caron and Allen Starr

**Type of Capture:** Trap
>       *Set type:* Dirthole
>       *Trap type and size: Foothold* – Northwoods 1 ½ - 2 coils, plain jaw
>       *Jaw spread and swivels:* 4 5/8 inches, 2 swivels
>       *Staking:* staked, 16 inch chain
>       *Bait:* Beaver, Cheese, dog food, fox lure mix
>       *Lure:* fox urine
>       *Visibility of Bait:* No
>       *Legal Set?* Yes

**Location of Capture:** T 1 R8 Wels/Grindstone

**Wildlife Management District:**      10

**GPS Coordinates (UTM preferred):**      525467   5064762
**GPS Map Datum (NAD 83 preferred):**      NAD 83

**Date of Capture:** 10/28/13

**Disposition of Lynx:** Alive, sedated, treated, and released

**Age/Sex:** Adult female; 20 lbs

## Description of events

**Response:** At 0819, Warden Martin responded to the call from a trapper that he caught a lynx. Wdn Martin contacted the lynx hotline. Wardens Martin and Powers and biologists Mark Caron and Allen Starr responded. The animal was sedated, examined for injuries, and given supportive care (hydrating fluids, antibiotics, monitor vital signs, and injury treated following established procedures) before being released. Wdn. Martin examined the trap and interviewed the trapper for compliance with State trapping laws. The set was legal. Biologist Jen Vashon notified USFWS Special Agent Eric Holmes of the capture.

**Weather conditions:** Overnight:~35 degrees F with clear skies. Daytime: 38 degrees F, cloudy, and slight wind.

**Disturbance:** None reported or observed at site

**Assessment of the lynx:** The animal was sedated and examined for injuries following SOAP procedures (subjective, objective, assessment, plan). Eyes, ears, nose, mouth, neck, and torso were normal. A small laceration was observed on the second toe of the left front capture foot. Body temperature was slightly below normal, the lynx was kept warm following established procedures. No broken, chipped, or missing teeth were observed. The animal was a female and weighed 20 lbs. The lynx was given antibiotics, subcutaneous fluids, and the laceration was cleaned following established procedures. The lynx was measured, weighed, ear tagged, and DNA was collected. An injection of yohimbine was given to reverse the effects of the sedative and the lynx was observed during recovery in a portable dog crate. Upon recovery, the lynx was observed walked away without a visible limp.

See attached forms: reporting incidental lynx, capture sheet, and WS Incident Card for more information.
Report prepared by: Jennifer Vashon 11/6/13;                                                   020811

**Incidental Lynx Capture Form** LYNX# 137

| | |
|---|---|
| ATE: | |
| Observers: Doran Park Tower Park | |
| Recorder: Caron | Town: Grindstone Twp |
| Road Name: Red River Rd | County: Penobscot |
| TMe 5:25:07 UTMn 5004 762 Datum: WGS84 NAD27 NAD83 | |

| | | | Time when manageable: 10:53 |
|---|---|---|---|
| | | | Time of recovery/ release: 12:20 |

| | Ketaset Concentration mg/ml | Xylazine Concentration mg/ml | Time | Delivery Method | Additional Drug (If Needed) | Amount |
|---|---|---|---|---|---|---|
| Dose | 0.45 m l | .05 m l | 10:43 | jab | Antibiotic (SCorIM) 0.5cc/10lbs | 1 cc |
| Dose | m l | m l | | | Yohimbine(IVorIM)0.5cc/20lbs | 11:36 |
| Dose | m l | m l | | | Midazelam(IVorIM) 0.5cc/slowly | |
| Dose | m l | m l | | | Epinephrine(SCorIM) 0.5cc/10lb | |
| mments: | | | | | Doxapram (IVorSL) 1.0cc/22lbs | |

ex: M (F)   **Estimated Age:** Kitten  Subadult  (Adult)  Year Born(if known)_____

arTag#(Left) 742   (Right) 743   Tag Color: yellow

| bjective (Body Condition): or ☐ Fair ☐ Good ☑ Excellent ☐ | Mark abnormal area below: | Body Temperature | Time |
|---|---|---|---|
| jective  Normal  Abnormal | | Normal – 101-102.5 | |
| es/Ears ☒ ☐ | | 98.6 F | 10:56 |
| se/Mouth ☒ ☐ | | 100.4 F | |
| ck/Torso ☒ ☐ | | 100.5 F | |
| in ☒ ☐ | | 100.5 F | 11:25 |
| tremities ☐ ☒ | | | |

sesment: caught by two small toes on one left hind bled small cut. treated

un: Release/no sedation   Sedation: Treat in field  fluids SQ irrigate la/uspray   Sedate/Transport to Vet   Euthanize

eth: (Normal) Missing Broken Worn Describe:_____ Photo? side view (2) / front view

at Condition: (Prime) Summer  Shedding  Mange  Bare/Worn   Describe:_____

pture Foot? Left Front  Right Front  Left Rear  Right Rear

pture Foot Injuries: Yes or No  Describe: Small cut on 2nd toe

| BODY MEASUREMENTS | | LYNX IDENTIFCATION | | | | |
|---|---|---|---|---|---|---|
| | | | Lynx | Bobcat | | |
| eight (Actual or Estimate) | 22.2 lbs | Tail Banding Pattern | No Bands | 1 Band  2 Bands  3 Bands | | |
| tal Length | -748 mm | Color of tip of tail | Completely Black | Black on top/white beneath | | |
| est Girth | 390 mm | Hind Foot Coloration | Grey | Dark Brown | | |
| NA Sample: Yes  No | | Ear Tuft Length | >1 inch / <1 inch | <1 inch | | |
| air  Blood  Tissue | Mouth Swab | Toe Coloration | Left Front | Right Front | Left Rear | Right Rear |
| arasites:  Yes  No | | (circle white toes) | (I M M O) | (I M M O) | (I M M O) | (I M M O) |
| arse  Abundant | Sample Y  N | | | | | |
| dio Collared: Y (N)  Initial/Previously Collared  Collar Works:Y  N  Make: LT  Sirtrack  ATS  GPS SAT  VHF | | | | | | |
| equency:_____ Replacement Collar Freq:_____ | | Collar Life:____months  Leather Circum:____mm | | | | |

mments: Small split on right ear also        Red River Rd off Pebaloks Rd

W 1157 44 9.33            Recovered in kennel - walked off fine

w 68 46 21.76            no visible inj.

otos? YES  NO  Photo Number_____            Reviewed Data Sheet?  YES  NO

Scott Martin was onsite in his capacity

020812

## 1. Obtain information from CALLER  *advise caller to minimize disturbance to the animal *

Date 10-28-13   Time 856 AM   IFW Staff collecting caller info: Scott Martin

Trapper/Individual Reporting (b) (6)
Address (b) (6)   Phone number: (b) (6)

Town: T-1-R8  Grindstone   LYNX ID (w/o disturbing cat)

Location: Near Roberts Rd
GPS coordinates: N 45° 44' 8.75"  W 68° 40' 21.72"
GPS datum: (WGS84) NAD27 NAD83
Directions and meeting time: Huber Rd to Roberts Rd Turn left at 5.5 m.le
1 m.le Down Road Lynx on Right

| | | |
|---|---|---|
| Blacktip tail | Yes | No |
| Spotted | Yes | No |
| Eartufts | (Yes) | No |
| Large feet | (Yes) | No |
| Grey legs | (Yes) | No |

Circle all info that applies

Type of trap? (Foot-hold) Conibear Cage   Animal still in trap? (Yes) No
When was trap last tended? 0830 10-27-13   (Alive) Dead
Staking of Trap? (Staked) Drag   Lynx appear injuried? Yes (No)
Is animal entangled? Yes (No)   Animal's Behavior (Calm) Sleeping Pacing

Disturbance at the site? Yes (No)   Other:
Type of Disturbance: Vehicle traffic  Hunters  Equipment operation  Animal disturbance

Cloudy
Current weather? (Clear) Rain Snow Windy   Current temperature? 38 Deg
Overnight weather? (Clear) Rain Snow Windy   Overnight temperature? 35 Deg

## 2. Contact IFW lynx hotline 592-4734   to coordinate response
## 3. At the site minimize disturbance (crowd and/or traffic control)
## 4. At the site: Assess the ANIMAL prior to chemical immobilization

Animal entangled in vegetation? Yes (No)
Unresponsive? Yes (No)
Broken bones? Yes (No)  If yes, Compound  non-compound
Bleeding? (Yes) No  If yes, (minor)  Major
Laceration? Yes (No)  If yes, superficial (through 1st layer of skin)  major (deep requires sutures)
Limping/dragging limb? Yes (No)

## 5. Information when ON-SITE:   Circle all information that applies

Conibear 110 120 160 220 Other:
Foothold trap type #1.75 #2 #3 MB 450 MB 550 Other: Northwoods 1 1/2
Inside jaw spread 4 5/8 inches   Number of Swivels? 2
Jaw type Padded Laminated Offset (Reg)   Number of coils? 2
Securing method (Staked) Drag Chain length: 16   In-line spring? Yes (No)
Bait? (Yes) No Type: Beaver/Cheese/Dog Food/FoxLure M-8   Visible? Yes (No)
Lure? (Yes) No Type: Fox Urine   Legal Set? (Yes) No

All people present 1 (b)(6)  2 Seth Powers (Udu) 3 Allen Starr (B.o)
4 Mark Caron (B.o) 5 Scott Martin (udu) 6  7

## 6. Anethesia (follow protocol and complete capture form)
## 7. Action Taken:
Release uninjured? Y/N   Euthanized? Y/N   Taken to veterinarian? Y/N
Name&Location of Veterinarian:   Phone #:
Comments:

*See Department Policy for situations when you can advise the trapper to release a lynx*   2013

020813

# Call For Service

CFS Number: **WS13-023217**
Date: **10/28/2013 8:18:23 AM**

## Call For Service

| | | | |
|---|---|---|---|
| CFS Number | **WS13-023217** | Complainant |  |
| Date | **10/28/2013 8:18:23 AM** | Address | |
| Dispatcher | | City, State, Zip | |
| Call Source | **0 - Phone** | Phone | |
| Received | **8:19:40 AM** | Call type | |
| Dispatched | **8:56:49 AM** | Reported Offense | **6892 - Trapping - Other** |
| Arrived | | Verified Offense | **6780 - Endangered/Threatened Species** |
| Cleared | **10:20:04 AM** | | |
| Location | **lat 45.723 lon -68.761; t1 r8 wels, red pine rd** | Tow Company | |
| City, State, Zip | **T1 R8 Wels** | Vehicle | |
| Jurisdiction | **W13 - Section 13** | Vehicle License | |
| Grid | **19816 - T1 R8 WELS** | Disposition | **2 - Inactive** |
| Sector | **WE82** | Priority | |
| Map | | Classification | |
| X Coordinate | | | |
| Y Coordinate | | Agency | **MWS - Maine Warden Service** |
| | | Case | |
| Reviewed By | **10321 - Scott, Dan** | Reviewed On | **11/4/2013 8:42:21 AM** |

**Officers**
0634 - Martin, Scott
2173 - Powers, Seth

Notes    2247 warden Scott Martin 60 miles 5 hours. Responded to a incidental catch of a lynx by a trapper. Investigated the scene and found no violations. Assisted biologists with the release of the lynx. Sent scanned document of lynx form and pictures to Jen Vashon, Mark Caron, Lt Tom Ward.

```
===========================================================================
CLOSED CALL FOR
SERVICE==================================================================
===------------------------------------------------- INCIDENT INFORMATION--------------------------
-------------------------------------------CAD EVENT NUMBER:        130023217        OFFENSE CODE:
wsre     AGENCY:          wm (CAD)      JURISDICTION:        ws (CAD)      SECTOR:
e13 (CAD)     GRID:          758 (CAD)  CREATED:          20131028 08:19:40        REPORTED:
20131028 08:18:23   OCCURRENCE START:        20131028 -1      OCCURRENCE END:          -1 -1
       CLOSED:          20131028 10:20:21      CALL TAKER:          lhall, d, hr02
       DISPATCHER:          lhall, d, hr02   MODIFIED BY:          lhall, hr02   [RESPONSIBLE
MEMBER]     MEMBER:          {10634] martin, scott      UNIT:          ws2247      GROUP ID:
warden  [ATTENDED]  [LOCATION]    ADDRESS:          lat 45.723 lon -68.761; t1 r8 wels, red pine rd
       CITY:          t1 r8 wels    LAT/LON:          4572295,-6876067      LOCATION
DETAILS:          incident  [INCIDENT DETAILS]need a warden ref to another lynx in his trap.  he is not sure if it
```

# Call For Service

CFS Number: **WS13-023217**
Date: **10/28/2013 8:18:23 AM**

is alive or not.  he is on his way there right now to check it
out==================================================================================
SUBJECTS============================================================================
====================================================================================
=
VEHICLES============================================================================
BUSINESSES==========================================================================
===
DISPOSITIONS========================================================================
======== ----------------------------------------------------------- DISPOSITION-------------------------------
------------------------------------------ [DETAILS] CODE:          6892          DISPOSITION DATE/TIME:
20131028 10:20:21     DEVICE:          hr02     PERSON ID:          lhall  [MISCELLANEOUS]
          CREATED DATE:          0     CREATED TIME:          0     MODIFIED BY OPERATOR:     lhall
          MODIFIED BY WORKSTATION:  hr02  LAST MODIFIED:          20131028
102019==============================================================================
==
MESSAGES============================================================================
====================================================================================
==
NCICReplies=========================================================================
== ACTIVITY
LISTS===============================================================================
=---------------------------------------------------------------[hr02, lhall]: (called adv that 2245 and 2246 are
very familiar with him and he has all ready spoken with both of the about same issue prior to this. )----------------
------------------------------------------------------------[hr02, lhall]: (waiting for 2246 to call in to sign 10-
8)==================================================================================
INCIDENT
ASSOCIATIONS========================================================================
========

Report No. **2013-TRP007**

Lynx ID: **LIC34**

**Name of Individual Reporting Capture:** ▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓

**Name of Biologist/Warden Responding to Report:** District Warden Brad Richards, Biologist Mark Caron and Tom Schaeffer

**Type of Capture:** Trap
> ***Trap type and size:*** *Foothold – #3 - 2 coils, offset jaws*
> ***Jaw spread and swivels:*** 6 ½ inches, 2 swivels
> ***Staking:*** drag, 4 ft chain
> ***Bait:*** meat
> ***Lure:*** urine
> ***Visibility of Bait:*** None
> ***Legal Set?*** Yes

**Location of Capture:** Codyville near the town line of Waite, Tomah Dam Rd

**Wildlife Management District:** 19

**GPS Coordinates (UTM preferred):** 607569, 5029042
**GPS Map Datum (NAD 83 preferred):** NAD 83

**Date of Capture:** 10/24/13

**Disposition of Lynx:** Alive, sedated, treated, and taken to veterinarian – released on 10/25/13

**Age/Sex:** adult female; 20 lbs

### Description of events

**Response:** At 1017, Warden Brad Richards responded to the call from a trapper that he caught two lynx in the town of Waite (also see report 2013_TRP008). MDIFW biologists Mark Caron and Tom Schaeffer were nearby responding to a previous lynx capture (report 2013_TRP006). Wdn. Richards and biologists Mark Caron and Tom Schaeffer responded. The animal was sedated, examined for injuries and given supportive care (hydrating fluids, antibiotics, monitor vital signs, and injury treated following established procedures) before being transported to a veterinarian. Wdn. Richards examined the trap and interviewed the trapper for compliance with State trapping laws. The set was legal. MDIFW Biologist Jen Vashon notified USFWS Special Agent Eric Holmes of the capture.

**Weather conditions:** Overnight: 33 degrees F and windy. Daytime: 41 degrees F and windy.

**Disturbance:** None reported or observed at site

**Assessment of the lynx:** The animal was sedated and examined for injuries SOAP procedures (subjective, objective, assessment, plan). Eyes, ears, nose, mouth, neck, and torso were normal. Extremities: Laceration on the hind left leg 1 ½ -2 inches long above tendon. Since body temperature was slightly above normal, lynx was cooled following established procedures. No broken, chipped, or missing teeth were observed. The animal was a female and weighed 20lbs. The lynx was given antibiotics, fluids, and the wound was irrigated and sprayed with aluspray. The lynx was then transported to and examined by a Maine veterinarian. The veterinarian shaved the fur around the wound, irrigated and administered aluspray and antibiotics, and recommended that the lynx be released. Although the veterinarian agreed with our protocol for seeking additional injury assessment, the injury did not require additional treatment. or long-term care. The lynx was given ear tags and released near the capture location on the afternoon of 10/25.

See attached forms: reporting incidental lynx, capture sheet, and WS Incident Card for more information.

Report prepared by: Jennifer Vashon 11/4/13;

020816

Staff Check List for responding and responding as appropriate: Capture of a Lynx

## 1. Obtain information from CALLER *advise caller to minimize disturbance to the animal*

Date __10/24/2013__ Time __1012__ IFW Staff collecting caller info:_____ Wdn. Brad Richard

Trapper/Individual Reporting (b) (6)

Address (b) (6) Phone number (b) (6)

Town:__ Codyville Plt

Location: Tomah Dam Rd

| | | | | LYNX ID (w/o disturbing cat) | | |
|---|---|---|---|---|---|---|
| GPS coordinates | 067 37.512 | W | 45 24 42 N | Blacktip tail | Yes | No |
| GPS datum | WGS84 NAD27 | NAD83 | | Spotted | Yes | No |
| Directions and meeting time: | | | | Eartufts | Yes | No |
| | | | | Large feet | Yes | No |
| | | | | Grey legs | Yes | No |

Circle all info that applies

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Type of trap? | Foot-hold | Conibear | Cage | Animal still in trap? | **Yes** | No | |
| When was trap last tended? | yesterday | | | | Alive | Dead | |
| Staking of Trap? | Staked | Drag | | Lynx appear injured? | Yes | **No** | |
| Is animal entangled? | Yes | No | | Animal's Behavior | Calm | Sleeping | Pacing |

Disturbance at the site? Yes **No** Other: _____

Type of Disturbance: Vehicle traffic Hunters Equipment operation Animal disturbance

| | | | | | | |
|---|---|---|---|---|---|---|
| Current weather? | Clear | Rain | Snow | Windy | Current temperature? | 41 |
| Overnight weather? | Clear | Rain | Snow | Windy | Overnight temperature? | 33 |

## 2. Contact IFW lynx hotline 592-4734 to coordinate response

## 3. At the site minimize disturbance (crowd and/or traffic control)

## 4. At the site: Assess the ANIMAL prior to chemical immobilization

| | | | | | |
|---|---|---|---|---|---|
| Animal entangled in vegetation? | **Yes** | No | | | |
| Unresponsive? | Yes | **No** | | | |
| Broken bones? | Yes | **No** | If yes, | Compound | non-compound |
| Bleeding? | **Yes** | No | If yes, | minor | Major |
| Laceration? | **Yes** | No | If yes, | superficial (through 1st layer of skin) | major (deep requires sutures) |
| Limping/dragging limb? | Yes | **No** | | | |

## 5. Information when ON-SITE: Circle all information that applies

| | | | | | | |
|---|---|---|---|---|---|---|
| Conibear | 110 | 120 | 160 | 220 | Other:_____ | |
| Foothold trap type | #1.75 | #2 | **#3** | MB 450 | MB 550 | Other:_____ |
| Inside jaw spread | 6 1/2" | inches | | | Number of Swivels?__2__ | |
| Jaw type | Padded | Laminated | **Offset** | | Number of coils:__2__ | |
| Securing method | Staked | Drag | Chain length: _4ft_____ | | In-line spring? Yes | **No** |
| Bait? | **Yes** | No | Type: Meat | | Visible? | Yes **No** |
| Lure? | Yes | No | Type: Urine | | Legal Set? | **Yes** No |

All people present (b) (6) Wdn. Brad Richard 3_Mark Caron_____

4__Tom Schaeffer_____ 5_____ 6_____ 7_____

## 6. Anethesia (follow protocol and complete capture form)

## 7. Action Taken:

Release uninjured? N Euthanized? N Taken to veterinarian? Y

Name&Location of Veterinarian: (b) (6) Phone #:

Comments:

# Incidental Lynx Capture Form

DATE: 10/24/13

Observers: Caren Schaaff

Recorder: Caren      Town: White/Clarksville

Road Name: Tan att Dar Rd    County: Winthrop

UTMe 0607569   UTMn 5023042   Datum: WGS84   NAD27   NAD83

Time when manageable: 1:18 pm

Time of recovery/ release: transported to vet

| | Ketaset Concentration 200 mg/ml | Xylazine Concentration 100 mg/ml | Time | Delivery Method | Additional Drug (If Needed) | Amount |
|---|---|---|---|---|---|---|
| 1st Dose | .5   ml | .05   ml | 1:02 | jab | Antibiotic (SCorIM) 0.5cc/10lbs | |
| 2nd Dose | ml | ml | | | Yohimbine(1VorIM)0.5cc/20lbs | |
| 3rd Dose | ml | ml | | | Midazelam(1VorIM) 0.5cc/slowly | |
| 4th Dose | ml | ml | | | Epinephrine(SCorIM) 0.5cc/10lb | |
| Comments: | | | | | Doxapram (1VorSL) 1.0cc/22lbs | |

Sex: M (F)    **Estimated Age**: Kitten   Subadult   Adult   Year Born(if known)_____

**EarTag#**(Left)_____ (Right)_____ Tng Color:_____

**Subjective (Body Condition):**
Poor   Fair   Good ✓   Excellent ✓

**Objective**   Normal   Abnormal

Eyes/Ears ✗
Nose/Mouth ✗
Neck/Torso ✗
Skin ✗
Extremities ✗

Mark abnormal area below:

| Body Temperature | Time |
|---|---|
| Normal = 101-102.5 | |
| 103.2 F | 1:30 pm |
| 103.4 F | 1:40 pm |
| 102.1 F | 1:55 pm |
| F | |

Assessment: caught by back right leg

back left leg had open wound - exposing tendon / back right leg laceration - treated

**Plan:** Release/no sedation   Sedation; Treat in field Fluids    Sedate/Transport to Vet   Euthanize

**Teeth:** Normal   Missing   Broken   Worn   Describe:_____ Photo? side view (2) / front view

**Coat Condition:** Prime   Summer   Shedding   Mange   Bare/Worn   Describe:_____

**Capture Foot?** Left Front   Right Front   Left Rear   Right Rear

**Capture Foot Injuries:** Yes or No   Describe: laceration - treated (wright, blue spray)

| BODY MEASUREMENTS | | LYNX IDENTIFCATION | | | |
|---|---|---|---|---|---|
| | | | Lynx | Bobcat | |
| Weight (Actual or Estimated) | 20 lbs | Tail Banding Pattern | No Bands | 1 Band   2 Bands   3 Bands | |
| Total Length | mm | Color of tip of tail | Completely Black | Black on top/white beneath | |
| Chest Girth | mm | Hind Foot Coloration | Grey | Dark Brown | |
| DNA Sample: Yes   No | | Ear Tuft Length | >1 inch | <1 inch | |
| Hair   Blood   Tissue | Mouth Swab | Toe Coloration | Left Front | Right Front | Left Rear | Right Rear |
| Parasites: Yes   No | | (circle white toes) | (I M M O) | (I M M O) | (I M M O) | (I M M O) |
| Sparse   Abundant | Sample Y   N | | | | | |

Radio Collared: Y   N   Initial/Previously Collared   Collar Works: Y   N   Make: LT   Sirtrack   ATS   GPS   SAT   VHF

Frequency:_____ Replacement Collar Freq:_____ Collar Life:____months   Leather Circum:____mm

Comments: Vet examined, cleaned wound similar to field staff & advised release. Released 10/30/
10/25/13   administer a antibiotic

Photos? YES NO   Photo Number_____    Reviewed Data Sheet? YES NO

020818

# Incidental Lynx Capture Form

DATE: 10/25/15  Observers: J Vashro (b) (6)
Recorder: J Vashro (b) (6)  Town: (b) (6)
Road Name: (b) (6)  County:

Time when manageable: 1030

Time of recovery/ release:

UTMe _____ UTMn _____ Datum: WGS84 NAD27 NAD83

| | Ketaset Concentration 100 mg/ml | Xylazine Conc Concentration 0.5 mg/ml | Time | Delivery Method | Additional Drug (If Needed) Combined | Amount |
|---|---|---|---|---|---|---|
| Torp 10mg/ml | | | | | | |
| 1st Dose 0.33 | 0.33 ml | 0.33 ml | 3933 | syringe pole | Antibiotic (SCorIM) 0.5cc/10lbs | 0.9 cc |
| 2nd Dose 0.27 | 0.37 ml | 0.27 ml | 0959 | syringe pole | Yohimbine(IVorIM)0.5cc/20lbs | |
| 3rd Dose 0.27 | 0.2 ml | 0.27 ml | 1022 | syringe pole | Midazolam(IVorIM)0.5cc/slowly | |
| 4th Dose | ml | ml | | | Epinephrine(SCorIM)0.5cc/10lb | |
| Comments: Ketaset / Dexdormitor / Torb | | | | | Doxapram (IVorSL) 1.0cc/22lbs | |

Sex: M (F)  Estimated Age: Kitten Subadult (Adult) Year Born(if known) _____

EarTag#(Left) 235 (Right) 235 Tag Color: Yellow

Subjective (Body Condition):
Poor Fair Good X Excellent X

Objective Normal Abnormal
Eyes/Ears X
Nose/Mouth X
Neck/Torso X
Skin X
Extremities X

Mark abnormal area below:



| Body Temperature | Time |
|---|---|
| Normal - 101-102.5 | |
| 104 F | 1040 |
| 103.1 F | 1055 |
| F | |
| F | |

Assessment: 3 small punctures left hind (capture foot) - mild bin 1cm, no vital structu the 1st layer of skin, right hind 1½-2" superficial laceration above hock

Plan: Release/no sedation  Sedation: Treat in field _____  Sedate/Transport to Vet  Euthanize

Teeth: Normal Missing Broken Worn Describe: _____ Photo? side view (2) / front view

Coat Condition: Prime Summer Shedding Mange Bare/Worn Describe: _____

Capture Foot? Left Front Right Front (Left Rear) Right Rear
Capture Foot Injuries: Yes or No Describe: see assessment

| BODY MEASUREMENTS | | LYNX IDENTIFCATION | | |
|---|---|---|---|---|
| | | | Lynx | Bobcat |
| Weight (Actual or Estimate) | 20 lbs | | | |
| Total Length | mm | Tail Banding Pattern | No Bands | 1 Band 2 Bands 3 Bands |
| Chest Girth | mm | Color of tip of tail | Completely Black | Black on top/white beneath |
| DNA Sample: Yes No | | Hind Foot Coloration | Grey | Dark Brown |
| Hair Blood Tissue | Mouth Swab | Ear Tuft Length | >1 inch | <1 inch |
| Parasites: Yes No | | Toe Coloration (circle white toes) | Left Front (I M M O) / Right Front (I M M O) | Left Rear (I M M O) / Right Rear (I M M O) |
| Sparse Abundant | Sample Y N | | | |

Radio Collared: Y N  Initial/Previously Collared  Collar Works: Y N  Make: LT Sirtrack ATS GPS SAT VHF

Frequency: _____ Replacement Collar Freq: _____ Collar Life: ___ months Leather Circum: ___ mm

Comments: following on antenna & fluids
On (b) (6) _____ wanted to try this ketaset combination to see if recovers smoother
Treatment: Wound care & debridement, long term antibiotics, subq fluids 350ml

Photos? (YES) NO Photo Number _____  Reviewed Data Sheet? YES NO

Subcutaneous fluids - 150 - 200 ml

Please recover from sedation & 
in _____

020819

# Call For Service

CFS Number: **WS13-M14392**
Date: **10/24/2013**

## Call For Service

| | | | |
|---|---|---|---|
| CFS Number | **WS13-M14392** | Complainant | (b) (6) |
| Date | **10/24/2013** | Address | **Tomah Dam Rd** |
| Dispatcher | | City, State, Zip | **Codyville** |
| Call Source | **0 - Phone** | Phone | (b) (6) |
| Received | **10:17:00 AM** | Call type | |
| Dispatched | **10:17:00 AM** | Reported Offense | **6892 - Trapping - Other** |
| Arrived | **10:40:00 AM** | Verified Offense | **6892 - Trapping - Other** |
| Cleared | | | |
| Location | **Tomah Dam Rd** | Tow Company | |
| City, State, Zip | **Codyville** | Vehicle | |
| Jurisdiction | **W13 - Section 13** | Vehicle License | |
| Grid | **15608 - Codyville Plt** | Disposition | **2 - Inactive** |
| Sector | | Priority | |
| Map | | Classification | |
| X Coordinate | | | |
| Y Coordinate | | Agency | **MWS - Maine Warden Service** |
| | | Case | |
| Reviewed By | **10321 - Scott, Dan** | Reviewed On | **11/1/2013 3:48:58 PM** |

**Officers**
10851 - Richard, Brad
**CFS Subject Profiles:**

| | | |
|---|---|---|
| Full Name | | Address |
| CSZ | | Home Phone |
| Work Phone | | Email Address |
| Sex | | Race |
| Ethnicity | | DOB |
| Age | | Hair Color |
| Eye Color | | Height |
| Weight | | DLN |
| State | | Driver License Exp. |
| SSN | | |

Notes    Richard 2187 2ot hours 4 reg hours C-1 called and said that he caught a lynx by the hind foot on the Tomah
Dam Road. I told him to stand by and I would be there as soon as I could get there. I arrived and took a few
pictures and had him stand by there at that location as he caught another lynx about 5 miles away. I assisted
Biologist getting that cat to the vet in (b) (6)    No trapping violations detected. CLOSE

Printed For: _____
November 1, 2013 - 3:49 PM

020820

Lynx Incidental Capture Report

**Report No. <u>2013-TRP008</u>**

<u>Lynx ID:  LIC35</u>

**Name of Individual Reporting Capture:** [(b) (6)]  trapper, [(b) (6)]
[(b) (6)]

**Name of Biologist/Warden Responding to Report**:  District Warden Brad Richards, Biologist Mark Caron, Rich Bard, and Tom Schaeffer

**Type of Capture:** Trap
  *Set type:*
  *Trap type and size:*  *Foothold – #3* - 2 coils, offset jaws
  *Jaw spread and swivels:*  6 ½ inches, 2 swivels
  *Staking:*  staked, 18 inch chain
  *Bait:*
  *Lure*:  urine
  *Visibility of Bait:* None
  *Legal Set?*  Yes

**Location of Capture**:  Waite, Bingo Rd

**Wildlife Management District:**    19

**GPS Coordinates (UTM preferred):**   609412, 5020929
**GPS Map Datum (NAD 83 preferred):**    WGS84/NAD 83

**Date of Capture:**  10/24/13

**Disposition of Lynx:**  Alive, sedated, treated, and released

**Age/Sex:**   Adult female; 21 lbs

### Description of events

**Response:** At 1017, Warden Brad Richards responded to the call from a trapper that he caught two lynx in the towns of Waite/Codyville (also see report 2013_TRP007). MDIFW biologists Mark Caron and Tom Schaeffer were nearby responding to a previous lynx capture (report 2013_TRP006). Wdn. Richards and biologists Mark Caron, Rich Bard, and Tom Schaeffer responded. The animal was sedated, examined for injuries and given supportive care (hydrating fluids, antibiotics, monitor vital signs, and injury treated following established procedures) before being released. Wdn. Richards examined the trap and interviewed the trapper for compliance with State trapping laws. The set was legal. Biologist Jen Vashon notified USFWS Special Agent Eric Holmes of the capture.

**Weather conditions:** Overnight: 32 degrees F and windy.  Daytime: 43 degrees F and windy.

**Disturbance:**  None reported or observed at site

**Assessment of the lynx:** The animal was sedated and examined for injuries following SOAP procedures (subjective, objective, assessment, plan). Eyes, ears, nose, mouth, neck, torso and extremities were normal. No injuries observed on lynx or capture foot.  Since body temperature was slightly below normal, lynx was kept warm following established procedures. No broken, chipped, or missing teeth were observed. The animal was a female and weighed 21 lbs. The lynx was given antibiotics and subcutaneous fluids, and was measured, weighed, ear tagged, and DNA was collected. The lynx was given an injection of yohimbine to reverse the effects of the sedative and observed during recovery in a portable dog crate. Upon recovery, although she still had some effects of the sedation, she walked away putting full-weight on all four legs.

See attached forms: reporting incidental lynx, capture sheet, and WS Incident Card for more information.
Report prepared by: Jennifer Vashon 11/4/13;

020821

Observers: _____
Recorder: _____
Road Name: _____
TMe: 60 94Ⅱ7  UTMn 5020929  Datum: WGS84) NAD27 NAD83

Town: _____
County: _____

Time when manageable: 5:42
Time of recovery/ release: 6:52

| | Ketaset Concentration 200 mg/ml | Xylazine Concentration 100 mg/ml | Time | Delivery Method | Additional Drug (If Needed) | Amount |
|---|---|---|---|---|---|---|
| Dose | 2.0 ml | 0.07 ml | 15 pn | Jab right | Antibiotic (SCorIM) 0.5cc/10lbs | 1.0 cc |
| Dose | 0.7 ml | 0.07 ml | — | d scoried | Yohimbine(IVorIM)0.5cc/20lbs | 0.5  437 |
| Dose | 0.7 ml | 0.07 ml | 15 55 | Jab flank | Midazelam(IVorIM) 0.5cc/slowly | |
| Dose | ml | ml | | | Epinephrine(SCorIM) 0.5cc/10lb | |
| Comments: | | | | | Doxapram (IVorSL) 1.0cc/22lbs | |

Sex: M  F)  **Estimated Age:** Kitten  Subadult  (Adult)  Year Born(if known)_____
EarTag#(Left) 241  (Right) 247  Tag Color: yellow

**Objective (Body Condition):**
Poor ☐  Fair ☐  Good ☐  Excellent ☒
Subjective  Normal  Abnormal
Eyes/Ears  ☒  ☐
Nose/Mouth  ☒  ☐
Neck/Torso  ☒  ☐
Skin  ☒  ☐
Extremities  ☒  ☐

Mark abnormal area below:

Assesment: _____

No injuries

| Body Temperature | Time |
|---|---|
| Normal – 101-102.5 | |
| 100.2  F | 3:47 |
| 100.1  F | 3:57 |
| 100.7  F | 4:07 |
| 99.1  F | 4:17 |
| 99.4  F | 4:23 |

Action: Release/no sedation  Sedation: Treat in field _____  Sedate/Transport to Vet  Euthanize

Teeth: Normal  Missing  Broken  Worn  Describe: _____  Photo? side view (2) / front view
Coat Condition: (Prime)  Summer  Shedding  Mange  Bare/Worn  Describe: _____
Puncture Foot? Left Front  Right Front  Left Rear  Right Rear
Puncture Foot Injuries: Yes or No)  Describe: _____

| BODY MEASUREMENTS | | | LYNX IDENTIFCATION | | | |
|---|---|---|---|---|---|---|
| Weight (Actual or Estimate) | 21 lb lbs | | | **Lynx** | **Bobcat** | |
| Total Length | 1020 mm | **Tail Banding Pattern** | No Bands | 1 Band  2 Bands  3 Bands | | |
| Chest Girth | 370 mm | **Color of tip of tail** | Completely Black | Black on top/white beneath | | |
| DNA Sample: Yes/ No | | **Hind Foot Coloration** | Grey | Dark Brown | | |
| Hair  Blood  Tissue | Mouth Swab | **Ear Tuft Length** | >1 inch 47 mm | <1 inch | | |
| Parasites: Yes (No) | | **Toe Coloration** (circle white toes) | Left Front (I M M O) | Right Front (I M M O) | Left Rear (I M M O) | Right Rear (I M M O) |
| Sparse  Abundant | Sample Y  N | | | | | |

Radio Collared: Y  (N)  Initial/Previously Collared  Collar Works:Y  N  Make: LT  Sirtrack  ATS  GPS  SAT  VHF
Frequency: _____  Replacement Collar Freq: _____  Collar Life: _____ months  Leather Circum: _____ mm

Comments: - He responds to 1 1/2 dose. Not sure why - cat moved when jabbed
- drug dose used for 30 lb cat, too heavy, took a long time to come out of drug
- some edema of drug, dark, mobile, no limping  - dog crate
Photos? YES  NO  Photo Number _____  Reviewed Data Sheet? (YES) NO

Staff Check List for verifying and responding to an entangled/captured Lynx

## 1. Obtain information from CALLER *advise caller to minimize disturbance to the animal*

Date __10/24/2013__  Time __11:07 AM__   IFW Staff collecting caller info:_____ Brad Richard

Trapper/individual Reporting   (b) (6)

Address: (b) (6)   Phone number: (b) (6)

Town: __ Waite

Location off end of Bingo Rd Pits
GPS coordinates   067 36.22   E   45 20.00   N
GPS datum   WGS84   NAD27   NAD83
Directions and meeting time:

LYNX ID (w/o disturbing cat)

| | | |
|---|---|---|
| Blacktip tail | Yes | No |
| Spotted | Yes | No |
| Eartufts | Yes | No |
| Large feet | Yes | No |
| Grey legs | Yes | No |

Circle all info that applies

| | | | | | | |
|---|---|---|---|---|---|---|
| Type of trap? | Foot-hold | Conibear | Cage | Animal still in trap? | Yes | No |
| When was trap last tended? | | Yesterday | | | Alive | Dead |
| Staking of Trap? | Staked | Drag | | Lynx appear injured? | Yes | No |
| Is animal entangled? | Yes | No | | Animal's Behavior | Calm | Sleeping | Pacing |
| Disturbance at the site? | Yes | No | | Other: _____ | | |
| Type of Disturbance: | Vehicle traffic | Hunters | Equipment operation | Animal disturbance | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Current weather? | Clear | Rain | Snow | Windy | Current temperature? | 43 |
| Overnight weather? | Clear | Rain | Snow | Windy | Overnight temperature? | 32 |

## 2. Contact IFW lynx hotline 592-4734  to coordinate response

## 3. At the site minimize disturbance (crowd and/or traffic control)

## 4. At the site: Assess the ANIMAL prior to chemical immobilization

| | | | | |
|---|---|---|---|---|
| Animal entangled in vegetation? | Yes | No | | |
| Unresponsive? | Yes | No | | |
| Broken bones? | Yes | No | If yes, | Compound   non-compound |
| Bleeding? | Yes | No | If yes, | minor   Major |
| Laceration? | Yes | No | If yes, | superficial (through 1st layer of skin)   major (deep requires sutures) |
| Limping/dragging limb? | Yes | No | | |

## 5. Information when ON-SITE:   Circle all information that applies

| | | | | | | |
|---|---|---|---|---|---|---|
| Conibear | 110 | 120 | 160 | 220 | Other:_____ | |
| Foothold trap type | #1.75 | #2 | #3 | MB 450 | MB 550 | Other:_____ |
| Inside jaw spread | 6 1/2" | inches | | | Number of Swivels? 2 | |
| Jaw type | Padded | Laminated | Offset | | Number of coils: 2 | |
| Securing method | Staked | Drag | Chain length: __18____ | | In-line spring? Yes  No | |
| Bait? | Yes | No | Type: _____ | | Visible? Yes  No | |
| Lure? | Yes | No | Type: urine | | Legal Set? Yes  No | |

All people present   1 Brad Richard   2 Rich Bard   3 Tom Schaeffer
4 Mark Caron   5 Roger Milligan   6 _____   7 _____

## 6. Anethesia (follow  protocol and complete capture form)

## 7. Action Taken:

Release uninjured?   Y/N   Euthanized?   Y/N   Taken to veterinarian?   Y/N
Name&Location of Veterinarian:   Phone #:
Comments:

*See Department Policy for situations when you can advise the trapper to release a lynx*   2013

020823

# Call For Service

CFS Number: **WS13-M14395**
Date: **10/24/2013**

## Call For Service

| | | | |
|---|---|---|---|
| CFS Number | **WS13-M14395** | Complainant | (b) (6) |
| Date | **10/24/2013** | Address | **Bingo Rd** |
| Dispatcher | | City, State, Zip | **Waite** |
| Call Source | **0 - Phone** | Phone | |
| Received | **11:17:00 AM** | Call type | |
| Dispatched | **11:17:00 AM** | Reported Offense | **6892 - Trapping - Other** |
| Arrived | **11:40:00 AM** | Verified Offense | **6892 - Trapping - Other** |
| Cleared | **4:00:00 PM** | | |
| Location | **Bingo Rd** | Tow Company | |
| City, State, Zip | **Waite** | Vehicle | |
| Jurisdiction | **W08 - Section 08** | Vehicle License | |
| Grid | **15491 - Waite** | Disposition | **2 - Inactive** |
| Sector | | Priority | |
| Map | | Classification | |
| X Coordinate | | | |
| Y Coordinate | | Agency | **MWS - Maine Warden Service** |
| | | Case | |
| Reviewed By | **10321 - Scott, Dan** | Reviewed On | **11/1/2013 3:48:59 PM** |

**Officers**
0851 - Richard, Brad
　　　Notes　Richard 4 Reg Hours 30 miles C-1 called and stated that he had caught a second lynx on the end of the Bingo Rd past Dwelley's pits. I responded and assisted the biologists dealing with the Lynx and getting some necessary equipment. No trapping violations detected.

**Lynx Incidental Capture Report**

Report No. <u>2013-TRP009</u>

Lynx ID: <u>LIC36</u>

**Name of Individual Reporting Capture:** ████(b) (6)████ trapper, ████(b) (6)████
████(b) (6)████

**Name of Biologist/Warden Responding to Report:** District Warden Will Shuman, Sgt. Bill Chandler, Biologist Scott McLellan

**Type of Capture:** Trap
> *Set type:*
> *Trap type and size:* *Foothold – MB550* - 2 coils, offset jaws
> *Jaw spread and swivels:* 4 5/8 inches, 2 swivels
> *Staking:* staked, 18 inch chain
> *Bait:* commercial coyote bait
> *Lure:* commercial coyote lure
> *Visibility of Bait:* No
> *Legal Set?* Yes

**Location of Capture:** T 4 R15 Wels

**Wildlife Management District:** 4

**GPS Coordinates (UTM preferred):** 449956 5095877
**GPS Map Datum (NAD 83 preferred):** NAD 83

**Date of Capture:** 10/25/13

**Disposition of Lynx:** Alive, sedated, treated, and released

**Age/Sex:** Adult male; 20 lbs

### Description of events

**Response:** At 1045, Warden Shuman responded to the call from a trapper that he caught a lynx. Wdn. Shuman and Sgt. Chandler and biologist Scott McLellan responded. The animal was sedated, examined for injuries and given supportive care (hydrating fluids, antibiotics, monitor vital signs, and injury treated following established procedures) before being released. Wdn. Shuman and Sgt. Chandler examined the trap and interviewed the trapper for compliance with State trapping laws. The set was legal. Biologist Jen Vashon notified USFWS Special Agent Eric Holmes of the capture.

**Weather conditions:** Overnight: 30 degrees F and windy. Daytime: 39 degrees F and windy.

**Disturbance:** Yes, vehicle traffic

**Assessment of the lynx:** The animal was sedated and examined for injuries following SOAP procedures (subjective, objective, assessment, plan). Eyes, ears, nose, mouth, neck, and torso were normal. A small laceration was observed on the right front capture foot. Body temperature was normal, lynx was kept warm following established procedures. No broken, chipped, or missing teeth were observed. The animal was a male and weighed 20 lbs. The lynx was given antibiotics, subcutaneous fluids, and the laceration was cleaned (i.e., irrigated following established procedures). The lynx was measured, weighed, ear tagged, and DNA was collected. An injection of yohimbine was given to reverse the effects of the sedative and the lynx was observed during recovery in a portable dog crate. Upon recovery the lynx walked away putting full-weight on all four legs.

See attached forms: reporting incidental lynx, capture sheet, and WS Incident Card for more information.
Report prepared by: Jennifer Vashon 11/6/13;

020825

DATE: 10/25/11  LYNX #: 56

Observers: LYON CHANDLER, WON SHUMP

Recorder: M. LEWANN   Town: T4 R15 WELS   Time when manageable: 1349h

Road Name: Mc COOSS/FW PWD RD. County: SOMERSET CO.   Time of recovery/release: 1540h

UTMe 449956 UTMn 5095877 Datum: WGS84 NAD27/NAD83

| | Ketaset Concentration 100mg/ml | Xylazine Concentration 100mg/ml | Time | Delivery Method | Additional Drug (If Needed) | Amount |
|---|---|---|---|---|---|---|
| Dose | 1.0 ml | 0.20 ml | 1329h | SYRINGE DART | Antibiotic (SCorIM) 0.5cc/10lbs | 1.0 |
| Dose | ml | ml | | | Yohimbine(IVorIM)0.5cc/20lbs | 0.5 |
| Dose | ml | ml | | | Midazolam (IVorIM) 0.5cc/slowly | |
| Dose | ml | ml | | | Epinephrine(SCorIM) 0.5cc/10lb | |
| Comments: | | | | | Doxapram (IVorSL) 1.0cc/22lbs | |

Sex: M F   Estimated Age: Kitten Subadult (Adult) Year Born(if known) PROBABLY 2011, BUT POSSIBLY A SUBADULT

EarTag#(Left) 214   (Right) 214   Tag Color: YELLOW

Objective (Body Condition): Poor ☐ Fair ☐ Good ☐ Excellent ☑

Subjective  Normal  Abnormal
Eyes/Ears ☑ ☐
Nose/Mouth ☑ ☐
Neck/Torso ☑ ☐
Brain ☑ ☐
Extremities ☐ ☑

| Body Temperature | Time |
|---|---|
| Normal – 101-102.5 | |
| 102.3 F | 1355h |
| 101.2 F | 1405h |
| 101.9 F | 1430h |
| F | |

Mark abnormal area below: DORSAL  VENTRAL

Assessment: SMALL (SIZE OF PIN HEAD) LACERATION ON DORSAL SIDE OF PAW + PHALANGES -- DROP OF BLOOD EXITED SITE IS ONLY WAY IT WAS DETECTED -- FLUID

Release/no sedation  Sedation: Treat in field IRRIGATE, ANTIBIOTICS Sedate/Transport to Vet  Euthanize

Teeth: Normal Missing Broken Worn Describe: APPEAR FULL-SIZE LIKE ADULT TEETH / Photo? side view (2) / front view

Coat Condition: Prime Summer Shedding Mange Bare/Worn  Describe: BETWEEN SUMMER + PRIME

Capture Foot? Left Front (Right Front) Left Rear  Right Rear

Capture Foot Injuries: Yes or No  Describe: See ornament

| BODY MEASUREMENTS | | LYNX IDENTIFCATION | | |
|---|---|---|---|---|
| Weight (Actual or Estimate) | 20 lbs | | Lynx | Bobcat |
| Total Length | 760 mm | Tail Banding Pattern | No Bands | 1 Band  2 Bands  3 Bands |
| Chest Girth | EX 410 mm | Color of tip of tail | Completely Black | Black on top/white beneath |
| NA Sample: Yes No | IN 420 | Hind Foot Coloration | Grey | Dark Brown |
| Hair Blood Tissue | Mouth Swab | Ear Tuft Length | >1 inch | <1 inch |
| Parasites: Yes No (UNK) | | Toe Coloration NONE (circle white toes) | Left Front (I M M O) | Right Front (I M M O) / Left Rear (I M M O) / Right Rear (I M M O) |
| Sparse Abundant | Sample Y N | | | |

Radio Collared: Y / N  Initial/Previously Collared  Collar Works:Y N  Make: LT Sirtrack ATS GPS SAT VHF

Frequency:_____ Replacement Collar Freq:_____  Collar Life:____months Leather Circum:_____mm

Comments: RECOVERED IN KENNEL + LET OUT @ 1540h -- LOOKED AWESOME (GOOD COORDINATION) GOOD USE OF ALL LIMBS, ETC

Photos? YES NO  Photo Number_____  Reviewed Data Sheet? YES NO

020826

# Staff Check List for Reporting and Responding to an Incidental Capture of a Lynx

## 1. Obtain information from CALLER *advise caller to minimize disturbance to the animal*

Date __10-25-13__   Time __1030__   IFW Staff collecting caller info: __Will Shuman__

Trapper/Individual Reporting __(b) (6)__
Address __(b) (6)__                    Phone number __(b) (6)__

Town: __TY R15 WELS__

Location: __McGoosisly Pond Rd__

GPS coordinates __N 46°00.6760'__  E  __W069° 38.7965'__  N

GPS datum  (WGS84)  NAD27  NAD83

Directions and meeting time:

LYNX ID (w/o disturbing cat)

| | | |
|---|---|---|
| Blacktip tail | (Yes) | No |
| Spotted | (Yes) | No |
| Eartufts | (Yes) | No |
| Large feet | (Yes) | No |
| Grey legs | (Yes) | No |

Circle all info that applies

| | | |
|---|---|---|
| Type of trap? | (Foot-hold) Conibear Cage | Animal still in trap? (Yes)  No |
| When was trap last tended? | __10-24-13 Aprox 8:00am__ | Alive  Dead |
| Staking of Trap? | (Staked)  Drag | Lynx appear Injuried? (Yes)  No |
| Is animal entangled? | Yes  (No) | Animal's Behavior (Calm)  Sleeping  Pacing |

Disturbance at the site? (Yes)  No    Other:
Type of Disturbance: (Vehicle traffic)  Hunters   Equipment operation   Animal disturbance

| | | | | |
|---|---|---|---|---|
| Current weather? | Clear  Rain  Snow  (Windy) | Current temperature? | __34° F__ |
| Overnight weather? | Clear  Rain  Snow  (Windy) | Overnight temperature? | __30's °F__ |

## 2. Contact IFW lynx hotline 592-4734    to coordinate response

## 3. At the site minimize disturbance (crowd and/or traffic control)

## 4. At the site: Assess the ANIMAL prior to chemical immobilization

| | | | | |
|---|---|---|---|---|
| Animal entangled in vegetation? | Yes | (No) | | |
| Unresponsive? | Yes | (No) | | |
| Broken bones? | Yes | (No) | If yes, | Compound  non-compound |
| Bleeding? | (Yes) | No | If yes, | (minor)  Major |
| Laceration? | (Yes) | No | If yes, | (superficial (through 1st layer of skin))  major (deep requires sutures) |
| Limping/dragging limb? | Yes | (No) | | |

## 5. Information when ON-SITE:    Circle all information that applies

| | | | | | |
|---|---|---|---|---|---|
| Conibear | 110 | 120 | 160 | 220 | Other: |
| Foothold trap type | #1.75 | #2 | #3 | MB 450  (MB 550) | Other: |
| Inside Jaw spread | __4 5/8__ inches | | | Number of Swivels? __2__ |
| Jaw type | Padded  Laminated  (Offset) | | | Number of coils? __2__ |
| Securing method | (Staked)  Drag  Chain length: __18'__ | | | In-line spring? Yes  (No) |
| Bait? | (Yes)  No  Type: __Commercial coyote bait/lure__ | | | Visible? ✗ (No) JHV ✱ |
| Lure? | (Yes)  No  Type: __"__         __"__ | | | Legal Set? (Yes)  No |

II people present   1 __Scott McLellan__   2 __(b) (6)__   3 __(b) (6)__
WDN Bill Chandler   5 __WDN Will Shuman__   6        7

## 6. Anethesia (follow protocol and complete capture form)

## 7. Action Taken:

Release uninjured? (Y)/N      Euthanized? Y/(N)      Taken to veternarian? Y/(N)

Name&Location of Veternarian:                   Phone #:

Comments:  ✱ no visible bait; error on datasheet per
conversation w/ Sgt. Chandler on 1/6/13 who
had also responded to capture. (JHV 1/6)   020827

# Call For Service

CFS Number: **WS13-M14350**
Date: **10/25/2013**

## Call For Service

| | | | |
|---|---|---|---|
| CFS Number | WS13-M14350 | Complainant | (b) (6) |
| Date | 10/25/2013 | Address | Mcgoosele Pond Rd |
| Dispatcher | | City, State, Zip | T4 R14Wels |
| Call Source | 0 - Phone | Phone | (b) (6) |
| Received | 10:45:00 AM | Call type | |
| Dispatched | | Reported Offense | 6780 - Endangered/Threatened Species |
| Arrived | | Verified Offense | 6780 - Endangered/Threatened Species |
| Cleared | | | |
| Location | Mcgoosele Pond Rd | Tow Company | |
| City, State, Zip | T4 R14Wels | Vehicle | |
| Jurisdiction | W12 - Section 12 | Vehicle License | |
| Grid | 11990 - T4 R14 WELS | Disposition | 1 - Active |
| Sector | | Priority | |
| Map | | Classification | |
| X Coordinate | | | |
| Y Coordinate | | Agency | MWS - Maine Warden Service |
| | | Case | WS13-M14350 |
| Reviewed By | | Reviewed On | |

**Officers**
11196 - Chandler, Bill
12159 - Shuman, Will

## CFS Subject Profiles: Cote, Gerald R.

| | | | |
|---|---|---|---|
| Full Name | (b) (6) | Address | (b) (6) |
| CSZ | | Home Phone | |
| Work Phone | | Email Address | |
| Sex | | Race | |
| Ethnicity | | DOB | |
| Age | | Hair Color | |
| Eye Color | | Height | |
| Weight | | DLN | |
| State | | Driver License Exp. | |
| SSN | | | |

Notes   lynx in trap on McGoosele Road

2235 Will Shuman- 150 miles travel, 6 hours time. Sgt. Chandler and I responded to a lynx capture off the Ragmuff Road in T4 R15 WELS. Scott Mclellan was the attending wildlife biologist. The Lynx was relased uninjured. 20 lb male. No trapping violations.

## Lynx Incidental Capture Report

**Report No. 2013-TRP010**

**Lynx ID:** NA

**Name of Individual Reporting Capture:** Retired Game Warden ███ and ███, trapper, ███

**Name of Biologist/Warden Responding to Report:** District Warden Dave Milligan

**Type of Capture:** Trap
  *Set type:*
  *Trap type and size:* *Foothold – MB550* - 2 coils, offset jaws
  *Jaw spread and swivels:* 5 3/8 inches, 2 swivels
  *Staking:* staked, 12-16 inch chain
  *Bait:*
  *Lure:* unknown
  *Visibility of Bait:* No
  *Legal Set?* Yes

**Location of Capture:** T 9 R11 Wels; 12 mile on the 522 rd.

**Wildlife Management District:**   5

**GPS Coordinates (UTM preferred):** 489595, 5138855
**GPS Map Datum (NAD 83 preferred):** WGS84/NAD 83

**Date of Capture:** 10/27/13

**Disposition of Lynx:** Alive and released on-site

**Age/Sex:** unknown- released by Wdn. Milligan

### Description of events

**Response:** At 1213, Warden Johansen received a report from State Police advising that a trapper had caught a lynx in the Haymock Lake Area. Wdn. Johansen advised State Police to contact an Ashland Warden since he was working another case, was not in the area, and would not be able to respond. At 1300, Warden David Milligan received a call from State Police advising him about the lynx and explained that a code 1000 (State Police Emergency) had been in progress when the call was received. Retired Warden ███ had made the call for the trapper from satellite phone at his sporting camp. Wdn. Milligan was not able to reach ███ and learn the location of the lynx until 1530. Wdn. Milligan called the lynx hotline and discussed the appropriate response with biologist Jen Vashon. Given Wdn. Milligan's closer proximity to the site, the late hour, and more than 3 hours before a biologist could reach the site, it was decided that Wdn. Milligan should respond, assess the potential for injury, and release the lynx if uninjured. Wdn. Milligan and Jen Vashon discussed procedures for assessing and releasing the lynx if uninjured. Jen Vashon notified USFWS Special Agent Eric Holmes. The lynx was released and Wdn. Milligan examined the trap for compliance with State trapping laws. Wdn. Johansen interviewed the trapper on 10/28/13. The set was legal.

**Weather conditions:** Overnight: rain and windy. Daytime: 35 degrees F, light rain and windy.

**Disturbance:** None observed while on-site; likely some vehicle traffic, but probably just a few vehicles since it was a Sunday (no hunting or logging activities).

**Assessment of the lynx:** Wdn. Milligan observed the lynx prior to release; the lynx was very calm, and there was no obvious injury. Wdn Milligan released the lynx using a catch pole with a loose loop. The lynx was very docile and watched Wdn. Milligan release the trap. Upon release, the lynx bounded off and appeared unharmed and in very good shape.

See attached forms: reporting incidental lynx, capture sheet, and WS Incident Card for more information.
Report prepared by: Jennifer Vashon 11/6/13;                                        020829

## 1. Obtain information from CALLER  *advise caller to minimize disturbance to the animal*

Date 10/27/2013   Time 1100   IFW Staff collecting caller info:_____

Trapper/Individual Reporting **(b) (6)**     **(b) (6)**

Address **(b) (6)**      Phone number: **(b) (6)**

Town:_ T9 R11 WELS

Location 12 mile on 522 road

| GPS coordinates | N46°24.1912 | E | W69°8.1219 | N |
| GPS datum | WGS84 | NAD27 | NAD83 |

Directions and meeting time:

LYNX ID (w/o disturbing cat)

| Blacktip tail | Yes | No |
| Spotted | Yes | No |
| Eartufts | Yes | No |
| Large feet | Yes | No |
| Grey legs | Yes | No |

Circle all info that applies

| Type of trap? | Foothold | | Animal still in trap? | Yes |
| When was trap last tended? | 10/26/2013 | | | Alive |
| Staking of Trap? | Staked | | Lynx appear injured? | | No |
| Is animal entangled? | No | | Animal's Behavior | Calm |
| Disturbance at the site? | No | | Other: |
| Type of Disturbance: | Vehicle traffic | Hunters | Equipment operation | Animal disturbance |
| Current weather? | Rain | Windy | Current temperature? | 35F |
| Overnight weather? | Rain | Windy | Overnight temperature? |

## 2. Contact IFW lynx hotline 592-4734  to coordinate response

## 3. At the site minimize disturbance (crowd and/or traffic control)

## 4. At the site: Assess the ANIMAL prior to chemical immobilization

| Animal entangled in vegetation? | No |
| Unresponsive? | No |
| Broken bones? | No | If yes, | Compound | non-compound |
| Bleeding? | No | If yes, | minor | Major |
| Laceration? | No | If yes, | superficial (through 1st layer of skin) | major (deep requires sutures) |
| Limping/dragging limb? | No |

## 5. Information when ON-SITE:  Circle all information that applies

| Conibear | 110 | 120 | 160 | 220 | Other:_____ |
| Foothold trap type | | | | MB 550 | Other:_____ |
| Inside jaw spread | 5 3/8" | inches | | | Number of Swivels? 2 |
| Jaw type | | off-set | | | Number of coils: 2 |
| Securing method | Staked | | Chain leng 12-16" | | In-line spring? Yes   No |
| Bait? | No | | Type:_____ | | Visible?   No |
| Lure? | Yes | No | Type: Unknown | | Legal Set?  Yes |

| All people present | Warden David Milligan | 2____ | 3____ |
| 4____ | 5____ | 6____ | 7____ |

## 6. Anethesia (follow protocol and complete capture form)

## 7. Action Taken:

Release uninjured?  yes   Euthanized?  no   Taken to veterinarian?  no

Name&Location of Veterinarian:_____   Phone #:_____

Comments: This form was partially filled out on 10-26-13 by Warden Robert Johansen after meeting with **(b) (6)** (trapper) in the Chamberlain Parking lot.

The following comments are those of Warden David Milligan. I received a call from the State Police at about 1300 hours on 10-27-13, advising that **(b) (6)** had caught another Lynx in the Haymock Lake area. The dispatcher explained that there had been a "Signal 1000", (which basically means that there was an emergency situation going on with the state police), at the time the call came in. This may explain why the dispatcher did not know if the Lynx had been released or not. She advised that the call had come from Retired Warden **(b) (6)**. I called **(b) (6)** and left a message for him to call back to let me know if the lynx had been released and if not, where it was, as well as where I would find the trapper. **(b)** called back at 1530hrs and advised the lynx was still in the trap at about 8 1/2 mile on the 522 road. I made the 1 1/2 hour ride into the woods and met **(b) (6)** at 8 mile. We were unable to find the lynx at the described location. After an hour of looking we split up **(b)** went south looking and I north. At about 1800hrs I found the lynx about five miles to the north. Jenifer Vashon had given me directions over the phone on how to release a lynx unharmed. I used the catch pole with a loose loop and released the Lynx fairly easily. It was very docile and just watched as I took the trap off. The lynx bounded off unharmed and looked in very good shape. The trap was a legal set. The weather was cold, breezy, and raining lightly. I made contact with Jennifer Vashon that night when I got back to town and advised her of how it went. I think it may have been better for the lynx if the trapper had released it immediately. While we were looking for it **(b)** saw a fisher not too far from the Lynx.

*See Department Policy for situations when you can advise the trapper to release a lynx*

# Call For Service

CFS Number: WS13-023176
Date: 10/27/2013 12:12:43 PM

## Call For Service

| | | | |
|---|---|---|---|
| CFS Number | WS13-023176 | Complainant | (b) (6) |
| Date | 10/27/2013 12:12:43 PM | Address | |
| Dispatcher | | City, State, Zip | |
| Call Source | 0 - Phone | Phone | (b) (6) |
| Received | 12:13:46 PM | Call type | |
| Dispatched | 12:33:24 PM | Reported Offense | 6892 - Trapping - Other |
| Arrived | | Verified Offense | 6780 - Endangered/Threatened Species |
| Cleared | | | |
| Location | lat 46.261 lon -69.152; t7 r11 wels, haymock lakes | Tow Company | |
| City, State, Zip | T7 R11 Wels | Vehicle | |
| Jurisdiction | W12 - Section 12 | Vehicle License | |
| Grid | | Disposition | 1 - Active |
| Sector | WD45 | Priority | |
| Map | | Classification | |
| X Coordinate | | | |
| Y Coordinate | | Agency | MWS - Maine Warden Service |
| | | Case | |
| Reviewed By | | Reviewed On | |

## Officers

11396 - Johansen, Robert
10060 - Milligan, David

Notes   2236 - Johansen - Houlton reported this to me and I was unable to make contact with (b) (6) or Lynx Biologists via satellite phone. Given the information provided by (b) (6) I was well out of position to respond and asked Houlton RCC to contact a Warden out of Ashland to see if anyone was closer. I was investigating a report of night hunting a moose in the Caucomgomoc Lake/Mountain Pond area.

2258 - Milligan- 140 truck miles, 1.5 regular hours, 3 OT hours, and 3 regular hours for filling out reports and phone calls with biologists. . I received a call from the State Police at about 1300 hours on 10-27-13, advising that (b) (6) had caught another Lynx in the Haymock Lake area. The dispatcher did not know if the Lynx had been released or not but advised that the call had come from Retired Warden (b) (6) I called (b) (6) and left a message for him to call back to let me know if the lynx had been released and if not, where it was, as well as where I would find the trapper. (b) (6) called back at 1530hrs and advised the lynx was still in the trap at about 8 1/2 mile on the 522 road. I made the 1 1/2 hour ride into the woods and met (b) (6) at 8 mile. We were unable to find the lynx at the described location. After an hour of looking we split up (b) (6) went south looking and I north. At about 1800hrs I found the lynx about five miles to the north. Jenifer Vashon had given me directions over the phone on how to release a lynx unharmed. I used the catch pole with a loose loop and released the Lynx fairly easily. It was very docile and just watched as I took the trap off. The lynx bounded off unharmed and looked in very good shape. The trap was a legal set. The weather was cold, breezy, and raining lightly. I made contact with Jennifer Vashon that night when I got back to town and advised her of how it went. I think it may have been better for the lynx if the trapper had released it immediately. While we were looking for it (b) (6) saw a fisher not too far from the Lynx.

# Call For Service

**CFS Number: WS13-023176**
**Date: 10/27/2013 12:12:43 PM**

CLOSED CALL FOR SERVICE━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ INCIDENT INFORMATION━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━━━ CAD EVENT NUMBER: 130023176    OFFENSE CODE:
wsre    AGENCY:    wm (CAD)    JURISDICTION:    ws (CAD)    SECTOR:
d12 (CAD)    GRID:    x28 (CAD)  CREATED:    20131027 12:13:46    REPORTED:
20131027 12:12:43    OCCURRENCE START:    20131027 0    OCCURRENCE END:    -1 -1
CLOSED:    20131027 19:46:48    CALL TAKER:    lhall, d, hr02
DISPATCHER:    lhall, d, hr02  MODIFIED BY:    jstevens, hr03  [RESPONSIBLE
MEMBER]    MEMBER:    [11396] johansen, robert UNIT:    ws2236    GROUP ID:
warden [ATTENDED]  MEMBER:    [10060] milligan, david    UNIT:    ws2258
[LOCATION]    ADDRESS:    lat 46.251 lon -69.152; t7 r11 wels, haymock lakes    CITY:
t7 r11 wels    LAT/LON:    4626072,-6915238    LOCATION DETAILS:    incident
[INCIDENT DETAILS]reporting that he has a trapper there about 8 miles north of him that has caught a lynx in
a trap twice today / 2236 dealt with the same issue a couple weeks ago with this same guy. his name is **(b) (6)**
**(b) (6)**━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

SUBJECTS━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

VEHICLES━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
BUSINESSES━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

DISPOSITIONS━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ DISPOSITION━━━━━━━━━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━ [DETAILS] CODE:    6780    DISPOSITION DATE/TIME:
20131027 19:46:46    DEVICE:    hr03    PERSON ID:    jstevens [MISCELLANEOUS]
CREATED DATE:    0    CREATED TIME:    0    MODIFIED BY OPERATOR:
jstevens    MODIFIED BY WORKSTATION:  hr03  LAST MODIFIED:    20131027
194645━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
MESSAGES━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

NCICReplies━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
━ ACTIVITY
LISTS━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━[hr02, lhall]: 2236//i cannot get ahold of caller it is
going to voicemail, I am a long ways away from there. let them know andy glidden released on up there the
other night as well.━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━[hr02, lhall]: 2236//i tried to call
the lynx hotline as well and didn't get anyone━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━[hr02,
lhall]: (second number for **(b) (6)**    and have to leave a message for him to call back**(b)**
━━━━━━━━━━━━━━━━━━━[hr02, lhall]: 2258//i will leave a message for **(b)** to call
me back. technically the trapper has 24 hours to report this━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

# Call For Service

CFS Number: **WS13-023176**
Date: **10/27/2013 12:12:43 PM**

----------[hr03, jstevens]: ws2258//says that it is a lynx, going to contact the od and then go in and release it.------
------------------------------------------------------------------------[hr03, jstevens]: ws2258//please advise ws2171 that i
will be going in to release the cat, have bad cell service, will call him to advise the results of cat.----------------------
--------------------------------------------------[hr03, jstevens]: (advised 2171)----------------------------------------------
-------------------------------[hr04, jrairdon]: (biologist called to advise that **(b) (6)** is enroute as well, 2258
advised)--------------------------------------------------------------------------[hr03, jstevens]: ws2258//found the cat,
going to be out of the vehicle for a while attempting to let it go, advise 2171 for me.-----------------------------------------
--------------------------------[hr04, jrairdon]: **(b) (6)** advised )------------------------------------------------------
-----------------------[hr04, jrairdon]: 2261//can you advise **(b)** that i was able to relase the cat (2261//10-4)--------
-------------------------------------------------------[hr04, jrairdon]: (left another message for **(b) (6)**)------
-----------------------------------------------------------------[hr03, jstevens]: ws2258//cat has been released,
already contacted jen the biologist, please contact ws2171 to advise him im off at home and the cat has been
released.------------------------------------------------------------------------[hr03, jstevens]: (advised
ws2171)================================================================================
=== INCIDENT
ASSOCIATIONS==============================================================================
============

020833



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington. D.C. 20240

ADDRESS ONLY THE DIRECTOR
FISH AND WILDLIFE SERVICE

**SEP 2 4 2001**

In Reply Refer To:
FWS/OCHR/004392

Memorandum

To:        Assistant Director for International Affairs
           Attention: Chief, Division of Management Authority

From:      Assistant Director for Endangered Species

Subject:   Transmittal of the Formal Ten-Year Biological Opinion on the Effects of the
           CITES Export Program for Appendix-II Furbearer Species on the Contiguous
           United States Distinct Population Segment of the Canada Lynx

This document transmits the Division of Consultation, HCPs, Recovery, and State Grants of the
U.S. Fish and Wildlife Service's biological opinion on the effects of the CITES Export Program
for Appendix-II Furbearer Species (CITES Export Program) on the contiguous United States
distinct population segment of the Canada lynx (*Lynx canadensis*) pursuant to section 7(a)(2) of
the Endangered Species Act of 1973, as amended (Act).

This biological opinion is based on information provided in the:

1.     February 28, 2001, Amended Biological Opinion on the CITES Export Program.

2.     March 29, 2001, letter from the Assistant Director - International Affairs to the
       Assistant Director - Endangered Species on the February 28 Amended Biological
       Opinion.

3.     April 27, 2001, telephone conversation between Bob Pine of Division of
       Consultation, HCPs, Recovery, and State Grants and lynx biologists Lori
       Nordstrom and Anne Vandehey of the Region 6 Montana Fish and Wildlife
       Office.

4.     April 30, 2001, Meeting between Bob Pine and Elena Babij of Division of
       Consultation, HCPs and Recovery and Andrea Gaski of Division of Management
       Authority.

5.     June 14, 2001, Biological Assessment by the Division of Management Authority.

020988

2

A complete administrative record of this consultation is on file at the Service's Division of Consultation, HCPs, Recovery, and State Grants.

If you have any questions, please contact Renne Lohoefener, Chief, Division of Consultation, HCPs, Recovery and State Grants at (703) 358-2171.  We appreciate the cooperation of the Division of Management Authority throughout this consultation process.

020989

# BIOLOGICAL OPINION

## Description of the Proposed Action

The CITES Export Program for Appendix-II Furbearer Species was developed because the species covered by the Program are listed in Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). The species are: Alaskan gray wolf *Canis lupus*, Alaskan brown bear *Ursus arctos*, bobcat *Lynx rufus*, lynx *Lynx canadensis* (currently only captive-bred specimens are exported under this Program), and river otter *Lutra canadensis*. Before any species listed in CITES Appendix II can be exported from the United States, the Division of Management Authority must determine that the specimens to be exported were legally acquired, and the Division of Scientific Authority must advise that their export will not be detrimental to the survival of the species or to other similarly-listed species.

The CITES Export Program provides for these findings to be made in accordance with CITES provisions and establishes an ongoing system for the issuance of permits and export of the five CITES Appendix-II native furbearer species. Approximately 20 years ago, these furbearer species were listed in CITES Appendix II as "look-a-like[1]" species, based upon the provisions of Article II, paragraph 2(b) of the CITES treaty. Such species are regulated because specimens of these species are similar in appearance to other species that are listed in Appendix I or II based on their own status so that trade in these other listed species can be effectively controlled.

The Service develops the two CITES findings when a State or Tribal program is approved, beginning in the year of approval and for subsequent years. The State or Tribal programs are reviewed periodically to verify that they still qualify for inclusion in the export program, and that the species involved still qualifies for listing in CITES for "look-a-like" reasons and not because they require the application of trade controls of their own merits.

Once these findings are made, tags are annually distributed in July by the export tag manufacturer directly to the States and Tribes. Skins are tagged in accordance with the protocol set up by the State or Tribe, and approved by the Division of Management Authority. Thereafter, skins may be exported from the United States through a designated wildlife port. Individuals and companies wishing to export skins must complete an export permit application, and pay the appropriate application and inspection fees. A valid CITES export permit, listing the pelt tag numbers, must accompany all exported skins.

The following sections specifically identify the type of information requested from each State or Tribe in order for the Service to make its two CITES findings for the CITES Export Program.

---

[1] Except for taxa already listed in Appendix I, the entire cat family, Felidae, otter sub-family, Lutrinae, and gray wolves, *Canis lupus*, were listed in CITES Appendix II in 1977, and the North American population of brown bear, *Ursus arctos*, except for U. a. nelsoni, were listed in Appendix II in 1975.

2

Usually, a report is submitted by each approved State or Tribe annually providing the information identified below.

Generally, the following conditions must be met for the program to be approved:

1.   Current State or Tribal hunting, trapping, and tagging regulations and sample tags must be on file with the Division of Management Authority;

2.   The tags must be durable and permanently locking, and must show the US-CITES logo, the abbreviation for the State or Tribe of origin, the year of take, the species abbreviation, and a unique serial number at the direction of the Division of Management Authority, with tags currently provided by the manufacturer to the approved programs;

3.   To minimize movement of untagged pelts as authorized and prescribed by State or Tribal regulation, trappers or other persons taking furbearers must permanently attach tags to all pelts within a minimum time after trapping, pelts not intended for export must still be tagged;

4.   Takers/trappers/dealers who are licensed or registered by the State or Tribe must account for all tags received and must return unused tags to the State or Tribe within a specified time after the season closes; and,

5.   Export of fully manufactured fur or hide products from the United States is allowed only when the CITES export tags removed from the hides prior to manufacture are surrendered prior to export.

As noted above, the Service must also ensure that export levels of species listed in CITES Appendix II will not be detrimental to the survival of the species. For CITES furbearers, such findings were made for State and Tribal export programs in a series of rules published from 1984 to 1999. The Service periodically reviews the status of the species involved in the furbearer programs. During such a review, the following information is considered:

1.   Whether the species is subject to legal harvest in each State or on Tribal lands; and

2.   A professional assessment, provided by the State or Tribe, of the status of the species on relevant State or Tribal lands.

In making its determination, the Service considers whether the information provided includes:

(1)   Data on population estimates and trends independent of harvest information, such as scent station surveys, archer surveys, and road kill counts;

(2)   An analysis of carcass demographics and population models;

(3)     An analysis of past harvest levels as a function of fur prices, trapper effort, or other indices not derived from the harvest data itself; and,

(4)     Reports prepared on population status and harvest as part of the State or Tribal management program.


When does the Action take place?  Under the terms of the annual Federal tag contract, the export program tags for furbearers are mailed by the tag manufacturer directly to each State or Tribe, no later than July 1 of each year.  However, in 2001, the tags will be mailed in early August.  Tags are then distributed within each State or Tribe in a manner and within a time frame decided upon by the State or Tribe and previously approved by the Service.  Exporters may apply at any time for an export permit to export tagged skins from the United States.  This consultation covers the ongoing implementation of the program through June 30, 2011.

Who is doing the action and under what authority?  The Division of Management Authority, under the authority of the Section 8A of the Endangered Species Act that implements CITES, administers this program.  On September 29, 1980, the Service first published criteria to make decisions on the export of bobcat, lynx, and river otter.

Forty-four States and five Native American Tribes have one or more programs for the five CITES Appendix II furbearer species included in the program.  The following summarizes the approved States and Tribal programs by species: 39 States and 5 Tribes for bobcat, 28 States and one Tribe for river otter, one State for Alaska lynx, one State for Alaska wolf, and one State for Alaska brown bear.

The States and Tribes approved for the export of bobcat are listed in Table 1.  Of these, fourteen States and three Tribes are within the range of the contiguous U.S. distinct population segment of the threatened Canada lynx.  These states, identified in the lynx listing final rule (65 FR 16052), are: Colorado, Idaho, Maine, Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont, Washington, Wisconsin, and Wyoming.  The Tribes include the Klamath Tribe in Washington, the Penobscot Nation in Maine, and the Wind River Reservation in Wyoming.  These approved States and Tribes and the number of export program tags used in 1990-1999 are listed in Table 2.  The opening and closing dates for bobcat trapping seasons for these approved States and Tribes are listed below.

4

The following is a summary of the bobcat trapping season opening and closing dates for the 14 states and 3 tribes with lynx habitat and bobcat trapping under the Service's Program:

| STATE/TRIBE | SEASON OPENING | SEASON CLOSING |
|---|---|---|
| Colorado | December 1 | February 28 |
| Idaho | January 1 | February 28 |
| Maine | December 1 | January 31 |
| Michigan | October 25 | March 1 |
| Minnesota | December 2 | January 7 |
| Montana | December 1 | February 15 – Districts 1-3; March1 – Districts 4-7 |
| New Hampshire | no OPEN season | CLOSED to Bobcat |
| New York | October 25 | February 15 |
| Oregon | December 1 | February 28 |
| Utah | November 22 | February 18 |
| Vermont | January 10 | February 7 |
| Washington | November 11 | January 31 |
| Wisconsin | October 20 | December 31 |
| Wyoming | January 1 | March 1 |
| Klamath Tribe | November 15 | No info |
| Penobscot Nation | October 15 | December 31 |
| Wind River Reservation | December 1 | February 15 |

How will the Action be accomplished? The first part of the Action will be accomplished through the issuance of tags to each State or Tribe for distribution throughout their jurisdictions. The second and final part of the Action will be accomplished through the issuance of CITES export permits and the export of tagged skins.

What are the conservation measures? The Division of Management Authority will ask the States or Tribes to immediately report any incidental take of lynx under this activity. The Division of Management Authority will immediately advise the Region 6 and the Washington Office Endangered Species Division of this take. If or when the maximum take for each year in the ten-year period is reached, this will trigger a reinitiation of this consultation between the Division of Management Authority and the Division of Endangered Species.

## Status of the Species

The following information is abridged text, taken directly from the March 24, 2000 final rule (65 FR 16052) on the listing of this lynx population:

> Lynx use large woody debris, such as downed logs and windfalls, to provide denning sites with security and thermal cover for kittens (McCord and Cardoza 1982; Koehler 1990; Koehler and Brittell 1990; Squires and Laurion 1999; J. Organ, U.S. Fish and Wildlife Service, *in litt*. 1999). For lynx den sites, the age of the forest stand does not seem as important as the amount of downed, woody debris available (Mowat *et al.* 1999). In Washington, lynx used *Pinus contorta* (lodgepole pine), *Picea* spp. (spruce), and *Abies lasiocarpa* (subalpine fir) forests older than 200 years with an abundance of downed woody debris for denning (Koehler 1990). A den site in Wyoming was located in a mature subalpine fir/lodgepole pine forest with abundant downed logs and a high amount of horizontal cover (Squires and Laurion 1999). A lynx den site found in Maine in 1999 was located in a forest stand in *Picea rubra* (red spruce) cover type that was logged in 1930 and again in the 1980s (J. Organ, *in litt*. 1999). The site is regenerating into hardwoods and has a dense understory (J. Organ, *in litt*.1999). The dominant feature of the Maine site was the abundance of dead and downed wood (J. Organ, *in litt*. 1999).

> The size of lynx home ranges varies by the animal's gender, abundance of prey, season, and the density of lynx populations (Hatler 1988; Koehler 1990; Poole 1994; Slough and Mowat 1996; Aubry *et al.* 1999; Mowat *et al.* 1999). Documented home ranges vary from 8 to 800 square kilometers (3 to 300 square miles) (Saunders 1963; Brand *et al.* 1976; Mech 1980; Parker *et al.* 1983; Koehler and Aubry 1994; Apps 1999; Mowat *et al.* 1999; Squires and Laurion 1999). Preliminary research supports the hypothesis that lynx home ranges at the southern extent of the species' range are generally large compared to those in the northern portion of the range in Canada (Koehler and Aubry 1994; Apps 1999; Squires and Laurion 1999).

> Lynx are highly specialized predators whose primary prey is the snowshoe hare (*Lepus americanus*), which has evolved to survive in areas that receive deep snow (Bittner and Rongstad 1982). Snowshoe hares use forests with dense understories that provide forage, cover to escape from predators, and protection during extreme weather (Wolfe *et al.* 1982; Monthey 1986; Hodges 1999a,1999b). Lynx concentrate their hunting activities in areas where hare activity is relatively high (Koehler *et al.* 1979; Parker 1981; Ward and Krebs 1985; Major 1989; Murray *et al.* 1994; O'Donoghue *et al.* 1997, 1998a).

> The association between lynx and snowshoe hare is considered a classic predator-prey relationship (Saunders 1963; van Zyll de Jong 1966; Quinn and Parker 1987). In northern Canada and Alaska, lynx populations fluctuate on approximately 10-year cycles that follow the cycles of hare populations (Elton and Nicholson 1942; Hodges 1999a,1999b; McKelvey *et al.* 1999b). Generally, researchers believe that when hare populations are at

their cyclic high, depletion of food resources exacerbated by predation cause hare populations to decline drastically (Buehler and Keith 1982; Krebs *et al.* 1995; O'Donoghue *et al.* 1997). Snowshoe hare provide the quality prey necessary to support high-density lynx populations (Brand and Keith 1979). Lynx also prey opportunistically on other small mammals and birds, particularly when hare populations decline (Nellis *et al.* 1972; Brand *et al.* 1976; McCord and Cardoza 1982; O'Donoghue 1997, 1998a). Red squirrels (*Tamiasciurus hudsonicus*) are an important alternate prey (O'Donoghue 1997;1998a; Apps 1999; Aubry *et al.* 1999). In the Yukon, lynx shifted to red squirrels when hare numbers began to decline (O'Donoghue 1998a, 1998b). However, a shift to alternate food sources may not compensate for the decrease in hares consumed (Koehler and Aubry 1994). In northern regions, when hare densities decline, the lower quality diet causes sudden decreases in the productivity of adult female lynx and decreased survival of kittens, which causes the numbers of breeding lynx to level off or decrease (Nellis *et al.* 1972; Brand *et al.* 1976; Brand and Keith 1979; Poole 1994; Slough and Mowat 1996; O'Donoghue *et al.* 1997).

Relative densities of snowshoe hares at southern latitudes are generally lower than those in the north, which has led to differing interpretations of the population dynamics of snowshoe hare populations. Snowshoe hares are generally associated with conifer forest cover types (Hodges 1999b). Relatively low snowshoe hare densities at southern latitudes are likely a result of the naturally patchy, transitional boreal habitat at southern latitudes that prevents hare populations from achieving densities similar to those of the expansive northern boreal forest (Wolff 1980; Buehler and Keith 1982; Koehler 1990; Koehler and Aubry 1994). Additionally, the presence of more predators and competitors of hares at southern latitudes may inhibit the potential for high-density hare populations with extreme cyclic fluctuations (Wolff 1980). If snowshoe hare populations in southern boreal forests do fluctuate (Hodges 1999b), then southern lynx populations also may be expected to fluctuate. Therefore, lynx densities at the southern part of the range never achieve the high densities that occur in the northern boreal forest (Aubry *et al.* 1999).

Lynx population dynamics in the contiguous United States may not be the same as in the northern boreal forests of Canada and Alaska. Regarding lynx in the northern boreal forests of Canada and Alaska, northern lynx populations undergo extreme fluctuations in response to snowshoe hare population cycles; lynx disperse when hare populations decline; lynx are capable of dispersing long distances; recruitment of young into the population seems to cease during cyclic lows of snowshoe hare populations; and lynx maintain home ranges (Mowat *et al.* 1999). We do not know the extent to which the northern lynx populations influence lynx occurrence in the contiguous United States. Because of the naturally fragmented habitat and lower density hare populations in the contiguous United States, we expect lynx in the contiguous United States to occur at naturally lower densities than in the north.

In the listing rule, the Service concluded that historic and current lynx densities in the contiguous United States are naturally low relative to lynx densities in the northern boreal forest.

## Environmental Baseline

Data that would help us determine whether resident populations of lynx existed historically or exist currently in many States are generally unavailable. Given the available data and the propensity of lynx to disperse, at this time it is impossible to determine with certainty whether reports of lynx in many States were: (1) merely dispersing animals from northern populations that were effectively lost from the metapopulation because they did not join or establish resident populations, (2) animals that were a part of a resident population that persisted for many generations, or (3) a mixture of both members of resident populations and dispersing animals.

There are several plausible explanations for a lack of lynx records, such as (1) the true absence of lynx, (2) lynx populations are at a cyclic low, (3) lack of adequate surveys, or (4) decreased trapper effort. In the listing rule, the Service suspected that some areas in the contiguous United States naturally act as "sinks" for lynx where mortality is higher than recruitment and lynx are lost from the overall population (McKelvey *et al.* 1999a). Sink habitats are most likely those places on the periphery of the southern boreal forest in the contiguous United States where habitat becomes more fragmented and more distant from larger lynx populations.

Thus, historic lynx data in the contiguous United States are scarce and exist primarily in the form of trapping records. Data showing few lynx trapped could be a result of decreased trapper effort, not necessarily a decreased population. These factors hamper our understanding of lynx population dynamics and status in the contiguous United States and preclude us from drawing definitive conclusions about lynx population trends. Data are too incomplete to infer much beyond simple occurrence (McKelvey *et al.* 1999b) and distribution of lynx in the contiguous United States. However, despite these difficulties, trapping data is the best information available on lynx presence throughout much of its range in the contiguous United States and therefore was relied upon in our analysis. The Appendix has information from the listing rule concerning the effect of trapping on lynx.

**Trapping in 2001**. Prior to the bycatch of one lynx in a Montana bobcat trap, the Service had no records of the incidental take of a lynx from approved States and Tribes in the CITES Export Program (Anon., 2000).

The following information on this one reported bycatch of lynx in a bobcat set is excerpted from the February 14, 2001 amendment to the Biological Assessment.

"...an edited summary of the incidental take of this lynx in the Montana trap. The summary is excerpted from the record of a conservation between a Service biologist and the Montana State Furbearer Coordinator (February 8, 2001), and a follow-up email between the same individuals (February 12, 2001). 'A [young] female, radio-collared

lynx was taken in a bobcat set on January 23, 2001, in Trapping District 2 (west central Montana). She was found dead near the trap with a swollen foot. It is not clear whether she pulled herself clear or if the trapper released her. It is also unknown what the cause of death was. Researchers have the body for necropsy.' Bobcat trapping quotas [in Montana] are set for each of the seven trapping districts. If the quota is met prior to the scheduled end of the trapping season, the district is closed to further trapping. Trapping districts 1, 2, and 3 are in discussion on trapping in Montana, [Montana] said that they had a strong trapper community. There is a lot of interest, both in trapping and in using hounds. Prices for Montana bobcats is about $80 to $120. Other fur prices also remain high enough to make the effort worth it."

The following excerpted email report with additional information on the incidental take was submitted by Division of Management Authority to Endangered Species on March 29, 2001 as required by the February 28, 2001, amended biological opinion.

"The following summarizes the incidental take based on a March 28, 2001, report submitted by the Furbearer Coordinator of the Montana Fish, Wildlife and Parks, and a [cited above] February 8, 2001, email record of a conversation that a Service CITES Policy Specialist/Biologist had with the same Montana State Furbearer Coordinator regarding the incidental take of a lynx in a bobcat set trap. According to these accounts, the incidentally taken lynx was a radio-collared yearling female ....'...considered to be in relatively poor physical condition upon recovery, as assessed by the United States Forest Service lynx project personnel on the date of recovery." He [the coordinator] further reported that, "...According to our [Montana's] investigating game warden, this incidental capture was reported by United States Forest Service personnel on January 1, 2001. This radio-collared lynx was a lynx project animal that had begun transmitting a mortality signal. The lynx was recovered dead on January 1, 2001, with an injury (laceration) on it's back left leg, lying approximately 30 yards away from a bobcat set. The lynx appeared to have been caught in a #4 double-spring foothold trap and had been released earlier by the trapper. During a follow up interview, the trapper indicated he had captured a small radio-collared lynx and had released it apparently uninjured on January 16, 2001. The trapper did not reset his trap while the lynx was in the area.'

The carcass has been retained by the lynx project but a necropsy has not yet been conducted to assess the cause of mortality. Division of Management Authority will periodically follow-up with the Montana State Furbearer Coordinator to check on the results of the necropsy and will provide this information as soon as it is available. The bobcat quota of 180 bobcats was not reached in Trapping District 2 during the 2000-2001 season and remained open until the season closed on February 15, 2001."

9

Other bycatch of lynx that occurred through trapping in 2001:

Montana –

One lynx killed in a conibear trap legally set for a wolverine; one female caught by the toe in a leghold (size 0 or 00) set for a marten; Fall 2000: a lynx was poached by a lion hunter; a trapper caught a lynx this year and let it go; a collared kitten was poached early in the lion season;

Maine --

Lynx broke its leg in a leghold set for a coyote; Maine Fish and Wildlife received video footage of a lynx released from a leghold set for a coyote.

Tagging Trends, Market Demand, and Skin Prices

Ten years of tagging data from 1990-1999 are available from requisite reports submitted by all participating States and Tribes under the CITES Export Program for Appendix II Furbearers. Table 1 lists the numbers for all bobcats tagged in the Program in all approved States and Tribes and Table 2 for lynx States and Tribes only. Figure 1 illustrates tagging trends over this period for all States and Tribes compared to the lynx States and Tribes.

The tagging trends in Figure 1 for all bobcat States and Tribes and lynx States and Tribes are roughly comparable. When comparing these bobcat tagging data of all States and Tribes to another CITES furbearer in the program, the river otter, bobcat tagging data from all States and Tribes fluctuates approximately the same as otters over the same ten year period (Figure 2).

The number of skins tagged in the lynx States and Tribes remained fairly steady in the ten year period fluctuating between 5,338 and 9,857 skins tagged and with a median of 8,037 skins tagged in 1991 (Table 2). The annual average for bobcat skins tagged over this period was about 8,100 each year in the 14 States and Tribes where lynx occur.

Table 3 lists all lynx States and Tribes and their respective 10-year average for tags skins. Figure 3 shows the average number of skins over the ten year period of 1990-1999 for all lynx State and Tribes in ascending order.

More than half of the tagged skins (*i.e.*, 54 percent) came from only 4 of the 17 lynx States and Tribes or those tagging an annual average of more than 3,000 skins: Colorado, Idaho, and Maine, and the Klamath Tribe in Washington. These States and Tribes occur at the northern-most part of the bobcat's United States range and these bobcat probably produce the heavier and more desirable skins sought after by the limited market (Anon, 2001a).

Based upon conversations with a few state furbearer managers and the request for additional tags from others, the number of skins tagged in 2001 may have increased; these data will not be available until next year. The 2001 North American average auction price for quality skins increased to $41.62 in February 2001 from $32.34 in March 2000 (Anon., 2001a). However, these price data should be used cautiously. According to the North American Fur Auctions, the overall market demand for bobcat skins is erratic and that demand is selective, based upon the quality and color of skins (Anon., 2001b; Anon., 2001c). Although prices for other wild furs are increasing in the region, only about a half or less of bobcat skins presented for auction were actually sold at auction in 2000 and 2001 (Anon., 2001a). North American Fur Auctions reports for Canada and the United States indicate that bobcat skins (marketed as lynx cat in the fur trade) are some, "...of the most difficult to sell over the past few seasons"(Anon., 2001b; Anon., 2001c).

**Effects of the Action**

The Appendix has excerpts from the March 24, 2000 final rule listing the lynx (65 **FR** 16052) that shows the potential threat of overutilization/trapping to the lynx to be minimal. The rule states that, "The threat to resident lynx from legal trapping for other species may be limited in many areas because bobcat or coyote trapping generally occurs outside of areas where lynx would be found, although we know that incidental capture occurs (Wydeven 1993; M. DonCarlos *in litt.* 1994; R. Naney, United States Forest Service, pers. comm. 1999). Although we are concerned about the loss of lynx that are incidentally captured, we have no information to indicate that the loss of these individuals has negatively affected the overall ability of the contiguous United States Distinct population segment to persist. Additionally, we believe that lynx have been incidentally trapped throughout the past, and still they persist throughout most of their historic range. In summary, we conclude that past and present overutilization is not a factor threatening lynx."

In the 20 years of the CITES Export Program, there has been one bycatch of lynx reported. Based upon available information, it is estimated that bycatch of lynx in traps set for bobcat for the next ten years for this Export Program would be uncommon. As excerpted from the February 14, 2001 amendment to the original May 19, 2000 Biological Assessment, "more than 7,500 bobcat skins were tagged in 1998, the last year in which the Division of Management Authority has complete data. It is estimated that at least this number were tagged in the 2000-2001 season because of the increase in the 2001 market price of skins, noted above. Therefore at a minimum, there were at least 7,500 successful bobcat traps set in the 2000-2001 season with one bycatch of lynx reported. This bycatch represents a 1:7,500 ratio, if considering only successful bobcat traps set."

It is unknown whether unreported lynx bycatch is occurring, and if it is occurring, the numbers of lynx that may be affected. In an April 27, 2001 telephone conversation between Bob Pine of Washington Office Division of Consultation, HCPs, Recovery and State Grants and lynx biologist Lori Nordstrom of the Region 6, Montana Fish and Wildlife Office, Lori stated that due

to the rarity of the lynx in the southern part of the range, that no more than one additional, unreported lynx was probably trapped in a bobcat set in the 2000-2001 trapping season and may potentially have been killed. Therefore, the expected lynx bycatch in bobcat sets that includes both reported and unreported trapping would be two lynx killed for the 2000-2001 season and the total reported and unreported bycatch of lynx for all trap sets would be expected to be 18 lynx. Some of these 18 lynx were released alive but injured from traps, and may have survived. Neither the actual reported number of one lynx trapped and killed as bobcat set bycatch or the addition of another unreported killed bycatch of lynx would significantly effect the listed distinct populalation segment.

**Long-term effects**. The market for bobcat skins should remain fairly steady for the next ten years as reflected by the past 10-year period, reviewed above. Since harvest activity is undoubtedly related to market demand and prices, the annual bobcat tagging data for 2001-2010 will also probably remain equally steady at the previous 10-year median, and average, of about 8,000 tagged skins for the States and Tribes where bobcat trapping is allowed and lynx are found. The tagging data may fluctuate in 2001-2010, as in the previous years, between about 5,000 to 10,000 skins. Extrapolating information in the Appendix and Figures 1 and 3, and from the 2001 trapping season, the small probability of lynx being caught in bobcat traps would indicate that bycatch of lynx in bobcat traps should continue to be uncommon over the next 10 years.

**Summary**. In summary, based on (1) trapping information from the 2000-2001 season, (2) information contained in Figures 1 and 3, (3) information contained in the lynx listing rule, and (4) an April 27, 2001, conversation with a Service lynx biologist, no more than twice the number of lynx trapped as bycatch, or two lynx, are expected to be killed annually and two are expected to be injured annually for the 10-year period of the proposed action. As stated previously, neither the actual reported number of one lynx trapped as bobcat set bycatch, that represents a 1:7,500 ratio if considering only successful bobcat traps set, nor the addition of another unreported bobcat-set bycatch of lynx, would significantly affect the listed lynx distinct population segment.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local, or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Trapping for non-CITES regulated species such as coyote, wolverine, and martin are expected to result in mortality and harassment of lynx. In the 2000-2001 season, eight lynx were trapped as bycatch in sets for non-CITES regulated species. A Service lynx biologist (Lori Nordstrom, April 27, 2001 telephone conversation) has stated that as many as an additional eight lynx may have been trapped as bycatch but not reported.

Forest thinning and fire suppression are likely to result in the loss of lynx habitat. Habitat connectivity is reduced by increasing urbanization and high volume traffic highways. Together, these may significantly affect the survival of the lynx.

**Conclusion**

After reviewing the current status of the affected species, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Division of Consultation, HCPs, Recovery and State Grants's biological opinion that the Cites Export Program for Appendix II Furbearer Species as proposed, is not likely to jeopardize the continued existence of the contiguous United States distinct population segment of the Canada lynx. Critical habitat for the lynx has not been designated.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act, and Federal regulation pursuant to section 4(d) of the Act, prohibits the take of endangered and threatened species, respectively, without special exemption. Take is defined as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harass is defined by the Service as actions that create the likelihood of injury to listed species by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Harm is defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this **Incidental Take Statement**.

The measures described below are nondiscretionary and must be undertaken by the Division of Management Authority so that they become binding conditions of any grant or permit issued to the applicant, as appropriate, for the exemption in section 7(o)(2) to apply. The Division of Management Authority has a continuing duty to regulate the activity covered by this incidental take statement. If the Division of Management Authority (1) fails to adhere to the terms and conditions of the incidental take statement, and/or (2) fails to retain oversight to ensure compliance with these terms and conditions, the protective coverage of section 7(o)(2) may lapse.

021001

**Amount or Extent of Incidental Take**

The Division of Consultation, HCPs, Recovery and State Grants anticipates that incidental take of lynx will be difficult to detect because there is little likelihood that trappers would report bycatch of lynx. The Service, therefore, anticipates the following levels of take as a result of this proposed project.

Incidental take for lynx is expected in the form of: two (2) lynx may be killed and two (2) injured annually due to trapping over the 10-year term of this biological opinion.

**Effect of the Take**

In the accompanying biological opinion, the Division of Consultation, HCPs, Recovery and State Grants determined that this level of anticipated take is not likely to jeopardize the continued existence of the lynx distinct population segment.

**Reasonable and Prudent Measures**

The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the effects of incidental take that might otherwise result from the proposed action. This biological opinion will expire 10 years from the date of issuance. Issuance of a new opinion will be subject to evaluation of the recovery of the species and the existence of additional documents providing protection to the lynx such as a 4(d) rule.

The Service believes the following reasonable and prudent measure is necessary and appropriate to minimize the impact of take on the lynx:

> When issuing CITES export tags for bobcats to the states or tribes, provide the states and tribes with information on lynx identification, life-history, recovery needs, and references to current and ongoing methodologies to reduce mortality and injury to lynx when trapping bobcat.

**Terms and Conditions**

In order to be exempt from the prohibitions of section 9 of the Act, Division of Management Authority must comply with the following terms and conditions, which implement the reasonable and prudent measures described above. These terms and conditions are non-discretionary.

The following terms and conditions implement the reasonable and prudent measure:

(1)     The Division of Management Authority shall prepare a brochure containing information on lynx (a) identification (b) life-history, (c) recovery needs, and

(d) references to current and ongoing methodologies allowing trappers to reduce mortality and injury to lynx when trapping bobcat. A draft of this brochure shall be provided to the following for approval prior to finalization and distribution: U.S. Fish and Wildlife Service, Chief, Division of Consultation, HCPs, Recovery and State Grants, 4401 N. Fairfax Drive, Room 420, Arlington, VA 22203; and, U.S. Fish and Wildlife Service, Montana Fish and Wildlife Office, 100 North Park, Suite 320, Helena MT, 59604. This brochure shall be updated as new information becomes available.

(2)     The Division of Management Authority shall issue one (1) copy of the finalized brochure for each trapper receiving a tag for bobcat issued to the states or tribes. If the brochure is revised at a later date, this procedure will again be followed. A letter shall accompany the brochures and tags recommending that the State or Tribe should provide a copy of the brochure to bobcat trappers on a one-time basis and again if brochure is revised.

**Reporting Requirements**

The Chief, Consultation, HCPs, Recovery and State Grants and the Montana Fish and Wildlife Office, Field Supervisor are to be notified within ten working days of the finding of any trapped lynx or any unanticipated harm to the lynx. The Washington Office Consultation, HCPs, Recovery and State Grants contact person for this is the Chief, Division of Consultation, HCPs, Recovery and State Grants at (703) 358-2171 and the Montana Fish and Wildlife Office contact person is the Field Supervisor at (406) 449-5225. Any dead or severely injured lynx shall be transferred to the nearest state, tribal, or federal wildlife agency. Carcasses become the property of the state or tribe for education purposes.

## CONSERVATION RECOMMENDATION

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. The Division of Consultation, HCPs, Recovery and State Grants recommends the following additional action:

The Division of Management Authority should continue discussions with the states and tribes on developing or using current methods to decrease mortality and injury to lynx resulting from bobcat trapping.

In order for the Division of Consultation, HCPs, Recovery and State Grants to be kept informed of actions minimizing or avoiding adverse effects or benefitting listed species or their habitats,

we request notification of the implementation of any conservation recommendations.

## REINITIATION - CLOSING STATEMENT

This concludes formal consultation on the actions outlined in the request.  As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to listed species or critical habitat that was not considered in this opinion; or,   (4) a new species is listed or critical habitat is designated that may be affected by the action.  In instances where the amount or extent of incidental take is exceeded, in this instance, one lynx is authorized to be taken, any operations causing such take must cease pending reinitiation.



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

ADDRESS ONLY THE DIRECTOR
FISH AND WILDLIFE SERVICE

**SEP 2 4 2001**

In Reply Refer To:
FWS/OCHR/004392

Memorandum

To:        Assistant Director for International Affairs
           Attention:  Chief, Division of Management Authority

From:      Assistant Director for Endangered Species

Subject:   Transmittal of the Formal Ten-Year Biological Opinion on the Effects of the
           CITES Export Program for Appendix-II Furbearer Species on the Contiguous
           United States Distinct Population Segment of the Canada Lynx

This document transmits the Division of Consultation, HCPs, Recovery, and State Grants of the
U.S. Fish and Wildlife Service's biological opinion on the effects of the CITES Export Program
for Appendix-II Furbearer Species (CITES Export Program) on the contiguous United States
distinct population segment of the Canada lynx (*Lynx canadensis*) pursuant to section 7(a)(2) of
the Endangered Species Act of 1973, as amended (Act).

This biological opinion is based on information provided in the:

1.   February 28, 2001, Amended Biological Opinion on the CITES Export Program.

2.   March 29, 2001, letter from the Assistant Director - International Affairs to the
     Assistant Director - Endangered Species on the February 28 Amended Biological
     Opinion.

3.   April 27, 2001, telephone conversation between Bob Pine of Division of
     Consultation, HCPs, Recovery, and State Grants and lynx biologists Lori
     Nordstrom and Anne Vandehey of the Region 6 Montana Fish and Wildlife
     Office.

4.   April 30, 2001, Meeting between Bob Pine and Elena Babij of Division of
     Consultation, HCPs and Recovery and Andrea Gaski of Division of Management
     Authority.

5.   June 14, 2001, Biological Assessment by the Division of Management Authority.

020988

13

**Amount or Extent of Incidental Take**

The Division of Consultation, HCPs, Recovery and State Grants anticipates that incidental take of lynx will be difficult to detect because there is little likelihood that trappers would report bycatch of lynx. The Service, therefore, anticipates the following levels of take as a result of this proposed project.

Incidental take for lynx is expected in the form of: two (2) lynx may be killed and two (2) injured annually due to trapping over the 10-year term of this biological opinion.

**Effect of the Take**

In the accompanying biological opinion, the Division of Consultation, HCPs, Recovery and State Grants determined that this level of anticipated take is not likely to jeopardize the continued existence of the lynx distinct population segment.

**Reasonable and Prudent Measures**

The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the effects of incidental take that might otherwise result from the proposed action. This biological opinion will expire 10 years from the date of issuance. Issuance of a new opinion will be subject to evaluation of the recovery of the species and the existence of additional documents providing protection to the lynx such as a 4(d) rule.

The Service believes the following reasonable and prudent measure is necessary and appropriate to minimize the impact of take on the lynx:

> When issuing CITES export tags for bobcats to the states or tribes, provide the states and tribes with information on lynx identification, life-history, recovery needs, and references to current and ongoing methodologies to reduce mortality and injury to lynx when trapping bobcat.

**Terms and Conditions**

In order to be exempt from the prohibitions of section 9 of the Act, Division of Management Authority must comply with the following terms and conditions, which implement the reasonable and prudent measures described above. These terms and conditions are non-discretionary.

> The following terms and conditions implement the reasonable and prudent measure:

> (1)    The Division of Management Authority shall prepare a brochure containing information on lynx (a) identification (b) life-history, (c) recovery needs, and

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 03, 2017
**Status:** Posted
**Posted:** April 03, 2017
**Tracking No.** 1k1-8vmi-w79n
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0079
Submitted Electronically via eRulemaking Portal

---

## Submitter Information

**Name:** Noble Armstrong

---

## General Comment

I am a trapper, hunter and fisherman. As a true conservationist and I support Alternative one.

We need to let the highly trained, highly skilled wildlife biologists perform their roles for which they have great expertise. Wildlife seasons are highly managed for sustainable populations. The monitoring programs prove, the State and Federal wildlife experts are doing an outstanding job.

Populations are actually expanding with sound hunting and trapping policies. Trapper's seldom come from higher income families. These individuals cannot afford more burdensome export fees. If implemented, we would see a further reduction in the numbers of trappers, and a drastic increase in wildlife conflicts with humans. Without Otter trappers, beaver populations will explode. Without Bobcat trappers, Coyote populations will grow out of control.

The alternative is to pay higher taxes to pay government trappers to manage these wildlife populations. The current tagging system has been successful. It is an excellent example of collaboration between the state agencies, USFWS, and trappers. Please leave the tagging system alone. No changes are required.

021229

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 03, 2017
**Status:** Posted
**Posted:** April 03, 2017
**Tracking No.** 1k1-8vmh-bp7i
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0089
Submitted Electronically via eRulemaking Portal

## Submitter Information

**Name:** Kryn Graham
**Address:**
412 mechanic st
Albion, MI, 49224-2077

## General Comment

Loss or higher cost/burden of export will result in declines in trapper participation and higher public costs for addressing wildlife conflicts. Certain species are often trapped together (e.g., otters and beavers, bobcats and coyotes), and a loss in export potential for CITES species will lead to increases in human-wildlife conflicts (e.g., aquaculture, flooding of roads/agriculture/private property, livestock depredation)

021240

file:///ifw-hqskyfs1/...0Public%20Comments/FWS-HQ-IA-2017-0012%202017-06-02%2014-22-29_docs/FWS-HQ-IA-2017-0012-0089.html[12/5/2017 1:20:07 PM]

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 03, 2017
**Status:** Posted
**Posted:** April 04, 2017
**Tracking No.** 1k1-8vmp-5vly
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0193
Submitted Electronically via eRulemaking Portal

---

## Submitter Information

**Name:** Steven McClintock
**Address:**
   891 East 910 Avenue
   Shobonier,  IL,  62885
**Email:** themacfarm@gmail.com
**Phone:** 618-292-2589

---

## General Comment

Please leave the CITES program the way it is. We need to let the biologists do what they are paid to do. Illinois has had it's first Bobcat season in 40 years, this past year. Our deer and turkey population has suffered greatly and ponds have been wiped clean of edible sized fish over the past 5 years because we (landowners) had no control over what our CITES species (bobcat and otter) have done to decimate these resources. We have strict laws that prohibit the over harvesting of these animals, yet, still are able to control the species to where there is a happy balance for all involved. (all wildlife and the landowners) Without a viable way to sell the furs of these animals there is no incentive for individuals to harvest these animals and sooner or later they are going to exceed their carrying capacity and become problems like the beaver and coyotes have. It makes more sense to have people pay to legally harvest these animals and provide a renewable resource for sale, than to have government paid individuals control these animals and their fur and carcasses go to waste.
Thank You
Steve

021347

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 04, 2017
**Status:** Posted
**Posted:** April 04, 2017
**Tracking No.** 1k1-8vn3-ee6v
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0248
Submitted Electronically via eRulemaking Portal

## Submitter Information

**Name:** Jeff Anonymous

## General Comment

I support Alternative #1 "No Action". The species targeted are already managed by the individual state agencies. Those agencies are in a better position to determine what the population can support. Louisiana can support a harvest of river otter while Indiana cannot. (Incidentally, Louisiana trapped many river otters that were transplanted to Indiana to reintroduce the extirpated population there.) Just as Alaska can support a harvest of lynx while Minnesota cannot. Alternatives 3 & 4 would make the resource nearly unmarketable. Without an outlet for these species, trapping and hunting would dwindle as would the resource dollars state agencies have to protect the species. I know it is counter-intuitive, but a managed selective harvest INCREASES the population. The steps proposed will do more to harm the animals in question.

021402

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 04, 2017
**Status:** Posted
**Posted:** April 04, 2017
**Tracking No.** 1k1-8vn5-xhnh
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0261
Submitted Electronically via eRulemaking Portal

---

## Submitter Information

**Name:** William Washburne
**Address:** United States,
**Email:** wfwdanvers@msn.com

---

## General Comment

The current regulations have resulted in thriving populations of Bobcat and Otter. The export of these furs, through the activity of trapping,
maintains a stable population of both species.

Any changes that would eliminate/reduce the demand for these pelts would result in less trapping activity and more difficulty
to maintain an ecological balance.

I strongly urge the continuation of the current export regulations for these species.

021415



# COLORADO
## Parks and Wildlife

Department of Natural Resources

Director's Office
1313 Sherman St., Suite 618
Denver, CO 80203
P 303.866.3203 | F 303.866.3206

April 10, 2017

United States Fish and Wildlife Service
Management Authority
Docket No.FWS-HQ-IA-2017-0012 [FF09A30000FXIA1671090000178]
Document Number: 2017-04872
Document Citation: 82 FR 13360

RE: Public Comments on the Draft Environmental Assessment Completed for the USFWS
CITES Export Program

Colorado Parks and Wildlife (CPW) appreciates the opportunity to comment on the U.S.
Fish and Wildlife Service's (USFWS) "Draft Environmental Assessment; Export Program
for Certain Native Species Under the Convention on International Trade in Endangered
Species of Wild Flora and Fauna (CITES)." We understand the purpose of the CITES
Export Program (CEP) is to provide a streamlined framework for the permitting system
that allows the export of certain furbearer species harvested in the United States.

The USFWS identified bobcat (*Lynx rufus*), Canada lynx (*Lynx canadensis*), Northern river
otter (*Lontra canadensis*), gray wolf (*Canis lupus*), and brown bear (*Ursus arctos*) in the
draft Environmental Assessment as being included in the CEP. Of these species, only the
bobcat is considered a game species in Colorado; the other four species are considered
non-game. In addition, the gray wolf and brown bear, while listed as endangered by
Colorado, do not have any established populations in the state.

CPW has a statutory responsibility to manage all wildlife species in Colorado; this
responsibility is embraced and fulfilled through CPW's mission to protect,
preserve, enhance and manage the wildlife resources of Colorado for the use, benefit
and enjoyment of the people of the state and its visitors. Although Colorado's use of the
CEP is limited, we find that this program efficiently processes paperwork required to
enter a high volume of furbearer specimens harvested nationwide in international trade,
while meeting the established CITES regulations set for the export of these specimens.
At this time, CPW does not support any of the proposed Alternatives from the Draft
Environmental Assessment that would change the CEP.

CPW supports the USFWS "Preferred Action" on this issue, which is to take no action that
would change the CEP for the following reasons: 1) Existing state, federal and
international regulatory measures safeguarding threatened species adequately ensure no
or negligible environmental disturbance occurs from international trade, and 2)
Proposed Alternatives 3 and 4 in the Draft EA would be counterproductive to the
conservation and sustainable use of species in the CEP.

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Robert W. Bray • Jeanne Horne
John Howard, Vice-Chair • Dale Pizel • James Pribyl, Chair • James Vigil • Dean Wingfield • Michelle Zimmerman, Secretary • Alex Zipp

021433

**Comment 1: Existing state, federal and international regulatory measures safeguarding threatened species adequately ensure no or negligible environmental disturbance occurs from international trade.**

Since 1977, state, tribal and federal cooperation under the CEP ensured that information on population status, management, and trade of species listed in the program met the conditions set in Article IV of the CITES Convention. Article IV requires that the Scientific Authority of the country of export has advised that such export will not be detrimental to the survival of that species, and the Management Authority is satisfied that the specimen was not obtained in contravention of the laws of that country. State and tribal governments provide sufficient information for the USFWS to determine the species was legally acquired within their jurisdiction and that export will not be detrimental to the survival of the species in the wild.

At a local level, state and tribal governments undertake their own conservation programs for species included in the CEP. For example, Colorado reintroduced Canada lynx to the state in 1999 and includes lynx and Northern river otter as Tier 1 species in Colorado's State Wildlife Action Plan. Any intentional harvest of lynx or river otter is prohibited by regulation (State Wildlife Regulations, Chapter W-10).

Further, CPW uses multiple regulations to manage the harvest of bobcat (State Wildlife Regulations, Chapter W-3), which includes a very specific mandatory tagging and sealing procedure for skins. CPW also maintains a regulation that restricts bobcat hunting and trapping on public land in Canada lynx recovery areas, or areas where lynx are known to inhabit. These measures were put in place to ensure Canada lynx were not accidentally harvested. In Colorado, there is no evidence showing that the harvest or export of bobcat has contributed to a decline in this species, Canada lynx, or other species.

With this context, there exists adequate international (CITES), federal and state regulations that safeguard overharvest, accidental take, or other harm associated with the export of furbearers from the United States. CPW agrees with USFWS that any permit issued within the CEP causes no or negligible environmental disturbance, thus CITES export permits should be categorically excluded from the requirement for preparation of an Environmental Assessment or Environmental Impact Statement under the National Environmental Policy Act.

**Comment 2: Proposed Alternatives 3 and 4 in the Draft EA would be counterproductive to the conservation and sustainable use of species in the CITES Export Program.**

Alternative 3 in the draft Environmental Assessment proposes to revise federal regulations to prohibit the export of parts and derivatives of the aforementioned furbearer species. Such action would deny some U.S. citizens from using these animals in the ways they are currently using them. CPW strives to enhance and manage the

021434

wildlife resources of Colorado for the use, benefit and enjoyment of the people of the state and its visitors, which includes harvest and trade. Therefore, Alternative 3 is in part counter to CPW's mission. In addition, loss of the ability to trade in furbearer parts and derivatives would lead to a loss of hunter and trapper license sales, which fund state agency wildlife conservation programs. Alternative 3 appears to be counterproductive for conservation efforts at the state level. CPW does not support Alternative 3.

Alternative 4 in the draft Environmental Assessment would require the USFWS to make legal acquisition findings for each specimen to be exported, instead of relying on States and Tribes to make these findings. If this alternative were implemented, tens of thousands of legal acquisition findings would need to be determined by the U.S. Management Authority.  The States and Tribes enforce their own regulations and determine whether a species was legally harvested, therefore any federal effort to make legal acquisition findings would be redundant and a waste of resources. In addition, the burdensome task of making legal acquisition findings for every export would increase the length of time needed to issue permits, discouraging hunters and trappers to participate in international trade. Hunter and trapper license sales support a large proportion of state agency operating expenses; therefore, any loss of license revenue restricts the ability of wildlife conservation and management at the state level. CPW does not support Alternative 4.

Conclusion

The draft Environmental Assessment considers the direct, indirect, and cumulative effects the CEP has on the natural and physical environment and the relationship of people with that environment. In this case, the natural and physical environment includes any effects associated with trade in bobcat, river otter, Canada lynx, gray wolf, and brown bear harvested in the United States. The Environmental Assessment does not demonstrate any effects that warrant changes to the existing CEP framework, though it does suggest potential adverse effects could be realized if any of the alternatives were adopted. CPW does not support Alternatives 3 and 4 as proposed in the draft, and has no comment on Alternative 2.  We support the USFWS preferred action, which is to take no action, and maintain the CEP in its current form.

Sincerely,

Reid DeWalt, Assistant Director
Wildlife and Natural Resources

cc:     Bob Broscheid
        Jeff Ver_Steeg
        Craig R. McLaughlin
        Matt Eckert

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 05, 2017
**Status:** Posted
**Posted:** April 05, 2017
**Tracking No.** 1k1-8vnh-lk9y
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on
International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0293
Submitted Electronically via eRulemaking Portal

---

## Submitter Information

**Name:** Jonathan Van Huss
**Address:**
   160 East Main
   Wellsville, UT, 84339
**Email:** Sirjonvh@yahoo.com

---

## General Comment

I support Alternative One/the preferred alternative of "no action". This would maintain the current tagging
process and allow for the continued export of otters and bobcats.

Trapping and hunting are highly regulated; trapping and hunting seasons are established to assure long-term
sustainability of bobcat and otter populations. States are the wildlife management authority for these species and
have monitoring programs in place to assure sustainable populations.

Since the current export program was established, otter and bobcat population size and occupied range has
increased in the United States. For example, otters occur in all states where they historically did, and 46 of 47
states have indicated stable to increasing otter populations.

The current system (tags/alternative 1) is a success story and an example of collaborative safeguards put in place
by state agencies and USFWS, with cooperation from trappers. This success story does not need to be fixed,
especially through alternative 3 and 5.

Loss of the export market (under Alternative 3) or higher costs/burden of individual export permits (Alternative
4) will have negative economic consequences to trappers, hunters, supply dealers, hunting guides, etc...

Loss or higher cost/burden of export will result in declines in trapper participation and higher public costs for
addressing wildlife conflicts. Certain species are often trapped together (e.g., otters and beavers, bobcats and
coyotes), and a loss in export potential for CITES species will lead to increases in human-wildlife conflicts (e.g.,
aquaculture, flooding of roads/agriculture/private property, livestock depredation)

021451

Thank you, Jonathan Van Huss

021452

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 06, 2017
**Status:** Posted
**Posted:** April 06, 2017
**Tracking No.** 1k1-8vol-89ks
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0378
Submitted Electronically via eRulemaking Portal

## Submitter Information

**Name:** Allen Godin
**Address:**
    Morrisville, VT, 05661
**Email:** allengodin@hotmail.com

## General Comment

I support Alternative One/the preferred alternative of "no action". This would maintain the current tagging process and allow for the continued export of otters and bobcats.

Trapping and hunting is highly regulated; trapping and hunting seasons are established to assure long-term sustainability of bobcat and otter populations. States are the wildlife management authority for these species and have monitoring programs in place to assure sustainable populations.

Since the current export program was established, otter and bobcat population size and occupied range has increased in the United States. For example, otters occur in all states where they historically did, and 46 of 47 states have indicated stable to increasing otter populations. The current system (tags/alternative 1) is a success story and an example of collaborative safeguards put in place by state agencies and USFWS, with cooperation from trappers. This success story does not need to be fixed, especially through alternative 3 and 5.

Loss or higher cost/burden of export will result in declines in trapper participation and higher public costs for addressing wildlife conflicts. Certain species are often trapped together (e.g., otters and beavers, bobcats and coyotes), and a loss in export potential for CITES species will lead to increases in human-wildlife conflicts (e.g., aquaculture, flooding of roads/agriculture/private property, livestock depredation)

The USFWS does not have primary responsibilty for game management in the States, so the "No Action" option is the only viable way to keep the local wildlife populations safe and the US trade in furs sustainable.

021545




DEPARTMENT OF NATURAL RESOURCES

LANSING

RICK SNYDER
GOVERNOR

KEITH CREAGH
DIRECTOR

April 6, 2017

Public Comments Processing
Attn: FWS-HQ-IA-2017-0012
Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5275 Leesburg Pike, MS: BPHC
Falls Church, Virginia 22041

To whom it may concern:

The Michigan Department of Natural Resources' (DNR) appreciates the opportunity to comment on the Convention on International Trade in Endangered Species (CITES) Furbearer Export Program Environmental Assessment. We strongly recommend that the preferred alternative - No change - be adopted. We feel this alternative of maintaining the CITES Export Program (CEP) in its current form provides adequate protection to those native species that are CITES species and found in Michigan. The current CEP ensures populations are not negatively impacted by harvest, including an extra tagging requirement not mandated by CITES.

Michigan does not find the elimination of the tagging portion of CEP, as described in Alternative 1, to be necessary as we require tagging on additional furbearing species in order to ensure animals are legally taken and accounted for through mandatory registration. We do not view a tagging requirement to be onerous and recognize the U.S. Fish and Wildlife Service (USFWS) efforts to ensure they not only comply with CITES requirements for monitoring and safe guarding CITES species and regulated harvest, but exceed them.

The current CEP facilitates use and sale of pelts taken in Michigan, easing the administrative burden on the USFWS and on individual trappers by approving the state's export program rather than requiring each individual trapper from having to apply for a permit from the USFWS for export. As explored under the EA's alternative 3, eliminating the approval of agency export programs for native furbearers harvested would not improve management of these species but would increase time and effort by agencies and legal harvesters. Michigan's goal of maintaining sustainable populations of bobcats and river otters while allowing for recreational opportunities for harvest and to manage using the best available science, ensures populations of both species thrive and the requirements of CITES are met. We provide information on our program and population status to the USFWS to demonstrate compliance with the intent of CITES. Agency program approval eliminates an unnecessary layer of regulation without negative consequences related to the species of interest or intent of CITES. We do not support this alternative.

Alternative 2 would eliminate the ability to export bobcat and river otter, which were legally taken in Michigan, to international markets. The change would not improve conservation of either species but rather would reduce the available markets for pelts taken without reason. Both bobcat and river otter have regulated harvest in Michigan based on the sustainability of take as a whole - not on the destination of pelts after harvest. This alternative could potentially decrease interest in participating in the legal take of bobcats in Michigan, reducing license sales and recreational opportunities and expenditures in the state. Michigan supports the ability of

CONSTITUTION HALL • 525 WEST ALLEGAN STREET • P.O. BOX 30028 • LANSING, MICHIGAN 48909-7528
www.michigan.gov/dnr • (517) 284-MDNR(6367)

021554

bobcat and river otter pelts legally taken in Michigan to be sold in the international market. We do not support Alternative 2.

Currently Michigan has regulated harvest of two CITES species, bobcat (*Lynx rufus*) and river otter (*Lontra canadensis*). These species may be taken by trapping and hunting (bobcat only) in Michigan. We regularly review and modify our regulations to ensure that harvest of these species is sustainable. We annually submit a report to USFWS to verify that our program is ensuring that both species are not over-harvested by Michigan state-licensed harvesters. Monitoring of these species is done through harvest surveys as well as by mandatory registration. We are continually looking to improve our monitoring methodologies to enhance management of these species. Our current harvest surveys indicate that statewide populations of both species are stable to increasing over long-term harvest effort trends which may be found in the most recent survey reports for bobcat and river otter.

http://www.michigan.gov/documents/dnr/2015_bobcat_harvest_report_553227_7.pdf
http://www.michigan.gov/documents/dnr/2015_otter_beaver_harvest_survey_549604_7.pdf

Michigan supports the continuation of the current CEP by adoption of the preferred alternative of No change outlined in the EA. We feel the other alternatives considered either do not offer the same level of protections or increase economic and social detriments without enhancing any of the environmental considerations of CITES or CEP.

Sincerely,

William E. Moritz, Ph.D.
Deputy Director
517-284-5810

cc:    Mr. Keith Creagh, Director, DNR
       Dr. Russ Mason, DNR



# COMMONWEALTH of VIRGINIA

### Department of Game and Inland Fisheries

**Molly J. Ward**
*Secretary of Natural Resources*

**Robert W. Duncan**
*Executive Director*

April 7, 2017

Public Comments Processing
Attn: FWS-HQ-IA-2017-0012
Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5275 Leesburg Pike; MS: BPHC
Falls Church, VA 22041

Dear Sirs:

The Virginia Department of Game and Inland Fisheries (VDGIF) has reviewed the draft environmental assessment (EA) prepared in accordance with the National Environmental Policy Act (NEPA) for the USFWS Convention on International Trade in Endangered Species (CITES) for certain furbearer species. Our Department respectfully submits the following comments in response to the Notice of Availability requesting public comments on this document.

Our Department strongly supports the preferred alternative of "no action", which would continue the CITES Export Program (CEP) in its current form. Our experience has been that the current system of mandatory tagging for bobcat and otter pelts exported outside of the United States has worked very well for VDGIF and Virginia fur harvesters. Our Department utilizes the tagging system as a mechanism for collecting valuable information related to bobcat and otter harvest. At the same time, the current system facilitates efficient export of these pelts to international markets that benefit Virginia trappers by realizing higher fur prices.

The Department concurs with the USFWS that no evidence exists to suggest that the current CITES export program has contributed to the decline of any furbearer or other wildlife species. Since 1977, when Virginia first received CITES export authority for bobcats and otters, populations of both species have substantially increased in number and expanded in distribution. National reviews addressing the population of these species suggest that similar trends have also been observed nationwide. Currently, bobcats and otters are both listed as species of "Least Concern" by the International Union for Conservation of Nature (IUCN).

Our Department further suggests that other proposed alternatives will either result in higher costs, increased export burdens, or direct economic losses. The "no tag" alternative #2 would likely result in more onerous recordkeeping requirements for trappers and fur buyers to export their pelts. The "no approved CITES export program" alternative #4 would have similar consequences and it would be cost-prohibitive for most trappers to obtain individual permits for each specimen exported. Direct effects of these more expensive and burdensome alternatives would be a decline in trapper participation and recruitment rates. Affected trappers currently play an important role in managing furbearer resources while also assisting in wildlife research, protecting human health and safety, protecting endangered species (i.e. trapping predators of endangered shorebirds), and controlling invasive species (i.e. nutria).

Public Comments Processing
April 7, 2017
Page 2

The "no permit" #4 alternative is particularly problematic since it would result in a complete loss of export markets for CITES regulated species.  The loss of this market would result in lower pelt values and a direct loss of income to trappers, hunters, trapping/hunting supply dealers, and local economies affected by hunting and trapping activities.  Lower pelt prices would also have an adverse effect on trapper participation and license sales, resulting in reduced income for state wildlife agencies.

In summary, it is the judgment of this agency that the current CITES Export Program (alternative #1) is the preferred option for VDGIF and the citizens of Virginia.  We urge the USFWS to continue this cost effective program that has helped facilitate the successful management of CITES affected species for the past 40 years.

Sincerely,

Robert W. Duncan
Executive Director

RWD/MF/ag

c:      David Whitehurst, Director, Bureau of Wildlife Resources

021624



STATE OF MAINE
DEPARTMENT OF
INLAND FISHERIES & WILDLIFE
284 STATE STREET
41 STATE HOUSE STATION
AUGUSTA ME  04333-0041

PAUL R. LEPAGE
GOVERNOR

CHANDLER E. WOODCOCK
COMMISSIONER

4/6/52017

Wildlife Trade and Conservation Branch
Division of Management Authority
US Fish and Wildlife Service
5275 Leesburg Pike
Falls Church, VA 22041

To Whom It May Concern:

The Maine Department of Inland Fisheries and Wildlife would like to thank the US Fish and Wildlife Service for the opportunity to comment on the "Draft Environmental Assessment:  Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)". We support the preferred alternative of "No Change".  We do not support options three and four as they have negative consequences for furbearer management in Maine.

We support the preferred alternative of "No Change" because CITES tagging of bobcat and otter allows Maine trappers to sell these furs on the international market.  Eliminating the CITES tagging system or requiring trappers and hunters to secure tags on a case-by-case basis would effectively end the harvest of these species and decrease overall trapping participation.  In Maine, regulated trapping plays an important role in minimizing human-wildlife conflicts related to infrastructure, human health and safety, livestock depredation, and destruction of private property.  Any decrease in trapping participation would exacerbate these issues.

Currently, the CITES program allows state and federal governments to ensure that these species are harvested in a legal and sustainable manner.  Maine tracks the population of bobcat and otter.  Our data indicates that both species populations are stable to increasing.  We ensure that they are legally harvested through an active law enforcement presence and pelt tagging requirement conducted only by Department staff.  As part of the CITES process, we review our bobcat and otter harvest data and provide reports to the USFWS regarding the status of these species annually.  Illegal take of either species is not an issue in Maine.  We urge the decision makers on this issue to not change the regulatory requirements for tagging species under this treaty.

Sincerely,

Furbearer and Small Mammal Biologist
Maine Department of Inland Fisheries and Wildlife
650 State St.
Bangor, ME 04401

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 09, 2017
**Status:** Posted
**Posted:** April 11, 2017
**Tracking No.** 1k1-8vqr-6ncv
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on
International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0546
Submitted Electronically via eRulemaking Portal

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

As an avid outdoorsman who loves the outdoors, I am concerned at to what the Wild Earth Guardians are doing, trying to stop
the export of bobcats and otters, among other species, through the current CITES program. As I see it, there is no environ-
mental impact on the environment if the USFWS continues with the current CITES program.

Out of the four alternatives posted in the EA draft, I feel that alternative number one, to keep the current CITES system in
place as it currently is. The system has worked for years without any negative impact to the environment or the
economy.

Trapping and hunting are highly regulated with seasons set based on sound scientific research. Seasons are set in place
during peak populations and when the fur is at its useful primeness. Seasons are also established to insure the sustainability
of furbearers. Along with this, since the CITES system was established, otter and bobcat populations have
flourished.

The current system has proven to be very successful and does not need to be fixed. The loss of an export market of these
furbearers, as alternative three suggests, or the higher cost and burden of individual export permits as in alternative four,
will have negative economic consequences to the trapping and hunting industry. This loss of export would cause negative
trapper interest to harvest these species, which in turn, would cause an overpopulation which would lead to disease and

023102

death which is negative to environment.

In closing, I thank you for the opportunity to allow me to comment on this important issue. I have been an outdoorsman
all of my life and I am thankful that I live in a country where I can state my comments and opinions in an effort to defend what I
believe. Since the establishment of the CITES system, it has proven successful and does not need fixing. I hope that your
decision on this matter sees that the system stays as it is.

023103

# PUBLIC SUBMISSION

**As of:** June 02, 2017
**Received:** April 09, 2017
**Status:** Posted
**Posted:** April 11, 2017
**Tracking No.** 1k1-8vqr-uixt
**Comments Due:** April 10, 2017
**Submission Type:** Web

**Docket:** FWS-HQ-IA-2017-0012
Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69)

**Comment On:** FWS-HQ-IA-2017-0012-0001
Notice of availability; request for public comments.

**Document:** FWS-HQ-IA-2017-0012-0547
Submitted Electronically via eRulemaking Portal

---

## Submitter Information

**Name:** Lynn Engle
**Address:**
    PO Box 5883
    Woodland Park,  CO,  80866
**Email:** lynn.engle@gmail.com
**Phone:** 7192384415

---

## General Comment

I support the Alternative 1 for no action. Wildlife management in its current form is a long standing success in this country including these species. Stopping export of fur through the CITES export program would take away part of this management process.
Outlawing export of these furs will increase the burden on state wildlife managers to slow down predation by these species. Prey species will take the brunt of this as predator numbers increase. River otter would increase, again prompting a larger burden on wildlife managers to protect fisheries public and private.
I support continuing to allow the legal harvest of furbearing animals. This is a win win for the trapper or hunter along with the current successful wildlife management programs. It makes no sense to eliminate the sale of fur when it is a big part of this collaborative management success story. Without trapper and hunter support the financial burden of management would trigger higher cost to the public.
The reasoning behind not harvesting a predator doesn't add up even if your personal goal is to save wildlife. Harvesting one predator saves a large number of prey species and pets that it would kill.
I am a beginning trapper and would personally be opposed to losing this side income. Professionals could lose their entire income along with the suppliers who support them. Why place this extra burden on our economy by creating job and income loss?

023104

Connecticut Department of

# ENERGY &
# ENVIRONMENTAL
# PROTECTION

---

79 Elm Street • Hartford, CT 06106-5127          www.ct.gov/deep          Affirmative Action/Equal Opportunity Employer

April 10, 2017

Public Comments Processing
ATTN: FWS-HQ-IA-2017-0012
U.S. Fish and Wildlife Service
5275 Leesburg Pike
MJ: BPHC
Falls Church, VA 22041

Dear Sir or Madam,

Thank you for the opportunity to comment on the Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora Draft Environmental Assessment (Docket ID FWS-HQ-IA-2017-0012). The Connecticut Department of Environmental Protection (CTDEEP) strongly supports the preferred alternative of "no change."

CTDEEP is the agency that manages wildlife species, including the species covered by the CITES export program within the State of Connecticut. The current CITES export program has worked efficiently for our state. Of the five affected species, only river otters are harvested and exported from Connecticut. Bobcats also commonly occur in Connecticut but currently harvest is not allowed.

Our monitoring of the river otter population has indicated that it has been stable to slightly increasing for decades. Otters are often associated with beavers and our otter population has benefitted from the dramatic increase and expansion of the beaver population over the past century. There has been no indication that harvest and export of otters has been detrimental to the population.

At this time we oppose the three other alternatives described in the EA. The "No Permit Alternative" would eliminate foreign markets of affected species – river otter in Connecticut. Foreign markets have been highly important to the trade value of wild caught furs. The loss of these markets and decline in wild fur values would impinge on our state's ability to manage human-furbearer conflicts. The resultant decrease in values would decrease trappers' incentive to trap. Decreased otter values would decrease our ability to address both otter conflicts and beaver conflicts because the two species are trapped in unison. Costs to property owners would increase through increased damage and increased costs of control measures. Trappers would receive lower income from pelts. Declines in the number of active trappers would result in lowered license sales, further decreasing our agency's ability to address conflicts.

The "No Approved CITES Export Program" alternative would set up an inefficient system in which the Service would be required to deal directly with each specimen and each exporter. This would be a highly burdensome and inefficient system. CTDEEP, like most state agencies, runs its CITES tagging program in concert with state-required tagging and reporting. (CITES species are tagged at the same time as non-CITES species.) This is an efficient system. In the absence of CITES tagging requirements our agency would require tagging of otter with CTDEEP tags, for we would still want to monitor harvests to meet our within state management responsibilities.

We do not support the "No Tag" alternative because of the inefficiencies pointed out in the EA. A lack of tags could also lead to misidentification of look-alike species as noted in the EA.

023141

In conclusion, we support the "No Change" alternative.  The system is efficient and benefits our ability to manage and monitor furbearer populations.  The inefficiencies and loss of markets associated with the other alternatives would be detrimental.

Sincerely,

*William A. Hyatt*

William Hyatt, Chief
Bureau of Natural Resources
Connecticut Department of Energy and Environmental Protection
79 Elm Street, Hartford, CT 06106-5127
P: 860.424.3010 | F: 860.424.4070  | E: william.hyatt@ct.gov

023142



April 10, 2017


Public Comments Processing
Attn:  FWS-HQ-IA-2017-0012
Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5275 Leesburg Pike
MS:  BPHC
Falls Church, VA  22041


*Submitted Online via http://www.regulations.gov*


**Re:  Comments on the Draft EA for the Export Program for Certain Native Species under CITES**


To the U.S. Fish and Wildlife Service's Division of Policy, Performance, and Management Programs:

The Center for Biological Diversity ("the Center") hereby submits the following comments on the Draft Environmental Assessment on the Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69) ("Draft EA").[1]  The Center is a 501(c)(3) non-profit organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has more than 1.2 million members and supporters dedicated to the protection and restoration of wildlife and wildlife habitat, including the wildlife impacted by this Draft EA.

---

[1] U.S. Fish and Wildlife Service, Draft Environmental Assessment on the Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69) (March 2017) (hereinafter "Draft EA").

1

## LEGAL & FACTUAL BACKGROUND

I.   **CITES Background**

   A.  **The Convention on International Trade in Endangered Species**

Recognizing that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems" and that "international co-operation is essential for the protection of [those] species . . . against over-exploitation through international trade," the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") was agreed to in 1973.[2] The treaty came into force in 1975, and now has 183 Party signatories, including the United States.

CITES includes over 35,000 animal and plant species on its three Appendices, providing the species varying degrees of protection. Species included on CITES Appendix I are "threatened with extinction."[3] CITES bans any international trade in Appendix I species done "for primarily commercial purposes" and further requires both export and import permits for other trade in such species.[4] *See Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 659 F.2d 168 (D.C. Cir. 1981) (describing treaty and appendices); *Native Fed'n of the Madre De Dios River & Tributaries v. Bozovich Timber Prods.*, 31 C.I.T. 585, 587 (2007) (same).

Species included on CITES Appendix II are "not necessarily now threatened with extinction [but] may become so unless trade . . . is subject to strict regulation in order to avoid utilization incompatible with their survival."[5] Trade in Appendix II species is prohibited without a CITES export permit.[6] To issue a valid export permit, (1) the exporting nation's Scientific Authority must find the export "will not be detrimental to the survival of the species," and (2) the nation's Management Authority must "be satisfied that the specimen was not obtained in contravention of the laws of th[e] State for the protection of fauna and flora."[7] Further, the nation must monitor all export permits granted to determine whether export "should be limited in order to maintain that species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which that species might become eligible for inclusion in Appendix I."[8]

---

[2] CITES, Mar. 3, 1973, 27 U.S.T. 1087.
[3] *Id.* at Art. II(1).
[4] *Id.* at Art. III(1)-(3).
[5] *Id.* at Art. II(2)
[6] *Id.* at Art. IV.
[7] *Id.* at Art. IV(2)(a), (b).
[8] *Id.* at Art. IV(3).

2

CITES Appendix III include species "which any Party identifies as being subject to regulation within its jurisdiction . . . and as needing the co-operation of other Parties in the control of trade."[9] Trade in Appendix III species without a CITES export permit is prohibited.[10] In order to issue a valid export permit, the nation's Management Authority must "be satisfied that the specimen was not obtained in contravention of the laws of th[e] State for the protection of fauna and flora."[11]

### B. CITES Guidance for Making Non-Detriment Findings

As noted above, before an export permit may be granted for the trade in any Appendix II species, the exporting nation must "determine[ ] that such export will not be detrimental to the survival of th[e] species" (referred as issuing a "non-detriment finding" or "NDF").[12] To assist Parties in making NDF determinations, the CITES Parties adopted Resolution Conf. 16.7. Resolution Conf. 16.7 states that "the best available scientific information is the basis for non-detriment findings" and recommends that an NDF be the "result of a science-based assessment."[13] In issuing an NDF, a nation should assess the species' biology, life-history, range, population structure, status, trends, threats, and levels and patterns of harvest and mortality.[14] Parties are also specifically directed to consider "the sustainability of the overall harvest."[15]

Further echoing the mandates of Article IV, Resolution Conf. 16.7 also states that Parties "should consider whether the species would be maintained throughout its range at a level consistent with its role in the ecosystems in which it occurs" and "should consider the volume of legal and illegal trade (known, inferred, projected, estimated) relative to the vulnerability of the species (intrinsic and extrinsic factors that increase the risk of extinction of the species)."[16]

### C. U.S. Implementation of CITES

In the United States, CITES is implemented by the U.S. Fish and Wildlife Service ("the Service") through the Endangered Species Act ("ESA"). 16 U.S.C. §§ 1537A; 1538; 50 C.F.R. §§ 23.1-23.92. Pursuant to a 1982 ESA amendment, the Service is required to make all NDF determinations for wildlife based on the "best available biological information derived from professionally accepted wildlife management practices." 16 U.S.C. § 1537a(c)(2). However, the Service "is not required to make . . . estimates of population size in making such determinations or giving such advice." *Id.*

---

[9] *Id.* at Art. II(3).
[10] *Id.* at Art. V(2).
[11] *Id.* at Art. IV(2)(a), (b).
[12] *Id.* at Art. III(2), IV.
[13] Res. Conf. 16.7.
[14] *Id.*
[15] *Id.* at (a)(i), note 1.
[16] *Id.* at (a).

3

The Service has issued regulations governing non-detriment findings. *See Franks v. Salazar*, 816 F. Supp. 2d 49, 53 (D.D.C. 2011) (summarizing Service standards). The regulations recognize that "[d]etrimental activities" include "unsustainable use and any activities that would pose a net harm to the status of the species in the wild." 50 C.F.R. § 23.61(b). In making an NDF determination, the Service must consider whether:

(1) Biological and management information demonstrates that the proposed activity represents sustainable use, [i.e., "the use of a species in a manner and at a level that maintains wild populations at biologically viable levels for the long term," *id.* § 23.5];

(2) The removal of the animal or plant from the wild is part of a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species;

(3) If no sustainable-use management plan has been established, the removal of the animal or plant from the wild would not contribute to the over-utilization of the species, considering both domestic and international uses;

(4) The proposed activity, including the methods used to acquire the specimen, would pose no net harm to the status of the species in the wild;

(5) The proposed activity would not lead to long-term declines that would place the viability of the affected population in question; and

(6) The proposed activity would not lead to significant habitat or range loss or restriction.

*Id.* § 23.61(c). The agency must make NDFs based "on the best available biological information," and, if information is insufficient, the Service "take[s] precautionary measures and would be unable to make the required" NDF determination. *Id.* § 23.61(f); *Prima v. DOI*, 1998 U.S. Dist. LEXIS 2203 (E.D. La. Feb. 19, 1998) (upholding Service's detriment finding due to lack of sufficient information). In total, the Service's regulations require "a determination of whether there is any effect, either adverse or beneficial, on the species in the wild, and if so, an assessment of the productivity of the species to determine whether the removal of specimens from the wild will adversely affect the species' long-term viability. 72 Fed. Reg. 48,402, 48,429 (Aug. 23, 2007).

4

Additionally, consistent with CITES's requirement that the Service "be satisfied that the specimen was not obtained in contravention of the laws of th[e] State,"[17] the Service must make a "legal acquisition finding" for each permit issued. 50 C.F.R. § 23.60(a). Specifically, the Service must determine whether the specimen was "[o]btained in accordance . . . all applicable local, State, Federal, tribal, and foreign laws." *Id.* § 23.60(b)(1).

### D.  The Service's Furbearer Program

The Service has promulgated regulations governing the trade in certain "CITES furbearers," including bobcat (*Lynx rufus*), river otter (*Lontra canadensis*), Canada lynx (*Lynx canadensis*), gray wolf (*Canis lupus*), and brown bear (*Ursus arctos*)." 50 C.F.R. § 23.69. Each of these species is currently included in Appendix II of CITES and thus the Service must issue CITES export permits before specimens may be traded internationally.[18]

Under the regulations, the Service makes either state-by-state or range-wide determinations to allow export under CITES, including a determination that export is not detrimental and specimens were legally acquired. *Id.* § 23.69(b). The program is referred to as the Service's CITES Export Program ("CEP"). Once a state's program or a range-wide program is approved, exporters are still required to file a CITES export permit; however, a more streamlined approval process applies. *Compare* Form 3-200-26 (permit form for furbearer export under approved program) *with* Form 200-27 (general export permit form).

In order for a state furbearer program to receive approval, the state must provide:

(1) An assessment of the condition of the population and the basis for that assessment, such as carcass demographics, population models, analysis of past harvest levels as a function of fur prices or trapper effort, or indices of abundance independent of harvest information;

(2) Current harvest control measures, including laws regulating harvest seasons and methods;

(3) Total allowable harvest of the species;

(4) Distribution of harvest;

(5) Indication of how frequently harvest levels are evaluated;

---

[17] CITES at Art. IV(2)(a), (b).
[18] *Id.* at Art. IV.

5

(6) Tagging or marking requirements for fur skins;

(7) Habitat evaluation; and

(8) A copy of any management plan, "[i]f available."

50 C.F.R. § 23.69(b)(1). If the Service approves a state program, the state must submit an annual "activity report" by October 31, including the number of animals taken or tagged, an assessment of the population's "condition" including trends, and any changes in management of the species. *Id.* Additionally, each fur skin exported under the program must be tagged, although no tagging is required for "fur skin products." *Id.* § 23.69(c).

## II.    NEPA Background

The National Environmental Policy Act ("NEPA") "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). To comply with NEPA, each federal agency is required to take a "hard look" at the impacts of its actions prior to the point of commitment, so that the agency does not act on incomplete information, only to regret its decision after it is too late to correct.

The United States' participation in CITES, and specifically the Fish and Wildlife Service's implementation of the CEP, is exactly the type of agency action subject to NEPA.[19] A NEPA analysis of the CEP is long overdue, and now only comes as the result of litigation.[20] And perhaps even more problematic is the Service's assertion that even though it is attempting to now comply with NEPA through release of this Draft EA, the agency still believes that it has no requirement to analyze the impacts of its actions.[21] However, there is no doubt that the Service's implementation of the CEP has significant direct, indirect, and cumulative impacts on the environment, and thus must be fully analyzed under NEPA.

---

[19] In fact, in previous comments, the Center has noted the Service's responsibility for complying with NEPA in amending its CITES regulations. In 2012, when the Service amended its CITES regulations to "include all U.S. populations of gray wolf and brown bear" under its CEP program, the Center noted the Service's obligation to comply with NEPA. Center Comments on Proposed Revision of CITES Regulations, 77 Fed. Reg. 14,200 (submitted May 7, 2012) (attached as Exhibit 1). We continue to believe the Service violated NEPA in failing to conduct a full NEPA analysis before expanding its CEP program to cover gray wolf and brown bear in 2012.
[20] *See WildEarth Guardians v. Hoover*, Parties' Clarification and Renewed Stipulation and Joint Motion, and [Proposed] Order, to Stay Proceedings, *Dkt. No.* 41, CV-16-65-M-DWM (filed Dec. 12, 2016).
[21] *See* Draft EA at 2-3 (stating the Service's "issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife or plants, including permits involving species listed under CITES, are categorically excluded from the requirement for preparation of an EA or an EIS under NEPA when such permits cause no or negligible environmental disturbance (Department Manual, Part 516, Chapter 8.5(C)(1).").

6

Unfortunately, the Draft EA is devoid of any real environmental analysis, and is completely insufficient to comply with NEPA's hard look requirements.  As we discuss below, the impacts of the CEP must be discussed fully in an Environmental Impact Statement, with an analysis of the science and the impacts surrounding the trapping incentivized by this program.

Without more analysis, and based solely on the Draft EA now before the public, we would support Alternative 3, which would call for ending the U.S.'s participation in the CEP.  Because we believe the CEP currently has myriad negative impacts on wildlife populations in the U.S., and those impacts are not being tracked or analyzed sufficiently by the Service, we believe that the program should be suspended until an honest and complete analysis is performed, including issuance of a full and legally sufficient Environmental Impact Statement ("EIS").  We provide some more specific comments on the environmental impacts of this program that should be considered herein.

<u>**THE SERVICE'S FAILURE TO COMPLY WITH NEPA**</u>

At the outset, we note this notice and comment process is fundamentally flawed by the Service's failure to make its actual decisions, both state and range-wide NDFs, available to the public so they can meaningfully participate in this process. These agency memoranda or "advices" as they are often referred were not posted on regulations.gov and when we requested them, the Service informed us we would need to submit a FOIA request to obtain them. Likewise, the Service failed to provide the CEP States' annual reports, which provide the informational backbone for the program. Of course, 30-days is wholly insufficient for receipt of these records and our request for a brief extension of the comment period was denied. As a result, these informational deficiencies rendered this NEPA process inadequate. Indeed, the goal of NEPA is for the Service to make an informed decision, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989), but the public cannot aid the agency in that mission without receiving the relevant information and draft decision documents the NEPA process is designed to influence.

I.      **The Purpose and Need Statement is Defined Too Narrowly.**

NEPA planning begins with an identification of the purpose and need for a project. NEPA's implementing regulations provide that an environmental document should "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternative including the proposed action." 40 C.F.R. § 1502.13.  The purpose and need will be judged under a reasonableness standard, and "[a]gencies are afforded considerable, although not unlimited, discretion to define the purpose and need of a project."  *Northwest Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175, 1185 (W.D. Wa. 2005) (citation omitted).  However, "deference does not mean dormancy, and the rule of reason does not give agencies license to fulfill their own prophecies, whatever the parochial impulses that drive them."  *Citizens Against Burlington, Inc.*

023213

*v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991), *cert denied*, 502 U.S. 994, 112 S. Ct. 616 (1991).
Accordingly, "an agency may not define the objectives of its actions in terms so unreasonably
narrow that only one alternative from among the environmentally benign ones in the agency's
power would accomplish the goals of the agency's action, and the EIS would become a
foreordained formality." *Id.* (citation omitted); *see also City of New York v. United States Dep't
of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983) ("[A]n agency will not be permitted to narrow the
objective of its action artificially and thereby circumvent the requirement that relevant
alternatives be considered."). Furthermore, an agency must exercise independent judgment in
defining the purpose and need of a project and cannot rely exclusively on the statements and
opinions of the applicant. *See Simmons v. United States Army Corps of Engrs.*, 120 F.3d 664,
669 (7th Cir. 1997) (stating that "an agency cannot restrict its analysis to those alternative means
by which a particular applicant can reach his goals") (internal citation and quotations omitted).

As it is currently laid out in the Draft EA, the Service just recites the purpose of the CEP, stating
its purpose "is to provide a framework for the permitting system that allows the export of bobcat,
river otter, Canada lynx, gray wolf, and brown bear harvested in the United States."[22] By
reciting the purpose of the CEP, the Service unduly narrows the scope of the environmental
analysis. The Service should have stated the purpose and need more broadly so that the agency
was truly evaluating the pros and cons of permitting the exports of these furbearers under the
CEP. As stated, the "purpose and need" is arbitrarily constrained and is defined so narrowly
such that only the preferred action alternative meets the purpose and need of the program. In
doing so, the Service skirts the entire purpose of performing a NEPA analysis.

The courts have been clear when rejecting this tactic. *See Citizens Against Burlington*, 938 F.2d
at 196 ("an agency may not define the objectives of its actions in terms so unreasonably narrow
that only one alternative from among the environmentally benign ones in the agency's power
would accomplish the goals of the agency's action, and the EIS would become a foreordained
formality."); *Simmons*, 120 F.3d at 666 ("If the agency constricts the definition of the project's
purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its
role. Nor can the agency satisfy [NEPA]"). An agency may not "define a project so narrowly
that it forecloses a reasonable consideration of alternatives." *Fuel Safe Washington v. Fed.
Energy Regulatory Comm'n*, 389 F.3d 1313, 1324 (10th Cir. 2004) (quoting *Davis v. Mineta*, 302
F.3d 1104, 1119 (10th Cir. 2002)); *Citizens' Comm. To Save Our Canyons v. U.S. Forest Serv.*,
297 F.3d 1012, 1030 (10th Cir. 2002). "Because the purpose and need defines the range of
alternatives, an agency 'cannot define its objectives in unreasonably narrow terms.'" *Sierra
Club v. U.S. Dep't of Transp.*, 310 F.Supp.2d 1168, 1192 (D. Nev. 2004) (citing *City of Carmel-
By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)). "While it is true that
defendants could reject alternatives that did not meet the purpose and need of the project, they
could not define the project so narrowly that it foreclosed a reasonable consideration of

---

[22] Draft EA at 9.

023214

alternatives." *Davis*, 302 F.3d at 1119.  By defining the purpose and need as one that can only be accomplished by maintaining the Service's CEP in its current form, the Draft EA does exactly what courts have admonished against.

## II.     The Draft EA Fails to Take a Hard Look at Environmental Impacts.

NEPA requires that an agency fully analyze all direct, indirect, and cumulative impacts from a project in its environmental analysis.  *See* 40 C.F.R. § 1502.16.  Direct effects include those "which are caused by the action and occur at the same time and place."  *Id.* § 1508.8(a).  Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  *Id.* § 1508.8(b).  Finally, cumulative impacts include those "which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id.* § 1508.7.

The Draft EA fails to address numerous impacts to wildlife as a result of the CEP, instead providing a scant economic analysis and concluding, without any analysis, that "[n]one of the alternatives considered, including the preferred alternative, will impact the physical environment in the United States."[23]  This statement ignores the fact that tens of thousands of animal trophies, skins, and pelts are exported every year, generally caught by traps placed on federal, state, and private lands across the U.S.  As analyzed below, these traps often lead to the injury or death of non-target animals, including federally and state protected species, as well as family pets.  Without a CEP that allowed for export sales of these animals, it likely that trapping rates would decrease dramatically, leading to less traps on U.S. lands.

Moreover, while the Service claims to analyze the population status of the species considered within the Draft EA, the Service does nothing of the sort.  The Service simply offers a conclusory analysis as to whether some alternatives that would constrict the CEP may lead to less trapping, but offers no science or data for any of the five species, including a complete lack of any population data for the species.  As described more below, the Service must take a hard look at the impacts of the alternatives contained within the Draft EA, including a close look at each species analyzed, other species that were not but should have been analyzed, and cumulative impacts of the Export Program and other impacts to the species covered by the program.

---

[23] *Id.* at 17.

### A.  Direct Impacts to Wildlife

The CEP for Appendix II furbearers facilitates an international market for the export and sale of pelts, parts, trophies, garments, and other components of bobcats, gray wolves, and other Appendix II furbearers. Indeed, online markets and high international demand have made it possible to sell and ship furbearers listed in Appendix II to many parts of the world.

As the EA acknowledges, "populations of these species probably would increase in abundance, at least in some areas, if export was not allowed."[24] But that the "extent export prohibition would actually affect harvest is unknown."[25]  Indeed, the EA provides no analysis of the potential for impacts on a species- or geographically-specific level, and the CEP fails to even monitor the most basic information, such as harvest levels by state. The EA provides that "States and Tribes provide data to the Service to qualify for the CEP on a voluntary basis."[26] But such information is needed to adequately analyze the environmental impacts. The failure to use the best available data to analyze the impacts of the program on these furbearers is a direct violation of NEPA.

To supplement the dearth of information provided in the EA, we provide available information for impacts to each of the five furbearer species.

### 1.  Brown Bears (*Ursus arctos*)

Currently, Alaska is the only state that participates in the CEP for brown bears.[27]  The Draft EA reports that the total value of U.S. exports of brown bear skins in 2015 was $300.[28]  However, 80 brown bear trophies were also exported from the United States in 2015, totaling a declared value of $145,720.[29]  This means that each individual brown bear trophy was worth an average of $1821.50 in 2015.

According to available data from the CITES Trade Database, the number of brown bear trophies varies from year to year, with a high of 114 in 2010 and a low of 39 in 2011 between 2010-2015.[30]  At least 20 brown bear skins or skin pieces have also been reported as exported since

---

[24] *Id.* at 17.

[25] *Id.*

[26] *Id.* at 11.

[27] Fish and Wildlife Service, List of States and Tribes with Approved Export Programs for Furbearers (April 2016), *available at* https://www.fws.gov/international/pdf/2016_list-of-states-and-tribes-with-approved-export-programs-for-furbearers-alligators-and-ginseng.pdf ). List of States and Tribes with Approved Export Programs and Furbearers, Alligators, and Ginseng (attached as Exhibit 2).

[28] *Id.* at 18.

[29] *Id.*  at 20.

[30] CITES Trade Database, *available at* https://trade.cites.org/.

2010, though a number of countries claimed that skins were imported from the U.S. that were apparently not reported during export.[31]

In general, scientists have found that hunting brown bears can have a ripple effect on the population.  For example, one field study found that hunting of male bears may lead to infanticide, when the removal of a male bear causes an immigrant male to move into deserted territory and kills the young.[32]  Biologists believe that one reason that immigrant males kill existing cubs is to increase his reproductive success, as killing the cubs can shorten the interval to a female's next conception.[33]  Due to the impacts of infanticide caused by hunting of male bears, this study found that killing one adult male had a population effect equivalent to killing 0.5 to 1 adult female.[34]

Scientists believe that in hunted populations, adult female bears may choose sexual segregation to reduce the risk of infanticide by immigrant males, but as a result females may end up in less than ideal habitat where abundance of nutritional foods is low.[35]  Consequentially, studies have shown that hunted populations generally have lower cub litter sizes and cub survival rates than unhunted populations.[36]  Female grizzlies in hunted populations may also have more unsuccessful pregnancies.[37]  Moreover, trophy hunting may be detrimental to a population's gene pool.[38]

The risk of overharvest in grizzly bear populations is especially dangerous when compared to other mammals, because bears have low reproductive rates, so it may be a decade or more before effects of overharvest are noticed, and depleted populations will be slow to recover.[39]  Some scientists have suggested that hunting resident adult male grizzlies can result in population decline and can even contribute to rapid population extinctions in small populations.[40]  Because trophy hunting of male grizzly bears is not compensatory, but conversely is depensatory for females, many scientists suggest that wildlife managers take a cautious approach when allowing trophy hunting.[41]  And because there is still a lot to be learned about how grizzly bear populations respond to trophy hunting, wildlife managers should err on the side of caution in the face of such uncertainty[42].

---

[31] *Id.*
[32] Swenson et al. (1997).
[33] *Id.*
[34] *Id.*
[35] Wielgus et al. (2001).
[36] *Id.*
[37] *Id.*
[38] Stringham (1977).
[39] Wielgus et al. (2001); Miller (1990).
[40] Wielgus et al. (2001).
[41] Wielgus et al. (2013).
[42] Artelle et al. (2013).

11

Although the Draft EA lumps brown bears and grizzly bears in Alaska together into one category, there are actually two different brown bears in Alaska.  Kodiak bears - or brown bears from the Kodiak Archipelago - are actually classified as a distinct subspecies from bears on the mainland because they have been isolated from other bears for about 12,000 years.[43]  According to the Alaska Department of Fish and Game, brown bears from the Kodiak Archipelago live in higher densities than grizzly bears in the northern and interior parts of Alaska, an important point which the Service should consider in its NEPA analysis.[44]  Although the ADFG notes that bear populations in Alaska are generally healthy, the agency also notes that bear densities in Alaska vary, and studies have shown that densities in Alaska's North Slope, for example, may be as low as one bear per 300 square miles.[45]  Thus, removing bears from the North Slope of Alaska may have a greater impact on the local population there than the impact of removing a bear from the Alaska Peninsula, Kodiak or Admiralty Island, where bear densities are generally higher.[46]  It doesn't appear that the Service tracks where in the state bear trophies for export come from, however, and therefore the Service cannot adequately analyze whether the CEP is harming local bear populations.  Perhaps it is unsurprising, therefore, that no such analysis is contained within the Draft EA.

Moreover, even in areas where grizzly bears in Alaska are more prominent, science has shown that intensive lethal management of grizzly bears to protect moose and caribou is threatening bear populations.  In Miller *et al.* (2011), scientists - including former employees from the Alaska Department of Game and Fish - warned that research studies on grizzly populations in areas of Alaska where hunting regulations were more liberal was lacking, and that the aggressiveness of grizzly bear management in areas of Alaska increases risk to the population.[47]  In 1994, an Intensive Management Law was adopted into state law in Alaska, calling for the reduction of grizzly bears, black bears, and wolves, in order to reduce competition with humans for wild ungulates.[48]  Following the 1994 law, grizzly bear hunting was greatly liberalized in approximately 76% of the state, with an increase in bag limits, bag limit exceptions, and a reduction of requirements that resident hunters purchase special tags to hunt grizzly bears, all designed to encourage grizzly bear harvests.[49]  As would be expected, the mean annual harvest skyrocketed, from a mean annual harvest of 387 bears between 1976-1980 to a mean annual harvest of 829 bears from 2004-2008.[50]  Despite the objectives of the 1994 law, there have been

---

[43] Alaska Department of Fish and Game, Brown Bear Species Profile, *available at* http://www.adfg.alaska.gov/index.cfm?adfg=brownbear.main (last visited Mar. 22, 2017).
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] Miller et al. (2011).
[48] *Id.* at 1245.
[49] *Id.* at 1245-46.
[50] *Id.* at 1246.

12

no studies demonstrating that increased grizzly bear hunting resulted in more harvestable moose or caribou.[51]

As a result of this 1994 law, ADFG biologists have noted that their hands are tied in effectively managing grizzly bears, which are managed under the 1994 law by political motives rather than scientifically supported management.[52]   A study undertaken by the National Resource Council in 1995 urged Alaska to take a more cautious, research-based, conservative, experimental, and adaptive approach to grizzly bear management, but those recommendations - which stand in stark contrast to Alaska's 1994 Intensive Management Law - have been ignored.[53]

And perhaps what is more concerning is that after 2000, research on grizzly bear populations in the "Liberal Hunt Area" was greatly reduced.[54]   Thus, even though hunting has greatly increased, there have not been any recent studies to determine if liberalized hunting is having any negative effects on grizzly bear populations.  Without such information, it is not possible for the Service to conclude that the CEP, which even further incentivizes hunters and trappers on top of the already liberalized hunting regulations in Alaska, is not having a detrimental effect on grizzly bears.

In other areas of Alaska, such as the Kenai Peninsula, scientists have also determined that liberalized hunting may be having a negative effect on grizzly bear populations.  In an article released just last year, scientists estimated that the peninsula-wide population of grizzly bears is about 582 bears, a low density compared to other coastal brown bear populations in Alaska.[55]  The population also is insular, and thus is at risk of a lack of genetic diversity.[56]  In 1998, the State of Alaska designated the brown bear population on the Kenai Peninsula a population of special concerns, stating it was "vulnerable to a significant decline due to low numbers, restricted distribution, dependence on limited habitat resources, or sensitivity to environmental disturbance."[57]  Despite the lack of a reliable estimate of brown bears on the peninsula, the State eliminated the special listing in 2011 and harvests of brown bears on the Kenai Peninsula have been increasingly liberalized since 2007.[58]  As a result of aggressive hunting, scientists are concerned about the long-term conservation of brown bears on the Kenai Peninsula.[59]

Moreover, while the Service notes correctly in the Draft EA that "[c]urrently, brown bears in the United States can only be taken in Alaska," the Service has also proposed a rule to remove

---

[51] *Id.* at 1248-49.
[52] *Id.* at 1250.
[53] *Id.* at 1244-45.
[54] *Id.* at 1247.
[55] Morton et al. (2016).
[56] *Id.* at 332.
[57] *Id.* at 333 (citation omitted).
[58] *Id.* at 333, 345.
[59] *Id.* at 345.

13

federal protections from grizzly bears in the Greater Yellowstone Ecosystem ("GYE"), and Wyoming, Idaho, and Montana have all passed regulations to initiate a grizzly bear hunting season if protections are removed.[60]  While we oppose delisting of bears in the GYE, we must note that should federal protections for bears in the GYE be removed and grizzly bears be hunted and exported as part of the CEP, the Service will need to update its NEPA analysis unless it considers the potential impacts of including grizzly bears from the GYE in the program within this current analysis.

For many of the same reasons that we oppose delisting, we do not believe that trophy hunting of grizzly bears in the GYE would be sustainable, and the CEP is likely to incentivize hunters to want to hunt grizzly bears for profit.  But the grizzly bear population in the GYE  has been on decline for the past two years, and the rate of human-caused mortalities has been on the rise.[61] We hereby attach our comments on the proposed delisting rule to demonstrate the types of impacts the Service should consider if grizzly bears in the GYE are added to the CEP.[62]

## 2.  Canada Lynx (*Lynx canadensis*)

The lynx was added to Appendix II of the CITES in 1977.  Currently, only Alaska participates in the CEP for Canada lynx, because lynx occurring elsewhere in the U.S. are federally protected.[63]

The Draft EA reports that the U.S. exports of skins for Canada lynx in 2015 totaled $26,306.[64] The EA contains no information as to how many lynx were killed relative to these exports in 2015.  According to the CITES Trade Database, in 2015 a total of 444 lynx skins for exported for commercial sale.  If one were to assume one skin per animal, then this means a total of 444 lynx

---

[60] 81 Fed. Reg. 13,174 (Mar. 11, 2016); Wyoming Game and Fish Commission, Wyoming Game and Fish Department, Montana Fish and Wildlife Commission, Montana Fish, Wildlife and Parks, Idaho Fish and Game Commission, and Idaho Department of Fish and Game, Memorandum of Agreement Regarding the Management and Allocation of Discretionary Mortality of Grizzly Bears in the Greater Yellowstone Ecosystem, *available at* https://www.fws.gov/mountain-prairie/es/grizzlybear.php (last visited Mar. 24, 2017).
[61] *See* USGS, 2016 Known and Probable Grizzly Bear Mortalities in the Greater Yellowstone Ecosystem, *available at* https://www.usgs.gov/data-tools/2016-known-and-probable-grizzly-bear-mortalities-greater-yellowstone-ecosystem (last visited Mar. 24, 2017) (58 mortalities); USGS, 2015 Known and Probable Grizzly Bear Mortalities in the Greater Yellowstone Ecosystem, *available at* https://www.usgs.gov/data-tools/2015-known-and-probable-grizzly-bear-moralities-greater-yellowstone-ecosystem (last visited Mar. 24, 2017) (61 mortalities).
[62] *See* Center for Biological Diversity Comments on Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife, 81 Fed. Reg. 13174 (Mar. 11, 2016) (May 10, 2016) (attached as Exhibit 3); Center for Biological Diversity Comments re Reopening of Comment Period on Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife, 81 Fed. Reg. 61,658 (Sept. 7, 2016) (Oct. 7, 2016) (attached as Exhibit 4).
[63] *See* 65 Fed. Reg. 16,052 (Mar. 24, 2000); *see also* List of States and Tribes with Approved Export Programs and Furbearers, Alligators, and Ginseng (April 2016) (Exhibit 2).
[64] Draft EA at 18. We note that we are concerned with the Service's use of 2015 data alone. While 2015 represents the most current export data submitted to CITES, reporting often lags several years, and 2015 data may not reflect actual exports from that year. We urge the Service to review several years' worth of recent data, to more fully reflect actual export data.

14

were killed for export, and each skin was worth an average of $59.20.[65]  But a quick search on
"eBay" implies that a single lynx pelt may be valued at a range of $150 to $800.  Furthermore,
the Alaska Department of Game and Fish notes that the average value of a lynx pelt ranged from
$104 to more than $300 between 2004 and 2009, which seems at odds with the calculated value
above of just over $59.[66]

More lynx skins seemed to be exported in years past.  For example, in 2010, a total of 5,601
skins were reported for export, with all but two skins being exported for commercial purposes.
In 2011, a total of 7,688 lynx skins were reported exported; in 2012, 5,033 skins and 1 body; in
2013, 5,949 skins plus 1 body; and in 2014, 2,529 skins plus 1 body.  It is clear based on these
figures that 2015 represents a very low figure of exported skins compared to other years, and
thus very misleading that the Draft EA contains only 2015 figures for analysis.  Furthermore, it is
unclear why the number of skins reported for export dropped so dramatically in 2015.  It is
possible that such a drop reflects a drop in the lynx population, and this is something the Draft
EA must explain and explore.  Of course, trapping efforts also vary based on the fluctuation of
the value of lynx pelts.[67]

The actual number of lynx in Alaska is not known, thought wildlife managers and scientists rely
often rely on harvest data, radio-collared lynx, visual observations and observation of lynx tracks
to estimate lynx populations.[68]  Lynx generally rely heavily on snowshoe hare as their main prey,
and lynx populations fluctuate in cycles of approximately 9 to 11 years in Alaska, in synchrony
with the population cycle of snowshoe hare.[69]  In general, reproduction and recruitment rates
decrease with a decline in hare density.[70]

Lynx are highly susceptible to trapping, and trapping mortality may be additive, rather than
compensatory, to natural mortality.[71]  Unfortunately, trapping has caused major declines in North
American lynx populations,[72] and lynx populations are less resilient when harvested during years
when lynx population cycles are low.[73]  By not accounting for the fluctuation of lynx populations
and the lower rates of reproduction and recruitment during years of low snowshoe hare
abundance, scientists believe previous models of lynx population dynamics may have over-
estimated sustainable harvest rates for lynx.[74]  As a result, lynx populations are prone to over

[65] CITES Trade Database, *available at* https://trade.cites.org/.
[66] Alaska Game and Fish Department, Lynx (Lynx Canadensis), *available at*
http://www.adfg.alaska.gov/index.cfm?adfg=lynx.printerfriendly (last visited Apr. 6, 2017).
[67] Bailey et al. (1986).
[68] Yom-Tov et al. (2007).
[69] *Id.*
[70] Mowat et al. (1996).
[71] Bailey et al. (1986).
[72] Mowat et al. (1996); Bailey et al (1986).
[73] Mowat et al. (1996).
[74] *Id.*

15

exploitation.[75]  For this reason, some scientists have suggested restricting harvest during cyclic lows to reduce the risk of overharvest to lynx populations, and even suggested that doing so would lead to an increased 10-year harvest.[76]  Alaska Game and Fish Department, however, does not set harvest quotas based on lynx population cycles.

Trapping of lynx may also lead to orphaned kittens, which have a lower chance of survival without their mother, especially during winter months.[77]  The number of kittens orphaned each year in Alaska as a result of lynx being trapped is unknown.

Lynx populations also vary widely based on where in Alaska they occur.  For example, lynx do not occur in southeast Alaska, and are poorly documented in southwest Alaska.[78]  In some areas of Alaska, such as the Alaska Peninsula, lynx are present but in low numbers.[79] Despite relatively low numbers of lynx on the Alaska Peninsula, and an unknown population estimate, lynx are still regularly harvested there.[80]

The amount and extent of dispersal by lynx can affect the structure and dynamics of lynx populations, and is important to maintain genetic diversity.[81]  Some lynx populations in Alaska, however, may be at risk of genetic depression due to low dispersal rates.[82]  Low dispersal rates may be exacerbated by trapping.  Genetic dispersal may also be more pronounced during cycles were snowshoe hare abundance is low, and thus genetic differentiation may be impacted by lynx population cycles.[83] Scientists have suggested that wildlife management agencies should take into account genetic diversity and the patterns of population structure when permitting trapping.[84]

Finally, scientists have found that at least one lynx population in Alaska - lynx on the Kenai Peninsula - has been the subject of overexploitation.[85]  In the late 1970s and early 1980s, there were few regulations that trappers had to follow, and trapping was especially high as the value of pelts rose.[86]  During a 649-day monitoring period between 1982-1984, including seasons closed to hunting, the study proponents found that the mortality rate of all radio-collared lynx was 90%,

---

[75] Bailey et al. (1986).
[76] Mowat et al. (1996).
[77] Id.
[78] See Alaska Game and Fish Department, Lynx species profile, available at
http://www.adfg.alaska.gov/index.cfm?adfg=lynx.main(last visited Apr. 5, 2017); Watts & Olson (2016).
[79] Watts & Olson (2016).
[80] Id.
[81] Row et al. (2012).
[82] Watts & Olson (2016).
[83] Row et al. (2012).
[84] Id.
[85] Bailey et al. (1986).
[86] Id.

023222

and trapping was the primary cause of death (even during seasons closed to trapping).[87]  The study concluded that "the magnitude of available data strongly suggests that the lynx population in the northern region and, to a lesser extent, in the central region of the [Kenai National Wildlife Refuge] was overexploited during 1973-83."[88]  And by overexploited, the authors explained they meant "an intense, persistent, and prolonged harvest for >10 years that exceeded the capacity of the lynx population to compensate for natural and human mortality and to naturally fill in vacancies left by the removal of lynx in more accessible habitats."[89]  The authors based their conclusions on a number of factors, including depressed harvest levels, intense trapping pressure, and estimated low population levels of lynx.[90]

As mentioned above, 2015 recorded by far the lowest number of lynx skins exported in years, from a high of 7,688 skins exported in 2011 to just 444 skins in 2014.  Even if a higher percentage of lynx harvested in 2015 were not exported compared to the percentage exported in 2011, it is undeniable that there must have been a dramatic reduction in the number of lynx harvested in 2015.  It is possible that this dramatic reduction in lynx harvest reflects overexploitation and a reduction in lynx populations in Alaska.  This possibility calls for further study and reflection, and it is something that is not even mentioned - let alone analyzed - in the Draft EA.

Because the Draft EA is devoid of any information on population trends, population cycle fluctuations, mortality rates, harvest levels, dispersal rates, reproductive rates, and a number of other characteristics associated with lynx survival and sustainability in Alaska, the Draft EA fails to take a hard look at the impacts of the CEP on lynx, and thereby violates NEPA.

### 3.  Gray Wolves (*Canis lupus*)

Two states participate in the CEP for wolves: Alaska and Montana. Montana announced its addition to the Program in January of 2015, and trappers can sell only pelts acquired starting in the 2014-2015 season.[91]  In other states where wolf harvest is legal, exports can occur through individual CITES export permits, which must be analyzed as cumulative impacts to the state export program.

The EA provides that the declared value of gray wolf skins from the U.S. is $2,410.[92]  The EA does not explain how many dead wild wolves that figure represents. At a December 2014 fur sale in Manitoba, Canada, wolf pelts sold for an average of $160 each, while the website for Moscow

---

[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] Montana FWP 2015; *see also* List of States and Tribes with Approved Export Programs and Furbearers, Alligators, and Ginseng (April 2016) (Exhibit 2).
[92] Draft EA at 18.

17

Hide and Fur of Moscow, Idaho, says the company buys top-quality wolf pelts for as much as $500, "preferably with the feet attached."[93]

Available data from the CITES database from 2010 - 2015 shows that the number of wolf items exported from the U.S. varies widely from year to year with a low of 213 in 2015 to 893 in 2013.[94] The number of skins exported each year also varies widely, with a low of 6 in 2014 and a high of 838 in 2013.[95] It is possible that category of "skins" is not consistently applied given that in 2014 when only 4 skins was exported, a high number of 418 "specimens" were exported.[96]

Those numbers from the CITES database are difficult to square with the number of wolves killed in Alaska and tagged with CITES seals, as reported by Alaska Dept. of Fish and Game. According to the state agency, 1195 wolves were killed in Alaska and tagged with CITES seals in 2011 and 1189 wolves in 2012.[97]

In addition, when wolf mothers are killed, young are left orphaned and frequently die from dehydration, starvation, predation or exposure, which the Service should consider in terms of indirect and cumulative impacts.

Without knowing the number of wild wolves killed to supply these exports, the Service cannot reasonably conclude that the impacts on wild wolves is not significant. This is particularly true given research indicating unsustainable levels of harvest in some areas. Person and Russell (2010) investigated the influence of habitat use on risk of death from hunting and trapping of 55 radiocollared gray wolves (*Canis lupus*) from an exploited insular population in Southeast Alaska. They found that "roads clearly increased risk of death for wolves from hunting and trapping and contributed to unsustainable rates of harvest."[98]

The EA suggests that no population-level impacts on wolves would occur. Yet Creel and Rotella (2010) found that wolf population growth declined as human harvest increased, even at low rates of harvest, and that wolf populations declined with harvests substantially lower than the thresholds identified in current state and federal policies.[99]

Moreover, the Service ignores the fact that removing even just one adult wolf can disrupt the social structure of the population.[100]  The impact of breeder loss on social group persistence, reproduction and population growth appears to be greatest when average group sizes are small

---

[93] Lundquist (2015).
[94] CITES Trade Database, *available at* https://trade.cites.org/.
[95] *Id.*
[96] *Id.*
[97] Alaska DFG 2012; Alaska DFG 2013.
[98] Person & Russell (2010).
[99] Creel & Rotella (2010).
[100] Haber (1996); Rutledge et al. (2010); Borg et al. (2015).

and mortality occurs during the breeding season.[101]  Murray et al. (2010) also observed a density-dependent response to harvest and concluded that demographic responses to mortality risk may be complex and more subtle than previously thought and requires individual-based hazard estimation as a complement to traditional population-level approaches.[102]

Other impacts from killing of wolves must also be considered by the Service, such as recreational impacts from harvest. Borg et al. (2016) found that harvest of wolves adjacent to protected areas can reduce sightings within those areas despite minimal impacts on the size of protected wolf populations.[103]

For all these reasons, FWS failed to fully analyze the impacts of the CEP in its Draft EA, and the agency must analyze in an EIS the impacts of the CEP on wolves.

### 4. Bobcats (*Lynx rufus*)

The Draft EA fails to address myriad direct impacts to bobcats as a result of the CEP.  First, the EA fails to examine the number of bobcats directly killed or injured due to the export of  bobcat pelts, parts and other products under the CEP.   Specifically, the CEP for bobcat is the most widespread furbearer export program in the country (with river otter following in close second), as 39 states and 32 tribes have approved bobcat CITES export programs.[104] In other states where bobcat harvest is legal, exports can occur through individual CITES export permits, but their take requires cumulative review.  Even though the Draft EA states that bobcat (along with river otter) is "commonly exported in considerable quantities,"[105] FWS, to the commenters' dismay, fails to provide any actual data on the number of specimens taken per year under the CEP.[106]

The CEP directly affects the annual nationwide bobcat take.  The chart below maps the amount of bobcat skins for export, provided by the CITES database, against the annual bobcat harvest data, provided by individual states' wildlife agencies.[107]  The direct correlation is clear and logical, as both data sets generally correlate.  That the annual nationwide take is greater than the number of exported skins may be attributed to the fact that not all bobcat specimens are exported for pelts but rather in other parts and forms (e.g., trophy and whole specimens) that are not

---

[101] Borg et al. (2015).
[102] Murray et al. (2010).
[103] Borg et al. (2016).
[104] U.S. Fish and Wildlife, "List of States and Tribes with Approved Export Programs for Furbearers, Alligators, and Ginseng" (2016), *available at*: https://www.fws.gov/international/pdf/2016_list-of-states-and-tribes-with-approved-export-programs-for-furbearers-alligators-and-ginseng.pdf.
[105] Drat EA at 5.
[106] Draft EA at 10.
[107] Association of Fish & Wildlife Agencies, "U.S. Fur Harvest 1970–present, Statistics by State, Region and Nation" (2014), *available at*: http://www.fishwildlife.org/index.php?section=furbearer_management&activator=27; CITES Trade Database, *available at* https://trade.cites.org/.

accounted by skins alone, as well as the fact that fur dealers may store pelts domestically and subsequently export once bobcat pelt prices have risen internationally.

Given this direct impact of exports on annual bobcat harvests, the scale of bobcats taken per year as a result of the CEP for bobcat is substantial. According to the individual states' wildlife agencies, the country has faced an exponential boom in nationwide bobcat harvest since the mid-2000s, reaching a peak of take in 2006 approximating 77,000 bobcats and in 2013 of nearly 70,000 bobcats.[108]  Exports of skins faced a similar trajectory, reflecting a first peak of exports nearing 60,000 skins in 2008 and a subsequent resurgence of nearly 70,000 in 2013.[109]



Moreover, the exponential rise in international prices for bobcat fur has fueled bobcat harvest and, hence, bobcat exports.[110]  The number of bobcats exported and harvested in the United States is tightly linked to economics.  Pelt prices and gasoline prices are important variables that influence harvest numbers each year.[111]  Bobcat pelts are highly prized overseas, and data show

---

[108]Association of Fish & Wildlife Agencies, "U.S. Fur Harvest 1970-present, Statistics by State, Region and Nation" (2014), *available at*: http://www.fishwildlife.org/index.php?section=furbearer_management&activator=27.
[109] CITES Trade Database, *available at* https://trade.cites.org/.
[110] *See, e.g.,* Rachel Bale, "Trapping Bobcats for Fur in the U.S. is Going Strong—And is Grisly," NATIONAL GEOGRAPHIC (Jan. 15, 2016), *available at*: http://news.nationalgeographic.com/2016/01/160115-bobcat-fur-trapping/; Taylor Hill, "Feeding Russia's and China's Fur Fixation, American Trappers Make a Killing with Bobcat Pelts," TAKEPART (April 16, 2015), *available at*: http://www.takepart.com/article/2015/04/15/bobcat-trapping-trade-legal-pelts-california.
[111] Rolley (1985).

023226

that pelt prices on the commercial market directly influence trapping effort.[112]  According to the
Draft EA itself, 2013 faced a high in bobcat pelt prices, as a single bobcat pelt sold $525.53 on
average in auctions in the western U.S. and plummeted 50% by 2015.[113]  A National Geographic
article details that bobcat pelts, though on average may be sold in the hundreds, can be sold in
the multiple thousands due to the international fur markets in China, Russia, and Europe.[114]  Both
bobcat skin exports and bobcat take also faced similar downward trajectories, as detailed above,
demonstrating the direct correlation between pelt price and take. The EA fails to examine the
environmental impact of bobcat exports as related to international market economics with which
it is intimately intertwined.

Notably, the Draft EA does provide one set of numbers that reflect the direct impact on bobcat
specimens as a result of the CEP, but the number is not wholly reflective or at all analytical of
the actual direct impact on bobcat take.  The Draft EA states that the 2015 total declared value of
bobcat skin exports totaled $3,830,097[115] and then refers to an endnote 4 that notes that the
cleared U.S. exports for bobcat skins amounted to 30,315[116] in 2015, which equates to an
average of $136.00 per pelt.  While the total amount of cleared skins is generally consistent with
the CITES report of skin exports, this number alone fails to depict the total number of specimens
effected.  The CITES database showcases a host of other bobcat products exported—including
garments, plates, tail, skull, skin pieces, trophies, and live bobcat—which are not reflected in the
Draft EA to demonstrate the total number of specimens represented in annual U.S. export.[117]  As
discussed above, this basic take data for bobcats is fundamental to evaluating the impacts of
bobcat harvest driven by the CEP on the country's bobcat population, and the Service's failure to
provide these numbers—and take trends over time—renders the EA inadequate and the Service's
conclusion of the insignificance of exports on bobcats unfounded.

Second, the EA's inadequacy is further demonstrated by the fact that it fails to analyze the
impacts of the CEP on bobcat populations.  Rather, the EA summarily claims that the Service's
"regular review" of the state and tribe programs somehow ensures that "the export is not
detrimental to the survival of the species"[118] and that the export of bobcat "does not threaten their
survival in the wild."[119]  However, the Service's conclusions are unsupported because of the
dearth of reliable estimates of bobcat populations that are needed to substantiate such claims.
Due to a reliance on hunter surveys and harvest data, reliable estimates of bobcat population for
management purposes are difficult to come by, as population trends vary widely from location to

---

[112] Tumlison & Mcdaniel (1986); Garcia (2011); Meshriy (2013).
[113] Draft EA at 64 (endnote 4).
[114] *See* Bale, *supra*, note 110.
[115] Draft EA at 18.
[116] *Id.* at 64 (endnote 4).
[117] CITES Trade Database, *available at* https://trade.cites.org/.
[118] Draft EA at 10.
[119] 82 C.F.R. 13361.

location, and year to year.[120]  Generalized population density estimates applied to a large area of an entire state are rarely accurate.[121]  Of the 47 states where bobcats occur, 41 employ some form of bobcat monitoring, primarily relying on hunter or trapper surveys in those states where such take is lawful.[122]  Only six states use any form of population modeling to monitor bobcat populations.[123]  Harvest trends can be unreliable and misleading, due to numerous factors that can influence total harvest, including fuel costs, pelt prices, weather conditions, and international market prices.[124]  Without reliable measurements of bobcat abundance, population trends remain unknown, and management strategies based on these data are likely to be flawed.[125]

Further, even though overall populations are unknown, studies do show that trapping, in addition to hunting, is responsible for a high proportion of bobcat deaths where legal.[126]  By comparison, for unlawful take of bobcat, incidental take or illegal harvest are significant influences, with vehicle collisions also contributing to mortality.[127]

Third, even if the CEP has unknown effects on nationwide or even statewide bobcat populations, the EA fails to examine the impacts of the export program on *local* bobcat populations and ecosystems.  Studies have shown that concentrated local trapping, as driven by bobcat exports, can result in the local extirpation of bobcat populations.[128]  Further, population extirpations from trapping have also played a significant role in bobcat genetic structure across its range.[129]  Overall, the examination of the CEP's impacts on bobcat populations require careful and thoughtful analysis with respect to the scale of the analysis; nationwide or statewide studies miss regional effects, while examination of a limited area will preclude necessary analysis of the immigration and emigration effects on the regional bobcat population and surrounding ecosystem. The Draft EA fails to take any of these considerations into account.

Fourth, the EA blatantly fails to discuss the multiple documented effects that bobcat trapping specifically has on non-target species. Notably, bobcats are one of the most lucrative species to trap and sell on the international market, and the decline in that species has led to the decline in the trapping of other animals because bobcat trappers are no longer engaging in the activity and catching other species at the same time. California—as the only state that has banned commercial fur trapping—provides a particularly illustrative example. Due to the ban on commercial trapping in 2015, the total number of species taken via trapping dropped from nearly

---

[120] Knick (1990).
[121] Preuss & Gehring (2007); Roberts & Crimmins (2010).
[122] Roberts & Crimmins (2010).
[123] *Id.*
[124] Rolley (1985).
[125] NY Dep't of Environmental Conservation (2012); Wisconsin Dep't of Natural Resources (2012).
[126] Nielsen & Woolf (2002); Riley et al. (2003); Kapfer (2012).
[127] *Id.*
[128] Reding et al. (2012); South Coast Wildlands (2010).
[129] Reding et al. (2012).

22

7,000 in 2015 to 2,000 in 2016.[130]  Bobcats only accounted for 760 of the 7,000 animals taken in 2015,[131] yet it spurred a decrease in trapping of other species—including skunk, gray fox, and muskrat—because such trappers were likely no longer actively practicing and trapping other species concurrently with bobcat.  Separately, bobcat trapping affects through incidental take of non-target species in traps laid out for bobcat, as well as poaching (see below for further discussion).

Fifth, the EA fails to analyze the incidental killing of non-targets species as a direct result of the CITES Trapping Program for bobcat.  Ample literature examines the real threat that bobcat trapping and hunting have on the incidental trapping of endangered and threatened species—foremost, lynx.[132]

In sum, the Service's failure to examine any of these direct impacts on bobcats in the Draft EA violates the basic requirements of NEPA environmental review.

### 5.  River Otters (*Lontra canadensis*)

River otter populations declined significantly in the early 1900s throughout their range in North America due to over harvesting as well as water pollution and loss of habitat.[133]  Indeed, river otters were suspected to have been extirpated in 11 states and suffered significant population declines in nine other states and as a result programs were conducted to reintroduce the species back into its historic range.[134]

Today, according to the Service, 38 states and 16 Tribes participate in the CEP for river otters.[135] In other states where river otter harvest is legal, exports can occur through individual CITES export permits, which must be analyzed as cumulative impacts to the state export program.

According to the EA, the declared value of river otter skin exports was $450,882 in 2015.[136]  The EA does not explain how many dead otters that figure represents. Based on internet research, river otter pelts range in price for intact pelts from $99.95 to $650.00 on "hideandfur" and on "eBay" fur pieces sell for a wider range of lower dollar amounts of $45 to $155 or more. If otter hides sell for $50, then roughly 9,017 animals were killed in 2015 but if the hides sell for $100 the number is closer to 4,500, or if a $600 price is used, then roughly 751 animals were killed. The CITES trade database indicates that the U.S. exported 10,368 otter skins of U.S. origin in

---

[130] Meshriy (2016).
[131] *Id.*
[132] *See, e.g.,* Cooper & Shadbolt (2007).
[133] Raesley et al. (2001).
[134] *Id.*
[135] List of States and Tribes with Approved Export Programs and Furbearers, Alligators, and Ginseng (April 2016) (Exhibit 2).
[136] Draft EA at 18.

23

2015.[137] If this number of exports is used, then each skin is valued at roughly $44 dollars assuming one animal per skin (which given their smaller size may be reasonable). However, these numbers seem doubtful given that the AFWA calculation of fur harvest data for the 2014-2015 season documented that 20,391 river otters were killed based on annual report data that states voluntarily provided to the organization.[138] Of course, not all of these otters were killed for export, but there still seems to be a possible discrepancy unless the domestic market is larger or roughly the same size as the international market. This discussion demonstrates that the EA lacks essential information upon which an effects analysis must be based.

Available data from the CITES database from 2010 - 2015 shows that the number of river otter (*Lontra canadensis*) skins from wild U.S. animals that are exported from the U.S. varies from year to year but typically is in the several tens of thousands. There was a low of 10,368 skins in 2015 and a high of 33,463 skins in 2013.[139] The low number of exports in 2015 is discerning given that appears to be the year the EA focuses upon for analyzing impacts to the species.

River otters populations are notoriously difficult to survey and track given the large amount of time the animals spend in the water.[140]  While survey methods are being developed for the species, it is critical that harvest be limited to ensure continued viability of populations.[141] Roberts et al. (2008) detected "a significant change in otter relative abundance" between 1996 and 1997 fall surveys when an otter harvest season was opened in 1997.

Impacts from trapping may affect river otters differently than other carnivores. Gorman et al. (2006) found "[r]ivers otters are more social and exhibit varying and complex social structures compared to other carnivores" and have high fidelity to their home ranges. River otters in different regions have significantly different distances that they disperse.[142]  This means that trapping of otters can affect populations in ways that do not occur for non-social carnivores. Moreover, it also means that trapping in different regions of the country has varied intensity of impacts to local river otter populations. River otter populations in coastal areas in the southern United States may experience a greater intensity of impacts due to their low dispersal rate than otter populations further north with greater dispersal rates. These impacts need to be addressed in the EA.

[137] CITES Trade Database, *available at* https://trade.cites.org/.
[138] By citing to this number of otters killed during 2014-2015, we do not mean to condone the AFWA dataset as being credible. Instead, we are merely using these numbers as a goalpost to indicate that a large number of otters are killed a year for their fur.
[139] CITES Trade Database, *available at* https://trade.cites.org/.
[140] Roberts et al. (2008); Stetz et al. (2016).
[141] Roberts et al. (2008); Nielsen (2016); Stetz et al. (2016).
[142] Latch et al. (2008).

24

River otters are predators in the aquatic ecosystems they inhabit.[143]  As a result, they play an important role in those systems and maintaining fish and even crab, crayfish, and other species population levels. River otters also have a unique relationship with beavers.[144]  Often the two co-exist and unfortunately are often caught in the same traps.[145]  Thus, the indirect impacts to beaver populations from trapping and the related negative impacts that loss of beavers has on stream systems both must be addressed in the EA.

### B.  Indirect Impacts

There are also numerous indirect effects of the program that should be analyzed in the Draft EA. For example, furbearers, especially large carnivores, play important ecological roles that are harmed by their removal.  By permitting exports of large carnivores including wolves, brown bear and lynx, the Service facilitates markets that result in more deaths than would otherwise occur without the export program. Such carnivores have many complex and positive effects on the ecosystem, and their deaths have harmful ecological impacts that should be analyzed in an EIS.

Numerous studies analyze how carnivore removal, in particular, can cause a wide range of unanticipated impacts that are often profound, including on native plant communities, wildfire and biogeochemical cycles, the spread of disease or invasive species, and more.[146]

Trophic cascades occur when predators limit the density or behavior of their prey and thereby enhance survival of the next lower trophic level.[147]  The removal of apex predators can cause the "release" of mid-sized or "mesopredators" like foxes, raccoons, and skunks that are not at the top of the food chain in the presence of large carnivores like wolves.[148]  For example, studies have also shown how wolves can aid pronghorn populations because "wolves suppress[ ] coyotes and consequently fawn depredation."[149]  Increased abundance of mesopredators in turn can negatively affect populations and diversity of other species, including ground-nesting birds, rodents, lagomorphs, and others. In some cases, declines in these species results in reduced prey for other predators and contribute to their decline and extirpation.[150]

An another example, researchers in Wisconsin documented a trophic cascade on plant communities (including increased forb richness) following the growth of wolf populations in the

---

[143] Trani & Chapman (2007).
[144] Swimley et al. (2008); Trani & Chapman (2007).
[145] AFWA, Best Management Practices for Trapping River Otter in the United States (available at: http://www.pgc.pa.gov/HuntTrap/TrappingandFurbearers/Documents/BMP%20Trapping%20Otter.pdf).
[146] Beschta & Ripple (2009); Estes et al. (2011); Levi et al. (2012); Bergstrom et al. (2013); Bergstrom (2017).
[147] Silliman & Angelini (2012).
[148] Crooks & Soulé (1999); Prugh et al. (2009).
[149] Berger & Gese (2007); Smith et al. (2003).
[150] Crooks & Soulé (1999); Soulé (1988); Sovada et al. (1995); Palomares et al. (1995).

25

state.[151]  Moreover, wolves in Yellowstone and Grand Teton national parks have benefited a host of species. By reducing numbers and inducing elk to move, wolves have reduced browsing on aspen and other streamside vegetation, which has benefitted beavers, songbirds and fish populations.[152]

Wolves also benefit scavengers by leaving carrion derived from predation; hence, wolf removal leads to reduced abundance of carrion for scavengers in specific areas.[153]  For instance, the extirpation of wolves harms grizzly bears because, in addition to acting as apex predators, grizzlies scavenge carrion left by wolves. In addition, wolf predation on elk has led to less elk browsing of berry-producing shrubs in Yellowstone National Park, providing grizzlies with access to larger quantities of fruit.[154]

For all these reasons, the Service must thoroughly analyze how reduced furbearer populations may impact other species and the health of ecosystems.

Incidental take of non-target animals is another indirect impact that should be analyzed within the Draft EA.  In general, traps are nondiscriminatory, and thus capture of non-target animals is fairly common.  Sometimes the non-target animals are released unharmed, but other times they may be injured or killed in the traps.  For example, a trap for beavers may incidentally trap and kill river otters.[155]  As discussed further below, trapping for bobcats often leads to trapping of lynx in places where lynx and bobcat overlap.  Wolves are also sometimes killed as a result of incidental taking by traps set for other species.[156] Similarly, mistaken identity may be an issue that leads to higher mortality rates than planned for.  For example, hunters with a tag to hunt black bears sometimes mistake a grizzly bear for a black bear, and kill it without the proper tag to do so.

Another potential impact from the program is increased poaching rates.  For example, the Service admits in the Draft EA that illegal harvest is a possible impact from the program, stating "it is possible that skins of native bobcats, river otters and other species are currently included in the CEP but that are from jurisdictions where legal harvest is prohibited could be laundered into the legal trade."[157]  It is logical that when poaching has a monetary reward because the poachers can export the animals for economic profit, the incentives for poaching increase.[158]  As discussed

---

[151] Callan et al. (2013).
[152] Ripple & Beschta (2011); Bergstrom et al. (2013); Estes et al. (2011).
[153] Ripple & Beschta (2011); Wilmers et al. (2003a); Wilmers et al. (2003b).
[154] Ripple et al. (2013).
[155] AFWA, Best Management Practices for Trapping River Otter in the United States (available at: http://www.pgc.pa.gov/HuntTrap/TrappingandFurbearers/Documents/BMP%20Trapping%20Otter.pdf).
[156] *See, e.g.,* Minnesota Department of Natural Resources, Gray wolf, Mortalities, available at http://dnr.state.mn.us/mammals/wolves/mgmt.html (last visited Apr. 8, 2017) (listing the reported death of 4 wolves as a result of incidental take between Jan. 1, 2015 to Oct. 6, 2016).
[157] Draft EA at 13.
[158] Treves & Bruskotter (2014).

26

further below, trapping and other means of lethally removing wildlife from the landscape can also impact social attitudes, which may in turn lead to more poaching.[159] Poachers may also kill animals during hunting and trapping seasons under the guise of legitimate activity.[160]  Thus, by providing the opportunity to export animals for profit, the Service increases the possibility that furbearers will be illegally removed from the landscape.

Finally, although the Draft EA includes a short economics analysis, the analysis does not include any data about how by incentivizing trappers to remove furbearers from the landscape, the CEP could in fact have a negative economic impact on communities that generate income from tourism focused on viewing these furbearers.  The literature is clear:  large carnivores are a draw for tourism, and thus the opportunity to view carnivores in the wild provides economic support for many communities which may be impacted by increased trapping as a result of the CEP.[161]  This fact should be a part of any economic analysis contained within the EA.

### C.  Cumulative Impacts

We are astonished that the Service asserts that it has not identified or analyzed any cumulative impacts that may impact the environment in conjunction with this program.  This assertion does not even pass the straight-faced test.  With mortality to the furbearers at issue from a variety of other sources, it is inevitable that there are cumulative impacts that must be analyzed in conjunction with the CEP, that the Service has admitted increases trapping and thus mortality rates.

First, state licensed hunting and trapping, even where the furbearers and not killed for export, causes mortality to these furbearers, potentially impacting local, state, and national populations.  And even if the Service were to show no impact to populations - which it does not assert in this Draft EA because there is no information on furbearer populations even included in the "analysis" - there still may be other impacts that should be considered.  For example, the killing of wolves may cause social disruption and break up family packs, which can lead to a variety of impacts, including the potential for increased predation on livestock.[162]  Hunting and trapping can also impact wildlife watching opportunities, including viewing furbearers in national parks even when the hunting and trapping takes place outside of park boundaries.[163]  These impacts are exacerbated by trapping for the CEP because more furbearers are removed from the landscape by trappers expecting to profit from the program.

---

[159] *Id.*
[160] Muth & Bowe (1998), p. 15; Eliason & Dodder (1999), p. 240.
[161] Richardson et al. (2014); Berger (2006) ("[B]ecause large carnivores act as a draw for tourists, they encourage conservation of protected areas by serving as mechanisms to generate income and provide employment opportunities for rural communities"), p. 752; Sillero-Zubiri & Switzer (2004), p. 9-11.
[162] Wielgus & Peebles (2014); Haber (1996); Rutledge et al. (2010); Borg et al. (2015).
[163] Borg et al. (2016).

27

Moreover, many states have programs aimed at predator removal, generally intending to protect livestock or protect wild ungulate game species such as deer, elk, or moose.[164]   State wildlife agencies are generally funded by the sale of hunting, trapping, and fishing tags, so they prioritize protecting game species from predators so that there are more available for people to hunt.   For example, in the last decade, the Alaska Board of Game has become increasingly aggressive in its efforts to reduce predators - including wolves and brown bears - to increase the availability of moose, deer, and caribou for hunters.[165]   Such predator control has included harvesting grizzly bears over bait; taking wolves and coyotes, including pups, during denning season; expanding season lengths and increasing bag limits; and authorizing shooting bears from aircraft and same day airborne hunting of bears at registered bait stations.[166]   Such aggressive methods facilitate the killing of wolves and bears in Alaska and must be considered in an analysis of cumulative impacts.   Moreover, the science generally has demonstrated that predator control efforts aimed at increasing ungulates are not successful, because having predators on the landscape may actually improve the overall health of ungulates by removing the weak, sick, and older ungulates from herds.[167]

Often, states, counties, towns, and private landowners also work in conjunction with Wildlife Services, an arm of the U.S. Department of Agriculture that targets furbearers and other wildlife for killing, primarily to benefit the agriculture industry.   For the last several years, for example, Idaho has contracted Wildlife Services to aerially gun down wolves in the Lolo Zone in northern Idaho to protect elk populations from predation.[168]   In 2014 and 2015 alone, Wildlife Services killed 42 wolves in the Lolo Zone.[169]   Montana has also contracted with Wildlife Services to remove wolves from the landscape.[170]   In 2016, Wildlife Services killed more than 2.7 million

---

[164] Sillero-Zubiri & Switzer (2004) ("In North America, carnivore populations have traditionally been controlled in order to increase game species, in particular wild ungulates."), p. 3.

[165] Boertje et al. (2010).

[166] *See* 5 AAC 85.

[167] *See, e.g.,* Zager & Beecham (2006); Bergstrom et al. (2013), p. 6; Levi et al. (2012).

[168] Idaho admits that elk populations have declined as a result of a decline in elk habitat quality that began well before wolves were reintroduced in Idaho in the mid-1990s, but asserts that wolves are to blame for preventing the elk population from rebounding.   *See* Idaho Department of Fish and Game, Predation Management Plan for the Lolo and Selway Elk Zones (rev'd Dec. 31, 2011), *available at*
http://fishandgame.idaho.gov/public/wildlife/planLoloSelwayPredation.pdf (last visited Mar. 22, 2017).

[169] *See* Idaho Fish and Game, News Release, "Wolf Control Action Completed in the Lolo Zone" (Feb. 28, 2014) (Widlife Services killed 23 wolves from a helicopter in the Lolo Zone in February 2014), *available at*
https://fishandgame.idaho.gov/public/media/viewNewsRelease.cfm?newsID=7007 (last visited Mar. 22, 2017);
Idaho Fish and Game, News Release, "Wolf Control Action Completed in the Lolo Zone" (Mar. 9, 2015) (Wildlife Services killed 19 wolves through aerial control in February 2014, and "[d]uring the last five years, six other agency control actions in the Lolo zone removed an additional 48 wolves"), available at
https://fishandgame.idaho.gov/public/media/viewNewsRelease.cfm?newsID=7545 (last visited Mar. 22, 2017).

[170] *See, e.g.,* "Wolves kill cattle in Absarokee area; Wildlife Services looks to eradicate pack," Billings Gazette (Mar. 28, 2016), *available at* http://billingsgazette.com/lifestyles/recreation/wolves-kill-cattle-in-absarokee-area-wildlife-services-looks-to/article_59263ea3-2b32-5829-9129-8b64924e93b9.html (last visited Apr. 7, 2017).

023234

animals in the U.S., including 415 gray wolves; 997 bobcats; 535 river otters, including 415 killed unintentionally; 407 black bears; and 3 grizzly bears.[171]

The Draft EA must also analyze the impacts of other sources of human-caused mortality, such as vehicle strikes, poaching, self-defense kills, and human-animal conflicts that lead to lethal removals, all of which can act cumulatively to impact species populations.

In addition to the various forms of human-caused mortality of furbearers, natural mortality is also another cumulative impacts that must be analyzed.  This may include mortality from old age, starvation, predation, wildlife conflicts, mortality from stochastic environmental events (such as fire, earthquakes, inclement weather events, flooding, landslides, or avalanches), or various other forms of mortality that may occur naturally in the wild.

Disease is another cumulative impact that may impact furbearers that the Service failed to consider.  These furbearers may suffer from a variety of infectious and parasitic diseases, which may play a role in population dynamics.  For example, wolves and grizzly bears in Alaska may suffer from brucellosis, largely as a result of preying on reindeer and caribou, which are primary hosts of the bacterial disease.[172]  The most common symptom of the disease is abortion in females.[173]  Toxoplasma gondii, a protozoan parasite, can infect grizzly bears, black bears, lynx, and wolves in Alaska, which can cause lymphadenopathy, myalgia, and neuralgia.[174]  And wolves in Alaska are known to suffer from Canine coronavirus, which can negatively impact the health of wolves as a result of diarrhea and dehydration, while wolves in Wisconsin may fall victim to vector-borne diseases such as Lyme disease, anaplasma, ehrlichiosis, or heartworm.[175] These are just a few examples of the various diseases that may negatively impact the health and the population of furbearers encompassed within the Draft EA.

Genetic health may also play a role in the overall health of a furbearer population.  Scientists are already concerned about the long-term genetic health of some furbearers in the United States. For example, grizzly bears in the Greater Yellowstone Ecosystem have been completely isolated from any other bear population for over a century, and no genetic exchange has been documented between the GYE and bears elsewhere.[176]  The Service originally cited lack of genetic diversity as one reason for listing the bear as a threatened species under the Endangered

---

[171] United States Department of Agriculture, Animal Plant Health Inspection Service, Wildlife Services, Program Data Report (2016), *available at* https://www.aphis.usda.gov/wildlife_damage/pdr/PDR-G_Report.php?fy=2016&fld=&fld_val= (last visited Mar. 20, 2017).

[172] Zarnke et al. (2006), p. 570.

[173] *Id.* at 576.

[174] Zarnke et al. (2001), p. 36.

[175] Zarnke et al. (2001)(2), p. 570; Jara (2016).

[176] Although grizzly bears in the lower 48 are currently protected under the Endangered Species Act and thus exportation of grizzly bears is illegal, the Service has a proposed rule in place to remove federal protections for grizzly bears in the GYE, 81 Fed. Reg. 13,174 (Mar. 11, 2016), as explained more fully above.

29

Species Act in 1975, and since has recognized that "decreases in genetic diversity would occur gradually over decades" and 1 to 2 effective migrants is necessary to "assure genetic health in the long term."[177]  If trophy hunting is permitted, which may be incentivized by the CEP, the potential for grizzly bears in the GYE to connect with other grizzly bear populations may be even further curtailed as potential connectivity routes that lie outside of more regulated zones within the GYE are targeted by hunters.

Scientists have also acknowledged that brown bears in Alaska are at risk of genetic depression where glaciated mountains and wider marine fjords as a result of climate change inhibit gene flow in bears, and recommend protecting shorelines and non-glaciated valleys as travel corridors to facilitate gene flow into the future.[178]  However, the Draft EA does not analyze this data, and the CEP incentivizes trophy hunting of grizzly bears in Alaska with no disincentives as to where the trophies are acquired within the state.

The Service also must look at how social tolerance of carnivores may be impacted by trapping for the CEP.  Although agencies have often tried to assert that lethal control increases tolerance, the science in fact shows the opposite.  A study conducted regarding the social tolerance of wolves in Wisconsin, for example, found that as lethal-control measures increased, tolerance actually decreased.[179]  Similarly, hunting and trapping - including trapping for the CEP - is also unlikely to increase social tolerance for carnivores.  One public study of attitudes toward brown bears found no difference between residents of a jurisdiction where hunting was allowed and residents of another jurisdiction where hunting was not permitted.[180]

These are several examples of cumulative impacts that must be considered in a NEPA analysis for the CEP, and we do not believe that these examples are exhaustive.  Thus, we urge the Service to work to identify other cumulative impacts that may also be appropriate for analysis.

## III.      The Draft EA is Results-Oriented.

NEPA's core precept is simple: look before you leap. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1502.2(f), (g), and 1506.1. As the courts have explained:

> Agencies are to perform this hard look before committing themselves irretrievably to a given course of action so that the action can be shaped to account for environmental values.

---

[177] 40 Fed. Reg. 31,734, 31,734 (July 28, 1975); 81 Fed. Reg. at 13,211.
[178] Lewis (2015), p. 1710.
[179] Brown-Nunez et al (2015); *see also* Bergstrom (2017); Bruskotter *et al.* (2015); Carter & Linnell (2016); Bruskotter & Wilson (2014).
[180] Kaczentsky et al. (2004).

023236

*Sierra Club v. Hodel*, 848 F.2d 1068, 1093 (10th Cir. 1988).  Logically, if this hard look is not prepared prior to the point of commitment, a federal agency deprives itself of the ability to "foster excellent action."  *See* 40 C.F.R. § 1500.1(c).  In the Supreme Court's words:

> NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing Government and public attention on the environmental effects of proposed agency action. 42 U.S.C. § 4321. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.

*Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 371 (1989).

NEPA's "purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action . . . [and] to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1(c).  Indeed, "[t]he thrust of [NEPA] is . . . that environmental concerns be integrated into the very process of agency decision-making."  *Davis v. Mineta*, 302 F.3d 1104, 1114 n.5 (10th Cir. 2002) (quoting *Andrus v. Sierra Club*, 442 U.S. 345, 350 (1979)).  This very purpose appears to have been lost on the Service here, because the Draft EA, as written, reveals a bias towards business as usual rather than an objective environmental analysis of a proposed action and alternatives to that proposal.

This Draft EA is not a forward-looking and action-forcing document that evaluates the impacts of the proposed action and alternatives to the action – as contemplated and required by NEPA. NEPA procedures are designed to insure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).  In this respect, it is clear that the Service is not using this NEPA process to inform decision making, but rather the Service made its decision first, to maintain the Service's CEP in its current form, then wrote the Draft EA to fit that decision.

By failing to provide a NEPA analysis that objectively evaluates the environmental impacts of the CEP, and by failing to ensure that the NEPA analysis informed the decision-making process, the Service has made these NEPA procedures a mere formality that do not meet the purpose and intent of the Act.

## IV.     The Service's EA Fails to Evaluate and Ensure Legally Sufficient and Biologically-Based NDF Determinations.

As argued above, the Service's Draft EA is seriously flawed and deeply inadequate. While the Service purports to analyze the impacts of its entire CEP program – a program which ultimately allows the export of *tens of thousands* of native animals each year[181] – the Service fails to analyze the actual direct, indirect, and cumulative impact authorizing such exports, which the agency admits increases the number of furbearers trapped.

Specifically, as part of the CEP, the Service determines on a range-wide or state-wide basis whether the harvest and export of furbearer species from the specified geographic area "will not be detrimental to the survival of th[e] species."[182] To make an NDF determination, the agency must determine whether trapping and export "represents sustainable use" and "is part of biologically based sustainable-use management plan" or otherwise does "not contribute to the over-utilization of the species," among other factors. 50 C.F.R. § 23.61(c). The CEP currently includes two Service approvals that cover the entire geographic ranges of both bobcats and river otters, in addition to numerous state-wide approvals for brown bears, wolves, and lynx. Thus the Service has, through the various approvals that comprise the CEP, determined that trapping and export of these five furbearers is "not detrimental" to the species and is done in a "sustainable" manner, which requires a detailed and extensive science-based NDF analysis.

However, the incredibly sparse Draft EA fails to even describe the various range- and state-wide approvals the Service purports to analyze in this EA. It is simply impossible for the Service or the public to evaluate the effects of the CEP – which is comprised of these various range- and state-wide approvals – without a detailed analysis of the actual approvals.

During the comment period, the Center specifically requested the "that the Service make all CEP furbearer approvals and any annual reports required by those approvals available for public review," so the public could actually evaluate the approvals being considered in the EA.[183] The Service flatly refused, directing the Center to file a Freedom of Information Act ("FOIA") request for the information and threatening to charge fees on such a request, claiming the

---

[181] Draft EA at 3. While the CEP program does not directly authorize exports, as exporters are still required to seek individual permits, the Service relies on its environmental analysis and legal analysis conducted under the CEP program to grant such permits. 40 C.F.R § 23.69(b). The Service is required to conduct NEPA analysis at the CEP approval stage, as it relies on the CEP approvals to make hundreds if not thousands of individual export permit decisions.

[182] CITES at Art. III(2), IV.

[183] *See* Letter from Center to Service requesting documents and extension of comment period (March 31, 2017). The Service refused to extend the comment period, noting it was under a court-ordered deadline to conduct its NEPA analysis. However, the Service could and should have issued its NEPA far earlier, so it was not so close to this deadline, allowing for full consideration of its massive CEP program (attached as Exhibit 5).

023238

response would be "voluminous."[184] The Service's refusal to provide information regarding or remotely evaluating the effects of the actual components of the CEP clearly violates NEPA, as detailed above; particularly when the agency suggests the missing information is extensive or "voluminous."

Further, under NEPA, an EIS must also be prepared if "the action threatens a violation of Federal, State, or local law," and thus both NEPA and its caselaw requires an agency to evaluate and provide sufficient information for the public to determine whether the agency's actions comport with underlying substantive law. 40 C.F.R. § 1508.27(b)(10); *see, e.g.*, *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) ("The CEQ regulations . . . require [an agency] to consider state requirements imposed for environmental protection to determine whether the action will have a significant impact on the human environment"); *Public Citizen v. DOT*, 316 F.3d 1002, 1026 (9th Cir. 2003) (reversed on other grounds) (finding agency "had an obligation to consider whether its regulations *might* violate" state air quality regulations in its EA) (emphasis in original). Here, the Service's CEP approvals must comport with CITES, the ESA, and the Service's implementing regulations. As such, the agency was required to fully evaluate the program *and the approvals that comprise the program* to determine whether the program comports with international and federal legal requirements, and conduct that analysis in a full EIS.

Finally, while the Service has not made available and we have not been able to access most of the current range- or state-wide CEP approvals/NDF determinations, we were able to access the Service's CEP approval/NDF for gray wolves in Montana for the 2014-2015 hunting season.[185] This approval and its NDF raise serious questions about the Service's compliance with CITES, the ESA, and the Service's CITES and CEP regulations.

Among many concerns regarding the direct and cumulative effect of Montana's gray wolf hunting program, Montana's 2014 hunting regulations did not contain an "overall harvest quota."[186] In addition, another 100 gray wolves may be taken without a license if threatening humans or livestock, of a total minimum Montana population of 627 wolves.[187] The Service concludes the program will not be detrimental to the gray wolf with very little analysis.

---

[184] Letter from Service in response to Center's information request (Apr. 4, 2017) (attached as Exhibit 6). While for many years, the Service published its CEP approval documents for various states in the Federal Register, including a summary of its NDF analysis, *see, e.g.*, 61 Fed. Reg. 2454 (Jan. 26, 1996) (approval of Tennessee's river otter program), the Service apparently now issues "Administrative Findings." The Service does not post these Administrative Findings online.  We urge the Service to reinitiate its practice of publishing a Federal Register notice upon approval of a range- or state-wide program under the CEP.
[185] U.S. Fish & Wildlife Service. Advice on State of Montana Request for Export of Gray Wolves Taken during the 2014-2015 Harvest Season (Oct. 31, 2014) (attached as Exhibit 7).
[186] *Id.* at 6.
[187] *Id.* at 7.

023239

However, the Service's regulations require the Service to find Montana's wolf hunting program "represents sustainable use," i.e., "the use of a species in a manner and at a level that maintains wild populations at biologically viable levels for the long term." 50 C.F.R. §§ 23.61(c), 23.5. Similarly, the Service must ensure the program will "pose no net harm" to the species' status *or* "lead to long-term declines that would place the viability of the affected population in question." *Id.* § 23.61(c). The Service simply cannot determine that harvest and subsequent export under Montana's 2014-2015 hunting season is "sustainable" if there is no quota or limit on the number of wolves killed.

Further, the Service's regulations also require that, for a State to receive approval under the CEP, the state must provide the "total allowable harvest of the species," as well as the "distribution of harvest." *Id.* § 23.69(b)(1). The Service sensibly requires this information because only with this information can the Service have any basis for making a determination that harvest is sustainable. Yet because Montana's program does not include a total quota, Montana cannot and presumably did not provide this information.

Accordingly, the Service's approval and NDF determination for Montana gray wolves like violates CITES, the ESA, and the Service's CITES regulations. *Id.* It is just this type of analysis that must be done *within the Service's NEPA documentation* to fully analyze the impacts of the Service's CEP.

## V.    An EIS for the CEP is Required.

Agencies must prepare an Environmental Impact Statement ("EIS") for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. §§ 4332(2)(C).  The relevant regulations that list factors to be considered in determining whether impacts from a project are significant, and thus require preparation of an EIS, can be found at 40 C.F.R. § 1508.27.  Notably, [four] of out of the ten factors that may lead to a significance determination are at issue for this program:  (1) the program lends itself to both beneficial and adverse significant impacts; (2) the program is highly controversial; (3) the program involves highly uncertain or unknown risks; (4) there are cumulative significant impacts; and (5) the program may adversely affect an endangered or threatened species or its habitat.

### A.    The Program Has Significant Impacts on Wildlife.

As explained above, the CEP undoubtedly has significant impacts on wildlife.  Indeed, to suggest that a program that incentivizes removal of so many animals from the landscape on an annual basis does not have significant impacts on wildlife seems contrary to reason and cannot withstand scrutiny here.

Although the Draft EA ignores any species-specific science or data, the science shows that removing between hundreds to upwards of tens of thousands of the specified species from the landscape annually for economic profit will undoubtedly have significant impacts on wildlife. As explained further in the species sections above, removal of so many furbearers from the landscape can cause a litany of negative impacts on wildlife, including potential extinction of local populations, lowering of genetic diversity, disruption of family groups and social structure, spread of disease, and orphaned young.[188]   Moreover, indirect impacts of the CEP may include disruption of natural trophic cascades that are ecologically beneficial, as well as incentives for increased poaching, and increased incidental take of non-target species as a result of hunting and trapping by those anticipating to benefic economically from the program.[189]

For the many reasons described in these comments, it is without question that the CEP has a significant impact on wildlife.

### B.    The Program is Highly Controversial.

In the NEPA context, a project is considered "highly controversial" if there is a "substantial dispute [about] the size, nature, or effect of the major Federal Action rather than the existence of opposition to a use." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (citations omitted).  The CEP causes an unknown number of species mortalities, including target and non-target animals, every year for commercial export.

There is controversy on the real impact of hunting and trapping on many of these species, largely because the Service does not provide information on the population size of these species, either locally or nationally, and does not even provide the number of animals killed in the Draft EA. For example, the impact of trapping on the bobcat population is debatable because even though the Service may not convey their belief that the CEP does not threaten the overall bobcat population, the risk to the actual species lies in the local extirpation of them.[190]   This may be true for other species as well.

Similarly, there is controversy and dispute about the effects of the CEP in terms of what level of take is sustainable.  There is debate in the scientific literature, for example, as to what percentage of harvest for wolves can be tolerated without leading to population-level declines.[191]   The Draft EA, however, does not address this scientific debate.

Moreover, as mentioned above, we know that incidental trapping of non-target animals is an indirect effect of the CEP, but we do not know how many animals are trapped, injured, or killed

---

[188] *See supra* The Service's Failure to Comply with NEPA, Section II.A.
[189] *See supra* The Service's Failure to Comply with NEPA, Section II.B.
[190] *See*, *e.g.*, Reding et al. (2012); South Coast Wildlands (2010).
[191] *See. e.g.,* Creel & Rotella (2010).

023241

as a result of incidental capture each year.  Thus, while the Service seems to presume that there are no significant impacts to non-target species, without more information, this assertion is not justifiable.

There is also debate as to whether non-target animals trapped, when released apparently uninjured, suffer injury that may impact the survival of the animal in the future.  In a recent case involving the incidental trapping of lynx in Idaho (largely as a result of bobcat trapping), a certified wildlife veterinarian testified that injuries of trapped animals often go unnoticed.[192] Such injuries include restricted blood flow, sprains, strains, tissue damage, hypo- and hyper-thermia, dehydration, organ damage, and more.

Moreover, a long-time controversy exists challenging the faulty ecological justification for the commercial trapping that underpins the CEP, as the program largely serves the commercial interests of trappers to exploit the nation's public furbearer species of private profit.  Ample literature challenges the traditional paradigm and assumption that trapping of a furbearer species should be permitted for commercial exploit except where such species' survival is endangered.[193] This baseline assumption of what has been captured in the North American Conservation Model—treating wild animals as a harvestable crop—is inconsistent with a new modern understanding of population conservation and ecosystem integrity concepts. [194] A separate school of conservation biologists have shunned the North American model in favor of the implementation of broad conservation measures that preserve and manage functionally intact, interconnected ecosystems.[195]  With respect to commercial trapping, this latter school argues the necessity to frame trapping of species for commercial venture within the ecological context of "need."[196]  Should these species survive at self-sustaining levels, this achievement should be considered a conservation victory that should not be met with efforts to place additional stressors on the population, particularly relying on cruel and inhumane methods of trapping.  Population ecologist Graeme Caughley once noted that the term "overabundance" is not an ecological term, but really a human expression embedded within a values framework. Such framework is undergoing a sea change today.  The CEP, arguably steeped in the consumptive ecological framework, raises this fundamental and heated controversy in the field of wildlife conservation.

These are just a few examples as to why the nature and extent of the impacts from the CEP are highly controversial, requiring preparation of an EIS.

---

[192] *See* Comments by T. Winston Vickers, Public Comments Processing FWS-HQ-IA-2017-0012 (Apr. 7, 2017); *see also* Animal Protection Institute (2004); The Wildlife Society (1990); Iossa (2007).

[193] *See, e.g.*, Animal Protection Institute (2004); The Wildlife Society (1990); Nelson et al. (2011).

[194] *See, e.g.*, Nelson et al. (2011).

[195] Animal Protection Institute (2004).

[196] *Id*.

023242

**C.     The Program Involves Highly Uncertain or Unknown Risks.**

According to the Ninth Circuit:

> An agency must generally prepare an EIS if the environmental effects of a
> proposed agency action are highly uncertain. Preparation of an EIS is mandated
> where uncertainty may be resolved by further collection of data, or where the
> collection of such data may prevent speculation on potential . . . effects. The
> purpose of an EIS is to obviate the need for speculation by insuring that available
> data are gathered and analyzed prior to the implementation of the proposed action.

*Native Ecosystems Council*, 428 F.3d at 1240 (internal citations and quotations omitted).

The Service repeatedly states throughout the Draft EA that it is unable to truly assess the impacts
of the CEP.  For example, the Service admits that if the U.S. did not permit export of these
furbearers through the CEP, harvest would likely decrease.[197]  However, "[t]o what extent export
prohibition would actually affect harvest is unknown."[198]  Moreover:

> We do not know to what extent supply, or harvest, of these species depends on
> price, although it is generally presumed that lower price reduces harvest.  A
> cursory, although not conclusive, analysis of pelt price and exports suggests that
> as price goes down, exports are also reduced.[199]

However, NEPA requires more than just a "cursory" analysis.  The Service goes on to tell us all
the things they do not know.

> Also, we do not have information on the capacity of our domestic market to
> expand if export were not possible.  In addition the potential exists for domestic
> stockpiling if export from the wild were not possible, but the extent is unknown.
> Despite these uncertainties, populations of these species probably would increase
> in abundance, at least in some areas, if export was not allowed.

> However, all the States and Tribes have regulatory mechanisms to manage these
> species, thus the effects of an export prohibition might be negligible to their
> conservation.  It is not possible to describe with any confidence the environmental
> impacts of an embargo on export of these species, even if population increases

---

[197] Draft EA at 17.
[198] *Id.*
[199] *Id.*

37

023243

were to result.  It is also unknown to  what extent such increases might affect populations of other species of the affected ecosystems.

….

Not approving export might help alleviate harvest pressure on other protected species and populations by reducing the opportunities for illegally traded pelts to be traded as legally obtained.  However, here is little evidence that this is occurring.  On the other hand, not approving export might increase harvest pressure on other protected species or populations.  It is uncertain to what extent any of these consequences of this alternative might occur.

While eliminating export of these species may or may not result in minor local population fluctuations, the direct impacts within the United States will likely be economic.[200]

The Service then goes on to offer an economic analysis, which is unhelpful and incomplete.  This economic analysis is the only discussion of actual impacts in the entire Draft EA.  As discussed above, numerous impacts should be discussed within this EA, such as the impact of removing predators from the landscape, incentives for increased hunting and trapping, incentives for poaching, impacts on local populations, impacts on dispersal and genetic diversity, incidental take, capture, injury, or mortality of non-target species, and so many more.  But rather than collect data that would be helpful to prepare an analysis of these impacts, the Service simply says "the impacts are certain, so we don't know."

The Service does not allege that it could not collect the necessary data to provide an analysis of these impacts, and indeed it could not make such an allegation.  For example, the Service could take surveys of trappers to determine what percentage of trappers would continue to trap if they could not participate in the CEP.  With that information alone, the Service could estimate the potential decrease in hunting and trapping, which could then be used to predict the extent to which not permitting export of furbearers under the CEP would lead to a decrease of impacts from removing predators from the landscape, decreased incentives for poaching, a decrease in potential impacts to local populations, and a decrease in occurrence of incidental trapping of non-target species.

Additionally, for bobcat and river otter, the Service made a range-wide non-detriment finding, so the Service does not require the States and Tribes to assess the condition of the population or provide the Service with any information as total allowable harvest of the species.[201]  Without even this basic information, it is impossible to determine if the program is having a significant impact on local, state-wide, or range-wide populations for these two species.  But even with a

---

[200] *Id.* at 17-18.
[201] *Id.* at 7-8.

non-detriment finding in place, the Service could still require the States and Tribes to collect and provide this information.  The agency's own failure to collect or require the necessary data to provide a true analysis of the impacts of the CEP does not excuse its failure to comply with NEPA.

The risks are also unknown because the Service does not collect enough data to determine how many animals are killed for purposes of export.  Even looking at the data, given there are many animal specimens - or parts - exported, it is impossible to determine how many animals were killed for export.  Without this data, the Service cannot determine the impact of the CEP, and neither can the public.  But the Service could easily require trappers to report how many animals they kill for export, and thus could easily make this determination.

Moreover, as explained above, the Service collects information from each State/Tribe approved for the program, but does not collect or maintain information as to where within the state or tribal lands the animals are killed.  Thus, local populations could be at significant risk of extirpation due to trapping in a concentrated area for the purposes of exporting the animals or their parts for profit, but the Service does not have enough information to evaluate this risk.  The Service could collect information on where animals are harvested by requiring hunters and trappers to fill out reports that include information on location of harvest, but once again, the Service simply does not collect the information.

As shown through these examples, rather than collect any data, the Service would rather take the easy way out and allege that the agency does not know anything about the impacts of the CEP, and therefore cannot provide an analysis of its impacts.  This is a classic situation where "uncertainly may be resolved by further collection of data," and therefore an EIS is required "to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action."  *See Native Ecosystems Council*, 428 F.3d at 1240.

### D.  There are Cumulative Significant Impacts

As laid out above, there are numerous cumulative effects that the Service should have analyzed in the Draft EA, and many of these cumulative effects are likely to be significant.

For example, removal of these furbearers are removed from the landscape for reasons not in conjunction with the CEP are significant cumulative impacts.  As discussed above, state licensed hunting and trapping, state programs for predator removal, contracts with Wildlife Services, poaching, vehicle strikes, self-defense kills, disease, and natural mortality from a number of reasons all may add up to a high rate of species mortality.  Add to those mortality rates mortality caused by the CEP, and there is very likely to be a significant effect from removing so many

native animals from the landscape.  Details on these cumulative effects are provided above and thus do not need to be repeated here.[202]

Suffice it to say that removal of high numbers of animals from the landscape for commercial sale under the CEP, including an estimated 80 brown bears, 444 Canada lynx, 213 wolves, 30,315 bobcats, and 10,368 river otters in 2015 alone, added to the numerous other sources of mortality these species face, is undoubtedly significant.  Moreover, these figures are only estimates because the Service does not provide information as to how many animals were actually killed in connection with the CEP, and most of these figures represent extremely low figures compared to export numbers from the last five years.  Thus, the figures may be much higher than these estimated lows.

### E.    The Program May Adversely Affect Threatened and Endangered Species

In completing a Biological Opinion and Incidental Take Statement in connection with the CEP, the Service already admitted that the program may adversely affect threatened and endangered species.  Section 7 of the ESA requires each federal agency, in consultation with the Service, to insure that any proposed action is not likely to jeopardize the continued existence of a threatened or endangered species, or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2).  To facilitate compliance with Section 7, the agency must first inquire with the Service to determine whether any listed or proposed species may be present in the area of the proposed action.  *Id.* § 1536(c)(1).  When a listed or proposed species may be present in the action area, the agency must prepare a "biological assessment" to determine whether the species or their critical habitat may be affected by the action.  *Id.*  If the agency determines that the proposed action may affect any listed species or critical habitat, it must engage in formal consultation with the Service.  50 C.F.R. § 402.14.

Formal consultation results in the issuance of a "biological opinion," where the Service concludes whether the proposed action is likely to jeopardize a listed species or result in the destruction or adverse modification of critical habitat.  *Id.* § 402.14(h).  If the Service concludes in the biological opinion that the proposed action is likely to jeopardize a listed species, the Service may recommend reasonable alternatives to avoid the likelihood of jeopardy so that the agency action may proceed.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).  Agencies are required to "use the best scientific and commercial data available" in assessing impacts to protected species during the consultation process.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

Formal consultation results in the issuance of a "biological opinion," where the Service concludes whether the proposed action is likely to jeopardize a listed species or result in the destruction or adverse modification of critical habitat.  *Id.* § 402.14(h).  If the Service concludes

---

[202] *See supra* The Service's Failure to Comply with NEPA, Section II.C.

40

in the biological opinion that the proposed action is likely to jeopardize a listed species, the Service may recommend reasonable alternatives to avoid the likelihood of jeopardy so that the agency action may proceed.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).  Agencies are required to "use the best scientific and commercial data available" in assessing impacts to protected species during the consultation process.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

Section 9 requires that agencies insure that the proposed action does not result in the "take" of any listed species.  16 U.S.C. § 1538(a)(1)(B).  "Taking" under the ESA "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  *Id.* § 1532(19).

The Service has the authority to issue an incidental take statement concurrent with a biological opinion if it concludes that incidental take is not likely to jeopardize the continued existence of the species.  50 C.F.R. § 402.14(i).  An ITS authorizes the agency to "take" listed species without facing ESA liability.  16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).  In an ITS, the Service must specify the amount or extent of any incidental "taking" of a species that is anticipated to occur as a result of the action and specify "reasonable and prudent measures" to minimize the impact of such takings, as well as the "terms and conditions" the action agency must follow in implementing such measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i), (ii) & (iv).

Canada lynx were listed as a threatened species in the contiguous United States in 2000.[203] Fourteen States and three Tribes approved for export of bobcat are within the range of Canada lynx in the contiguous U.S.:  Colorado, Idaho, Maine, Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont, Washington, Wisconsin, Wyoming; the Klamath Tribe in Washington, the Penobscot Nation in Maine, and the Wind River Reservation in Wyoming.  In order to address incidental take of lynx while engaged in otherwise lawful hunting and trapping for bobcat, the Service conducted a Section 7 consultation regarding the CEP.[204] The Service ultimately issued a biological opinion ("BiOp") and incidental take statement ("ITS") under 16 U.S.C. § 1536(b)(4).[205]  In the BiOp and associated ITS, the Service predicted in the ITS that two lynx would expected to be killed annually and two would be expected to be injured annually for the following ten years.[206]  In 2012, the Service extended the BiOp and ITS indefinitely.[207]

---

[203] 65 Fed. Reg. 16,052 (Mar. 24, 2000).

[204] *See id.* at 16,067.

[205] *See* United States Department of the Interior, Fish and Wildlife Service, Biological Opinion (2001) (hereinafter, "2001 BiOp and ITS") (attached as Exhibit 8).

[206] *Id.* at 11.

[207] *See* United States Department of the Interior, Fish and Wildlife Service, Memorandum from Acting Assistant Region Director-Ecological Services, Region 6 to Assistant Director-International Affairs, Division of Management

The fact that the Service prepared this BiOP—not attached to or even referenced in the Draft EA—is proof that the Service has acknowledged that the CEP may affect Canada lynx.  The Service acknowledged that trapping for bobcats may lead to the incidental trapping of Canada lynx, which is an impact to a threatened species.  The Service anticipated that trapping for bobcats may lead to the injury of two lynx and the death of two lynx.

The Service has noted in other instances that bobcat trapping is likely to harm lynx.   In the Canada Lynx Conservation Assessment and Strategy published in 2013, the Service noted that in states where lynx and bobcat overlap, there is potential for lynx to be harmed.[208] In Minnesota, for example, where the Service notes that bobcat trapping has been on the rise, "there is potential for accidental shooting of lynx, or for bobcat hunting with dogs to harvest or harm lynx."[209]

Moreover, under Section 4(d) of the ESA, the Service may extend the take prohibition to threatened species, 16 U.S.C. § 1533(d), and it has done so for "wild" lynx in the contiguous United States. 50 C.F.R. § 17.40(k)(2). The prohibition does not apply to "captive" lynx, defined as "lynx, whether alive or dead, and any part or product, if the specimen was in captivity at the time of the listing, born in captivity, or lawfully imported or transported into the contiguous United States." *Id.* § 17.40(k)(3)(i).  Thus, the trapping of lynx, even if the lynx is not injured or killed, is a "take" under the Endangered Species Act, and is considered a violation of the Act.

As noted by the Service, "[l]ynx are easy to trap."[210]  Indeed, numerous lynx in the contiguous U.S. have been incidentally trapped by trappers seeking bobcat.  In Maine, from 2000-2012, 59 lynx were reported captured in traps set for other furbearers and at least 6 of those were mortalities.[211]  In Minnesota from 2000-2012, 22 lynx were reported captured in traps and snares, and at least 12 of those were mortalities.[212]  In Montana from 2000-2012, 10 lynx were reported trapped, of which at least 4 died.[213]  In Maine, Minnesota, and Montana, it is possible that those numbers have gone up since 2012.[214]  And in Idaho since 2012, three lynx have been incidentally trapped in Idaho by trappers seeking bobcat, and one of those was shot and killed by the trapper who misidentified the lynx as a bobcat.[215]

---

Authority Attention: Robert Gabel re: Impacts of the CITES Export Program for Furbearers on the Canada Lynx (Apr. 11, 2012) (attached as Exhibit 9).
[208] Interagency Lynx Biology Team (2013).
[209] *Id.* at 49.
[210] 65 Fed. Reg. at 16,084.
[211] *Id.* at 79.
[212] Interagency Lynx Biology Team (2013), at 79.
[213] *Id.*
[214] *Id.*
[215] *See* Defendants' Responses to Second Set of Discovery Requests, Exhibit C, Declaration of Peter M.K. Frost, *Dkt. No.* 58-3, Case No. 1-14-cv-00258-BLW (8-7-15), at 4.

023248

These numbers have likely gone up since 2012, and these are only the reported incidents of lynx trapping.  According to the Service, however, it is unlikely that all incidental take of lynx is reported.  In 2001, the Service considered effects on lynx of bobcat trapping, and stated that it "anticipates that incidental take of lynx will be difficult to detect because there is little likelihood that trappers would report bycatch of lynx."[216]  The Service estimated that for every reported incidental take of lynx, one incidental take remains unreported.[217]

Thus, there is no question that the CEP may negatively impact the threatened Canada lynx in the contiguous United States, and the Service has admitted as much.

For all of these reasons, the Service must prepare an EIS in order to comply with NEPA.

## THE SERVICE'S OTHER LEGAL VIOLATIONS

I.       **The CITES Permit Biological Opinion and Incidental Take Statement Do Not Immunize States from Liability for Take of Threatened or Endangered Species in Connection with State Authorized Trapping Programs.**

The Service has asserted, in litigation related to the incidental trapping of lynx as a result of bobcat trapping in Idaho, that the BiOp and ITS provide blanket immunity for states from violations of Section 9 of the ESA that prohibits "take" of listed species that results from statue-authorized trapping programs.[218]  As noted above, Section 7 requires federal agencies to consult if federal "agency action" may affect a listed species. 16 U.S.C. § 1536(a)(2).  The Service then prepares a BiOp and ITS, the latter shielding the federal action from take liability as long as it does not exceed limits in the ITS.  Id. §§ 1536(b)(4), (o)(2); *Or. Nat. Resources Council v. Allen*, 476 F.3d 1031, 1037 (9th Cir. 2007) (a limit on incidental take set "a 'trigger' that, when reached, results in an unacceptable level of take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate consultation.").

Under certain limited circumstances, an ITS may also shield non-federal actions, including state actions, from take liability. 50 C.F.R. § 402.14(i). This occurs when the federal action that triggered Section 7 consultation involves approving state action, or an agreement with states. *Ramsey v. Kantor*, 96 F.3d 434, 439 (9th Cir. 1996) (Under Section 7, "statutorily-defined 'applicants'" that wish to perform an action that may affect listed species, and require federal agency approval, may apply to have the "action" covered by an ITS).  Two tests must be met. First, the "applicant" must be "any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting *the*

---

[216] 2001 BiOp and ITS (Exhibit 8) at 13.

[217] *Id.* at 11.

[218] *See* Second Declaration of Bridget Fahey, *Dkt. No.* 120-2, Case No. 1:14-CV-00258-BLW (Feb. 8, 2016) (attached as Exhibit 10); *see also* 2001 BiOp and ITS (Exhibit 8) and 2012 extension of BiOp and ITS (Exhibit 9).

*action.*" 50 C.F.R. § 402.02 (emphasis added). Second, the "action" is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, *by Federal agencies* in the United States or upon the high seas . . . ." *Id.* (emphasis added).

The Service has authority under the CITES program to authorize the export of certain imperiled species or their parts. 16 U.S.C. § 1537a. As noted above, the Service has approved the export of bobcat pelts, and fourteen states and three Indian tribal areas participate in the CEP for bobcats. Recognizing that the export of bobcat pelts from states and tribal areas where lynx and bobcats overlap, the Service prepared the 2001 BiOp and ITS that exempts from liability the Service's authorization of bobcat pelt exports that do not result in more than two lynx  killed and two injured annually across these state and tribal areas.[219]

The Service has asserted that the states are "applicants" under Section 7 for the CITES bobcat pelt export program, and the ITS for that program covers take of lynx in Idaho by bobcat trappers.[220]  However, the states are not "applicants" and state authorization of trapping is not "the action" under 50 C.F.R. § 402.02. First, the states are not applicants because they do not need approval or authorization from any federal agency—including the Service—to allow trapping of bobcats.  Further, state-authorized trapping is not "the action" that triggered the ITS, because the states cannot demonstrate that their trapping programs are in any respect "authorized, funded, or carried out, in whole or in part" by the Service or any other federal agency.  *See* 50 C.F.R. § 402.02.[221]  By contrast, the states or tribes have never contended that if two or more lynx are killed and injured annually across these states and tribal areas, state authorization of trapping would be impacted.  *Cf. Friends of the Wild Swan v. Babbitt*, Case No. 97-36005, 1999 WL 38606, at *2 (9th Cir. Jan. 28, 1999) (unpublished opinion stating that a federal ITS can cover a non-federal activity *if* it covers "the entirety of the 'agency action.'").

Moreover, even if the Service's broad reading of the application of the ITS was correct—which it is not—the states and tribes participating in the CEP for bobcats would still not be exempt for illegal "take" of lynx during state-authorized bobcat trapping where trapped lynx are not injured or killed.  The Ninth Circuit has held that Section 9 of the ESA establishes "a blanket prohibition" on take.  *Ore. Natural Res. Council v. Allen*, 476 F.3d 1031, 1033 (9th Cir. 2007). "Take" under Section 9 is not limited to situations where a species is injured, but also includes situations where the species is trapped, captured, collected, or harassed.  *See* 16 U.S.C. § 1532(19).  Congress codified each of these acts as independent, prohibited take.  *Babbitt v. Sweet Home Chapter Communities for Greater Ore.*, 515 U.S. 687, 697-98 & 702 (1995); *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 98 (D. Me. 2008) ("[E]ven if a lynx is harmlessly trapped, it has been the subject to a prohibited take under the [ESA]."). While the ITS purports

---

[219] 2001 BiOp and ITS (Exhibit 8), at 13.

[220] *See* Second Declaration of Bridget Fahey (Exhibit 10), at ¶¶ 6-7.

[221] The Canada lynx conservation assessment and strategy, prepared by four federal agencies, makes clear that "[t]he states regulate hunting and trapping." Interagency Lynx Biology Team (2013), at 63.

44

to cover take of two lynx deaths and two lynx injuries annually due to state- and tribal-authorized bobcat trapping pursuant to the CEP, the ITS does not provide immunity for take of lynx from bobcat trapping when lynx are trapped, captured, collected, or harassed, if the trapping does not lead to injury or death.[222]  Whether the trapped species negatively impacts the population segment as a whole, or jeopardizes its continued existence, is irrelevant.  *See, e.g., Loggerhead Turtle v. County Council*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995) (The ESA "does not distinguish between a taking of the whole species or only one member of the species. *Any taking and every taking* - even of a single individual of the protected species - is prohibited by the [ESA].") (emphasis in original; citations omitted).

## II.     The States Must Manage Wildlife As a Trustee for the Public.

The Service acknowledges that "States and Tribes have broad trustee and policy powers to control and regulate the taking and possession of resident wild species within their boundaries."[223]  However, the Service has a broader duty to protect wildlife and wildlife populations for those who enjoy having these majestic furbearers on the landscape.  The states therefore have a legal obligation to act as trustees to protect wildlife--not just for trapping--for the citizens of their states.  In the current instance, hunters and trappers have captured the attention of the States, which have a history of managing wildlife for the benefit of those special interests as opposed to non-consumptive interests.  But the States must balance those special interests with other legally recognized interests in wildlife, including wildlife watching, photography, and other interests that may be harmed when the States and the federal government manage furbearers for the benefit of a few.[224]  Taking actions that only favor hunters and trappers and those wishing to export these animals for profit over other desires of U.S. citizens violates this legal obligation.[225]  The Service, therefore, has a public trust responsibility to protect species, a public resource which the American public has entrusted the Service to steward.  Foundational to this public trust duty is to ensure a thorough and lawful NEPA review of the CEP.

## <u>CONCLUSION</u>

For the reasons stated herein, we believe the Service has failed to comply with the National Environmental Policy Act and other laws through its approval of the CEP without proper analysis.  We believe the CEP has significant impacts on wildlife that must be analyzed fully and immediately if the Service is to continue to approve exports of furbearers under this program.

---

[222] 2001 BiOp and ITS (Exhibit 8), at 13; *see also Ctr. for Biological Diversity v. Otter*, 2016 U.S. Dist. LEXIS 3958 (D. Idaho Jan. 8, 2016), at * 19.
[223] Draft EA at 6.
[224] Treves et al. (2015), p. 8.
[225] *Id.* at 2.

023251

Sincerely,

Andrea Santarsiere
Senior Attorney, Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
Tel: (303) 854-7748
Email:  asantarsiere@biologicaldiversity.org

# REFERENCES

Alaska Dept. of Fish and Game. 2012. Regulatory Year 2011 CITES Furbearer Export Report.

Alaska Dept. of Fish and Game. 2013. Regulatory Year 2011 CITES Furbearer Export Report.

Animal Protection Institute. 2004.  Cull of the Wild:  A Contemporary Analysis of Wildlife
     Trapping in the United States.  Printed by Bang Publishing, Brainerd, Minnesota, USA.
     Eds. Camilla H. Fox and Christopher M. Papouchis.

Artelle, Kyle et al. 2013. Confronting Uncertainty in Wildlife Management: Performance of
     Grizzly Bear Management. PLoS ONE 8(11): e78041.
     doi: 10.1371/journal/pone.0078041

Bailey, Theodore et al. 1986. An Apparent Overexploited Lynx Population on the Kenai
     Peninsula, Alaska. The Journal of Wildlife Management 50(2): pp. 279-290.

Berger, K.M. and E.M. Gese. 2007. Does interference competition with wolves limit the
     distribution and abundance of coyotes?  Journal of Animal Ecology 76: 1075.

Berger, Kim. 2006.  Carnivore-Livestock Conflicts: Effects of Subsidized Predator Control and
     Economic Correlates on the Sheep Industry.  Conservation Biology 20(3): pp. 751-761.
     doi: 10.1111/j.1523-1739.2006.--336.x.

Bergstrom, Bradley. 2017. Carnivore conservation: shifting the paradigm from control to
     coexistence. Journal of Mammalogy 98(1): pp. 1-6.

Bergstrom, Bradley et al.  2013.  License to kill: reforming federal wildlife control to restore
     biodiversity and ecosystem function.  Conservation Letters 00 (2013):  pp. 1-12.

Beschta, R.L. and W.J. Ripple. 2009. Large predators and trophic cascades in terrestrial
     ecosystems of the western United States.  Biol. Conserv. 142(11): pp. 2401-2414.

Boertje, Rodney et al. 2010. Science and Values Influencing Predator Control for Alaska Moose
     Management.  Journal of Wildlife Management 74(5): pp. 917-928.

Borg, Bridget et al.  2016.  Implications of Harvest on the Boundaries of Protected Areas for
     Large Carnivore Viewing Opportunities.  PLoS ONE 11(4): e0153808.
     doi: 10.1371/journal.pone.0153808.

023253

Borg, Bridget et al.  2015. Impacts of breeder loss on social structure, reproduction and
        population growth in a social canid.  Journal of Animal Ecology 84: pp. 177-187.

Browne-Nunez, C., A. Treves, D. MacFarland, Z. Voyles, and C. Turng.  2015.  Tolerance of
        wolves in Wisconsin: A mixed-methods examination of policy effects on attitudes and
        behavioral inclinations. Biological Conservation, at
        http://dx.doi.org/10.1016/j.biocon.2014.12.016.

Bruskotter, Jeremy & Robyn Wilson.  2014.  Determining Where the Wild Things Will Be:
        Using Psychological Theory to Find Tolerance for Large Carnivores.  Conservation
        Letters May/June 2014, 7(3): pp. 158-165.  doi:  10.1111/conl.12072.

Bruskotter, Jeremy et al. 2015. Assessing Tolerance for Wildlife - Clarifying relations between
        concepts and measures.  Available at:
        https//www.researchgate.net/publication/271512646.

Callan, R., N.P. Nibbelink, T.P. Rooney, J.E. Wiedenhoeft, A.P. Wydeven. 2013. Recolonizing
        wolves trigger a trophic cascade in Wisconsin (USA). Journal of Ecology 101(4): pp.
        837-845.

Carter, Neil & John Linnell. 2016. Co-Adaptation is Key to Coexisting with Large Carnivores.
        Trends in Ecology & Evolution 31(8): pp. 575-578.  doi: 10.1016/j.tree.2016.05.0006.

Cooper, E. and T. Shadbolt. 2007. An Analysis of the CITES-Reported Illegal Trade in Lynx
        species and Fur Industry Perceptions in North America and Europe. Available at:
        https://www.fws.gov/international/pdf/report-an-analysis-of-the-cites-reported-illegal-trade-
        in-lynx-species-and-fur-industry-perceptions.pdf.

Creel, S. et al. 2015. Questionable policy for large carnivore hunting:  U.S. wolf-hunting policies
        do not align with ecological theory or date.  Science, 350(6276): pp. 1473-1475.

Creel, S. and J.J. Rotella. 2010. Meta-Analysis of Relationships between Human Offtake, Total
        Mortality and Population Dynamics of Gray Wolves (Canis lupus). PLoS ONE 5(9):
        e12918. doi: 10.1371/journal.pone.0012918.

Crooks, Kevin R. and Michael E. Soule. 1999. Mesopredator release and avifaunal extinctions in
        a fragmented system. Nature 400(5): pp. 563-566.

Eliason, Stephen L. & Richard A. Dodder.  1999.  Techniques of Neutralization Used by Deer
        Poachers in the Western United States:  A Research Note.  Deviant Behavior 20:3, pp.
        233-252.  doi:  10.1080/016396299266489.

023254

Estes, J.A. et al. 2011. Trophic Downgrading of Planet Earth. Science 333: pp. 301-306.

Garcia, J. 2011. 2010-2011 Bobcat Harvest Assessment. Pp. 1–12.

George, Kelly et al. (2016). Changes in attitudes toward animals in the United States from 1978 to 2014.  Biological Conservation 201: pp. 237-242, at http://dx.doi.org/10/1016/j.biocon.2016.07.013.

Gorman, T.A., Erb, J.D., McMillan, B.R., & Martin, D.J. 2006. Space use and sociality of river otters (Lontra canadensis) in Minnesota.  Journal of Mammalogy 87(4): pp. 740-747.

Haber, G.C. 1996. Biological, Conservation, and Ethical Implications of Exploiting and Controlling Wolves.  Conservation Biology 10(4): pp. 1068-1081.

Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R 1-13-19, Missoula, MT. 128 pp.  Available at: https://www.fs.fed.us/biology/resources/pubs/wildlife/LCAS_revisedAugust2013.pdf.

Iossa, T. C.D. Soulsbury and S. Harris. 2007. Mammal trapping: a review of animal welfare standards of killing and restraining traps.  Animal Welfare 16: pp. 335-352.

Jara, Rocio et al. (2016). Gray Wolf Exposure to Emerging Vector-Borne Diseases in Wisconsin with Comparison to Domestic Dogs and Humans. PLoS ONE 11(11). doi: 10.1371/journal.pone.0165836.

Kaczensky, P., M. Blazic & H. Gossow.  2004.  Public attitudes towards brown bears (Ursus arctos) in Slovenia.  Biological Conservation 118: pp. 661-674.

Kapfer, P. 2012. Bobcat (lynx rufus) spatial ecology and harvest in Minnesota. University of Minnesota.

Knick, S. 1990. Ecology of bobcats relative to exploitation and prey decline in southern Idaho. Wildlife Monographs:1–2.

Latch, E.K. et al. 2008. Deciphering ecological barriers to North American river otter (Lontra canadensis) gene flow in the Louisiana landscape. Journal of Heredity 99(3): pp. 265-274.

023255

Levi, T., A.M. Kilpatrick, M. Mangel, and C.C. Wilmers. 2012. Deer, predators, and the emergence of Lyme disease. Proc Natl Acad Sci 109(27): pp. 10942-10947.

Lewis, Tania et al. 2015. Contemporary genetic structure of brown bears (Ursus arctos) in a recently deglaciated landscape.  Journal of Biogeography 42, pp. 1701-1713.

Litvaitis, J. a., J. P. Tash, and C. L. Stevens. 2006. The rise and fall of bobcat populations in New Hampshire: Relevance of historical harvests to understanding current patterns of abundance and distribution. Biological Conservation 128:517–528. doi: 10.1016/j.biocon.2005.10.019.

Lundquist, L.  2015. U.S. wolf pelts can be sold internationally. Bozeman Daily Chronicle (Jan. 21, 2015, *available at* http://www.bozemandailychronicle.com/news/wildlife/u-s-wolf-pelts-can-be-sold-internationally/article_b4f79fcc-a1cd-11e4-83e7-cfad6685333e.html.

Meshriy, M. 2013. Bobcat Harvest Assessment (2012-2013). Pp. 1–16.

Meshriy, M. 2016. Licensed Fur Trappers' and Dealers' Report (2015-2016). Pp. 1–6.

Miller, Sterling et al. 2011. Trends in Intensive Management of Alaska's Grizzly Bears, 1980-2010.  The Journal of Wildlife Management 75(6): pp. 1243-1252. doi: 10.1002/jwmg.186.

Miller, Sterling. 1990. Impact of Increased Bear Hunting on Survivorship of Young Bears. Wildlife Society Bulletin 18: pp. 462-467.

Montana Fish, Wildlife and Parks. 2015. New Tags Allow Wolf Pelt Transport to Canada, *available at* http://fwp.mt.gov/news/newsReleases/fishAndWildlife/nr_0722.html.

Morton, John et al. 2016. Estimation of the Brown Bear Population on the Kenai Peninsula, Alaska.  The Journal of Wildlife Management 80(2):  pp. 332-246. doi: 10/1002/jwmg.1002.

Mowat, Garth et al. 1996. Lynx Recruitment during a Snowshoe Hare Population Peak and Decline in Southwest Yukon.  The Journal of Wildlife Management 60(2): pp. 441-452.

Murray, D.L. et al. 2010. Death from anthropogenic causes is partially compensatory in recovering wolf populations. Biological Conservation 143: pp. 2514-2524.

Muth, Robert M. and John. F. Bowe.  1998.  Illegal Harvest of Renewable Natural Resources in North America:  Toward a Typology of the Motivations for Poaching.  Society & Natural Resources 11(1), pp. 9-24.  doi:  10.1080/08941929809381058.

023256

Nelson, Michael P., John A. Vucetich, Paul C. Paquet, and Joseph K. Bump. 2011. An inadequate construct? *The Wildlife Professional* 5, no. 2: 58-60.

Nielsen, Clayton K. 2016. Modeling Population Growth and Response to Harvest for River Otters in Illinois. Journal of Contemporary Water Research & Education 157: pp. 14-22.

Nielsen, C. K., and A. Woolf. 2002. Survival of unexploited bobcats in Illinois. Journal of Wildlife Management 66: pp. 833–838.

NY Department of Environmental Conservation. 2012. Management Plan For Bobcat in New York State. Pp. 1–28.

Palomares, F., P. Gaona, P. Ferreras, and M. Delibes. 1995. Positive effects on game species of top predators by controlling smaller predator populations: an example with lynx, mongooses, and rabbits. Conservation Biology 9: 295.

Person, D.K. and A.L. Russell. 2008. Correlates of Mortality in an Exploited Wolf Population. The Journal of Wildlife Management 72(7): 1540.

Preuss, T. S., and T. M. Gehring. 2007. Landscape Analysis of Bobcat Habitat in the Northern Lower Peninsula of Michigan. Journal of Wildlife Management 71: pp. 2699–2706. doi: 10.2193/2006-389.

Prugh, L.R., C.J. Stoner, C.W. Epps, W.T. Bean, W.J. Ripple, A.S. Laliberte and J.S. Brashares. 2009. The Rise of the Mesopredator. BioScience 59(9): 779.

Raesly, Elaine J. 2001. Progress and Status of River Otter Reintroduction Projects in the United States. Wildlife Society Bulletin 29(3): pp. 856-862.

Reding, D. et al. 2012. Pleistocene and ecological effects on contintental-style genetic differentation in the bobcat (Lynx rufus). Molecular Ecology 21: pp. 3078-3093.

Richardson, Leslie et al.  2014.  The economics of roadside bear viewing.  Journal of Environmental Management 140:  pp. 102-110.  doi:  10.1016/j/jenvman.2014.01.051.

Riley, S. P. D., R. M. Sauvajot, T. K. Fuller, E. C. York, D. A. Kamradt, C. Bromley, R. K. Wayne, S. Monica, M. National, R. Area, W. Hillcrest, and T. Oaks. 2003. Effects of Urbanization and Habitat Fragmentation on Bobcats and Coyotes in Southern California 17: pp. 566–576.

Ripple, W.J., R.L. Beschta, J.K. Fortin, and C.T. Robbins. 2013. Trophic cascades from wolves to grizzly bears in Yellowstone. Journal of Animal Ecology, available at http://www.cof.orst.edu/leopold/papers/Ripple_2013_JANE.pdf.

Ripple, W.J.and Beschta, R.L. 2011. Trophic cascades in Yellowstone: The first 15 years after wolf reintroduction. Biological Conservation 145: 205.

023257

Roberts, Nathan M. & Shawn M. Crimmins. 2010. Bobcat Population Status and Management in North America: Evidence of Large-Scale Population Increase. Journal of Fish and Wildlife Mgmt 1(2): pp. 169-174.

Roberts, N.M. et al. 2008. An evaluation of bridge-sign surveys to monitor river otter (Lontra canadensis) populations. The American Midland Naturalist 160(2): pp. 358-363.

Rolley, R. E. 1985. Dynamics of a Harvested Bobcat Population in Oklahoma. J. Willdife Management 49: pp. 283–292.

Row, J.R. et al. 2012. Dispersal promotes high gene flow among Canada lynx populations across mainland North America. Conservation Genetics 13: pp. 1259-1268.

Rutledge, L.Y. et al. 2010. Protection from harvesting restores the natural social structure of eastern wolf packs. Biological Conservation 143: pp. 332-339.

Sillero-Zubiri, C. and Switzer, D. 2004. Management of wild canids in human-dominated landscapes. People and Wildlife Initiative. Wildlife Conservation Research Unit, Oxford University. Pp. 257-266. In Sillero-Zubiri, C., M. Hoffmann and D.W. Macdonald, editors. Canids, foxes, wolves, jackals and dogs. Status survey and conservation action plan, 2nd ed. IUCN Canid Specialist Group. Gland, Switzerland and Cambridge, UK. Found at: http://www.kora.ch/malme/05_library/5_1_publications/S/Sillero-Zubiri_&_Switzer_2004_Management_of_wild_canids_in_human-dominated_landscapes.pdf.

Silliman, B.R. and C. Angelini. 2012. Trophic Cascades Across Diverse Plant Ecosystems. Nature Education Knowledge 3(10): 44, available at http://www.nature.com/scitable/knowledgeg/library/trophic-cascades-across-diverse-plantecosystems-80060347.

Smith, D.W., R.O. Peterson and D.B. Houston. 2003. Yellowstone after Wolves. BioScience 53(4): 330.

Soulé, M.E. 1988. Reconstructed dynamics of rapid extinctions of chaparral-requiring birds in urban habitat islands. Conservation Biology 2: 75.

South Coast Wildlands. 2010. California Essential Habitat Connectivity Project: A Strategy for Conserving a Connected California. *Available at*: http://www.scwildlands.org/reports/California EssentialHabitat ConnectivityProject.pdf.

Sovada, M.A., A.B. Sargeant, and J.W. Grier. 1995. Differential effects of coyotes and red foxes on duck nest success. Journal of Wildlife Management 59: 1.

023258

Stetz, J.B. et al. 2016. Discovery of 20,000 RAD-SNPs and development of a 52-SNP array for monitoring river otters. Conservation Genetics Resources 8(3): pp. 299-302.

Stringham, Stephen. 1977. Possible Impacts of Hunting on the Grizzly/Brown Bear, A Threatened Species; in Bear: Their Biology and Management, Volume 4. A selection of papers from the Fourth International Conference on Bear Research and Management. Pp. 337-349.

Swenson, J.E. et al. 1997. Infanticide caused by hunting of male bears.  Nature 386: pp. 450-451.

Swimley, T.J. et al. 1998. Predicting river otter latrine sites in Pennsylvania.  Wildlife Society Bulletin 26(4): pp. 836-845.

The Wildlife Society.  1990. Traps, Trapping, and Furbearer Management: A Review. Ed: John D. Gill.

Trani, M.K. & Chapman, B.R. 2007.  Northern river otter, Lontra canadensis. In The Land Manager's Guide to Mammals of the South, pp. 480-485.

Treves, Adrian et al.  2015.  Predators and the public trust.  Biological Reviews. doi: 10.1111/brv.12227.

Treves, Adrian & Jeremy Bruskotter.  2014.  Tolerance for Predatory Wildlife.  Science 344:  pp. 476-477.  doi:  10.1126/science.1252690.

Tumlison, R., and V. R. Mcdaniel. 1986. Harvest trends of the bobcat (felix rufus) in Arkansas pp. 1–4.

Watts, Dominique E. and Link E. Olson. 2016. Recent Records of Lynx on the Alaska Peninsula. Northwestern Naturalist 97: pp. 124-129.

Wielgus, Robert & Kaylie Peebles. 2014. Effects of Wolf Mortality on Livestock Depredations. PLoS One 9(12): e113505.  doi: 10/1371/journal.pone.0113505.

Wielgus, Robert et al. 2013. Effects of male trophy hunting on female carnivore population growth and persistence. Biological Conservation 167: pp. 69-75.

Wielgus, Robert et al. 2001. Estimating effects of adult male mortality on grizzly bear population growth and persistence using matrix models. Biological Conservation 98: pp. 293-303.

023259

Wilmers, C.C., R.L. Crabtree, D.W. Smith, K.M. Murphy and W.M. Getz. 2003a. Trophic facilitation by introduced top predators: grey wolf subsidies to scavengers in Yellowstone National Park. Journal of Animal Ecology 72: 909.

Wilmers, C.C., D.R. Stahler, R.L. Crabtree, D.W. Smith and W.M. Getz. 2003b. Resource dispersion and consumer dominance: scavenging at wolf- and hunter-killed carcasses in Greater Yellowstone, USA. Ecology Letters 6(11): 996.

Wisconsin Department of Natural Resources. 2012. Wiconsin Natural Resources Board Agenda. Pp. 1–13.

Yom-Tov, Yoram et al. 2007. Population Cycles and Changes in Body Size of the Lynx in Alaska. Oecologia 152(2): pp. 239-244.

Zager, Peter & John Beecham. 2006. The role of American black bears and brown bears as predators on ungulates in North America.  Ursus 17(2): pp. 95-108.

Zarnke, Randall et al. 2006.  Geographic Pattern of Serum Antibody Prevalence for Breucella SPP. in Caribou, Grizzly Bears, and Wolves From Alaska, 1975-1998.  Journal of Wildlife Diseases 42(3): pp. 570-577.  doi:  10.7589/0090-3558-42.3.570.

Zarnke, Randall et al. 2001. Serologic Survey for *Toxoplasma Gondii* in Lynx From Interior Alaska.  Journal of Wildlife Diseases 37(1):  pp. 26-38.

Zarnke, Randall et al. 2001(2). Serologic Survey for Canine Coronavirus in Wolves From Alaska.  Journal of Wildlife Diseases 37(4): pp. 740-745.

Zarnke, Randall et al. 1995. Prevalence of *Trichinella Nativa* in Lynx (Felis Lynx) From Alaska, 1988-1993.  Journal of Wildlife Diseases 31(3): pp. 314-318.

023260



April 7, 2017

Public Comments Processing
Attn: FWS-HQ-IA-2017-0012
Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5725 Leesburg Pike
MS: BPHC
Falls Church, Virginia 22041

      Re:    Draft Environmental Assessment: Export Program for Certain Native Species
                under the Convention on International Trade in Endangered Species of Wild Flora
                and Fauna (50 C.F.R. 23.69)

To the U.S. Fish and Wildlife Service:

      Thank for considering our comments on the U.S. Fish and Wildlife Services' ("Service")
Environmental Assessment ("EA") on the Export Program for Certain Native Species under the
Convention on International Trade in Endangered Species of Wild Flora and Fauna. These
comments are submitted on behalf of our organization, and the Humane Society of the United
States and Humane Society International. We submit with these comments a CD that includes
documents in PDF format, generally listed chronologically by year of publication, authorship, or
creation.

      WildEarth Guardians is a non-profit organization with over 207,000 members and
activists dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of
the American West. Our members, staff and board members have significant aesthetic,
recreational, scientific, inspirational, educational, and other interests in the conservation and
proper management of wildlife.

      NEPA is "our basic national charter for protection of the environment." 40 C.F.R. §
1500.1(a). NEPA is "intended to help public officials make decisions that are based on
understanding of environmental consequences, and take actions that protect, restore, and enhance
the environment." *Id*. § 1500.1(c). The draft EA fails to meet the requirements of NEPA. We

107 SE Washington Street, Suite 490     Portland OR 97214     503-278-0669     fax 505-213-1895     www.wildearthguardians.org
DENVER • LARAMIE • MISSOULA • PORTLAND • SAN DIEGO • SAN FRANCISCO • SANTA FE • SEATTLE • TUCSON

023422

encourage the Service to prepare an Environmental Impact Statement ("EIS"), given the significant effects of the program and its controversial nature.

1.    The draft EA states at pp. 2-3 that "the issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife, or plants, including permits involving species listed under CITES are categorically excluded from the requirement for preparation of an EA or an EIS under NEPA when such permits cause no or negligible environmental disturbance." The draft EA at p. 9 states that species listed under CITES "may not generally be exported from the United States without CITES permits," and at p. 8 acknowledges that "[u]nder the U.S. CITES Export Program (CEP) CITES export program . . . the ability to export [CITES] species is facilitated by the CEP." Previously, however, the Service conceded that the export program influences the amount of trapping that occurs in the United States by facilitating international trade, and, as such, is a "significant contributing factor" in the need to conserve these species. 42 Fed. Reg. 10462, 10463 (February 22, 1977). The Service fails to explain its reversal in conclusion. The CITES export program causes significant environmental effects, and therefore is not eligible to be categorically excluded under NEPA.

2.    The draft EA states at p. 4 that bobcat (*Lynx rufus*), gray wolf (*Canis lupus*), river otter (*Lontra Canadensis*), brown bear (*Ursus arctos*), and captive-bred Canada lynx (*Lynx canadensis*) are listed in Appendix II, and that CITES documents are required for export of parts and products of these species. The draft EA states at p. 4 that before a permit can be issued for the export of Appendix II species, the Service must determine that the export will not be detrimental to the survival of the species. The draft EA states at p. 6 that "[g]iven the high trade volume for some [Appendix II] species, it is more practical to develop non-detriment findings on a State-wide or tribal basis, where possible, rather than individual findings for each export of specimens of these species during the year." The draft EA at pp. 7-8 states that the Service has "made range-wide non-detriment findings for bobcat and river otter." But the reasons for those findings, and the data or information upon which the Service relied to make them, are illegally absent from the draft EA. The draft EA illegally lacks any contemporary analysis or disclosure of the Service's determinations that the export of parts or products of all of the Appendix II species is not detrimental to any of them. Without that information, the public cannot adequately understand or comment on the Service's conclusions, nor are those conclusions adequately supported by the disclosed facts or record.

The draft EA at p. 5 cites to and incorporates a "Report of the Working Group on Bobcat, Lynx, and River Otter" (March 28, 1978). The authors of this report wrote they "feel extremely uncomfortable about our charge," which was apparently to assist the Service "in judging whether international trade in Appendix II species would be detrimental to their survival." Regardless, the report fails completely to provide the bases for any such determinations. Instead, it recommends "that the Management Authority seek the advice of recognized scientists with expertise on the individual species. . . . This advice should be sought by the U.S. ESSA and Management Authority form an advisory panel of scientists specifically selected for each species." In turn, the draft EA illegally fails to disclose whether that was ever done for any of the CITES species or, if it was, the bases for any such determinations.

Moreover, the 1978 Report is outdated, as it is almost forty years old. The Report does not include analysis based on any current data, does not reflect the more recent increase in exports, and does not reflect current scientific understanding of CITES species. The draft EA fails to explain whether the Service considered any changes in the status of listed species and the

023423

manner, means and volume of trapping in the nearly 40 intervening years. The 1978 Report is not a basis for any legitimate, current effects analysis.

3.      The draft EA at p. 10 states that the Service's ability to analyze impacts and make the requisite legal and scientific findings for the export of Appendix II species is based largely (if not entirely) on data and reports supplied by State and Tribal agencies. The draft EA at p. 7 states that States and Tribes must provide "sufficient information" in order for the Service to analyze impacts and make the requisite findings that the furbearers harvested were legally acquired and that export will not be detrimental to the species. The draft EA at p. 10 states that the Service "has reviewed information on population status, management, and trade for [CITES] animals in every State in which they are harvested. This accumulated information, including available population estimates, demonstrates that these species, where approved for export from the United States under CEP, may be exported consistent with the fundamental principles of Article II and requirements of Article IV of CITES." And yet the draft EA illegally fails to disclose and analyze any of this information.

        The draft EA at p. 11 states: "Continual monitoring by the Service enables us to detect any significant downward trend in the populations of [CITES] species and, where necessary, implement more restrictive export controls in response to them." And yet the draft EA fails to disclose the methodology or results of any such continued monitoring, and the information and data the Service relied upon.

        To our knowledge, the Service has not continually monitored all State or Tribal harvest activities in the States or Tribal areas from which it allows exports, nor demanded to know from the approved States and Tribes the environmental effects of trapping, snaring, or otherwise capturing Appendix II species. For example, in 2012, Bridget Fahey of the Service emailed a colleague and stated that in the context of incidental "take" of lynx by bobcat trappers in approved states, "[t]he States were supposed to be reporting how much take they had but surprise surprise they haven't been reporting take. So [the Division of Management Authority] doesn't know how many lynx (if any) have been killed or injured over the last 6 years." *See* Varied Dates FWS Emails at 1. The Service has failed in its duty to track and assess the impacts or trapping and snaring and therefore has no basis to conclude that a CE is appropriate.

4.      The draft EA acknowledges that the Service has authority under its CITES regulations to establish conditions for State or Tribal trapping or snaring programs if those States or Tribes wish to have parts or pelts of species listed under Appendix II eligible for export. As an example, the draft EA at p. 6 states that such States and Tribes "are required to develop a Service-approved tagging program that requires the tagging of the skins of these species for the skins to be eligible for export. This tagging requirement is not a CITES requirement, it is a stricter domestic measure promulgated by the Service through the U.S. CITES implementing regulations." Separate from its independent authority under the CITES program, Bridget Fahey of the Service has testified that the Service can also condition State or Tribal participation in the CITES program via the Endangered Species Act by, for example, enacting terms and conditions in an Incidental Take Statement that dictate how trapping and snaring may be conducted. *See* 2016 Fahey Depo at 67:17-22 & 68:1-7.

        Despite this authority, the draft EA fails to include or analyze a reasonable alternative that would modify the program and further condition State and Tribal participation in the export program to better mitigate for damaging effects of State and Tribal trapping, snaring, and capture

023424

of CITES species and non-target species. As a result the draft EA lacks a reasonable range of alternatives, and/or reasonable conditions within the considered alternatives, as required by law.

For example, the Service has prepared a document entitled "How to Avoid Incidental Take of Lynx While Trapping or Hunting Bobcats and other Furbearers." *See* 2003 Lynx Take Brochure. The document specifies measures to reduce the prospects that lynx will be trapped or snared by those seeking bobcats, including trap sizes, snare thickness and loop size, and measures related to use of baits. *Id.* Further, an additional reasonable condition is the requirement that when a trapper traps or snares a lynx, s/he must immediately report the incident to the respective State or Tribe, so qualified State or Tribal biologists can examine the captured lynx, and determine if it is injured, and rehabilitate it before any release. That is among the conditions the state of Maine adopted and the Service approved when it issued an Incidental Take Permit for the Maine furbearer trapping program, anticipating that that program would result in incidental take of lynx. Further, the Service's Lynx Conservation and Assessment Strategy notes that requiring trap checks daily "can minimize [lynx] freezing injuries and starvation." *See* 2013 LCAS at 80. In fact, the state of Colorado, one of the States the Service has approved for bobcat exports, requires furbearer trappers who trap in "lynx recovery areas, or where lynx are, to check traps in person, every 24 hours." 2016 CO Furbearer Regulations at 8. And yet other States, such as the state of Idaho, has a trap check interval of 72 hours for trappers seeking bobcats, including in lynx habitat.

The EA fails to even consider requiring States and Tribes that include lynx habitat to adopt the nine measures to reduce the likelihood that lynx or other non-target species will be taken in traps and snares set for bobcats, even though the Service is well aware that many ESA-listed lynx have been trapped or snared in the lower forty-eight states. The state of Montana has refused to adopt all of the Service's recommendations for avoiding the incidental take of lynx, resulting in additional incidental take of lynx.

Finally, the failure to accurately report capture of lynx is a problem the Service has itself acknowledged, yet it fails in the draft EA to propose measures or conditions to address this issue.

5.     The Service can and should require approved States and Tribes to require those they license or authorize to trap, snare, or capture bobcats, wolves, or other CITES species to obtain a special license or tag that grants them authority to do so. For example, the state of Montana has represented that in addition to a general trapping license, those seeking to trap, snare, or capture bobcats in Montana must have their license "validated specifically for bobcat trapping." *Friends of the Wild Swan v. Vermillion*, No. 9:13-cv-00066-DLC (D. Mt.) (Doc. # 53 at 10). Further, the state of Montana, which the Service has approved under CITES the export of gray wolf, requires those seeking wolves to get a special license to do so. As a result of a specific validation or license condition, the Service can determine effects of its CITES export program, because trappers who possess special licenses or conditions and seek to trap CITES species would, in annual or other periodic reports of animals they trap, snare, or otherwise catch, yield information and data about effects linked to CITES.

By contrast, because the Service does not appear to universally require special licenses or conditions for those seeking under various State or Tribal laws to trap or capture Appendix II species, such as bobcat, gray wolf, or bear, it may be difficult to determine whether a trap or snare was set for such a species. As the Service has acknowledged, for example, in the state of Maine, "trappers can currently trap for bobcat, fox, coyote, fisher, marten and other furbearers.

4

Many sets are 'generic' sets for any of these species." *See* Varied Dates FWS Emails at 7. The draft EA illegally fails to consider requiring States and Tribes to issue special licenses for Appendix II species as a reasonable requirement for seeking to participate in the export of those species.

6.      The draft EA is devoid of an analysis of how the CITES export program may directly or indirectly impact species listed in Appendix II, including river otter, brown bears, gray wolves, and bobcats. Indeed, because data and reports on the amount, location, and methods used to take these species are improperly missing from the draft EA, there are no data or disclosures for the public to analyze. In fact, the draft EA makes no differentiation between the impacts to river otters, brown bears, gray wolves, Canada lynx, or bobcat at all. Are impacts to river otters the same as impacts to gray wolves or brown bears? Nor does the draft EA differentiate between the same species in different geographic areas. Are impacts to gray wolves in Alaska, for example, the same as the impacts to gray wolves in Montana, even though wolf population numbers are significantly lower in the contiguous United States? The Service cannot presume that impacts to one species in one area where it is relatively abundant are identical to other areas.

7.      The draft EA at p. 5 states that bobcat parts and products "are commonly exported in considerably quantities," yet the draft EA fails completely to consider or disclose the environmental effects of trapping and snaring for bobcats, or for any other Appendix II species. The draft EA at p. 17 states that the CITES program has "[p]ossible impacts on the population status of [CITES] species," and that prohibiting their export "would likely reduce the harvest of all five of these species," but [t]o what extent export prohibition would actually affect harvest is unknown." But most States and Tribes presumably know, based on annual or other periodic reports from trappers, how many Appendix II species are trapped, snared, or otherwise caught. For example, the state of New Mexico represents that it has "a running 38-year harvest dataset that is used in conjunction with other field-collected data and hunter/trapper harvest surveys to monitor [wildlife] population[s] and hunter trends." The state of New Mexico asserts that "[t]his system has been integral to successfully maintaining bobcat populations in New Mexico over the long-term . . . ." And the Service knows how many Appendix II species are exported annually. So it is feasible and reasonable that the Service collect the data to discern the extent to which authorizing the export of Appendix II species is linked to their being trapped, snared, or otherwise caught. The draft EA is illegally bereft of required data and information like this. The Service cannot fail to collect the requisite data and then hide behind a dearth of data to avoid analysis required under NEPA.

8.      The draft EA illegally fails to consider and disclose the methods by which species approved for export through the CITES program are captured. The draft EA notes at endnote 3 that in 2014, the Service issued an "Administrative Finding: Letter" approving the export of gray wolf pelts and parts from Montana. As noted, snares are a primary tool for trapping or capturing wolves. But snares are also relatively indiscriminate in terms of species snared. Without conditions on the ways in which wolves are trapped or captured, the setting of snares to capture wolves to export under the CITES program presents a significant risk of capture, injury, or death to other species, such as mountain lions, who may have one or more leg caught in the snare, or have a noose tighten around the torso, resulting in significant injury or death.

9.      The draft EA illegally fails to acknowledge, analyze, or even disclose the direct, indirect, and cumulative effects on non-target species ("bycatch") of trapping, snaring, and/or capture of target Appendix II species, including bobcats and wolves, in approved States and Tribal areas. It

023426

is feasible to compile such data—at least for reported activities, and to ensure accurate reporting in the future by requiring improved reporting regimes by States and Tribes. The state of Idaho, for example, requires all licensed trappers to submit by July 10 of each year a report that states whether the trapper trapped at all or, if he trapped, what animals he caught, including any and all "non-target catches." *See* 2017 ID Report Form *see also* https://fishandgame.idaho.gov/public/hunt/furTaker.cfm (visited March 29, 2017). Data from Idaho-licensed trappers' annual reports from the 2010-2011 through 2015-2016 trapping seasons reveal that trappers reported they caught and released or caught and killed numerous non-target species, including 227 mountain lions, 207 fisher, five eagles, and four wolverines. *See* 2010-2016 ID Bycatch. The reports also indicate that trappers caught and released or caught and killed 158 domestic dogs. *Id*. Data and information related to bycatch exist, and yet the draft EA illegally fails to consider or evaluate all of the environmental effects of trapping and snaring in States and Tribes with approved CITES programs.

10.     Lynx are extremely vulnerable to trapping and are often caught in traps set for bobcats and sometime wolves (even with a pan tension setting limitation). Since lynx were listed as threatened with extinction under the Endangered Species Act ("ESA") in March, 2000, at least 16 incidents of lynx being caught and sometimes killed in traps set for other species has been reported in Montana alone. These are only the reported incidents in a single state. The majority of the incidents of lynx take in Montana occurred in traps set for bobcats, likely for export pursuant to CITES. And yet nowhere in the draft EA does the Service consider or analyze the potential effects to an already small lynx population from the export program.

11.     The Service has proposed wolverines for listing under the ESA and, as such, conferencing is required under Section 7 of the ESA. Further, the Forest Service has designated wolverine as a "sensitive" species in most national forests where wolverines exist in the lower forty-eight states.

        The best available science reveals that wolverines are also extremely vulnerable to trapping, and are routinely caught and killed in traps set for other species, including Appendix II furbearers. For example, Banci (1994) at 101-02 noted that 35% to 90% of wolverine trapping in Alberta, Saskatchewan, and Manitoba is incidental. The Service is aware of the incidental trapping of wolverines in States and Tribal areas approved for CITES export. During the 2008-2009 trapping season, the Service reported that two wolverines were killed in traps set for other species in Beaverhead and Granite Counties in Montana, in areas closed to wolverine trapping. 78 Fed. Reg. 7864, 7881 (Feb. 4, 2013). There are other incidents of trapping of wolverine in areas in Montana closed to wolverine trapping. *See e.g.*, Montana Fish, Wildlife and Parks (MFWP), Furbearer Occurrence/Distribution Report (Feb. 2, 2012) (reporting wolverine caught in leg-hold trap and released in Ravalli County); MFWP, Furbearer Occurrence/Distribution Report (Jan. 1, 2012) (reporting wolverine caught in Conibear trap set in Beaverhead County); MFWP, Furbearer Occurrence/Distribution Report (Jan. 25, 2009) (reporting female caught in leg-hold trap and released in Lewis and Clark County); *see* Banci (1994) at 101-02 ("Most of the current trapper harvest in Montana is believed to be incidental, in sets for other furbearers (B. Giddings, pers. Comm.).")." An additional wolverine mortality (incidental) was reported during the 2013-2014 season in the state of Montana, and four cases of incidental wolverine trapping have occurred in Idaho in recent years. *See* 79 Fed. Reg. 47522, 47540 (Aug. 13, 2014).

        In addition, APHIS-Wildlife Services, the federal wildlife killing program, incidentally trapped three wolverines while trying to trap wolves (one in 2004, 2005, and 2010) and another

6

wolverine was incidentally trapped in Wyoming in 2006. 78 Fed. Reg. at 7881. Additional evidence of wolverine being accidentally caught in traps and snares set for other species is well documented in scientific literature. *See e.g.*, Hornacker and Hash (1981) at 1300; Inman (2007d) at 89.

Only 250-300 wolverine are thought to exist in the lower forty-eight states. Notably, in many subpopulations of wolverine, the loss of *a single* individual—especially a reproductive female—is significant. In the Service's warranted but precluded finding for wolverine (Dec. 14, 2010), Copeland (2010), McKelvey (2011), and Schwartz (2009) demonstrate that the trapping wolverines (intentionally or incidentally), when added to the other existing threats to the species (climate change and an already small population), has harmed, is harming, and will continue to harm an already fragile population in Montana. Indeed, the effective population of wolverines in Montana is likely *less than 35*. Schwartz (2009) And, this population is currently facing the threat of climate change which is resulting in increased habitat fragmentation (less connectivity) and—by 2045—is projected to result in a 33% or greater reduction in the amount of available wolverine habitat in the contiguous United States. McKelvey (2011) at 2893, 2894. Decreased connectivity and additional losses of wolverine habitat will result in the additional loss of wolverine populations, especially in Montana's smaller mountain ranges. *Id*. at 2894; 75 Fed. Reg. at 78045.The Service notes that the projected loss in habitat "should result in a loss of wolverine numbers that is greater than the overall loss of habitat area." *Id*. at 78045. Under these circumstances, every wolverine in the contiguous United States counts and no mortalities are incidental to the population.

For example, Squires (2007) estimated that four mountain ranges in western Montana collectively contained only about 13 wolverines. Squires (2007) at 2217.  "[S]uch population densities are too low for long-term persistence without connectivity to other populations." McKelvey (2011) at 2894.  The trapping and killing of one wolverine (either intentionally or accidentally) from this isolated population can result in serious harm to the population. Squires (2007) at 2218.  The trapping and killing of two pregnant females is devastating to the local population. *See id*.; Krebs (2004) at 4999-500.

By contrast, based on data from the Glacier Wolverine Project (2002-2007), for instance, researchers determined that the population in the protected park where no trapping occurs "was stable to just very slightly increasing." Chadwick, *The Wolverine Way* at 250 (2010). But, using the same data, they predicted "that the additional death of *one more* adult, particularly a breeding-age female, would have put the population on a downward trend.  Two such deaths would have made for a much sharper rate of decline." *Id*. (emphasis added). In *The Wolverine Way*, Douglas Chadwick explained how this occurs: "Wolverine females don't produce offspring until at least age three and then have two kits per litter every other year, on average . . . .  So in a female's breeding life, which would end after around age ten, she'll have three litters and a total of six kits. The sex ratio is 50:50, so we've got three new males and three new females in the population. Half those kits will die before reaching maturity. Now we're down to 1.5 males and 1.5 females as the offspring. One of each has to survive and stick around to replace their parents in the population. That leaves half a male and half a female to disperse and carry genes somewhere else. You can see how a small change in the number of breeding females would make a big difference." *Id*. If a nursing mother "is taken in a trap anywhere within her wide hunting range, you'd have to subtract both that breeding-age female and her young starving back in the den from the population." *Id*. Likewise, should "the resident adult male be trapped instead during the course of his still wider and more frequent travels, a transient male could come in and

023428

kill the kits. If the newcomer doesn't kill them, the kits still grown up with less protection from other wolverine and less experience gained from traveling with a father after they separate from the mother. Both factors lower the offspring's chances of successfully reaching adulthood and either replacing numbers in the population or transporting genes to other homelands." *Id*.

13.     The draft EA fails to disclose or analyze how many exports, and of what species, the Service has authorized on a "shipment-by-shipment" basis, and the environmental effects thereof. How can the Service approve such exports without requisite information from the State or Tribe in which the species was caught, in order to determine that it was caught legally and its export will not be detrimental to the species?

14.     The draft EA contains five alternatives: (1) a "no action" alternative that is "preferred," and is defined to include the status quo of continuing to require that CITES species be tagged for export; (2) a "no tag" alternative, where the Service would not require pelts or parts to be tagged before export, but would develop some other method of ensuring the type and origin of the pelt or part; (3) a "no permit" alternative, where the Service would not allow the export of species listed under CITES taken in the wild, but would allow the export of pelts or parts of captive-bred species; and (4) a "no approved CITES export program" alternative, which would eliminate the export program but control exports by allowing individuals to apply for export permits and re-export certificates on a case-by-case basis for each specimen to be exported.

15.     The "no action" alternative in the draft EA is illegal, because "no action" should be not permitting or licensing the export of CITES species, not the status quo of continuing to permit or license exports. The failure to properly denominate a no action alternative distorts the disclosure of effects in the draft EA, because there is not a proper baseline to consider and disclose effects of the action alternatives. In turn, the alternative of "no approved CITES export program" fails to perform the function of a proper no action (baseline) alternative, because it completely fails to consider or disclose the effects of discontinuing the export of Appendix II species.

16.     The draft EA states at p. 2 that pelts and parts of "lynx" are classified under Appendix II, but fails to state that in the lower forty-eight states, that means only captive-bred lynx (lynx trapped, snared, or otherwise caught in the wild in Alaska may be exported pursuant to CITES). The draft EA at p. 15 attempts to disclose effects of the "no permit" alternative, and states without any support in the draft EA, or any of its attachments, that "captive production of these [CITES] species is very limited or altogether commercially nonviable." The draft EA and accompanying documents illegally provide no data, information, or explanation for either of these two conclusory statements. By contrast, the Service's online CITES export data appear to state that for 2015, for captive-bred lynx, 444 skins, 8 garments, 13 skulls, and may trophies were exported. *See* 2015 CITES Lynx Data. The draft EA illegally fails to consider or disclose whether captive-bred species may suffice for export demand for any of the Appendix II species, and/or the environmental effects of the choice to do so or not to do so.

        Inclusion of such data in the development of the EA is not only required by NEPA, but it is not a uniquely burdensome or difficult task. For example, Wildlife Services catalogues and publishes a searchable (by multiple variables) database of animals it kills each year. *See e.g.*, https://www.aphis.usda.gov/wildlife_damage/pdr/PDR-G_Report.php?fy=2016&fld=&fld_val= (Wildlife Services' 2016 killing statistics). The Service is responsible for collecting these data from States and Tribes, analyzing it in the context of this EA and other decisions, including those made pursuant to the ESA, and making it available to the public for review and comment.

023429

17.     The draft EA at pp. 19-21 purports to include a cost/benefit/economic analysis of the various alternatives. The Service asserts without any supporting data or information that the economic benefit of trapping would be lost if the CITES export program were eradicated. But the Service fails to analyze the potential benefit of increased tourism from wildlife observers who are more likely (as the Service acknowledges) view various animals if the CITES program is not continued and trapping of Appendix II species is reduced. It is impermissible under NEPA to quantify potential costs without quantifying potential benefits of a proposed action and the alternatives to it. One court has rejected such an approach. *High Country Conservation Advocates v. USFS*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (stating: "In effect the agency prepared half of a cost-benefit analysis, incorrectly claimed that it was impossible to quantify the costs, and then relied on the anticipated benefits to approve the project). Other courts have rejected cost analyses that are misleading. *See*, *e.g.*, *Hughes River Watershed Conservancy*, 81 F.3d 437, 446-48 (4th Cir. 1996) ("it is essential that the EIS not be based on misleading economic assumptions"); *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (agency choosing to "trumpet" an action's benefits has a duty to disclose its costs).

18.     The draft EA impermissibly fails to conduct an adequate cumulative impacts analysis. The entirety of the Service's analysis consists of this sentence at p. 21: "Continuing to approve the export of these five species might benefit other species of spotted cats and otters, and other populations of brown bears and gray wolf protected by CITES." However, no support is provided for the possibility that the continued export will benefit other species. Nor does this conclusory unsupported statement constitute analysis. The draft EA wholly fails to analyze the cumulative impacts of the export program.

        Here, the cumulative effects that must (but have yet to be) analyzed in the final EA include: (a) how the CITES export program, in conjunction with other private, state, and government actions may cumulatively impact targeted Appendix II furbearers (bobcats, gray wolves, brown bears, river otters, and Canada lynx) as well as non-targeted but incidentally taken species, including Canada lynx (in the lower 48), wolverine, and fisher. Every year thousands of animals – including many sensitive, candidate, or threatened and endangered species, including grizzly bears, wolverine, fisher, and lynx – are caught in sets set for Appendix II furbearers. The draft EA, however, is devoid of any analysis of the cumulative impacts to such species from otherwise legal trapping of Appendix II species for export.

        Gray wolves, for example, are Appendix II furbearers targeted and approved for export from the states of Alaska and Montana and perhaps are or soon will be from the state of Idaho (the draft EA fails to disclose whether the state of Idaho has applied to export gray wolves). Other sources of gray wolf mortality include federal (Wildlife Services) and state predator management, hunting and trapping in states like Idaho, Montana, and Wyoming, a "bounty" paid by private funds in Idaho, natural causes, and other human caused morality from highways and poaching. Yet nowhere in the draft EA does the Service analyze the total, combined effect these actions may have on gray wolves as required by NEPA. The same is true for lynx, wolverine, and other species cumulative impacted by the CITES export program.

19.     The draft EA illegally lacks sufficient disclosures. The Service has acknowledged that the CITES export program may affect ESA-listed species such as Canada lynx. In 2012, the Service prepared a Biological Opinion to evaluate whether the program may jeopardize ESA-listed lynx. *See* 2012 Lynx BiOp. The draft EA fails to disclose whether the Service has consulted again

023430

under Section 7 of the ESA as to the effects of the CITES export program, or whether the Service relies on the 2012 Biological Opinion to fulfill its substantive and procedural duties under the ESA.

If the Service continues to rely on the 2012 Biological Opinion and ITS to comply with the ESA related to the impacts of the CITES program on ESA-listed lynx in the DPS in the lower forty-eight states, those documents are arbitrary and capricious. The 2012 BiOp is based on incomplete and/or erroneous information about the extent and/or nature of the incidental take of lynx due to the CITES export program. The 2012 ITS illegally fails to provide an "amount or extent" of all types of incidental take of lynx due to the CITES export program. The 2012 ITS illegally fails to provide any rational definition of or parameters for "injury" as a basis for permissible "take." The Service has illegally failed to establish appropriate conditions for the determination of "injury" under the 2012 ITS, instead generally leaving that determination to unqualified trappers. Those who are not trained in veterinary or other animal sciences are unqualified to determine if a trapped lynx has not in fact been injured. The ITS fails to include reasonable terms and conditions to limit the incidental take of lynx due to trappers seeking Appendix II species. The 2012 BiOp and ITS fail to include the sufficient monitoring and reporting from States and Tribes to track the amount and type of take of lynx. The Service has taken the position that the ITS immunizes certain States or Tribes from incidental take of lynx by trappers seeking Appendix II species, but it has illegally failed to consider or disclose the effects of the ITS under NEPA.

20.     The Service must prepare an EIS for the CITES export program for Appendix II furbearers. The program is a major federal action "significantly" affecting the quality of the human environment. As noted, as the Service concedes, the export program influences the amount of trapping that occurs throughout the United States by facilitating international trade in Appendix II furbearers, and, as such, is a "significant contributing factor" in conserving these species. 42 Fed. Reg. at 10463. Trapping for Appendix II furbearers, including river otter, Canada lynx, bobcats, gray wolves, and brown bears has affected and continues to affect unique and ecologically critical areas, including but not limited to, designated wilderness areas, wilderness study areas (WSAs), potential wilderness, areas of critical environmental concern (ACECs), National Parks, National Monuments, National historic sites, National conservation areas, and National Wildlife Refuges. The effects of the Service's CITES export program on native predator populations, ecological functions, and special management areas (including wilderness character) in the United States are highly controversial, highly uncertain, and involve unknown risks. The Service's export program also establishes precedent for future actions, and, when combined with other actions, results in cumulative significant effects to Appendix II furbearers and non-target species incidentally caught and injured or killed in traps (i.e., lynx, grizzly bears, fisher, and wolverine). Further, as noted, the CITES export program is also likely to adversely affect lynx and grizzly bears, two listed under the ESA, and wolverine, a species proposed for listing under the ESA.

21.     The draft EA fails to consider or acknowledge numerous professional studies and publications related to effects of trapping, snaring, and otherwise capturing Appendix II species, including bycatch thereof. WildEarth Guardians submits certain of those studies with these coments.

As noted, we strived to submit with these comments the studies and reports we have cited. Others may be in possession of the Service or available in the public domain. If the Service

023431

wants us to locate and submit any document we have cited that we have not already, please let us know, and we will promptly do so.

Thank you for the opportunity to comment.

Sincerely,

Bethany Cotton, JD
Wildlife Program Director
WildEarth Guardians
P.O. Box 7516
Missoula, MT 59807

Nicole Paquette
Vice President, Wildlife Protection
The Humane Society of the United States
1255 23rd Street, NW, Suite 450
Washington, D.C. 20037

Teresa M. Telecky, Ph.D.
Director, Wildlife Department
ttelecky@hsi.org
t 301.258.1430  f 301.258.3082
Humane Society International
1255 23rd Street, NW, Suite 450
Washington, D.C. 20037

11

023432

Without killing and conducting post-mortem injury assessment (i.e., necropsies), it is difficult to detect some trap-related injuries (e.g., the more serious injuries such as luxation, fractures, bone abrasion, capture myopathy, mild freezing) in a field setting. Trapping studies have used several different injury scoring systems to categorize and quantify the extent of injury incurred by a trapped animal. A standard trauma scoring system was developed by the International Organization for Standardization (ISO; Standard 10990-5:1999, www.iso.org, Harris et al. 2006). Engeman et al. (1997) found that inconsistent assessment of trap injury occurred, even among an international panel of veterinary pathologists highly experienced with trap injuries. With training and experience, wildlife biologists may be able to improve their ability to detect, diagnose, and score injuries (Engeman et al. 1997).

The MDIFW has incorporated a number of elements into the ITP to ensure that their trapping related survival and injury information is as robust as possible, while considering appropriate tradeoffs with the risk of stress related to delaying release of captured Canada lynx, immobilization, and/or transportation. Measures to assure accurate injury assessment include having adequately trained wildlife biologists respond to Canada lynx capture events and assess the potential for injuries prior to release; developing an updated field based injury assessment system with veterinary assistance; and having veterinarians periodically evaluate the effectiveness of injury evaluations. We believe these practices will maximize the accuracy of injury assessments. However, we recognize that actual injuries may sometimes be either more or less severe than indicated by assessments and that some Canada lynx will be unintentionally released with undetected, severe injuries that could affect their subsequent survival and reproduction. On balance, however, we believe that the accuracy of injury assessments is good and will improve under the ITP.

(3) **Uncertainty about post-release effects on Canada lynx survival and reproduction:**
Trapping, chemical immobilization, and handling of wild animals have been documented to cause detrimental effects to some wildlife species (Beringer et al. 1996, Cattet et al. 2008, Williams and Thorne 1996) but not others (Delgiudice et al. 1986, Johannesen et al. 1997). Post-release effects for wildlife include decreased survival (White et al. 1972), reproduction (Ballard and Tobey 1981), abandonment of offspring (Cote et al. 1998), and increased predation on captured animals (Bro et al. 1999).

The MDIFW assessed information collected from Canada lynx caught in padded foothold traps and cage traps for their 12-year telemetry study, to conclude that trapping had little effect on post-release survival of Canada lynx that had no, or only minor, apparent injuries (ITP section 4.1). The MDIFW's study tried to account for undetected serious injuries by waiting a month before measuring survival of their radio-tagged Canada lynx. Ultimately, based on their study results, the MDIFW does not believe undetected injuries are likely to affect Canada lynx survival or reproduction after capture, since most females survived and gave birth to kittens (ITP section 4.1).

For severely injured Canada lynx (not to exceed nine animals over the life of the permit) that are rehabilitated and released, the MDIFW will monitor survival related effects through radio transmitters. For the purposes of this biological opinion, we assume that the post-release survival and reproduction of seriously injured Canada lynx could be moderately reduced (see

24

external examination of live lynx may not detect all injuries (ITP p. 60), but data from monitoring (i.e., their 12-year telemetry study) and AFWA's BMP trap study for lynx (AFWA 2013) indicate that any undetectable injury would not likely impact their ability to survive and reproduce after capture.  The Service provides additional explanation of the anticipated effects in section 5.3.1.1 of the revised DEA.

The MDIFW also has incorporated a number of elements into the ITP to ensure that their trapping related survival and injury information is as robust as possible.  These includes having adequately trained wildlife biologists respond to lynx capture events and assess the potential for injuries prior to release (ITP, p. 86 and 89, IM2 and IM6), implementing standard operating procedures for responding to lynx captures and updating the procedures every 3 years, in consultation with a veterinarian (ITP, p. 86, IM3), developing an updated field based injury assessment system with veterinary assistance (ITP, p. 86, IM3), transporting and rehabilitating lynx that have severe injuries (ITP, p. 88, IM5), and having veterinarians periodically evaluate the effectiveness of injury evaluations (ITP, p. 89, IM7).  The ultimate evaluation of effects of the various injury rates in the MDIFW's ITP is how injury rates affect the survival of individual lynx.  For severely injured lynx that are rehabilitated and released, the MDIFW will monitor survival related effects through radio transmitters (ITP, p. 88, IM5).  Finally, the MDIFW has included changed circumstances in the plan to address the potential that injury rates or fatality rates are higher than they anticipated in the plan (ITP, p. 120, changed circumstance #2).

In response to public comments regarding post-trapping survival, we have added a review of pertinent scientific literature on this topic to section 5.3.1.1 of this DEA.  Commenters were correct that three of six lynx caught by fur trappers, radio-tagged, and monitored by the MDIFW died within one month post-release.  Survival for this subsample of lynx appears to be lower than the subsample caught and handled by the MDIFW.  The MDIFW's prior public drafts of the ITP describe the fate of these six lynx as follows:

- Three lynx were caught in foothold traps with no or minor injuries near the MDIFW's lynx study area and radio-tagged.  One lynx lived for 20 months, one lived for 17 months, and one died within one month of unconfirmed causes, although predation was suspected.

- The other three lynx were caught by fur trappers and had injuries that required veterinary care.  After rehabilitation, the lynx were radio-tagged and then released and tracked.  Two of these lynx were caught in killer-type traps (we note that this was before regulations were in place requiring leaning pole sets for killer-type traps) and one was caught in a foothold trap in a drag set.  Both of the lynx injured in killer-type traps survived for less than a month.  One survived less than 2 weeks and died of starvation and the other died while crossing a swift river.  The lynx caught in the foothold trap lived more than five years.

In addition to these six lynx, a lynx caught in a foothold trap set on a drag by a fur trapper in fall, 2013 was rehabilitated, radio-tagged and released in late-winter, 2014.  It is still alive as of publication of this DEA, several months after release.

Several public comments raised concerns that some injuries may not be able to be detected by external evaluations of lynx.  There are several forms of capture-related injury that are difficult to diagnose in the field and some may take days to develop into recognizable pathology (Nocturnal Wildlife Research 2008).  Post-release survival may be impaired even by relatively minor injuries (Seddon et al. 1999, American Veterinary Medical Association 2008).  Capture myopathy can only be diagnosed by necropsy and histopathology (Spraker 1993), so researchers may be unaware that a trapped animal's survival may be compromised.  Trap pressure may cause occlusion of blood flow, and the sudden return of circulation (after release) may cause necrosis of tissue over a few days – a condition called pressure necrosis (Walker 1991, Stocker 2005).  Withey et al. (2001) recommended allowing several days to weeks to elapse for the

effects of capture and tagging before collecting data from radio-collared animals.  The MDIFW's telemetry study (which serves as the basis for the anticipated injury and fatality rates in its ITP) allowed 30 days after capture before assessing lynx survival (ITP p. 59).

Mowat et al. 1994 noted that many serious injuries to trapped lynx, especially bone abrasions, severed tendons or ligaments, muscle degeneration, and joint luxation could escape detection and affect post-release survival.  The MDIFW acknowledges that external examination can potentially miss some injuries (ITP p. 60).  That is in part why they have incorporated minimization measures that include having a veterinarian assist in develop and evaluate a field-based injury rating system, provide training oversight to the MDIFW staff that are involved in injury evaluation, and have veterinarians participate in several incidental lynx capture events throughout the permit term.

### 2.3 Trapping practices

### 2.3.1 Requirement for killer-type traps be set off the ground on leaning poles or in trees and their effectiveness as exclusion devices

We received the most comments on the topic of requiring killer-type traps to be set on leaning poles and whether this trap set is effective at excluding incidental capture of lynx.  We received a range of comments opposing or questioning this measure based on perspectives including that leaning poles are not effective at excluding lynx from killer-type traps, raising issues such as whether snow depth could allow lynx to more easily access traps set on leaning poles, raising issues with the trap tending time for killer-type traps, pointing out information suggesting that lynx can readily climb poles, and raising concerns about the complexity of MDIFW's regulations.  We also received a number of comments supporting this measure based on perspectives such as that after hundreds of thousands of trap nights no lynx have been reported in legally set leaning pole sets, observations that lynx don't climb or are reluctant to climb poles, or opinions that no further modifications to regulations or trap sets are justified.

The Service also raised a number of questions and uncertainties with leaning pole sets, as are outlined in section 5.1.1.1 of the revised DEA.  In response to public and Service comments regarding the effectiveness of leaning pole sets, the MDIFW has incorporated additional explanation and rationale in the 2013 revised ITP.  MDIFW presents data in the revised ITP (p. 134) that indicates that the risk of incidental capture of lynx in leaning pole sets is extremely low.  However, to address the Service's concerns, they included a changed circumstance whereby if a lynx is killed in a killer-type trap they will implement contingencies, which could include further study of the effectiveness of leaning pole sets or implementing exclusion devices (ITP, pp. 122 to 23, changed circumstance #3).  A study (e.g., field trial using trail cameras) may resolve uncertainty concerning the effectiveness of the leaning poles at excluding lynx from killer-type traps.  Excluding devices would be one way to prevent incidental trapping in killer-type traps, in the event that leaning pole sets are less effective than currently anticipated, and still allow trappers to catch fisher and marten (see comment 2.3.2).

The MDIFW has not explicitly incorporated any incidental take from killer-type traps into their take authorization request, though should lethal take occur it would count toward the three lethal takes for which the MDIFW has requested.  This is based on their assessment that leaning poles are effective at avoiding incidental take of lynx in killer-type traps.  If that assessment is incorrect, then incidental take authorized on the permit will likely be insufficient, triggering the need for further avoidance measures or amending the permit.  As part of the plan, the MDIFW will increase warden service compliance checks to ensure that killer-type trap sets are compliant with regulations (ITP, p. 99, PI 4).  This will also be a tool for independently evaluating that leaning pole sets are effectively preventing incidental capture of lynx.

begins to occur distal to the gripping point or at the gripping point. This damage can result in long-term loss of neuromuscular function or persistent pain. Damage also occurs with release of the restriction (reperfusion syndrome), and that damage can be local or in worst cases systemic, potentially leading to organ damage or even death. As little as two to four hours of serious restriction in some experimental models results in damage and chronic pain that can be significant and permanent.

Trap Release Considerations

Assumptions that non-target animals are uninjured if held in a foothold/leg-hold trap or foot or neck snare, and then released, are not based on accepted biology or physiology. Even mountain lions, a large and robust species relative to the bobcats and smaller species that traps are set typically set for, have been recorded as dying in traps and losing feet, toes, and teeth after inadvertent capture. Data from the Nevada Department of Wildlife that I have been able to examine showed that a percentage of all mountain lions harvested by hunters over 10 years had evidence of damage to feet such as missing toes and other portions of the foot, and teeth, that are consistent with being captured in leghold traps set for other species. Others may have died from their injuries and thus were not collected by hunters. It is my understanding that several radio-collared pumas in studies done in Nevada have had apparent foothold/leg-hold trap related injuries noted when captured by researchers, and at least GPS-collared puma has died in a trap set for another species. This is in contrast to a near-total absence of these types of injuries over 150 mountain lion captures that our research team has conducted in southern California, where no commercial foothold/leg-hold or snare trapping is allowed. We have also examined many additional uncollared mountain lions that were deceased from various causes in California such as vehicle strikes and deaths secondary to depredation permits. Again, foot and toe injuries have been almost totally absent in these animals.

It is incorrect to assume that the condition of animals released from foothold/leghold traps, or from a snare, and any restriction of their fitness that occurred as a result of the trap or snare, can be accurately evaluated by observing the animal in the trap, or as it dashes away after release. In my opinion, observation alone, and even post-capture GPS collar tracking by itself, cannot detect all damage that has occurred to an animal during confinement in a trap or snare. An unusual gait, even in an animal with significant damage to feet or legs due to trapping, is difficult to perceive on its release due to: (a) adrenaline in the animal allowing it to overcome any restrictions for short times; (b) the short time (often only seconds) that animals are in sight after release – stressed wild animals close to humans don't walk away slowly in full view; and (c) rapid movement making clear observation difficult. I have been present when an island fox that had an amputated leg was released from a trap and more than ten observers watched it depart without detecting anything abnormal. I was also present when a radio-collared mountain lion with two broken rear legs (he had apparently been hit by a car) was flushed from his location, and no gait abnormality was detected by myself, an expert tracker, or a California Department of Fish and Wildlife warden that saw the lion move off.

I have also observed and experienced that GPS-collared animals that are only partially restricted by limb injury can move across the landscape at normal rates of travel as indicated by their GPS data, but may nevertheless gradually deteriorate in condition if their hunting ability is hindered by the injury, and calorie intake suffers. Our study documented one GPS-collared

024540

mountain lion that suffered a fracture of all metatarsals on one rear foot, with gradual healing and stabilization over time. This animal had not demonstrated any significant change in travel rate per his collar data, but nevertheless had lost approximately 20% of his body weight when recaptured an estimated three months after the fracture occurred (based on level of healing). This type of fracture would have severely hampered that animal's ability to launch attacks on larger prey, yet his GPS-determined rate of movement on the landscape had not detectably changed. In other words, a formerly trapped animal that has three fully-functional legs may be able to walk at a normal pace but may nevertheless be significantly hindered when attempting to acquire food. Another GPS-collared puma in our study suffered complete fractures of both femurs, yet was still moving on the landscape (based on GPS data) until his condition dictated that he stay in one location long enough to trigger a mortality signal from his collar. Even at that point, when approached he was able to move rapidly away through the brush without his injuries being detectable by observing personnel. His injuries were not discovered until after he died.

Damaged foot or leg tissues may deteriorate over time after release, even when damage is not apparent at the time of release, resulting in loss of toes, entire feet or legs, damage to internal organs, or death. The report of the Island Conservation/Institute for Wildlife Studies trapping effort directed at removal of feral cats from San Nicolas Island documents this phenomenon. Channel Island foxes and feral cats were captured in #1 foothold traps with padded jaws set by skilled trappers/biologists. Over 900 captures occurred of over 400 individuals, and many island foxes were recaptured later in cage traps for reevaluation. Many injuries that were detected (~7% of captures) would likely have escaped notice without careful palpation of feet and toes by veterinarian-trained biologists working on that project. In that project, if injuries to island foxes or feral cats were suspected by examining biologists, animals were then further evaluated via radiographs, blood sampling, and veterinarian examinations. Many of the injuries detected would have been unlikely to be detected by a typical trapper in the usual trapping situation, and animals would be likely to be released and categorized as unharmed by the trapper.

There are only two ways to be confident that the animal's experience of having been trapped or snared has not been detrimental enough to affect the animal's fitness, normal behaviors, or survival. One is to place a GPS radiocollar on the animal and closely monitor it post-trapping, and the second is to recapture the animal later (humanely, in a continually-monitored cage trap), and have it evaluated by a veterinarian.

## Time in Trap Considerations

At either high or low temperatures, wild animals have coping mechanisms to maintain their core temperatures within appropriate ranges and to avoid temperature-related damage to extremities. However, when confined in a trap or snare of any kind, the animal may not be able to use some of these mechanisms, such as seeking the coolest shade or water for high temperatures or seeking warmer den environments in cold temperatures. Additionally, the stress of being confined by a trap or snare of any kind and the stress of being unable to escape, further exacerbates issues with temperature management and other negative physiological processes induced by the trap or snare. Trappers may not place trapping devices in the most ideal location for avoiding extremes, *i.e.*, a location where a trapper may expect best trap success is often along or in travelways, not necessarily in the more sheltered portions of the landscape. These are often not the best locations for the animal to have full use of its normal strategies to mitigate

024541



**Bridget Fahey/R6/FWS/DOI**
09/13/2007 07:59 AM

To  Anne Vandehey/R6/FWS/DOI@FWS, Shawn
Sartorius/R6/FWS/DOI@FWS

cc  Lori Nordstrom/R5/FWS/DOI@FWS

Subject  Bobcat Trapping  BO reinitiation

OK, I got the scoop now.  DMA in DC has requested whether a 75% increase in the amount of bobcat harvest over what was projected in the BO is grounds for reinitation.  However, their letter did not indicate whether there were effects to lynx beyond what was considered so I called Craig Hoover in DMA to get the scoop.  The BO allowed for take in the form of mortality of 2 lynx and take in the form of injury for 2 lynx.  The States were supposed to be reporting how much take they had but surprise surprise they haven't been reporting take.  So, DMA doesn't know how many lynx (if any) have been killed or injured over the last 6 years.  Craig has heard through press that two lynx have been killed in Minnesota but he's not sure it was from bobcat trapping.  He will be attending AFWA next week and will be asking the states for this information.  I told him we would hold off on a response until we hear back from him on whether take was exceeded.   If take hasn't been exceeded, we can send them a letter saying that the big increase in bobcat harvest hasn't resulted in any impacts to lynx beyond those considered in the BO.  If take has exceeded, we should reinitate, which your office would have the lead for.

It was news to me that incidental trapping of lynx during bobcat trapping was covered nationwide.  I thought that the Minnesota lynx deaths from trapping were "uncovered"--Lori do you know if those takes happened from non-bobcat trapping?

Here's the DMAs new request and a copy of the 2001 BO.

[attachment "CITES bobcat trapping reinitiation.pdf" deleted by Anne Vandehey/R6/FWS/DOI]
[attachment "CITES bobcat trapping BO.pdf" deleted by Anne Vandehey/R6/FWS/DOI]

~~~~~~~~~~~~~~~~~~~~~~~~~~
Bridget Fahey
Chief of Endangered Species
Mountain-Prairie Region
U.S. Fish and Wildlife Service
(303) 236-4258
(303) 236-0027 (fax)
~~~~~~~~~~~~~~~~~~~~~~~~~~

024546

# Alderson®

## COURT REPORTING

Transcript of **Bridget Fahey**

December 20, 2016

*Center for Biological Diversity et al. v. C.L. "Butch" Otter et al.*

Alderson Reporting
1-800-367-3376
info@aldersonreporting.com
http://www.aldersonreporting.com

Alderson Reference Number: 67684

ORIGINAL

024560

Bridget Fahey

December 20, 2016

Falls Church, VA

Page 1

1                  UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF IDAHO

3    CENTER FOR BIOLOGICAL              )

4    DIVERSITY, ET AL.                  )

5              Plaintiffs,              )

6    v.                                 ) Case No. 1:14-CV-00258

7    C.L. ("BUTCH") OTTER, ET AL.,)

8              Defendants.              )

9    - - - - - - - - - - - - - -)

10                        Falls Church, Virginia

11                        December 20, 2016

12              Deposition of BRIDGET FAHEY, a witness

13   herein, called for examination by counsel for the

14   Plaintiffs in the above-entitled matter, pursuant to

15   Notice, the witness being duly sworn by CARLA L.

16   ANDREWS, a Notary Public in and for the Commonwealth

17   of Virginia, taken at U.S. Fish and Wildlife

18   Service, 5275 Leesburg Pike, Falls Church, Virginia

19   22041 at 1:10 p.m., Tuesday, December 20, 2016, and

20   the proceedings being taken down by Stenotype by

21   CARLA L. ANDREWS, RPR, and transcribed under her

22   direction.

Bridget Fahey                                    December 20, 2016
Falls Church, VA

1    APPEARANCES:

2    On behalf of the U.S. Fish and Wildlife Service and

3    the Witness:

4        TRAVIS J. ANNATOYN, ESQ.

5        U.S. Department of Justice

6        Environment & Natural Resources Division

7        601 D Street, N.W., Third Floor

8        Washington, D.C. 20004

9        202-514-5243

10

11   On behalf of the Plaintiff WildEarth Guardians:

12       PETER M.K. FROST, ESQ.

13       MATTHEW BISHOP, ESQ.

14       Western Environmental Law Center

15       1216 Lincoln Street

16       Eugene, Oregon 97401

17       541-485-2471

18

19

20

21

22

Bridget Fahey

December 20, 2016

Falls Church, VA

Page 3

```
 1    (APPEARANCES (Continued):

 2

 3    On behalf of the Plaintiff Center for Biological

 4    Diversity:

 5         ANDREA SANTARSIERE, ESQ.

 6         Center for Biological Diversity

 7         Post Office Box 469

 8         Victor, Idaho 83455

 9         303-854-7748

10

11    On behalf of the Defendant Intervenors, The

12    Trappers:

13         GARY R. LEISTICO, ESQ.

14         Rinke Noonan

15         1015 West St. German Street

16         St. Cloud, Minnesota 56301

17         320-656-3518

18

19

20

21

22
```

Bridget Fahey                                              December 20, 2016

Falls Church, VA

Page 4

1    APPEARANCES (Continued):

2    On behalf of the Defendants Idaho Department of Fish

3    and Game Director Virgil Moore and Commissioners

4    Attebury, Clezie, Fischer, Cameron, Meyers, Corkill,

5    Blanco:

6         KATHLEEN E. TREVER, ESQ.

7         Office of Attorney General

8         Department of Fish & Game

9         600 S. Walnut

10        P.O. Box 25

11        Boise, Idaho 83707

12        208-287-2710

13   ALSO PRESENT:

14        SARAH McMILLAN

15        BETHANY COTTON

16        PARKS GILBERT

17

18

19

20

21

22

Bridget Fahey
December 20, 2016
Falls Church, VA

Page 5

1                    C-O-N-T-E-N-T-S

2   WITNESS:                EXAMINATION BY COUNSEL FOR

3   BRIDGET FAHEY        PLAINTIFF WILDEARTH GUARDIANS

4   By Mr. Frost                     7, 84

5                       EXAMINATION BY COUNSEL

6                        FOR PLAINTIFF CENTER

7                        FOR BIOLOGY DIVERSITY

8   By Ms. Santarsiere               78

9

10                    E-X-H-I-B-I-T-S

11     NO.                            PAGE

12     1:  Second Declaration         11

13     2:  April 11, 2012, Memorandum  22

14  Note:  Exhibit No. 1, Retained.

15

16

17

18

19

20

21

22

Bridget Fahey                                          December 20, 2016

Falls Church, VA

```
 1                  P-R-O-C-E-E-D-I-N-G-S

 2

 3          MR. FROST:  Good afternoon, Ms. Fahey.  I

 4    am Pete Frost.  I know we have already gone through

 5    introductions, but I am going to do it again on the

 6    record.  I am an attorney for plaintiff WildEarth

 7    Guardians in this case.  And I would like the other

 8    counsel of record in the case to introduce

 9    themselves for the record as well.

10          MR. LEISTICO:  I am Gary Leistico here on

11    behalf of the defendant Intervenors, The Trappers.

12          MS. TREVER:  I am Kathleen Trever, and I

13    represent Idaho Department of Fish and Game director

14    Virgil Moore and the seven Idaho Fish and Game

15    commissioners.

16          MR. ANNATOYN:  And I am Travis Annatoyn.

17    I am here on behalf of the Agency, the Fish and

18    Wildlife Service and on behalf of the deponent.

19          MS. SANTARSIERE:  I'm Andrea Santarsiere.

20    I am here with Center for Biological Diversity.

21    Thereupon,

22                  BRIDGET FAHEY,
```

Bridget Fahey
December 20, 2016

Falls Church, VA

Page 7

1    was called as a witness and, after being duly sworn

2    by the notary, was examined and testified as

3    follows:

4                EXAMINATION BY COUNSEL FOR

5            PLAINTIFF WILDEARTH GUARDIANS

6                BY MR. FROST:

7        Q.    Ms. Fahey, could you please spell your

8    name for the court reporter?

9        A.    Bridget, B-R-I-D-G-E-T; Fahey, F, as in

10   Frank, A-H-E-Y.

11       Q.    Ms. Fahey, have you been deposed before?

12       A.    No, I have not.

13       Q.    So let me give you some ground rules for

14   how we conduct this.  I will be asking you

15   questions, and you are to answer them.  If I ask you

16   something that's unclear, please ask me to clarify

17   my question.  Please speak audibly with your answers

18   rather than nodding our head because the court

19   reporter can't transcribe a nod.

20       A.    Okay.

21       Q.    Please let me know if you need a break.

22   I appreciate that you are ill and very much

Bridget Fahey                                              December 20, 2016
                          Falls Church, VA

                                                              Page 29

1    Justice.

2              BY MR. FROST:

3         Q.    What was meant in the 2012 document by

4    the Service when it stated at issue is the potential

5    take of the Canada lynx caused by the program?

6         A.    So as the biological opinion describes,

7    in the course of lawful trapping for bobcats there

8    is a possibility that lynx could be captured

9    accidentally.

10        Q.    What did the Service mean in terms of the

11   program causing the potential take of lynx?

12        A.    So but for the DMA authorizing states to

13   trap and export bobcat, Canada lynx would not be in

14   a position to be accidently trapped by a proposed

15   action.

16        Q.    By bobcat trappers?

17        A.    Correct.

18        Q.    So does a -- does the Service mean -- in

19   terms of its program, does it mean to cover only

20   those pelts that are slated for export or that are

21   exported, i.e., that move into the CITES Program?

22        A.    So, again, that's an area for the

Bridget Fahey

December 20, 2016

Falls Church, VA

Page 35

1    second full paragraph, please review that.  And it

2    says to me incidental take for lynx is expected in

3    the form of two (2) lynx may be killed and two (2)

4    injured annually due to the trapping over the

5    10-year term of this biological opinion.

6              So I am asking for the official

7    interpretation of that provision and ask if it is

8    that.  It states, "Permissible take of two lynx

9    deaths and two lynx injured annually due to bobcat

10   trapping."  Is that what that provision means.

11        A.    That is how I read the provision, yes.

12        Q.    So does that mean there must be both

13   death and injury to reach the cap or, for example,

14   if one lynx is killed and 10 are injured in a single

15   year, is the cap met?  Is it surpassed?

16        A.    According to the BO, yeah, a take would

17   be exceeded in the form of injury because it is

18   capped at two.

19        Q.    Yeah.  What I am struggling with is

20   similarly the Service's interpretation of the word

21   "and" in there.  So if, for example, 12 lynx were

22   injured in the states and tribes approved under the

Page 58

1    within the Service, are you aware of studies or

2    other bases for the Service to come up with that as

3    a reason to reinitiate consultation?  What is the

4    how much kind of question must occur for that to be

5    triggered?

6              MR. ANNATOYN:  Objection.  I will just

7    say 2(e) and direct the witness not to answer.

8              BY MR. FROST:

9        Q.    Is injury a criterion for incidental take

10   in the ITS?

11       A.    The ITS describes injury as a way of

12   knowing when take would be exceeded.

13       Q.    Do you know how the injury is defined for

14   the purposes of the ITS?

15       A.    What the BO just says to injured animal.

16       Q.    I am sorry.  Could you repeat that?

17       A.    The BO just says two -- two taken in the

18   form of injury for two animals.

19       Q.    Do you know how the Service knows that an

20   animal that is trapped and released is not injured?

21       A.    So I would say no evidence of broken

22   bones or blood or limping.

# DEPARTMENT OF
# NATURAL RESOURCES

April 7, 2017

Public Comments Processing
Attn: FWS–HQ–IA–2017–0012
Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5275 Leesburg Pike; MS: BPHC
Falls Church, VA 22041

Dear Sir/Madam:

The Minnesota Department of Natural Resources (MNDNR) provides the following comments in reference to the public notice for comment on the United States Fish and Wildlife Service (USFWS) Draft Environmental Assessment on the Export Program for Certain Native Species Under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). The MNDNR supports the Preferred or "No Action" alternative that continues the furbearer export program as currently implemented.

The purpose of CITES is to ensure that international trade does not threaten the survival of wild species. The species to which this EA currently applies, specifically bobcats, river otters, Canada lynx, gray wolves, and brown bears, are listed on Appendix II of CITES. Sustainable use and export of species on Appendix II is allowed for these species provided assurances the trade is of legally-obtained specimens and is not detrimental to the survival of that species in the U.S. Such assurances are jointly monitored and guaranteed by State, Tribal, and Federal wildlife management authorities. Since 1978, the State of Minnesota has had USFWS export approval for river otters, bobcats, and Canada lynx (prior to ESA listing). Should wolves be removed from ESA protection in the Great Lakes, we would likely seek export approval for gray wolves as currently approved in the states of Alaska and Montana. We also have in the past, and anticipate in the future, a need to export biological samples of black bears, Canada lynx, gray wolves, and possibly river otters and bobcats for various scientific analyses.

As noted on the draft EA, all states have regulatory mechanisms to manage these species. In Minnesota, harvest and export of river otters has occurred since 1978, and during this interval river otter populations have expanded to nearly every county in the state and the population has essentially doubled. Similarly, harvest and export of bobcats has occurred since 1978, and bobcat populations have more than tripled during this time. These same positive trends are apparent nationwide for bobcats (Roberts, N.M., and Crimmins, S.M. 2010. Bobcat population status and management in North America: evidence of large-scale population increase. Journal of Fish and Wildlife Management 1:169–174) as well as river otters (Association of Fish and Wildlife Agencies, unpublished data). State and Tribal management and enforcement programs along with the USFWS Scientific and Management Authorities have clearly ensured that the existing program and preferred alternative has been successful in conserving populations and meeting the the intent of CITES.

As a result of ESA and state protections, Canada lynx and gray wolves cannot be legally harvested in Minnesota. However, lynx were legally harvested prior to 1983, and gray wolves were legally harvested from 2012-2014. During the federal listing of neither Canada lynx nor gray wolves was modern regulated harvest, nor accidental harvest, deemed a cause of decline nor a current threat to the survival of these species. While it remains uncertain if or when harvest of these species will occur again, we are confident that any harvest that would be allowed, and export approved by USFWS, would meet with the same success as well documented for river otters

and bobcats.  Furthermore, there is no evidence that past or present legal export of river otters and bobcats has in any way negatively impacted the conservation status of any other CITES- or ESA-listed species.

We are unaware of any negative environmental or ecological effects in Minnesota resulting from the existing (and preferred) CITES furbearer export program.  Conversely, harvest and export contributes positively to many conservation activities, to management of human-wildlife conflicts, and is consistent with the conservation mission of our agency.   Hence, we see no reason to change a very successful program.

With respect to Alternative 2 ("no tags"), we agree with the USFWS that, while feasible and still allowing export, there is likely little or no gain from this alternative, yet a potential for additional administrative costs/challenges to both the State and the USFWS.  We are neutral on Alternative 2; however, we prefer Alternative 1 ("No Change").

We are strongly opposed to both Alternative 3 ("No Permit") and Alternative 4 ("no approved CITES export program").  Loss of export markets (under Alternative 3) or substantially higher costs/burden of individual export permits (under Alternative 4) will have direct negative economic consequences.  Loss of markets or higher individual burdens will likely lead to a direct loss of income for trappers and hunters, trapping/hunting supply dealers, hunting guides, taxidermists, and others; there will also be an economic 'multiplier effect', particularly in rural economies.  While most hunters and trappers are motivated by many factors beyond fur prices, historical data clearly demonstrates that reduced prices will reduce hunting and trapping participation and effort.  This has the potential to produce more indirect economic effects.  For example, beavers and river otters are commonly trapped simultaneously, so reduction in river otter prices and trapper motivation may result in a decline in beaver harvest.  In Minnesota, private trappers offer an important and cost-effective tool for managing human-beaver conflicts, such as flooding impacts to transportation infrastructure and private property.  A potential increase in conflicts, combined with a potential loss of cost-effective conflict management options (private trappers), will have negative economic impacts to individuals and the State.  Similarly, a reduction in prices for bobcats or wolves (should harvest resume) will likely lead to a reduction in bobcat, coyote and wolf harvest in some areas of the state, leading to potential increases in livestock depredation conflicts or higher public costs of addressing those conflicts.  While it is difficult to quantify the exact increase in costs, we are confident this will result under either Alternative 3 or 4.

Under Alternatives 3 and 4, we also feel there will be negative conservation-related impacts.  First, under Alternative 3, biological samples could not be exported to labs outside the U.S. for scientific analysis, as is often done.  While some of these analyses could be conducted within the U.S., in some cases international labs are necessary or more experienced with certain analyses.  Second, biological data (age, health, reproductive metrics, etc.) important for management and conservation is commonly collected from bobcats, river otters, black bears, and wolves harvested by hunters and trappers.  This data collection is substantially cheaper in most cases than when collected through other means (e.g., radio-telemetry studies).  Reductions in harvest under either of these alternatives, driven by reduced prices from export restrictions, will either reduce scientific data collection or increase costs of acquiring the data necessary to make sound management decisions.  Third, reductions in trapper and hunter interest, experience, or recruitment from reduced markets/prices may at times impact management goals/options for other wildlife species.  For example, recent research in Minnesota suggests that bobcats may be having an impact on fisher populations in some areas.  With reduced markets/prices for bobcats, should we ever determine a need to locally stabilize or reduce bobcat numbers for the conservation of fisher, cost-effective options for doing so (i.e., private trappers) will be reduced.  Other relevant examples in the U.S. where declines in trapper experience or availability could have negative economic or other impacts include management of otter depredation at aquaculture facilities, protection of coastal marshes from nutria damage

Minnesota Department of Natural Resources • Division of Fish and Wildlife
500 Lafayette Road, St. Paul, MN 55155

(i.e., otter markets influence direct and indirect trapping effort for nutria), cost-effective capture of animals for wildlife research projects (e.g., MNDNR has utilized private trappers to live-capture otter, bobcats, wolves, etc.) and wildlife reintroductions (e.g., private trappers were critical in the restoration of river otters to many states, as well as wolves to Yellowstone), and for protection of endangered species (see examples in H. B. White, T. Decker, M. J. O'Brien, J. F. Organ & N. M. Roberts. 2015. Trapping and furbearer management in North American wildlife conservation.  International Journal of Environmental Studies DOI: 10.1080/00207233.2015.1019297). Reducing management flexibility or increasing costs of management when there is no environmental or ecological basis for doing so is neither wise, nor the purpose of CITES.

In addition to the above general comments, we offer the following specific comments on wording in the draft EA.

1) Page 11 – "*Continual monitoring by the Service enables us to detect any significant downward trends in the populations of these species and, where necessary, implement more restrictive export controls in response to them*".
   a. We agree, but feel it should be noted that through COLLABORATIVE State, Tribal, and Federal monitoring and management, there has never been a need for "more restrictive export controls" over the years, and in fact export authority has expanded to more states as these species/populations increased.  The current export program has been successful, and we are not aware of a single negative noteworthy environmental impact attributable to modern export of bobcats or river otters from Minnesota or elsewhere.

2) Page 13 – "*In addition, it is possible that skins of native bobcats, river otters and other species currently included in the CITES Export Program but that are from jurisdictions where legal harvest is prohibited could be laundered into the legal trade.  Reducing Service oversight by eliminating tagging of the pelts of these species, potentially dilutes the traceability of legally acquired specimens and could result in a larger volume of pelts in international trade, and may result in less rigorous documentation of these pelts*".
   a. We do not disagree in theory; however, we feel it could be noted that through sound management and collaborative state-federal-tribal enforcement, there is little to no evidence to suggest the overall volume of export from Minnesota (or the U.S.) is influenced by illegally-acquired pelts, be they CITES (tagged) species or not.  Nor is there evidence that these species in Minnesota or elsewhere are being impacted by illegal harvest.  As said above, the existing and preferred alternative has been successful.

3) Page 17 - "*Despite these uncertainties, populations of these species probably would increase in abundance, at least in some areas, if export was not allowed*".
   a. It may be more accurate to say that these species COULD POSSIBLY increase in some areas/situations…….  There is no generalizable data that demonstrates harvests are in fact regulating these species, nor does the statement acknowledge that states could alter harvest seasons in response to increases (or decreases) in populations.  Furthermore, basically all species of relevance here have ALREADY been increasing over much of the last 30 years.

4) Page 18 and similar statement on P. 19 – "*Export restrictions may reduce incentives for State and tribal conservation program for these species*".
   a. We feel that our <u>incentive</u> to manage is based on the inherent values of wildlife, our fiduciary responsibility to manage wildlife populations for future generations, and sound principles of

Minnesota Department of Natural Resources • Division of Fish and Wildlife
500 Lafayette Road, St. Paul, MN 55155

conservation, not export markets.  We believe it is more appropriate to articulate that export restrictions "may reduce funding available for the full array of state and tribal conservation programs, and increase costs of management in certain situations" (as discussed in various places above).

5) Page 18 – "*Not approving export might help alleviate harvest pressure on other protected species and populations by reducing the opportunities for illegally traded pelts to be traded as legally obtained. However, there is little evidence that this is occurring*".
   a. We believe that these 2 statements should just be combined to say "There is no evidence to indicate that legal export authority for sustainably-harvested species is the ultimate or proximate cause of any illegal harvest or trade, nor any evidence that any illegal harvest that may occur is detrimental to the survival of protected species in the U.S.".

6) Page 18 – "*On the other hand, not approving export might increase harvest pressure on other protected species or populations. It is uncertain to what extent any of the consequences of this alternative might occur*".
   a. Similar to the above, we do not see any evidence of a connection between legal export authority for these species and illegal harvest of or detriment to other protected species in Minnesota or the U.S.  It is always true that there is some uncertainty in the finer details, but we believe the concluding point here is that 30+ years of export authority for many of these species has clearly demonstrated no impact to the viability of these or other species, nor any clear causal connections to or detrimental effects on a species from any illegal harvest that may occur.

Once again, we reiterate our strong support for the preferred alternative of "No Change", and strongly believe that Alternatives 3 and 4 will have both negative economic and conservation impacts without offering any demonstrated need or benefit to the environment or any wildlife species.

Thank you for the opportunity to provide input.  Should further clarification of these comments be necessary, please do not hesitate to contact Dr. John Erb at john.erb@state.mn.us or 218-328-8875.

Sincerely,

*Lou Cornicelli*

Dr. Lou Cornicelli
Acting Chief, Wildlife Section
Minnesota Department of Natural Resources

# MISSOURI DEPARTMENT OF CONSERVATION

*Headquarters*

2901 West Truman Boulevard, P.O. Box 180, Jefferson City, Missouri 65102-0180
Telephone: 573-751-4115 ▲ www.MissouriConservation.org

SARA PARKER PAULEY, Director

April 10, 2017

ATTN: FWS-HQ-IA-2017-0012
Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5275 Leesburg Pike
MS: BPHC
Falls Church, VA 22041

To Whom It May Concern:

I am writing on behalf of the Missouri Department of Conservation (Department) to provide comment and express support for the preferred alternative of "No Action" as discussed under the Draft Environmental Assessment: Export Program for Certain Native Species under the Convention on the International Trade in Endangered Species of Wild Fauna and Flora (50 CFR 23.69). The Department has State Constitutional authority over the management of the native wildlife of Missouri, including bobcat and river otter. The Department has the mission to protect and manage the fish, forest, and wildlife resources of the state; to facilitate and provide opportunity for all citizens to use, enjoy, and learn about these resources. Pursuant to this mission, the Department establishes rules and regulations pertaining to the harvest of wildlife, including bobcat and river otter, to allow for the sustainable use of these species while minimizing human-wildlife conflict and ensuring populations for future generations of Missourians.

Bobcat, otter, lynx, wolf, and brown bear populations have become stable or increased due to sound management practices by state, federal, and tribal authorities. All of the above mentioned species are listed as species of "Least Concern" by the International Union for Conservation of Nature. There has not been a need for more restrictive export controls and population expansions have occurred in much of these species' ranges, thus there is no need to change the current export system for these species. In Missouri, we have documented 1 lynx and several wolves that have dispersed into the state from nearby growing populations. Bobcat populations in Missouri have expanded dramatically since the 1970's, as a result of sound, science-based management by the Department. Bobcats are present in all suitable habitats within Missouri, and have even expanded to suburban landscapes, all while sustaining a harvest during the hunting and trapping season. River otter were reintroduced in Missouri in the 1980's to augment very low populations. During an 11-year program, 845 otters were released into the state and the population rapidly grew to over 15,000 otters in about 20 years. The first regulated otter trapping season was initiated in 1996 and has expanded over the last 2 decades to increase harvest and reduce damage to privately-owned ponds. The Department has regulations in place to control and monitor both bobcat and otter harvests, including mandatory checking or registering of carcasses or green pelts. The data collected are used to monitor statewide and regional harvest and to comply with CITES regulations. Both bobcat and river otter populations have decreased slightly in recent years; however, both populations continue to have an overall long-term stable trend. The Department is also collecting data to use statistical population reconstruction (SPR) to model bobcat and river otter populations. Sound scientific management has ensured that these populations continue to flourish, while maintaining the ability to sustain harvest and export of pelts. Under the preferred alternative of "No Action", there are no negative environmental impacts.

Missouri's wild fur market has been monitored annually since 1940, with some information dating back to 1934. Over time, we've seen tremendous fluctuations in the harvest of Missouri's primary furbearing animals as both market and social trends change. The Department monitors the fur market using mandatory fur dealer transaction records, mandatory pelt registration of bobcats (since 1980) and river otters (since 1996), and information gathered at fur auctions. Bobcat and river otter are both extremely important components of the Missouri wild fur market, as is the ability to export the pelts of these species under the current export framework. During the 2015-16 season, 2,207

COMMISSION

DON C. BEDELL
Sikeston

JAMES T. BLAIR, IV
St. Louis

MARILYNN J. BRADFORD
Jefferson City

DAVID W. MURPHY
Columbia

024828

U.S. Fish and Wildlife Service
April 10, 2017
Page 2

bobcats were harvested and 1,356 otters were harvested. The 2015-16 bobcat harvest was a decrease of 31.65% from 2014-15, and 50.29% below 2013-14 season harvest. Bobcat pelt prices during 2015-16 dropped by 42.2% and fewer bobcats were harvested. Otter harvest was down 37.60% from the previous year, and down 49.21% from the 2013-14 season. Otter pelt prices declined 27% from last year.  High harvest during the previous two furbearer seasons and lower pelt prices are likely the reasons for decreased harvest in the 2015-16 season. In Missouri, we have documented that there is a strong relationship between harvest (supply) and pelt prices (demand). Alternative 3 (complete loss of export markets) and alternative 4 (dramatically higher cost/burden on individual trappers, hunters, or fur buyers), as discussed in the environmental assessment would have negative impacts on economic growth in Missouri, and the United States. Decreasing the ability of trappers and hunters to sell pelts, will cause reductions in income for hunters and trappers, a loss of income to trapping/hunting supply companies, and a loss of income to local fur buyers. The cascading effects of the loss of export ability as a result of alternatives 3 and 4 could be devastating for rural communities and those individuals who depend on income from the wild fur market.

The economic impacts that could occur as a result of alternatives 3 and 4 are not only limited to those who participate at varying levels in the wild fur market. As a result of decreased economic incentive, participation in trapping will likely suffer. These effects will be far reaching as trappers often participate in research activities with state fish and wildlife agencies, help protect endangered species, and contribute to overall population control or local control to reduce damage caused by furbearing mammals. In Missouri, we continue to get complaints from residents about "too many bobcats" and damage as a result of depredations on livestock. We also receive complaints from pond owners that experience fish-loss due to otter depredations. These complaints will likely continue, but the ability for residents to work with local trappers/hunters will be limited under alternatives 3 and 4.  In addition, hunting and trapping permit sales are likely to decrease which will result in a loss of revenue to state fish and wildlife agencies that provide important conservation programs. Under the preferred alternative of "No Action", the current system would not change and there would be no negative economic impacts.

The current CITES export program has been successfully implemented, exceeds the requirements for CITES export, and has direct benefits to local, state, and national economies. The Department fully supports the preferred alternative of "No Action" to the current CITES export program. It is unnecessary to consider alternative 2.  Alternatives 3 and 4 would result in negative economic impacts to hunters/trappers and those who participate in the fur market, cascading effects on citizens who experience damage from furbearing mammals, and the potential for negative impacts to conservation efforts as a result of decreased revenue from permit sales. State fish and wildlife agencies and the U. S. Fish and Wildlife Service have continually demonstrated their commitment to upholding the requirements of CITES. To date, this effort has been a collaborative success for which no changes need to be made to the current export system.

Sincerely,

SARA PARKER PAULEY
DIRECTOR

c:      Deputy Director Tom Draper
        Wildlife Division Chief Jason Sumners
        Protection Division Chief Larry Yamnitz
        Resource Science Division Chief Mike Hubbard
        Resource Science Center Chief Vince Travnichek
        Resource Science Supervisor Charles Anderson
        Resource Scientist Laura Conlee



RECEIVED

APR 1 0 2017

Div. of Policy, Perf. &
MGMT. Programs

## TOURISM, ARTS AND HERITAGE CABINET
## KENTUCKY DEPARTMENT OF FISH & WILDLIFE RESOURCES

**Matthew G. Bevin**
Governor

**Don Parkinson**
Secretary

#1 Sportsman's Lane
Frankfort, Kentucky 40601
Phone (502) 564-3400
1-800-858-1549
Fax (502) 564-0506
fw.ky.gov

**Regina Stivers**
Deputy Secretary

**Gregory K. Johnson**
Commissioner

April 7, 2017

Public Comments Processing
Attn: FWS-HQ-IA-2017-0012
Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5275 Leesburg Pike, MS:BPHC
Falls Church, VA 22041

To Whom It May Concern,

This letter is to express support by the Kentucky Department of Fish and Wildlife Resources (KDFWR) of the preferred alternative of "no action" outlined in the Draft Environmental Assessment; Export Program for Certain Native Species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) (Docket No. FWS-HQ-IA-2017-0012). The CITES Export Program should continue in its current form under 50 CFR 23.69. The harvest of bobcat and river otter for export to international markets is not a detriment to the survival of these species. KDFWR Law Enforcement Division monitors the harvest of bobcat and river otter to ensure they are lawfully obtained, and CITES tagging requirements are strictly enforced.

The expansion of bobcat back to its original North American range is well documented. The successful recovery is a result of careful and conservative management by state agencies. A recent range wide assessment estimates the bobcat population in the United States at 2.4 million to 3.6 million (Roberts and Crimmins 2010). Bobcats are abundant throughout Kentucky. Regulated harvest began in 1987 and annual harvests now exceed 2,000 bobcats. KDFWR routinely receives bobcat observations by reports of road-kills, trail camera photos, and complaints of depredated poultry. KDFWR is exploring new techniques to monitor and assess the current population status of bobcats in Kentucky.



KentuckyUnbridledSpirit.com

024883
An Equal Opportunity Employer M/F/D

Public Comments Processing
April 7, 2017
Page Two

KDFWR's River Otter Reintroduction Program in the early 1990's was a success; otters are now abundant and thriving statewide.  KDFWR has conservatively managed the harvest of river otter through seasons and bag limits and is exploring current techniques for monitoring river otter populations.  The relatively low number of trappers in Kentucky and poor fur market limit harvest.  River otters occur in high densities in parts of Kentucky and cause substantial damage to boats and docks in marinas and depredate large quantities of fish in hatcheries and private ponds across the state.

Trapping is a critical tool for alleviating damage caused by bobcat and river otter to personal property and livelihood.  Fur trappers commonly trap problem bobcat and river otter for landowners free of charge in exchange for the opportunity to sell the hides to international markets.  Removing the ability to export fur, as described in Alternative 2, would provide no incentive to trappers to assist landowners.  Loss of export markets (Alternative 2) and the enormous burden of applying for individual CITES permits for each hide exported (Alternative 3) would reduce participation in trapping all furbearers.  Bobcat are often trapped with coyote, and river otter trapped with beaver.  With reduced incentives to trap - because bobcat and otter are more valuable on the market than coyote and beaver, human conflicts with coyote and beaver are likely to increase.  Any trapping that did continue would result in discarding and wasting the hides.

KDFWR's Law Enforcement Division closely monitors the harvest of bobcat and river through bag limits, checking requirements, and CITES tagging to ensure lawful take of exported hides.  The Law Enforcement Division has conducted undercover operations to enforce the CITES tagging process.  We are confident that the harvest and subsequent export of bobcat and river otter hides is not a detriment to the survival of these species.  The KDFWR fully supports the U.S. Fish and Wildlife's proposed action to maintain the CITES Export Program in its current form.

Sincerely,

Gregory K. Johnson
Commissioner
Kentucky Department of Fish and Wildlife Resources

024884



GOVERNOR
DOUGLAS A. DUCEY

COMMISSIONERS
CHAIRMAN, EDWARD "PAT" MADDEN, FLAGSTAFF
JAMES R. AMMONS, YUMA
JAMES S. ZIELER, ST. JOHNS
ERIC S. SPARKS, TUCSON
KURT R. DAVIS, PHOENIX

DIRECTOR
LARRY D. VOYLES

DEPUTY DIRECTOR
TY E. GRAY

THE STATE OF ARIZONA

# GAME AND FISH DEPARTMENT

5000 W. CAREFREE HIGHWAY
PHOENIX, AZ 85086-5000
(602) 942-3000 • WWW.AZGFD.GOV



April 4, 2017

Public Comments Processing
Attn: FWS-HQ-IA-2017-0012, Division of Policy, Performance, and Management Programs
U.S. Fish and Wildlife Service
5275 Leesburg Pike
MS: BPHC
Falls Church, VA 22041

RECEIVED

APR 2 5 2017

Div. of Policy, Perf. &
MGMT. Programs

Dear Mr. Hoover,

The Arizona Game and Fish Department (Department) appreciates the opportunity to provide comment on the USFWS Draft Environmental Assessment; Export Program for Certain Native Species Under the Convention on International Trade in Endangered Species of Wild Fauna and Flora. In general, the Department supports the preferred alternative of "no action" to continue the CITES export program consistent with their current regulations at 50 CFR 23.69. Harvest data suggests that no other action needs to be taken.

**Comments by Section**
1. **Page 9, ALTERNATIVES section, Alternative 1, the "preferred action" alternative**
   The Arizona Game and Fish Department supports the preferred "no action" alternative to maintain the CITES Export Program in its current form which includes the mandatory tagging of skins of these species prior to export. The AGFD has participated in the CITES Export Program for bobcats for many years, which has allowed the AGFD and USFWS to collect valuable harvest and population data that may not have been collected otherwise, and has been instrumental in monitoring this species. This program has allowed for a more streamlined process for our hunters and trappers to participate in international markets.

2. Bobcats exist in large numbers across the continent. The U.S. population has been estimated by Roberts and Crimmins in 2010 to be between 2.3 and 3.6 million bobcats. Most states, including those with limited bobcat distributions, reported increasing bobcat populations in 2008. In Arizona, they are particularly abundant in rugged habitats associated with Sonoran desert scrub and interior chaparral.

   The AGFD uses the sex ratio of the harvest, obtained through the CITES Export tagging program to monitor harvest trends. In addition, the AGFD began aging teeth in 2013-2014 that are submitted during the tagging process to evaluate the impact of harvest on the bobcat population. Tooth submission was much easier to implement because the

tagging process was already established. Arizona has documented some of the highest densities of bobcats in the western U.S. In central Arizona, the minimum estimated density of adult resident bobcats was 1 bobcat per 3.6-4.1 km$^2$. Analyses of annual harvest data, observation questionnaire data, prey abundance, nuisance complaints, and observations by field personnel continue to support previous research findings in Arizona that bobcat densities in the state remain high. The age and sex composition of the bobcat harvest as well as the increasing trend in bobcat observation rates and bobcat density estimates do not provide any evidence that harvest or export have contributed to any decline of the species. On the contrary, data suggest the bobcat population in Arizona is healthy and robust.

Although the Arizona Game and Fish Department does not currently allow for the regulated harvest of river otters in the state, Department surveys as well as a review of river otter occurrences in the Heritage Data Management System, nuisance reports, and sighting information have provided evidence of successful reestablishment in the Verde River Watershed.

3. **Page 12, Alternative 2, the "no tag" alternative**
The Department would support the "no tag" alternative but not if a paper documentation system would be established in its place. A paper recordkeeping system that USFWS would institute under the "no tag" alternative would be just as burdensome, if not more, on the trapper/hunter and the Department and would not save any time or reduce workloads.

4. **Pages 14, Alternative 3, the "no permit" alternative or Alternative 4, the "no approved CITES export program alternative**
The "no permit" alternative or "no approved CITES export program" alternative would seriously inhibit the management of these species by the state of Arizona. These alternatives would require that trappers/hunters acquire individual export permits, which would increase the financial costs to the trappers/hunters and the time associated with acquiring these permits. This could lead to a decrease in participation in trapping and hunting activities and a loss of revenue for the Department.

5. **Economic impacts of alternatives, Page 19, Alternative 3, the "no permit" alternative**
This alternative would prohibit the export of biological samples from these species to labs outside of the US. The Department often works with foreign labs, including most recently a river otter genetics analysis project with Wildlife Genetics International in British Columbia, CA, to estimate river otter population size along the Verde Watershed in Arizona. The Department also uses this same lab for genetic analysis of Mexican gray wolves. This type of prohibition could seriously inhibit our ability to understand and manage these species.

Thank you for the opportunity to provide input on the USFWS Draft Environmental Assessment; Export Program for Certain Native Species Under the Convention on International Trade in

Endangered Species of Wild Fauna and Flora.  For further coordination, please contact me at javey@azgfd.gov or 623-236-7385.

Sincerely,

Josh Avey, Terrestrial Branch Chief