IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

OCT 2 6 2018

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| WILDEARTH GUARDIANS, | Lead Case No. CV 16-65-M-DWM |
| Plaintiff, | |
| and | Member Case No. CV 17-99-M-DWM |
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Consolidated-Plaintiff, | ORDER |
| vs. | |
| UNITED STATES FISH & WILDLIFE SERVICE; et al.,[1] | |
| Defendants, | |
| and | |
| MONTANA TRAPPERS ASSOCIATION, NATIONAL TRAPPERS ASSOCIATION, AND FUR INFORMATION COUNCIL OF AMERICA, | |
| Defendant-Intervenors. | |

Plaintiffs WildEarth Guardians and the Center for Biological Diversity

---

[1] Pamela Scruggs is substituted for Craig Hoover pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. (*See* Doc. 121 at 1 n.1.)

(collectively "Plaintiffs") seek declaratory and injunctive relief against the United

States Fish and Wildlife Service and related officials and entities (collectively the

"Service") for violating the National Environmental Policy Act ("NEPA") and the

Endangered Species Act ("ESA") in their administration of a wildlife export

program under the Convention on International Trade in Endangered Species

("CITES").[2] Because the continued administration of the CITES Program does not

amount to "major Federal action" triggering NEPA, summary judgment is granted

in favor of the Service on Plaintiffs' NEPA claims. Plaintiffs prevail, however, on

their ESA claims because the incidental take statement for Canada lynx does not

set adequate triggers and fails to minimize take.

BACKGROUND

## I.    CITES

CITES is an international agreement governing trade in imperiled species of

flora and fauna. 27 U.S.T. 1087. Currently, there are 183 parties to the

Convention, which the United States joined in 1975. AR00004. In the United

States, the Service functions as both management and scientific authority for

administering CITES, 16 U.S.C. § 1537a(a), and has used its rulemaking authority

under the ESA, 16 U.S.C. § 1540(f), to promulgate implementing regulations, 50

---

[2] The Court generally eschews the use of acronyms because they tend to obfuscate rather than aid; however, the acronyms used in this case are widely used terms of art in environmental litigation.

C.F.R. §§ 23.1–23.92.  These regulations include prohibitions on the import or export of CITES-listed animals, live or dead, whether whole or part, unless expressly authorized by valid CITES documents or specifically exempted from CITES documentation requirements.  50 C.F.R. § 23.13(a).

The Service maintains a tagging and permitting system to control and facilitate the export of certain species.  Animal species covered by CITES are listed in three Appendices.  Appendix I is comprised of species threatened with extinction that are or may be affected by trade.  CITES, art. II(1).  CITES strictly bans all commercial, international trade in Appendix I species, but allows for some scientific and zoological non-commercial trade.  *Id.* at art. III(1)–(3).  Appendix II is comprised of species that are not presently threatened with extinction, but may become so if their trade is not regulated.  *Id.* at art. II(2).  Appendix II includes species in which trade is controlled to avoid utilization incompatible with their survival, or with the survival of Appendix I species because of factors such as similarity of appearance to other species.  *Id.*  International trade in these species is prohibited unless subject to a valid CITES export permit.  *Id.* at art. IV.  Appendix III is comprised of species protected in at least one member country when the country has asked other CITES parties to assist it in controlling trade in those species.  *Id.* at art. II(3).  All international trade in Appendix III species is prohibited unless subject to a valid CITES export permit.  *Id.* at art. V.

3

In 2007, the Service issued regulations implementing the CITES program for certain Appendix II species in the United States, including bobcats, gray wolves, river otters, Canada lynx, and brown (grizzly) bears. 72 Fed. Reg. 48, 402 (Aug. 23, 2007); 50 C.F.R. § 23.69. Certain requirements must be met before these species can be exported from the United States. Specifically, the Service must determine that the export will not be "detrimental to the survival of the species," including finding that (1) harvest of the animals is sustainable and (2) the specimen to be exported was legally obtained. 50 C.F.R. §§ 23.61(a), 23.60. "Detrimental activities" include "unsustainable use and any activities that would pose a net harm to the status of the species in the wild." 50 C.F.R. § 23.61(b). In making a "non-detriment finding," the Service must consider whether the proposed activity is sustainable use, prevents over-utilization of the species, poses harm to the status of the species in the wild, leads to long-term declines, or leads to significant habitat or range loss or restriction. 50 C.F.R. § 23.61(c). The Service's findings must be based "on the best available biological information." 50 C.F.R. § 23.61(f).

Since the late 1970s, the Service has allowed states and tribes to apply for the opportunity to directly distribute CITES tags to individual hunters and trappers under the CITES Program. 50 C.F.R. § 23.69(b). To participate, interested states and tribes must submit information on population condition, harvest control measures, total allowable harvest, tagging or marking requirements, habitat status,

and any management plans for the species in the state or tribal area. 50 C.F.R. § 23.69(b)(1). "A State or Tribe must provide sufficient information for [the Service] to determine that its management program and harvest controls are appropriate to ensure that CITES furbearers harvested within its jurisdiction are legally acquired and that export will not be detrimental to the survival of the species in the wild." AR000008. The state or tribe must also submit annual "activity reports" on the effects of the Program. 50 C.F.R. § 23.69(b)(3).

The Service annually distributes export tags to approved states and tribes, which are then distributed to trappers, hunters, or other individuals seeking to export furbearer species.[3] To be eligible for export, Appendix II furbearer species' skins and pelts must be tagged with serially unique and non-removable CITES tags. 50 C.F.R. § 23.69(c). Properly tagged skins and pelts may then be exported from the United States through designated wildlife ports. *Id.* Under this export system, the states and tribes regulate harvest and domestic trade of species, providing information to the Service for continued participation in international trade. AR00020. The Service's role is limited to the regulation of international export, ensuring CITES is implemented and enforced. *Id.* The record contains hundreds of pages of approval documents for various state and tribal programs,

_____

[3] The export of Appendix II species in areas that do not participate in CITES is possible by applying directly to the Service for a permit. 50 C.F.R. § 23.69(e)(2). No such export permits have been issued in the last five years. AR00057.

AR02173–355, and thousands of records of approved states' and tribes' annual reports, AR02679–20305.

In the recent past, commercial exportation of wild bobcats, river otters, gray wolves, Canada lynx, and brown bears total:

| Species | 2012 | 2013 | 2014 | 2015 |
|---------|------|------|------|------|
| Bobcats | 51,472 | 65,603 | 57,405 | 30,312 |
| River otters | 22,327 | 33,461 | 26,329 | 10,365 |
| Gray wolves | 16 | 19 | 2 | 16 |
| Brown bears | 4 | 4 | 3 | 3 |
| Lynx | 2,996 | 3,425 | 1,781 | 331 |
| **Total** | **76,815** | **102,512** | **85,520** | **41,027** |

(Doc. 97 at ¶ 1.)  These species are discussed individually below.

**Gray Wolves.**  Gray wolves were listed as endangered under the ESA in 1978, 43 Fed. Reg. 9,607 (Mar. 9, 1978), and included in the CITES Appendix II in 1979, AR00169.  Pursuant to congressional rider, the Northern Rocky Mountain wolf population, including wolves in Montana, were removed from the ESA listing in 2011.  76 Fed. Reg. 25,590 (May 5, 2011).  Only Montana and Alaska are approved for wolf exports.  AR00011, 14 190.  Alaska has reported no recent significant changes in its gray wolf abundance and Montana has reported that its

"gray wolf population is healthy and stable," with population numbers above recovery goals. AR00014.

**Bobcats.** Bobcats were included in CITES Appendix II in 1977. AR00161. The Service has approved 41 states and 32 tribes for bobcat exports under CITES. AR00017, 19, 187. The nationwide bobcat population is estimated to have increased since 1981, remaining stable since 2010. AR00013. There is a nation-wide non-detriment finding for bobcat. AR00025.

**River Otters.** The river otter was included in Appendix II in 1977. AR00167. The Service has approved 40 states and 16 tribes for river otter export under CITES. AR00018, 20, 189. There is also a nation-wide non-detriment finding for river otter. AR00025.

**Canada lynx.** Canada lynx were included in Appendix II in 1977. AR00165. In 2000, the Service listed the distinct population segment of Canada lynx in the contiguous United States as threatened with extinction under the ESA. 65 Fed. Reg. 16,052 (Mar. 24, 2000). In Alaska, where lynx are not listed under the ESA, harvest of lynx is allowed. AR00014, 188. Alaska, however, has reported no significant change in Canada lynx abundance. AR00014. In the contiguous United States, bobcat trapping has resulted in incidental take of lynx. AR21077. The Service has approved bobcat pelt exports from 14 states and three tribal areas that include habitat for ESA-listed lynx. AR20992.

7

**Brown bears.** Brown (or grizzly) bears were listed in Appendix II in 1979. AR00163. Alaska is the only state approved for export of brown bears. AR00186.

## II.   Procedural and Administrative History

This action was originally filed as a NEPA challenge by Plaintiff WildEarth Guardians ("WildEarth") in May 2016. (Doc. 1.) However, in December 2016, the parties moved for a joint stay of the proceedings, pending the Service's decision to undertake the NEPA process and draft an environmental assessment ("EA") for the CITES Program. (*See* Doc. 42.) On February 8, 2017, the Service issued a Draft EA, and, following a public notice and comment period, the Service issued its Final EA and Decision Notice on May 18, 2017. (*See* Doc. 54.) The EA includes four alternatives: (1) a preferred and "no action" alternative maintaining the current CITES Program, AR00012–21; (2) a "no tag" alternative, under which the Service would not issue or require tagging prior to export, AR00021–23; (3) a "no permit" alternative, under which the Service would deny export of CITES Program species from the wild, AR00023–24; and (4) a "no approved CITES export program" in which the Service would eliminate its CITES Program but still allow export on a case-by-case basis, AR00024–25.[4] Ultimately, the EA found that the preferred "no action" alternative would have no significant impact on the

---

[4] Alternative 4 received no support during public comment. AR00031, 35–36, 57.

human environment and would best permit the streamlined, efficient review of state and tribal furbearer regimes. AR00011, 12. The Service issued a Finding of No Significant Impact ("FONSI"). AR00068–73.

In July 2017, WildEarth filed an amended complaint, updating its NEPA claims in light of the EA and adding claims under the ESA. (Doc. 62.) In 2012, the Service had issued a Biological Opinion under Section 7 of the ESA to evaluate the effect on Canada lynx of bobcat trapping in states and tribal areas approved under the CITES program. AR21057–58, 77–78. The 2012 Opinion renewed, modified, and extended a 2001 Biological Opinion. *See* AR21013–33. The Service found that since 2001, the take of lynx attributable to the Program was limited to eight trappings where the lynx were released unharmed. AR21077. The Service determined that the export of bobcat pelts or parts under the CITES Program will not jeopardize the continued existence of the Distinct Population Segment of Canada lynx. AR21078.

The 2012 Biological Opinion incorporated an Incidental Take Statement, which remains in effect. *Id.* Under that Statement, "two (2) lynx may be killed and two (2) injured annually due to trapping over the 10-year term of th[e] biological opinion." AR21002. The Statement requires that when issuing bobcat tags, the Service must provide states and tribes with "information on lynx identification, life-history, recovery needs, and references to current and ongoing

9

methodologies to reduce mortality and injury to lynx when trapping bobcat."
AR21002–03. The Service implements this measure by preparing a brochure and
issuing it to states and tribes. AR21002; *see* AR21034–53.

In July 2017, Plaintiff Center for Biological Diversity filed a separate action,
raising similar NEPA challenges. *See* CV 17-99-M-DWM. The two cases were
consolidated, (Doc. 68), and the *WildEarth* case designated the lead case. All
docket references are therefore to documents filed in CV 16-65-M-DWM.
Additionally, the Montana Trappers Association, National Trappers Association,
and Fur Information Council of America (collectively "Defendant-Intervenors")
have been granted leave to intervene. (*See* Docs. 21, 44.)

## SUMMARY CONCLUSION

The parties fundamentally disagree about the nature and scope of the
Program and environmental review at issue. Both the Service and Defendant-
Intervenors argue that the CITES Program is merely an administrative framework
that streamlines CITES compliance determinations, AR00003, but does not
directly affect either trapping or exports, AR00026, 27. Under their view, the
CITES Program "does not eliminate any federal permitting requirements for
exporters, nor does it command changes to state and tribal permitting regimes."
(Doc. 108 at 9.) The Service therefore insists that the relevant analysis is that of
the Program itself, "not . . . subsequent actions taken pursuant to or consistent with

10

the Program," such as localized management decisions. (*Id.*)

On the other hand, "the crux of Plaintiffs' claim is that the [CITES] Program increases exports, which in turn increases trapping, which in turn harms Plaintiffs' members." (Doc. 112 at 8.) According to Plaintiffs, the Service and Defendant-Intervenors "attempt to relegate the Program to a mere paperwork exercise with no real world effects." (Doc. 117 at 9.) They allege that the record shows localized declines and other concerns for CITES species, (*see* SUF, Doc. 97 at ¶ 58), and that trapping activities increase when state export programs are approved, (*id.* at ¶ 60). Plaintiffs insist the record shows a direct connection between the CITES Program and trapping, as the Service alone controls whether furbearers can be exported, *see* 50 C.F.R. § 23.13(a), and the Program stands in the place of individual determinations for each export permit, AR00003.

Both parties are partially correct. The continued administration of the CITES Program does not amount to "major Federal action" triggering NEPA. But, the incidental take statement for Canada lynx is remanded to the Service.

### ANALYSIS

Plaintiffs claim the Service violated NEPA when it did not adequately analyze the direct, indirect, and cumulative effects of the Program and when did not prepare an EIS. Plaintiffs further argue that the 2001 and 2012 Biological Opinions and Incidental Take Statement referenced and incorporated in the EA are

11

deficient under the ESA.  Those claims, as well as the Service's standing challenge, are addressed below.

## I.    Legal Standards Applicable to All Claims

### A.    Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (NEPA and ESA).  The scope of review is narrow, and a court should "not [] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or agency expertise." *Id.*

### B.    Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment is particularly applicable to cases involving

judicial review of final agency action. *Occidental Eng'r Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (alteration in original) (quotation marks omitted).

## II.    Standing

The Service first argues that Plaintiffs do not have Article III standing. To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs, as the party seeking to invoke the court's jurisdiction, bear the burden of establishing standing. *Id.* This Court previously denied a motion to dismiss on these same grounds. (*See* Doc. 35.)[5] However, unlike the pleading stage, where Plaintiffs were merely required to allege facts demonstrating each element, *Spokeo, Inc.*, 136 S. Ct. at 1547, at summary judgment Plaintiffs "can no longer rest on such mere allegations but must set forth by affidavit or other evidence specific facts, which for the purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561

---

[5] The Court also denied a motion to dismiss pursuant to Rule 19. (*See* Doc. 94.)

13

(internal quotation marks and citation omitted).

The Service contests Plaintiffs' showing of causation and redressability. While the burdens to show causation and redressability are lessened in a procedural injury case, *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008), when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else* . . . [m]ore particular facts are need to show standing," *Novak v. United States*, 795 F.3d 1012, 1019 (9th Cir. 2015) (internal quotation marks and citation omitted). "To plausibly allege that the injury was not the result of the *independent* action of some third party, the plaintiff must offer facts showing that the government's unlawful conduct is at least a substantial factor motivating the third parties' actions." *Id.* (internal quotation marks omitted).

The Service insists that Plaintiffs have not set forth specific facts showing their injuries—a potential decline in opportunities to view and enjoy wildlife—are caused by the CITES Program because the challenged procedures are only "tenuously connected to the ultimate source of those injuries, *i.e.*, the act of trapping itself." (Doc. 108 at 21.) The Service emphasizes that the CITES Program is merely an administrative tool and "has no substantiated link with the frequency or methodology of trapping nationwide or at the specific locales where Plaintiffs claim to have experienced adverse consequences from trapping." (*Id.*)

14

The Service's position is belied by the record.  The decision documents reference the relationship between the CITES Program, export, and trapping: "Prohibition of export ([as evaluated in] Alternative 3) would likely reduce the harvest of all five of these species."  AR00026 (EA), 20321, 20318 (Draft EA). Comments provided by state agencies and individual trappers further support the relationship identified by Plaintiffs.  For example, a letter from the Maine Department of Inland Fisheries and Wildlife states that "[e]liminating the CITES tagging system or requiring trappers and hunters to secure tags on a case-by-case basis would effectively end the harvest of these species and decrease overall trapping participation."  AR23095; *see also* AR00041; AR021435 (Colorado); AR00040 (Missouri).  Plaintiffs also provide an extensive list of state commentary, (*see* Doc. 117 at 13 n.1), and cite to commentary by individual trappers, *see, e.g.*, AR021402 ("Without an outlet for these species, trapping and hunting would dwindle as would the resource dollars state agencies have to protect the species."). These comments corroborate the link between the injuries identified in Plaintiffs' declarations and the Program.  (*See* Doc. 98-1 at ¶ 18; Doc. 98-10 at ¶ 16).

Because the Service's administration of the CITES Program is a "substantial factor motivating the third parties' actions," *Novak*, 795 F.3d at 1019, the fact that individual trappers cause the harm does not defeat causation.  While Plaintiffs concede there are factors beyond the Program that influence harvest numbers, *see*

15

AR00026–29, 56 (pelt price), AR00034 (local management regimes), the Service

need not be the sole cause of injury, *WildEarth Guardians v. Dep't of Agric.*, 795

F.3d 1148, 1157 (9th Cir. 2015). And, the EA recognizes that "the absence of a

foreign market would most likely lead to a decline in [hunting and trapping]

license sales." AR00030. Contrary to the Service's position, Plaintiffs have set

forth facts showing that the CITES Program "is at least partially causing the

alleged injury." *WildEarth Guardians v. Dep't of Agric.*, 795 F.3d at 1157.

Plaintiffs also make an adequate showing of redressability. Because they

allege procedural injury, Plaintiffs need not show a favorable court decision will in

fact change trapping or management of trapping, only that it "could influence"

trapping. *Id.* at 1156; *Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*, 789 F.3d

1075, 1083 (9th Cir. 2015). The record shows such a connection. The Service

argues that invalidating the Program does not equate to prohibiting export. While

the Service is correct that export would still be allowed on a case-by-case basis, *see*

AR00007; 50 CFR § 23.36, the EA states that no individual permits have been

issued in the past five years, AR00057, and there was no public support for a case-

by-case export permit system, AR31, 35–36. Plaintiffs need not show that the

agency would reach a different conclusion after completing the necessary analysis.

*Ctr. for Biological Diversity v. Export-Import Bank of the U.S.*, 894 F.3d 1005,

1012 (9th Cir. 2018). Given the Service's regulatory authority over the Program,

Plaintiffs have standing. *Id.* at 1013.

## III.  NEPA

NEPA is a procedural statute that does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002) (internal quotation marks omitted).  NEPA provides that all federal agencies shall prepare an environmental impact statement ("EIS") for every "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  The EIS must analyze all "direct," "indirect," and "cumulative" environmental impacts of the proposed action.  40 C.F.R. §§ 1502.16, 1508.8, 1508.25(c).  To determine whether an EIS is required, an agency first prepares an EA.  40 C.F.R. §§ 1501.4(b), 1508.9.  If any agency decides in an EA that there is no significant impact associated with the proposed action, it may issue a finding of no significant impact ("FONSI") instead of preparing an EIS.  40 C.F.R. § 1508.9(a)(1).

Plaintiffs raise a total of six NEPA claims, five challenging the EA and the sixth insisting that an EIS was required.  But as a threshold matter, the Service argues that Plaintiffs' NEPA claims are not cognizable "because the Service voluntarily prepared the EA to assess the environmental impacts of the status quo," and "[c]ontinuation of the program . . . does not trigger NEPA."  (Doc. 121 at 12

17

(internal citations omitted).) The Service is correct.

The Service's argument is premised on two grounds: (1) that the CITES Program is categorically excluded and (2) that NEPA was not triggered because the Program merely continues the "status quo." As argued by Plaintiffs, the Service's first argument is not compelling because the permits, not the Program, are categorically excluded under NEPA. *But see Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) (holding promulgation of categorical exclusion not major federal action requiring an EA or EIS). But the Service's second argument is fatal to Plaintiffs' NEPA claims.

NEPA provides that federal agencies shall prepare an EIS for "every major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "Actions" means "new and continuing activities," and generally includes the adoption of official policies, formal plans or programs and the approval of specific projects. 40 C.F.R. § 1508.18. The Service argues the continuation of the CITES Program as outlined in the EA—i.e., the status quo—is not a "major Federal action." Three cases are relevant to this inquiry.

In *Upper Snake River Chapter of Trout Unlimited v. Hodel*, the Ninth Circuit addressed whether the agency was required to prepare an EIS "before periodically adjusting the flow of water from the Palisades Dam[.]" 921 F.2d 232, 233 (9th Cir. 1990). The court answered in the negative, concluding that reducing

18

the flow "d[id] not constitute a 'major Federal action' within the meaning of [NEPA]," *id.* at 234, and reaffirming that "where a proposed federal action would not change the status quo, an EIS is not necessary," *id.* at 235. The court noted that the agency had been operating the dam for over ten years prior to the passage of NEPA and in altering the flow levels the agency was "doing nothing new, nor more extensive, nor other than contemplated when the project was first operational." *Id.* However, an important distinguishing factor here is that the operation of the Palisades Dam pre-dated NEPA, while the CITES Program has never undergone NEPA review despite CITES's ratification in 1975, five years after NEPA was enacted.[6]

In *Northcoast Environmental Center v. Glickman*, the Ninth Circuit held that there was no final agency action triggering NEPA where the agency guidelines at issue "neither propose[d] any site-specific activity nor . . . call[ed] for specific action directly impacting the physical environment." 136 F.3d 660, 670 (9th Cir. 1998). The court explained that the cedar management plan programs at issue were not "specific enough" to trigger NEPA and that the plaintiffs could challenge the sufficiency of an EIS when a discrete agency action occurred. *Id.* Most

---

[6] The only environmental analysis appears to be a 1978 Working Group Report on Bobcat, Lynx, and River Otter. *See* AR00170–85 (Mar. 28, 1978). At the time, participants were skeptical about including bobcat, lynx, and river otter in Appendix II, believing they were not threatened by export. *See* AR00179.

19

recently, in *Idaho Conservation League v. Bonneville Power Administration*, the Ninth Circuit held that the Army Corps of Engineers' decision to return to flexible winter levels on Lake Pend Oreille was not major federal action because it was "consistent with past conduct." 826 F.3d 1173, 1176–78 (9th Cir. 2016). However, the court partially relied on a 1995 EA and EIS. *Id.*

Ultimately, an EIS is not necessary in the absence of specific agency action that alters the status quo. Here, despite the preparation of an EA,[7] there is no identifiable agency action that alters the status quo. Rather, the Service has administered the CITES Export Program since 1975, *see* AR00058, and the EA does not propose "any site-specific activity nor . . . call for specific action directly impacting the physical environment." *Northcoast*, 136 F.3d at 670.

Plaintiffs present three arguments in an attempt to establish the existence of a "major Federal action." The first is that the Service performs an annual review of the status of Appendix II species for CITES-approved states and tribes. *See* 50 C.F.R. § 23.69(b)(3). Plaintiff clarified during oral argument that they believe the

---

[7] The EA states: "the issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife or plants, including permits involving species under CITES, are categorically excluded" under NEPA. AR00003. It further explains that "[a]lthough the export program for certain native furbearers is directly tied to CITES permitting, we have decided to prepare an EA under NEPA on our export program for certain native furbearer species to help us conduct a thorough review of all relevant factors and potential impacts on the quality of the human environment as envisioned under NEPA." AR00003–04.

Service is required to perform NEPA analysis every time it approves an individual

state or tribe for export of an individual species. This view would obligate the

Service to go through the EA/EIS process on an annual basis for five individual

species across over thirty state and tribal approvals. That interpretation is not

consistent with NEPA's baseline requirement for "major Federal action."

Moreover, the continuing administration of the CITES Program is not consistent

with those categories of "action" listed in NEPA's implementing regulations, i.e.,

"Federal actions [that] tend to fall within . . . [certain] categories," including

adopting official policies, plans or programs and approving specific projects. *See*

40 C.F.R. § 1508.18(b). While "tend to fall" is not exclusive language—indicating

that the list is not exhaustive—the list provides context for the type of activity

meant to qualify; a mere continuation of current activity is not consistent with the

qualities shown by the other listed activities. Rather, the annual review performed

by the agency implements the procedural rules outlined in the CITES Program.

In this same vein, Plaintiffs insist that the Program has undergone

significant changes that impact the human environment, warranting NEPA review.

But, Plaintiffs fail to identify what the changes were and how they impacted the

environment. To the extent Plaintiffs are referring to the 2007 rule update, they

have waived any such challenge by failing to bring a timely claim. *See* 28 U.S.C

§ 2401(a) ("[E]very civil action commenced against the United States shall be

barred unless the complaint is filed within six years after the right of action first accrues."). To the extent Plaintiffs refer to the overall number of exports, the record shows that exports have declined in recent years. (*See* Doc. 97 at ¶ 1.)

The second argument raised by Plaintiffs is that the incidental take statement included as part of the 2001 and 2012 Biological Opinions is tantamount to a permit, which requires NEPA analysis. In *Ramsey v. Kantor*, the Ninth Circuit concluded that an take statement for salmon was "functionally equivalent to a permit because the activity in question [fishing for salmon] would, for all practical purposes, be prohibited but for the incidental take statement." 96 F.3d 434, 444 (9th Cir. 1996). That is not the case here. It is legal (i.e., not take) to trap bobcats. The take statement at issue, which is discussed below, is for lynx that are accidentally trapped in an attempt to trap bobcat. Unlike the situation in *Ramsey* where continued fishing would necessarily result in incidental take of protected salmon, one could trap bobcat for a lifetime and never trap a lynx. The take statement does not provide independent grounds for NEPA review.

Plaintiffs' final argument is that the CITES Program has never been subject to NEPA analysis. This fact was likely the impetus for the Service to undertake the May 2017 EA in the first place. But the mere absence of previous environmental review does not obviate the threshold requirement of "major Federal action." Because the Service's maintenance of the status quo does not

22

amount to "major Federal action," Plaintiffs' NEPA claims fail. Plaintiffs' other challenges to the EA's finding of no significant impact are therefore moot. *Idaho Conserv. League*, 826 F.3d at 1178.

## IV. ESA

"The ESA obligates federal agencies 'to afford first priority to the declared national policy of saving endangered species.'" *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084–85 (9th Cir. 2005) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)). Section 7 of the ESA directs each agency to ensure, in consultation with the Service, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat" designated as "critical" for such species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01. The formal consultation process culminates in the issuance of a biological opinion, in which the Service must determine—based on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2)—whether the proposed action will jeopardize the survival and recovery of a protected species. 16 U.S.C. § 1536; 50 C.F.R. § 402.02. An agency action "jeopardizes" a protected species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of survival and recovery of a listed species in the wild by reducing the

23

reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The

Service also must determine whether the proposed action will destroy or adversely

modify a protected species' designated critical habitat. 50 C.F.R. § 402.14(g)(4);

*see* 16 U.S.C. §§ 1532(5)(A) (defining critical habitat), 1533(a)(3)(A) (directing

the promulgation of regulations designating critical habitat for listed species).

If, as here, the Service issues a "no jeopardy" and "no adverse modification"

opinion, but determines that the action may incidentally "take" individual members

of a listed species, the Service issues an incidental take statement. 16 U.S.C.

§ 1532(19) ("take"); 16 U.S.C. § 1536(b)(4). The statement specifies the impact of

incidental take, reasonable and prudent measures designed to minimize the impact

of take, and terms and conditions to implement those measures. 16 U.S.C.

§ 1536(b)(4)(i)–(iv). Take that complies with the statement's terms and conditions

is not prohibited. 16 U.S.C. § 1536(o)(2). The action agency must reinitiate

consultation if take is exceeded or if new information or a modification to the

action indicates previously unexamined effects. 50 C.F.R. § 402.16.

Here, the Canada lynx is listed under the ESA as threatened wherever found

in the contiguous United States. 79 Fed. Reg. 54,782 (2014). Consequently, take

of wild Canada lynx is prohibited in the contiguous United States. In accordance

with Section 7(a)(4) of the ESA, the Service consulted with its Ecological Services

program regarding the CITES Program's export authorization for legally taken

24

bobcat from approved state or tribes. It initiated consultation in 2001, and

reinitiated consultation in 2012, which resulted in the issuance of a Biological

Opinion. AR00010. That Biological Opinion concluded that implementation of

the CITES Program is not likely to jeopardize the continued existence of Canada

lynx across its range. AR21001. The Opinion also includes an Incidental Take

Statement: "[i]ncidental take for lynx is expected in the form of: two (2) lynx may

be killed and two (2) injured annually due to trapping over the 10-year term of

th[e] biological opinion." AR21002.[8] Since 2001, the threshold of "two lynx

killed and two lynx injured annually" has not been met. AR00010.

### A.    Immunity

Plaintiffs first argue that while non-federal entities may gain take immunity

under certain circumstances for the purposes of ESA Section 7, a federal agency

must analyze the state program and set mandatory standards to minimize incidental

take. *See Ramsey*, 96 F.3d at 438.[9] Plaintiffs argue that that Service's disavowal

of any management authority—and the attendant lack of mandatory standards—

means the state and tribes approved under the CITES Program do not qualify for

---

[8] Though not at issue here, the Biological Opinion includes a July 2014 incidental take statement for one lynx killed and one lynx captured per year over a ten year period resulting from the legal take of wolf. *See* AR00011.

[9] The parties initially dispute whether the states and tribes are "applicants" under 50 C.F.R. § 402.02. Ultimately, however, the parties appear to agree that they are not applicants and can only be granted immunity through the operation of *Ramsey*.

the immunity envisioned by *Ramsey*.

Plaintiffs read *Ramsey* too narrowly. As stated therein, "any taking—
whether by a federal agency, private applicant, or other party—that complies with
the conditions set forth in the incidental take statement is permitted." 96 F.3d at
441. The statement at issue here clearly contemplates trapping by individuals
consistent with the requirements of both the ESA and CITES. And while the
Service itself does not implement any direct regulations on trapping, its assessment
of "detriment" and the implementation of the CITES Program is dependent upon
states' and tribes' issuance of trapping regulations and continued monitoring of
their local management programs. As held in *Center for Biological Diversity v.
Otter*, the CITES incidental take statement allows for take of lynx as part of a
state's trapping regime. 2018 WL 539329, at *2 (D. Idaho Jan. 24, 2018). In the
absence of the statement, states and tribes would be unable to rely on its operation
and any take of lynx related to trapping of bobcat would be unpermitted under
Section 9 of the ESA. 16 U.S.C. § 1538(a); 50 C.F.R. § 17.31. The incidental take
statement is therefore the basis for state and tribal immunity for inadvertent lynx
trapping. *Ramsey*, 96 F.3d at 441–42. The Service's success on this point is a
Pyrrhic victory, however, in light of the take statement's infirmity.

## B. Trigger

The "trigger" in an incidental take statement must set a "clear standard for

26

determining when the authorized level of take has been exceeded." *Ariz. Cattle Growers' Ass'n v. Fish & Wildlife Serv.*, 273 F.3d 1229, 1251 (9th Cir. 2001); 50 C.F.R. § 402.14(i)(1)(i). Here, the trigger is: "two (2) lynx may be killed and two (2) injured annually due to trapping over the 10-year term of th[e] biological opinion." AR21002. In 2012, this timeframe was extended indefinitely. AR21077–78. Plaintiffs argue that this trigger is illegal for three reasons: (1) the conjunctive "and" is ambiguous and could mean, for example, so long as no lynx were killed, it is okay for 10 to 20 to be injured, or vice-versa; (2) "annually" could mean "two and two" needs to occur in successive years; and (3) "injured" is subjective and conflicts with the requirement that the statement be based on "the best scientific and commercial data available, *see* 50 C.F.R. § 402.14(g)(8).

The Service and Defendant-Intervenors argue that any ambiguity has since been clarified by an official December 29, 2016 deposition of Bridget Fahey, the Division Chief for Conservation and Classification for the Service, who "oversee[s] the . . . Service's international and domestic listing program as well as [its] ESA litigation and records management functions." AR24574–75; *see Otter*, No. 1:14-CV-258, Doc. 105-2 (D. Idaho 2016). In *Otter*, Judge Winmill concluded that Fahey's interpretation of the incidental take statement was entitled to deference "as an official position of the [Service]." 2018 WL 539329, at *2.

27

### 1.    Two *and* Two

Plaintiffs first argue that the use of the word "and" is ambiguous. The

Service and Defendant-Intervenors insist any ambiguity has been clarified by

Fahey's deposition, the relevant portion of which states:

Q:    So I am asking for the official interpretation of that provision and ask if it is that. It states, "Permissible take of two lynx deaths and two lynx injured annually due to bobcat trapping." Is that what that provision means.

A:    That is how I read the provision, yes.

Q:    So does that mean there must be both death and injury to reach the cap or, for example, if one lynx is killed and 10 are injured in a single year, is the cap met? Is it surpassed?

A:    According to the [biological opinion], yeah, a take would be exceeded in the form of injury because it is capped at two.

Q:    Yeah. What I am struggling with is similarly the Service's interpretation of the word "and" in there. So if, for example, 12 lynx were injured in the states and tribes approved under the export program but none of those injured lynx were killed, would the cap - - would it exceed the cap on permissible take?

A:    Yes, because more than two were injured.

Q:    Okay. Even though there is - -

A:    Even though – right.

Q:    I am sorry to be unclear, but do you see why I am struggling when there is an "and" in there? I am struggling with that meaning.

A:    So if three lynx were killed, the take would be exceeded.

28

Q:     Okay.

A:     And if three lynx were injured, the take would be exceeded.

Q:     Okay.  And what happened if the cap is exceeded?

A:     Exceeding incidental take is a reason for reinitiation of
       consultation.

AR24595–96.  The Service concedes that the "two and two" standard is "not
entirely clear," (Doc. 108 at 27), but insists that the clarification—and concomitant
interpretation—provided by Fahey is due deference.  According to the Service,
"and" is read as "or," making the take statement disjunctive.

Because the term "two and two" is ambiguous, the Court must determine
whether the Service's "interpretation is persuasive and reasonable." *Television
Stations, Inc. v. Aereokiller, Inc.*, 851 F.3d 1002, 1013 (9th Cir. 2017).  "To do so
[courts] review "the thoroughness evident in [the Service's] consideration, the
validity of its reasoning, and its consistency with earlier and later
pronouncements." *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228
(2001)) (alterations omitted).  Here, there are no "earlier or later pronouncements"
to consider and there is no evidence of the "the thoroughness" of the Service's
reflection.  Thus, reasonableness turns on the "validity" of the Service's reasoning.

There is no question—and the Service does not dispute—that the provision
is poorly worded.  Rather than fix it, however, the Service has simply adopted its
disjunctive interpretation, placing the Court in the untenable position of having to

29

defer to a reasonable interpretation of an unreasonable statement. While the Service's interpretation of "two *and* two" as "two *or* two" is reasonable, mere deference is not sufficient to save the statement from its inherent infirmity. As currently worded, "two and two" fails to set an adequate trigger for take.

### 2. Annually

Plaintiffs further challenge the take statement on the ground that the word "annually" is also ambiguous, and "could be interpreted to mean the requisite lynx take in a single year, or that it must repeat in some (undefined) number of successive years." (Doc. 117 at 33.) The Service does not address this argument, but Defendant-Intervenors insist this question was also clarified by Fahey's deposition, where she responds in the affirmative when the "two and two" cap is described as applying to a "single year." *See* AR24595. Plaintiffs argue that "annually" is modified by "over the 10-year term" to mean that take greater than "two and two" would have to occur for ten consecutive years for reinitiation to be triggered. Once again, none of the parties dispute what the statement is *supposed* to mean. But once again, knowing what it should say is not the same as stating it. While this ambiguity is independently insufficient to make the statement arbitrary and capricious, it is yet another straw on the camel's back.

### 3. Injury

Plaintiffs also challenge the word "injury," arguing it is difficult to assess

30

and diagnose, AR24288 (Maine 2014 EA), and trapped lynx are usually found by trappers, AR20997 (indicating one lynx was found by one trapper on one occasion). According to Plaintiffs, "[t]he problem is the Service chose a standard that trappers are not qualified to assess. . . ." (Doc. 117 at 34.) Plaintiffs argue that trappers should be required to contact the Service before releasing lynx so that "adequately trained wildlife biologists" can respond and "assess the potential for injuries prior to release." *See* AR24361–62 (the process followed in Maine).

In response, the Service argues that there is no hard-and-fast rule for setting a trigger and that the Ninth Circuit has upheld a wide range of different triggers, including proxies that have no actual relation to the number of animals taken. *See Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249–50. According to the Service, the trigger need only be sufficiently clear under the circumstances. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) (holding that while "a numerical limitation" is preferred, there are situations where such a limitation is not feasible and the Service "may utilize a surrogate"). The Service's response does not address Plaintiffs' concern: defining and assessing injury.

Fahey's deposition briefly addresses this issue, explaining that "injury" was used as a basis for triggering reinitiation because "it is a more pronounced or egregious form of take as far as the effects of lynx." AR24610. Essentially, the Service needs to know if lynx are "getting injured in higher numbers than . . .

31

anticipated." *Id.* But, when asked to define "injury," Fahey stated "injury is not defined, so I would use the dictionary." AR24617. She then explained that a trapped animal that is released without injury would have "no evidence of broken bones or blood or limping." AR24618.

While the definition of "injury" has been cabined by usage throughout the ESA, it lacks precision here. First, the Service concedes it is not explicitly defined in this context. *See* AR24617. Second, turning to the dictionary—as the Service recommends—only expands the range of potential injurious conditions. For example, according to *Webster's Third International Dictionary*, while "injury" can mean impairing the soundness of health or inflicting material damage, it can also include the mere causing of "pain, distress, or impairment." *Injury*, 1164 (Merriam-Webster 1986). And, "injury" is defined so broadly that specific synonyms, such as "damage," "harm," or "hurt," are generally preferred to convey the specific type of "injury" inflicted.[10] *Id.* These definitions are all reasonable readings of the word "injury" within the context of this take statement, but reflect starkly different physical realities for a trapped lynx. For example, injury can

---

[10] For example, "hurt" focuses primarily on physical impairment, while "damage" applies to "injury involving loss." *See Injury*, 1164 (Merriam-Webster 1986); *see also* AR21001 (Incidental Take Statement defining "harass" and "harm" in relation to "disrupt[ing]" or "impairing behavior patterns"); *see also* 16 U.S.C. § 1532(19) (defining "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct").

mean pain or stress, which trapping undoubtedly causes even when lynx are released with no physical indication of harm. Moreover, while Fahey implies only serious injury qualifies as take in her deposition, AR24610, 24618, serious injury may not always be immediately visible or ascertainable, *see* AR24361 (Maine 2014 Incidental Take Plan: "There are several forms of capture-related injury that are difficult to diagnose in the field and some may take days to develop into recognizable pathology."), and even minor injuries can impair post-release survival, *id.* It is for these reasons that Maine determined it was appropriate to "hav[e] a veterinarian assist in develop[ing] and evaluat[ing] a field-based injury rating system, provide training oversight to the [Maine Fish and Wildlife] staff that are involved in injury evaluation, and have veterinarians participate in several incidental lynx capture events." AR24362. Moreover, the take statement later uses the term "severely injured," AR21003, raising the question why the statement uses the qualifier "severely" if "injury" was already limited to serious injuries.

While the statement has a "numerical cap," "a numerical cap is only useful insofar as the action agency is capable of quantifying take to determine when the trigger has been met." *Wild Fish Conserv. v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010). While reinitiation of consultation is triggered under the statement if two lynx are killed or two lynx are injured in a single year, that clear numerical cap is undercut by the amorphous definition of injury and those tasked with assessing it.

33

Because "there are no numeric limits on the number of lynx that can be captured by the traps if the lynx are released unharmed," *Otter*, 2018 WL 539329, at \*2; AR00061 ("Lynx caught and released unharmed as a result of bobcat trapping are not counted towards the threshold as detailed in the [Incidental Take Statement]."), the assessment of "injury" is critical to reinitiation of consultation.

The agency's use of the term "injury" is both overbroad and underinclusive. The term applies to a wide range of conditions and includes those that are both very obvious yet superficial and those that are latent but deadly. Additionally, this amorphous condition is assessed by untrained trappers, not an experienced Service wildlife biologist whose interpretation would be due deference. The Service's interpretation and use of the term "injury" in the context of this case is arbitrary and capricious and not based on the best available science.

## C.    Accurate Reporting

"[T]o monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement." 50 C.F.R. § 402.14(i)(3). An incidental take statement must include reporting requirements that, once executed, permit the Service to determine whether reinitiation requirements have been triggered. *Wild Fish Conserv.*, 628 F.3d at 532. Plaintiffs argue that because bycatch is not being reported and states are not reporting take, *see* AR24546 (2007

34

Fahey email: "The States were supposed to be reporting how much take they had but surprise surprise they haven't been reporting take."), the take statement fails to provide a basis for reinitiation. Plaintiffs note that at the time of the 2001 Biological Opinion, only one bycatch was reported in 20 years, AR20999, and only eight instances of reported bycatch occurred between 2001 and 2012, AR21077.

The Service argues that it recognized the difficulty in ascertaining lynx bycatch, AR20999–21000, and that underreporting would occur, *see* AR21002 ("[The Service] anticipates that incidental take of lynx will be difficult to detect because there is little likelihood that trappers would report bycatch of lynx."), and therefore included a higher level of take to compensate for this uncertainty, *see San Luis*, 747 F.3d at 626–27 (concluding that an averaging methodology employed by the Service "counteracts the uncertainties inherent in its analysis by overestimating known parameters") (internal quotation marks and alteration omitted). And, as Defendant-Intervenors point out, the 2001 Biological Opinion requires local regulatory officials be informed "within ten working days of the finding of *any* trapped lynx or any unanticipated harm to the lynx." AR21003 (emphasis added). It therefore appears that while take only applies to dead or injured lynx, AR21002, all trapping of lynx must be reported, AR21003.

But, the disconnect between what is to be reported and what constitutes take is itself a problem because the purpose of reporting is to permit the Service to

35

determine whether reinitiation requirements have been triggered. *Wild Fish Conserv.*, 628 F.3d at 532. Here, the reporting and take requirements are like two ships passing in the night and the disconnect that can only be remedied by addressing the trigger itself. In the absence of a connection between reporting and take, the reporting requirement is arbitrary and capricious in violation of the ESA.

### D. Minimize Incidental Take

A take statement must specify "reasonable and prudent measures" that are "necessary or appropriate to minimize" the impact of "incidental taking on the species." 50 C.F.R. § 402.14(i)(1)(i), (ii). "Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2). Here, the incidental take statement includes one minimization measure: when bobcat tags are issued, the Service must "provide states and tribes with information on lynx identification, life-history, recovery needs, and references to current and ongoing methodologies to reduce mortality and injury to lynx when trapping bobcat." AR21002. To meet its obligations, the Service created a brochure. *See* AR21002–03; AR21034–53.

Plaintiffs argue that this brochure fails to minimize incidental take of lynx because it includes only "recommendations," does not require any rules or regulations to be promulgated by local management agencies, and trappers are not

36

required to read it. *See Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1080 (D. Minn. 2008) (finding state regulatory issuance of similar brochure inadequate under ESA in a case where there was no incidental take statement). As a counter-example, Plaintiffs point to Maine's management program, which sought "to improve how injuries are evaluated and managed," AR24022, and proposed trap-check interval requirements, AR24542. Defendant-Intervenors argue that the take statement evaluated states' and tribes' current trapping seasons, methodology, and historical bycatch information, AR20992–93, 20996–21001, and determined that the current regulations would not jeopardize the lynx, AR21000. Given this background, Defendant-Intervenors argue the brochure sufficiently minimizes take.

Ultimately, the basis for the brochure and its content does not compensate for the fact that states and tribes are not required to give it to trappers, *see* AR21003 ("A letter shall accompany the brochures and tags recommending that the State or Tribe should provide a copy of the brochure to bobcat trappers on a one-time basis and again if brochure is revised."), and trappers are not required to read it, *see Animal Prot. Inst.*, 541 F. Supp. 2d at 1080. Thus while the information provided in the brochure and the lack of mandatory language may be "necessary or appropriate to minimize" the impact of "incidental taking on the species" in these circumstances, it is not "reasonable and prudent," 50 C.F.R. § 402.14(i)(1)(i), (ii).

## CONCLUSION

Accordingly, IT IS ORDERED:

(1)     Plaintiffs' motion for summary judgment (Doc. 96) is DENIED as to their NEPA claims and GRANTED as to their ESA claims.

(2)     The Service's cross-motion for summary judgment (Doc. 107) is GRANTED as to Plaintiffs' NEPA claims and DENIED as to Plaintiffs' ESA claims.

(3)     Defendant-Intervenors' cross-motion for summary judgment (Doc. 111) is GRANTED as to Plaintiff's NEPA claims and DENIED as to Plaintiffs' ESA claims.

(4)     The incidental take statement is remanded to the Service for further review and clarification consistent with this Order. The parties shall file a joint proposed date certain for the promulgation of a revised take statement on or before **November 9, 2018**. That joint filing shall include the reasoning for the recommended date and any other deadlines the agency believes are necessary to ensure the date certain can be met.  The current take statement and biological opinions are not set aside but shall remain in effect until a different take statement for lynx is promulgated by the Service.

(5)     These cases are no longer consolidated.  The Clerk of Court is directed to enter judgment consistent with this order in each individual case.

Because Plaintiff Center for Biological Diversity alleged only NEPA violations in

CV 17-99-M-DWM, that judgment should reflect summary judgment fully in favor

of the defendants and against the plaintiffs.  Judgment in CV 16-65-M-DWM is

split consistent with (1), (2), and (3) outlined above.

DATED this ___ day of October, 2018.

_____
Donald W. Molloy, District Judge
United States District Court